No. 4:10-mc-512 (*In re Sealed Filer*)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____

RAPHAEL DEON HOLIDAY,

*Petitioner,*

v.

RICK THALER,
  Director, Texas Department of Criminal Justice,
  Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
278th District Court of Madison County, Texas

_____

**PETITION FOR WRIT OF HABEAS CORPUS**
_____

**SETH KRETZER**
SBN: 24043764

Two Post Oak Central
1980 Post Oak Blvd; Suite 1900
Houston, TX 77056

(713) 775-3050 (office)
(713) 623-0329 (fax)
*email: seth@kretzerfirm.com*

**JAMES W. VOLBERDING**
SBN: 00786313

Plaza Tower
110 North College Avenue
Suite 1850
Tyler, Texas 75702

(903) 597-6622 (Office)
(903) 597-5522 (fax)
*e-mail: jamesvolberding@gmail.com*

Court-Appointed Attorneys for the Petitioner

No. 4:10-mc-512

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

———————————————————————————————

RAPHAEL DEON HOLIDAY,

*Petitioner,*

v.

RICK THALER,
      Director, Texas Department of Criminal Justice,
      Institutional Division,

*Respondent.*

———————————————————————————————

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
278th District Court of Madison County, Texas

———————————————————————————————

**PETITION FOR WRIT OF HABEAS CORPUS**

———————————————————————————————

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, RAPHAEL DEON HOLIDAY, the Petitioner, and respectfully submits his

Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the

Institutional Division of the Texas Department of Criminal Justice.  This application follows his

conviction and death sentence in the 278th District Court of Madison County, Texas, cause numbers

10,423, 10,425 and 10,427, styled *State v. Raphael D. Holiday.*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, RAPHAEL DEON HOLIDAY, certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Raphel Deon Holiday | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | Two Post Oak Central 1980 Post Oak Blvd. Suite 1900 Houston, TX 77056 | Appointed attorney for current federal habeas |
| Mr. James W. Volberding | 110 North College Avenue Suite 1850, Plaza Tower Tyler, TX 75702 (903) 597-6622 | Appointed attorney for current federal habeas |
| Mr. Alexander L. Calhoun | 11319 Long Branch Austin, TX 78736 | Appointed attorney for state habeas writ petition. |
| Gerald Bierbaum | 1744 Norfolk Houston, TX 77098 | Appointed attorney for state habeas writ petition. |
| Mr. William F. Carter | 102 East 26th Street Bryan, Texas 77803 | Appointed attorney for trial and direct appeal. |
| Mr. Frank Blazek | 1414 11th Street Huntsville, Texas 77340 | Appointed attorney for trial and direct appeal. |
| | | |
| | | |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |

iii

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| | Office of the Attorney General *Counsel for the State* Capital Litigation Division P.O. Box 12548, Capitol Station Austin, TX 78711-2548 (512) 936-1600 (voice) (512) 320-8132 (fax) | Asst. Attorney General |
| Mr. Tommy Skaggs | Austin | Asst. Attorney General |
| Ms. Tina Dettmer | Austin | Asst. Attorney General |
| Mr. William C. Bennett | Courthouse 101 W. Main, Room 207 Madisonville, Texas 77864 | Criminal District Attorney Madison County |
| Mr. Charles Mac Cobb | | Asst. District Attorney Asst. Attorney General |
| Judges | | |
| Hon. Jerry Sandel | | 278th District Court, Madison County, Texas |
| | | |
| | | |

iv

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

DESIGNATION OF ABBREVIATIONS and
EXPLANATION OF THE TRIAL RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Circumstances Surrounding the Filing of this Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Holiday's Potential Incompetence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

State Court Presumption of Correctness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    A.     Procedural History in State Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    B.     Procedural History in Federal Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    **GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW  IN TEXAS** . . . . 13

HOLIDAY HAS MET ALL PROCEDURAL REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . 19
    ALL CLAIMS HAVE BEEN EXHAUSTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED . . . . . . . . . . . . . . . . . . 22
    A.     Explanation of Default Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    ***B.***     ***Holiday's Response to the Trial Court's and CCA's Findings That Holiday***
             ***Procedurally Defaulted Claims.*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

## DESIGNATION OF ABBREVIATIONS and
## EXPLANATION OF THE TRIAL RECORD

"Petitioner's Record Excerpts" are referred to in this brief with the abbreviation "PRE." References to the trial record statement of facts are abbreviated as "SF." References to the transcript are abbreviated as "CR" for the clerk's record.

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five (due process clause), eight (cruel and unusual punishment clause), and fourteen (due process and equal protection clauses), of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

### CIRCUMSTANCES SURROUNDING THE FILING OF THIS PETITION

Holiday's case became final May 5, 2010, when the CCA denied his petition for post-conviction relief. On February 15, 2011, this Court appointed undersigned counsel to represent Holiday in his federal habeas corpus proceedings. Pursuant to current Fifth Circuit authority, Holiday's one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") expires May 5, 2011. *See* 28 U.S.C. § 2244(d). Under these incredibly short time strictures, Holiday's habeas counsel, despite diligent efforts, have not yet managed to organize the voluminous record in Holiday's case and have not had the opportunity to review meaningfully the record. Moreover, counsel have not had the opportunity to conduct any independent investigation or develop a relationship of trust with Holiday as required by the professional standards of capital defense attorneys.[1]

_____

[1]*See* 2003 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and United States Supreme Court precedent adopting the ABA

1

Due to these circumstances, this initial petition should be considered a notice pleading that counsel has put together in good faith and in compliance with the relevant rules, using information that is true to the best of counsel's current knowledge and beliefs about the state court proceedings in this matter and the constitutional violations that occurred therein. *See* Rule 2, Rules Governing Section 2254 Cases in the United States District Court ("Habeas Rules") (outlining general requirements for a federal habeas petition's contents). When filed, the amended petition will contain a complete and detailed analysis of the facts and law underlying each claim and will contain a detailed description of the factual background of the case, none of which was possible due to the time frame in which this petition was compiled.

## HOLIDAY'S POTENTIAL INCOMPETENCE

Holiday has a right to be competent during his federal habeas proceedings. *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 814 (9th Cir. 2003). Further, the Ninth Circuit has stated that "conducting an entire habeas proceeding while a petitioner is incompetent" would constitute structural error. *Id.* at 818. Here, based on counsel's information and belief, there is a legitimate possibility that Holiday is presently incompetent and unable to assist with his defense or to rationally communicate with counsel. (This assertion is based upon previous counsel's requests for mental health evaluations, particularly, we think, a neurological-psychological examination.) If Holiday is incompetent, these proceedings must be stayed until Holiday regains competence and can communicate rationally to assist in his defense.[2] *Id.* at 818-19. However, due to the very short time

---

Guidelines. *E.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), *Florida v. Nixon*, 543 U.S. 175, 191 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

[2]Holiday's counsel is not required to identify specific claims in which Holiday's assistance is needed, *Rohan*, 334 F.3d at 817-18. But there may be circumstances in which

frame between appointment of federal habeas counsel and the expiration of the AEDPA's one-year statute of limitations and the fact that despite well-supported requests Holiday's state court counsel were never provided with funds to retain a mental health expert, it may be that Holiday has never been evaluated by a mental health professional.  Counsel has taken steps to obtain a meaningful mental health evaluation of Holiday as quickly as possible and will update the Court immediately if counsel receives information confirming Holiday's incompetence.  We emphasize, however, that we are making this incompetence pleading based on incomplete information; if we later determine that a factual basis is lacking, we will withdraw the assertion.

### STATE COURT PRESUMPTION OF CORRECTNESS

Holiday hereby provides notice of his intention to challenge the presumption of correctness of certain findings of fact made by the state court in his case.  Certain factual findings of the state court in Holiday's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1).  These include, but are not limited to, factual findings made by the trial court in Holiday's trial and the opinions by the CCA on direct appeal.  Pursuant to 28 U.S.C. § 2254(e)(1), Holiday intends to assert that certain findings of fact by the state court at trial, or on direct appeal, if any are found to exist, are not fairly supported by the record.  Holiday also intends to assert other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings; that material facts were not adequately developed at the state court hearings;

---

Holiday may be the only available source of information regarding many of the events and circumstances surrounding his conviction.

that Holiday did not receive full, fair and adequate hearings in the state court proceedings; and that Holiday was otherwise denied due process of law in the state court proceedings.

In addition, Holiday asserts that certain findings of fact by the state court in regard to his state post-conviction proceedings, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to: any and all factual findings made by the trial court in regard to Holiday's state post-conviction proceedings, as well as the decisions of the CCA on petition for review. Pursuant to 28 U.S.C. § 2254(e)(1), Holiday intends to assert that certain findings of fact by the state court, concerning his state post-conviction proceedings, if any are found to exist, are not fairly supported by the record.

## EXHAUSTION

Holiday states that most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[3] Some claims, however, were not fully presented to the state court, were not ripe for review, or could only be raised in this forum. Holiday expressly reserves his right to amend this petition. In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first

---

[3]The burden is on the Director to demonstrate that Holiday failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

petition. *Id*. at 497-98.  Holiday believes additional claims may be identified following a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held.  At the appropriate time during these proceedings, Holiday will present any additional claims through amendments to the petition.

## PROCEDURAL HISTORY

### A.  *Procedural History in State Court.*

Holiday was indicted for capital murder in the 278th District Court of Madison County, Texas, and tried in consolidated cause numbers 10,423, 10,425 and 10,427, styled *State of Texas v. Raphael Deon Holiday*.  Following a jury verdict in favor of the state, the court imposed a death sentence.

Holiday's conviction and sentence were automatically appealed to the CCA in cause numbers AP-74,446, AP-74,447 and AP-74,448.  The CCA denied the appeal entirely on February 8, 2006.  *Holiday v. State*, 2006 Tex. Crim. App. Unpub. LEXIS 737 (Tex. Crim. App. Feb. 8, 2006).

Holiday's motions for rehearing were denied April 26, 2006.  *Holiday v. State*, 2006 Tex. Crim. App. LEXIS 848, 849 and 850 (Tex. Crim. App. Apr. 26, 2006).

Holiday timely sought a writ of *certiorari* from the Supreme Court, which denied his petition November 13, 2006.  *Holiday v. Texas*, 549 U.S. 1033, 2006 U.S. LEXIS 8661 (Nov. 13, 2006).

Holiday timely sought state habeas relief in an application filed in the same trial court, and assigned the cause numbers 10,423(A), 10,425(A) and 10,427(A), and styled *Ex parte Raphael Deon Holiday*.

The trial court recommended denial of all relief and on May 26, 2009 signed without any changes findings of fact and conclusions of law written by the local prosecutors.

5

The CCA denied relief May 5, 2010 in a summary order in cause numbers WR-73,623-01, WR-73,623-02 and WR-73,623-03.  *See Ex parte Holiday*, 2010 Tex. Crim. App. Unpub. LEXIS 262 (Tex. Crim. App. May 5, 2010).

### B.     Procedural History in Federal Court.

As mentioned, Holiday petitioned for appointment of counsel to file an application for writ of habeas corpus under section 28 U.S.C. § 2254.  The court appointed counsel February 15, 2011.

During these proceedings, since 2000, Holiday has been confined in the Polunsky Unit by the Director of the Texas Department of Criminal Justice.

## STATEMENT OF FACTS

In support of this post-conviction writ of habeas corpus, Holiday asks this Court to take judicial notice of the state appellate and habeas record and incorporates his federal claims in that record by reference into this writ application.

The testimony at trial is briefly summarized as follows:

Holiday and Tammy Wilkerson formed a romantic relationship in mid 1996 or 1997.   Prior to the relationship,  Wilkerson, had already birthed two daughters, Tierra Shinea Lynch and Jasmine Rockell DuPaul, by two different fathers.  During the relationship with Holiday, Wilkerson gave birth to Holiday's daughter, Justice Holiday.

The family couple moved to Plantersville in 1998, and then moved to Madison County, where they lived in a residence owned by Wilkerson's parents, Beverly and Louis Mitchell.  The residence was located approximately a mile from the Mitchells' own home in a rural area.

In March 2000, Holiday was charged with Aggravated Sexual Assault of Tierra, and was excluded from Wilkerson's residence by a protective order.   Nevertheless, Holiday and Wilkerson

6

saw each other on several occasions, and sometimes engaged in sexual relations, on several instances between March 2000 and September 5, 2000. They also maintained daily phone contact. Although Wilkerson later claimed during the trial of this case that she was coerced into continuing her relationship with Holiday, Wilkerson never notified the authorities regarding the alleged violations of the protective order. In August 2000, Holiday was arrested for violation of a protective order after attempting to see her at her place of employment. Nevertheless, the relationship between Wilkerson and Holiday continued after his release from jail.

On the day of the incident, Holiday drove to Wilkerson's house in the late evening with two friends, Robert Lowery and John White, got out of the car and sent his friends away. When he got out of the car, Holiday took with him a pistol, a can of gasoline, and a screw driver.

After Holiday's friends left, Wilkerson became alarmed after seeing a figure at the window and called her parents. Wilkerson's mother, Beverly Mitchell, and Mitchell's brother, Terry Keller arrived at Wilkerson's residence, Keller armed with a shotgun. As they were placing the girls in the car, Holiday appeared in the house. Wilkerson immediately left through the backdoor of her house to call for help, leaving her mother, uncle and children with Holiday. Holiday compelled Keller to put down the shotgun. Holiday started to pour gasoline from the can he had brought on the ground and on Wilkerson's car. He attempted to light the gasoline, but it would not ignite. Holiday then directed Mitchell and Keller to bring the girls inside the house and sit on the sofa. Holiday and Mitchell left in Mitchell's car to go to her house, leaving Keller alone in the house with the three girls. At this point, Keller left the house – and the girls – to seek help.

On arriving at Mitchell's house, Holiday and Mitchell retrieved two five gallon containers of gasoline and returned to the Wilkerson's residence. Holiday directed Mitchell to pour gasoline

7

through the residence, allegedly starting at some recliners in the livingroom-kitchen area of the residence and moving throughout the house into the washroom and bedroom. While in the bedroom, Mitchell testified that she heard one of her grandchildren call her name and she looked into the living room. Mitchell stated that she saw Holiday bend down toward the floor, and then she saw a fire start and move through the room. Mitchell escaped through a window in the back bedroom; Holiday escaped through the front door. The girls, who had been sitting on the couch when the fire started, did not escape.

Outside, Holiday took Mitchell's car and started to drive away. As he was driving away, he collided with a car driven by Madison County Sheriff's Deputy Ivan Linebaugh. Holiday and Linebaugh engaged in a high speed, multi-agency car chase until Holiday's car crashed and caught fire.

After Holiday was removed from the car and taken into custody, police and medical personnel observed that Holiday was burned on his hands, fingers, arms, and neck. A forensic pathologist who reviewed the photographs taken of Holiday's burn injuries opined that the burns were "consistent with" a person being burned by a flash after bending and reaching down as if to light an floor-level accelerant.

A forensic analysis of the debris recovered from the Wilkerson residence and from the person of Holiday and Mitchell revealed the presence of gasoline on debris collected from the laundry room, the kitchen and Holiday's tennis shoes. The results were negative for gasoline on Holiday's shirt and pants, Mitchell's night shirt and pants, clothing from one of the decedents, debris under the couch on which the decedents had been sitting, and on two cigarette lighters taken from Holiday after his arrest.

8

Wilkerson's father, Louis Mitchell, testified that the residence had a propane gas stove in which the pilot light was ignited, and a Dearborn heater on which the pilot light had been turned off. The house also had several electric utilities, the refrigerator, water heater, washer and dryer, and three air conditioners, all of which were in working order.

The State presented testimony regarding the causation of the fire by John DeHaan, a fire/arson investigator, and president of Forensic Scientists, Inc., from Viejo, California.  DeHaan opined that the only scientifically supportable basis for causation of the fire was Holiday's having ignited the fire.  DeHaan excluded as possible bases for the fire's causation the stove pilot light, the refrigerator, the air conditioner units, the water heater, and the floor heater.

The defense expert, Judd Clayton, presented the defense's theory of ignition that the fire could have started from the water heater located in the bathroom, an electrical spark the refrigerator, the window mounted air conditioner units, or the pilot lights on the stove top.   Although Clayton agreed with DeHaan that the broiler pilot light could not have been a possible ignition source, his reasons differed from DeHaan; DeHaan identified the broiler pilot light as a continuously burning gas pilot but concluded that the broiler pilot could not reasonably have ignited the gas vapors because the light was placed too high from the vapors, the light was placed in a compartment which retarded the entrance of the fumes, and that there had been no resulting explosion.  Clayton excluded the broiler as a possible ignition source because he believed it to be an electrical ignition system.

The jury found Holiday guilty of capital murder as alleged in each of the three indictments.

At the punishment phase of trial, the State presented evidence that in addition to the facts leading up and involved in the incident ultimately leading to the fire in the Wilkerson residence, Holiday had previously sexually assaulted his maternal aunt and a cousin, and struck his mother in

9

an argument when he was 15 years of age before leaving home.  A forensic psychiatrist testified on behalf of the State, that based on a hypothetical set of facts relating to Holiday, that he had an anti-social personality disorder, and that he was likely to constitute a future danger of violent conduct.

The defense presented several witnesses who testified that  Holiday had experienced a normal, uneventful and Church-going childhood, that he had been respectful to others, that he had been proud of his (deceased) daughter, and had adjusted well to incarceration.  A forensic psychiatrist testified for the defense that Holiday's profile on a personality test, the MMPI revealed that he had suffered from depression and had poor internal mechanisms  for coping with stress and frustration.

The jury answered the future dangerousness question in the affirmative, and answered the mitigation question in the negative, resulting in the imposition of a sentence of death.

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW  IN TEXAS

The following is an overview of capital punishment law in Texas.  This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty.  To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder.  For instance, kidnaping and then killing a person is a capital offense.  So is killing two people, rather than one.  Killing a police officer in his line of duty is a capital offense.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys.  One of the lawyers is the lead attorney; the other is the second chair attorney.  Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions.  The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge.  Death penalty jurisprudence is thick with constitutional and statutory issues.  All unsettled challenges to death penalty procedures must be raised.  Failure to do so means that the issues are waived for direct appeal.  Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the

11

failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense. The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts. Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors. Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700. Many jurors exercise certain allowable rights not to serve; others cannot be found. On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel. Either side may ask for the jury to be shuffled at this point. Jurors will be seated randomly in numerical order. Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service. In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror. The judge may excuse some jurors but not others. At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench. Frequently, the lawyers for both sides will agree to excuse a juror for some reason. There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror.  After the juror leaves, each side is permitted to challenge for cause.  If granted, the juror is finally excused and deleted from the pool.  If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges.  For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied.  This is sometimes called the sequential method of selecting the jury.  The State goes first.  If the State strikes the juror, the juror is gone.  If the State declines to strike the juror, then the right passes to the defense.  If the defense strikes the juror, the juror is eliminated.  If the defense does not strike the juror, then the juror joins the twelve-member petit jury.  This process is repeated until twelve jurors and two alternates are seated.  Each side has ten peremptory challenges.

The second method can be referred to as the pool method.  The goal is to create a pool of forty-eight death penalty qualified jurors.  Each juror is questioned by the parties individually.  The court rules upon any challenges for cause by the State or Defense.  If the juror is not disqualified, then the juror is added to the pool in consecutive number.  When forty-eight are reached, the court designates a day for strikes.  Beginning with the first juror qualified, the State announces whether

13

it will accept the juror or exercise one of its peremptory challenges.  If not, the Court turns to the Defense, which announces whether it will accept the juror or use a strike.  If the juror is not struck by either, then the juror joins the petit jury.  The process ceases when twelve jurors and two alternates are seated.  *See Rousseau v. State*, 824 S.W.2d 579, 582 n.4 (Tex. Crim. App. 1992), *aff'd,* 855 S.W.2d 666, *cert. denied*, 510 U.S. 919 (1993).

Both prosecutors and defense attorneys generally prefer the pool method.  Both sides can exercise their strikes intelligently, eliminating the jurors at the extremes based on their death penalty views.  This method benefits the defense by allowing identification of each of the *Morgan v. Illinois* jurors who managed to escape a cause challenge, before using any strikes.  (In *Morgan v. Illinois*, the Supreme Court held that a juror who would automatically impose the death penalty for a capital murder regardless of the mitigating circumstances may be removed for cause.  *See* 112 S. Ct. 2222 (1992).)

Once the jury is selected and sworn, trial proceeds in the usual fashion.  If the defendant is found guilty of capital murder, the sentencing phase begins.  In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues.  The questions have varied over the years.

The method of answering the special issues is complicated.  If the jurors unanimously answer all three questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically.  If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes.  It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue.  If this occurs, then the defendant is sentenced automatically to life in prison.  There is no retrial.  Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case.  The result is always either a life sentence or a death sentence.  Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence.  Unanimity is required for a death sentence.  A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor.  Again, the answer is that the defendant receives an automatic life sentence.

In a non-capital case, jurors are informed of the effects of parole.  In 1990, Texans amended the state constitution to require juries to be informed when a defendant becomes eligible for parole.  In the 1970s and 1980s, there was concern that defendants served only a fraction of their sentence.  Those supporting accurate sentencing wanted jurors to know when the defendant would be eligible for parole so that this could be taken into consideration when deciding the sentence.

In sharp contrast, in a death penalty case jurors are not permitted to know this information.  A defendant who is tried for the death penalty, but who receives a life sentence, is eligible for parole only after he has served forty years.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071

application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## HOLIDAY HAS MET ALL PROCEDURAL REQUIREMENTS

## ALL CLAIMS HAVE BEEN EXHAUSTED[4]

There are procedural hurdles which must be crossed before a petitioner may ask a federal court to review a claim entitling him to federal habeas relief. *See generally Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999).

A petitioner seeking a writ of habeas corpus in federal court must show that he has exhausted all avenues of relief in state court. A federal district court may decline to address the merits of a claim that was inexcusably "defaulted" by the petitioner in state court proceedings.

A federal "default" question generally involves an evaluation of whether and how a claim for relief was presented to and considered by a state court. A default question arises in several ways. First, a default question can arise if a claim in a habeas corpus petition was not presented, or not fully presented, to the state court. Presenting a claim to the state courts is called "exhausting" the claim. *See Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1720 (1992) (the exhaustion requirement is grounded in "comity concerns." "The purpose of exhaustion is . . . [to] afford the State a full and fair opportunity to address and resolve the [federal] claim on the merits.")

"In order for a claim to have been 'fairly presented' to a state court to fulfill the exhaustion requirement, the applicant 'need not spell out each syllable of the claim before the state court.' Instead, a federal claim must only be the 'substantial equivalent' of one presented to the state courts." *Fisher*, 169 F.3d at 303 (citations omitted).

---

[4]Portions of this and the following section on exhaustion and procedural default were abstracted from a 1995 paper written entitled *Pleading Prejudice in Capital Habeas Corpus Proceedings*, by John H. Blume and Mark E. Olive.

Second, a default question may arise if the claim was presented to the state court, but not in the manner that the state court normally and regularly requires that it be presented, such as when the claim is presented untimely, and the state court invoked its state rule to bar consideration of the inmate's claim.  This is called a "procedural default."  *See Wainwright v. Sykes*, 433 U.S. 72 (1977). This is discussed below.

***Demonstrating Cause and Prejudice.***   A federal district court is required to give considerable analysis and receive evidence when called upon to determine whether there has been a default, and if so, whether the default will be excused so that the federal court can reach the constitutional merits of a claim.  Whether there exists an independent and adequate state court basis for barring a claim is decided by the district court, and "[w]hether a petitioner's actions have created a state law procedural bar is a mixed question of law and fact." *Hansbrough v. Latta*, 11 F.3d 143, 145 (11th Cir. 1994).  Even when a state court decides there has been default, the federal district court must make an independent inquiry. *Macklin v. Singletary*, 24 F.3d 1307 (11th Cir. 1994), *cert. denied*, 513 U.S. 1160 (1995).

Even if there has been an enforceable default, the federal district court may still proceed to the merit's of the petitioner's claim if the petitioner can demonstrate "cause" for and "prejudice" from the default.  Cause and prejudice are federal questions requiring *de novo* review by the federal district court. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) ("cause and prejudice" is a mixed question of law and fact which the federal court must decide).  If the state alleges and the federal court finds that a procedural default is applicable, a petitioner is entitled to an evidentiary hearing on the matter of cause and prejudice. *See Tamayo-Reyes*, 112 S. Ct. at 1721 ("a remand to the District Court is appropriate in order to afford respondent the opportunity to bring forward evidence

18

establishing cause and prejudice"); *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977); *Murray v. Carrier*, 477 U.S. 478, 487 (1986); *Walker v. Davis*, 840 F.2d 834, 839 (11th Cir. 1988); *Harich v. Dugger*, 813 F.2d 1082 (11th Cir. 1987).

Examples of cases applying these principles include: *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) (new factual allegations supporting claim in federal court do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts); *Beauchamp v. Murphy*, 37 F.3d 700, 704 (1st Cir. 1994) (discussing the fair presentation doctrine, recognizing here that state court would not have viewed the claim differently had the word "federal" appeared in the heading to the issue), *cert. denied*, 115 S. Ct. 1365 (1995).

*Scarpa v. DuBouis*, 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 940 (1995), includes a good discussion of the fair presentation doctrine, discussing ways in which a petitioner can fairly present claims to state courts. These include citing a specific provision of the Constitution, alerting the state court to the claim's federal nature through the substance of the claim, relying on federal constitutional precedents, claiming a particular right guaranteed by the Constitution, and asserting a state law claim that is "functionally identical" to a federal claim.

Other examples include *Laswell v. Frey*, 45 F.3d 1011, 1013-14 (6th Cir. 1995) (Court held that petitioner's pre-state-court trial double jeopardy claim was exhausted), *cert. denied*, 116 S. Ct. 199 (1995); *Williams v. Washington*, 59 F.3d 673, 677-78 (7th Cir. 1995) (Petitioner fairly presented her ineffective assistance of counsel claim; in applying this rule courts should "avoid hypertechnicality"), *cert. denied*, 516 U.S. 1179 (1996); *Shute v. Texas*, 117 F.3d 233, 237 (5th Cir. 1997) (court construed § 2254(b)(2) to allow only for the denial of an entire mixed petition, as opposed to selective denial of meritless unexhausted claims).

*Application to Holiday*.  Each of the claims presented by Holiday in this application have been exhausted.  Each claim was presented at least once to the state trial court and the CCA.

## NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED

A.  *Explanation of Default Principles*

As mentioned, a requirement of a state death row petitioner seeking a federal writ of habeas corpus is to show that she has not procedurally defaulted any of the grounds for relief presented.  In order for a claim to have been procedurally defaulted, the state court's ruling must *not* be based upon the federal constitution.  In other words, the state ruling must be on grounds independent of the federal constitution.  In addition, the state court's ruling *must be* based upon an adequate state ground.  *See Ford v. Georgia*, 498 U.S. 411, 423 (1991) (discussing what is meant by "adequate" state ground).

For example, *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995), held that ineffective assistance at guilt phase issue was adequately presented to state courts.  Even though the issue was not "precisely articulated" in state post-conviction proceedings, the "necessary arguable factual commonality" existed between claims presented in state court and in the federal petition.

*Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995), held that a petitioner's claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds."

In *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998), the court held that a petitioner's failure to object at trial to the admission of a snitch's out-of-

court statements did not prevent the federal habeas court from considering the petitioner's confrontation clause claim where the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review.

"A federal court reviewing a state prisoner's habeas claim must respect a state court's determination that the claim is procedurally barred under state law." *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977). "The rule is quite simple: 'a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Williams*, 125 F.3d at 275 (*quoting Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989) (internal quotation marks and citation omitted)).

"In *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S. Ct. 2546, 2559, 115 L.Ed.2d 640 (1991), the Court explained that the 'clear and express' statement requirement applies to cases where the state court's judgment fairly appears to rest primarily upon federal law, or to be interwoven with federal law, and not to cases where there is no reason to question whether the decision was based upon independent and adequate state law grounds." *Williams*, 125 F.3d at 275 n.3.

Of course, if there has been no adjudication on the merits in state court, and the claim is exhausted, then the statute by its terms requires no deference to the state decision. In that situation, the general rule that federal courts review questions of law *de novo* would apply. See *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (Where the state appellate court erroneously applied a

state procedural default rule to bar review, there was no adjudication on the merits and § 2254(d) did

not apply.)

**B.      *Holiday's Response to the Trial Court's and CCA's Findings That Holiday Procedurally Defaulted Claims.***

As mentioned, each of the claims presented by Holiday in this application have been

exhausted.  Each claim was presented at least once to the state trial court and the CCA.

The State (before the state trial court and CCA) takes the position that when a death row

inmate presents a claim *twice* to the state courts he procedurally defaults that claim.  This position

is illogical and contradicted by federal law.

What has occurred is that Texas prosecutors have adopted a tactic of asking state court judges

to sign decisions finding *federal* procedural default has occurred, then asking federal judges to defer

to state court findings that an inmate's federal claim was defaulted.  This is not permitted by federal

law.  Procedural default is a federal concept, not a state one.  It is not appropriate for state courts to

declare whether an inmate's federal claim has been procedurally defaulted for federal court purposes.

Here, all claims have been exhausted and none procedurally defaulted.  Under each ground

for relief, Holiday identifies the point at which the issue was preserved at trial, and later presented

on direct appeal or in his state habeas petition.  Issues need only be presented once to the state courts.

It is not required that an issue presented to the state courts on direct appeal, and later again in the

state habeas action.

In *Cone v. Bell*, 129 S.Ct. 1769 (2009), Tennessee similarly argued that federal courts could

not review Cone's *Brady* claim because it was presented twice to state courts, and was thus

procedurally defaulted.  *Cone* held that state court procedural rules cannot automatically deny federal

review of federal claims.  It is the prerogative of federal court to decide whether a federal claim was appropriately presented to state courts.  *Cone*, 556 U.S. 1782 at slip op. 16.  "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review."  *Cone*, 556 U.S. 1782 at slip op. 17.  "When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted.  To the contrary, it provide strong evidence that the claim has already been given full consideration by the state courts and is thus *ripe* for federal adjudication."  *Cone*, 556 U.S. 1782 at slip op. 17-18 (emphasis in original). "A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration – not when the claim has been presented more than once."  *Id.* at 18.

In *Jimenez v. Quarterman*, 555 U.S. 133 (2009), the Court rejected Texas' arguments that an inmate's federal habeas petition was untimely because it was filed more than one year after the date his state conviction became final, notwithstanding that the state permitted an out-of-time direct appeal.  The inmate argued that by permitting additional state review of his conviction by granting out-of-time direct appeal, the one-year AEDPA period did not begin until the completion of his direct appeal.  The Justices unanimously agreed.

The Court identified the one-year AEDPA limitations period as "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  *Jimenez*, 555 U.S. 113, slip op. at 5 (quoting 28 U.S.C. § 2244(d)(1)(A)).  A state court judgement is final upon the conclusion of direct review or the expiration of the time for seeking such review.  *Id.* at 6.

In the event, however, that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Holiday respectfully makes two requests.  First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence.  Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted.  The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court.  In *Burton v. Stewart*, 549 U.S. 154, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options.  They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition.  We have held that in such circumstances the later filed petition would not be 'second or successive.'  *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)."

"Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton*, slip op. at 6 (citations omitted).

## ASSERTION OF CAUSE AND PREJUDICE

If necessary, Holiday is able to demonstrate cause and prejudice for any procedural default because his ineffective trial and appellate lawyers were responsible for the default and their failures may be imputed to the State because the default occurred at a stage of the proceedings at which Holiday was constitutionally entitled to effective counsel with respect to the defaulted issue.

24

The "cause and prejudice" test requires that the applicant show cause for and prejudice resulting from the default. *Wainwright v. Sykes,* 433 U.S. 72, 87 (1987); *see also Engle v. Isaac*, 456 U.S. 107, 135 (1982); *Murray v. Carrier,* 477 U.S. 478, 495-96 (1986). Generally, cause exists if an objective factor external to the defense excuses counsel's failure to comply with the state procedural rule. *See generally Coleman v. Thompson,* 501 U.S. 722, 749-750 (1991); *Carrier*, 477 U.S. at 488.

Here, if indeed Holiday's attorneys failed to comply with a state procedural rule, their conduct in and of itself was so egregious that it satisfied the *Strickland* standard.[5]

## ARGUMENT AND AUTHORITIES

**Claim 1: The evidence underlying Holiday's conviction for capital murder fails to satisfy the sufficiency standard of *Jackson v. Virginia*, 443 U.S. 307 (1979).**

**Exhaustion**:  Presented to CCA as points of error number 1 and 2 in direct appeal brief.  The CCA denied the claim on the merits in its direct opinion in 2006.  2006 Tex. Crim. App. Unpub. LEXIS 737, *12.

According to Tami Wilkerson "around October, '96-'97" Holiday met her in Conroe, Texas, and approximately six months later they started living together.  RR 32, p. 43; RR 32, p. 44.  When they started living together, Tami was living with her two children: Tierra Shinea Lynch, who was

---

[5]   *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 496; *e.g., Gray v. Lynn*, 6 F.3d 265, 268-69 (5th Cir. 1993) (failure to object to obvious defect in jury instructions IAC); *Freeman v. Lane*, 962 F.2d 1252, 1257-58 (7th Cir. 1992) (failure to raise 5th Amendment claim on appeal was IAC and cause for default); also *Prou v. United States*, 199 F.3d 37, 48 (1st Cir. 1999) (failure to challenge timely charging document was IAC and cause for default of challenge); *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (appellate counsel's failure to raise obvious double jeopardy claim was IAC); *Mason v. Hanks*, 97 F.3d 887, 891-92 (7th Cir. 1996) (appellate counsel omission of meritorious claim was IAC and cause for default).

born on November 5, 1992, and whose father was Lorenzo Merchant, and Jasmine Rockell DuPaul, who was born on February 27, 1995, and whose father was Timothy Lewis.  RR 39, pp. 92–93.  In August of 1998, they moved to Plantersville in Grimes County, Texas, and lived in a trailer house on property owned by his parents, James and Angela Nickerson.  RR 39, p. 94.  While living in Plantersville, Holiday's daughter, Justice Holiday, was born on November 18, 1998.  RR 32, p. 43.

In September of 1999, they moved to the house in Madison County, Texas—where this offense occurred.  RR 39, p. 94. This house was located approximately a mile from the home of Louis and Beverly Mitchell, who were Tami's parents.  In March of 2000, Holiday was charged with aggravated sexual assault of his step-daughter, Tierra Shinea Lynch, and a protective order was issued prohibiting him from being around Tami or the children, including his daughter, Justice.

Holiday moved to Grimes County, and, despite the protective order, he and Tami continued to see each other.  Tami said she and Holiday saw each other about 10 times from March until September of 2000. RR 32, p. 72.  They would meet at Holiday's house, at her house, and at a motel in Navasota, Texas.  RR 32, p. 72.  She said that Justice would stay over night with him.  RR 32, p. 72.  Because they continued to see each other, Louis Mitchell, Tami's father, tried to convince her to notify the necessary authorities regarding the violation of the protective order; she refused to do so.  RR 39, p. 45.

In August of 2000, Holiday came to the IHOP where Tami was working to see her, and she called 911; he was arrested for violation of the protective order.  RR 32, p. 76.  From March until September, 2000, Holiday and Tami talked almost daily on the phone.  RR 39, p. 98.

Holiday stayed with Steve Taylor in Grimes County during the two weeks prior to this incident.  RR 36, p. 5.  Taylor said that during the two week period Holiday and Tami talked on the

26

phone on a daily basis.  RR 36, p. 8.  He said that one time Holiday told Tami he would kill her if "I can't get my kid", but he told Taylor that he was joking.  RR 36, p. 9.  During the two week period Tami came to visit Holiday twice.  RR 36, p. 10.  One night Taylor took Holiday  to meet Tami—near her residence—and Holiday got in the trunk of Tami's car; they went to Tami's house.  RR 36, p. 24.  Holiday talked about "Tami and another man" and said he was "going to kill somebody."  RR 36, pp. 11–12.

Robert Lowery said Holiday told him that "he was going to go up there and burn the house down and watch her [Tami] run out."  RR 36, pp. 37–38.

On the night of this incident, Holiday asked Robert Lowery and John White to ride around with him, and unbeknownst to them, Holiday drove to Tami's house.  RR 36 p. 51.  When they arrived, Holiday got out of the car and told them to take his car back to his mother's house in Grimes County; he had a screwdriver, a gas can and a pistol.  RR 36, p. 54.  That night Tierra told Tami she heard glass break, and Tami looked out the window and saw a figure.  She immediately called her mother, and Ms. Mitchell and her brother, Terry Keller, drove to Tami's house; they had a shotgun with them.  RR 33, p. 77.  When they arrived, Ms. Mitchell put Tierra and Jasmine in her car, asked Tami if she had called 911—she had not—and started to call 911.  When Ms. Mitchell turned around, Holiday was in the house "staring right at" her.  RR 33, p. 80.  Holiday "jerked" the phone out of her hand and "threw it against the wall and broke it."  RR 33, p. 81.  Then, Tami—who was standing near Mr. Mitchell—took off running through the bedroom and out the back door.  RR 33, p. 83.  Tami ran to a neighbor's house and called 911.  Holiday pulled out a pistol and held it to his head, and Ms. Mitchell "thought he was going to shoot his self" so she tried to stop him.  RR 33, p. 84.  Holiday pulled the gun down from his head, and said "I'm going to make Tami pay for what she

did to me taking my baby away."  RR 33, p. 84.  Ms. Mitchell said that Holiday was angry, and she could not calm him down.  RR 33, p. 85.  When Terry Keller realized that Holiday was in the house, he went to the door.  Holiday then grabbed Ms. Mitchell and said "tell Terry to put the gun down or I'm going to kill you."  RR 33, p. 85.  Terry complied with his instruction and dropped the shotgun. Then, Holiday took Ms. Mitchell outside and ordered her to pick up the shotgun; she picked it up and gave it to Holiday.  RR 33, p. 88.  Holiday begin pouring the gasoline—he had brought with him—in front of the house and on the cars; he again said he would make "Tami pay."  RR 33, p. 89. Jasmine and Tierra were in the car where he had poured gasoline.  Holiday tried to light the gasoline, but it "didn't light."  RR 33, p. 91.  During this time, Justice had been in the house asleep, and Holiday told Terry Keller to get her and bring her outside—which he did.  RR 33, p. 92.  Holida took possession of the shotgun and the pistol; he shot the pistol "down in the ground" and the shotgun "up into the air"; he said "you see I'm not playing now."  RR 33, p. 92.  He then took all of them in the house and made them sit on the sofa, and he asked if there was any more gasoline; Ms. Mitchell said she did not know.  He then told Ms. Mitchell to come with him, and they left the house in her car. RR 33, pp. 93–94.  They drove to the Mitchell residence and got "two five gallon things of gas" and drove back to Tami's house.  When they returned, the children were still there, but Terry Keller was gone.  RR 33 p. 95.  He had left to find Ms. Mitchell.  Ms. Mitchell said:

> We got to the house.  He said "bring the gas into the house".  Excuse me—so he went into the house and I put the gas down behind—in front of the table on the floor.  And he said "pick up one and soak down the recliners".  And I said "okay".

RR 33, p. 96.

Ms. Mitchell said:

28

I come in the door and I sat the gas can here and Raphael over here, high chair.  I go by him and start at the first recliner and go around it.  And he said soak it good so I poured a whole bunch on it.  And I go over to this recliner and pour it.  All the time it's upside down.  And I go in the room and I pour it around the room, washers and dryers.  And I come back out and I go in her bedroom over to the dresser and around her bed and the gas cans are empty.

RR 33, p. 118.

She did not pour any gasoline around the couch where the children were sitting.  RR  33 p. 119.  When she was in the bedroom she heard Tierra call her name, and she turned back toward where the children were sitting.   RR  33, pp. 97–98.  When she turned around she said "I see Raphael with his foot up on the high chair and he was saying something, and I don't know what he was saying, and he bent down and the fire started."  RR 33, p. 98.  She said that she did not see a match or a lighter in his hand—when be bent down—but that the fire started "immediately as he reached down."  When the fire started she said it "went the way that I poured the gas," and that she could not "get to the girls" so she went out the back door.  RR 33, pp. 98–99.

Ms. Mitchell admitted that during the pretrial hearing she did not remember saying anything about "seeing Raphael [Holiday] bend down at the time the fire started."  RR 38, p. 169.  Furthermore, in her statement to Ranger Frank Malinak on September 6, 2000, she admitted that she did not mention that Holiday "bent down" at the time the fire started.  RR 38, p. 186.

After Ms. Mitchell went out the backdoor she was unable to go back in the house because of the fire.  She saw Holiday "standing out by a big mimosa tree ... and he said ' what happened'."  RR 33, p. 103.  Holiday tried to force her into the car, but she "took off running" because she "didn't know if he had the gun or not."  RR 33, p. 103.  Holiday then got in Ms. Mitchell's car and drove off.

29

As Deputy Ivan Linebaugh was approaching the scene in his vehicle Holiday—in Ms. Mitchell's car—rammed into the deputy's vehicle. Deputy Linebaugh proceeded to give chase and Holiday's car "swerved off the road ... like he was trying to run over somebody. I seen another female running off in the woods and he went that way and then come back on the road and that's when I caught back up to him." RR 33, p. 169. The female was Tami Wilkerson.

Deputy Linebaugh engaged in a high-speed pursuit of Holiday in excess of twenty miles into Walker County where the engine of Holiday's car caught fire. Deputy Linebaugh effected an arrest. After Holiday was handcuffed, Deputy Linebaugh searched him and found fourteen bullets and "two cigarette lighters in his pocket" which he did not remove. RR 33, pp. 177–178. Deputy Linebaugh observed burn injuries on Holiday's hands, his fingers, the back of his ear, the back of his neck and "some burning on his arms." RR 33, pp. 199–200.

Holiday was transported to the Madison County Jail,  and during the booking process William Babee, one of the jailers, took two cigarette lighters from him. RR 34, pp. 95–96. The cigarette lighters were sent to the lab  for analysis. RR 35, p. 85. That same morning, Robert Dunn, chief deputy of the Madison County Sheriff's Department, observed that Holiday had "suffered some burns," and he was taken to the hospital. RR 34, p. 121.

Ivan Wilson, a trace evidence expert, testified that a .38 caliber revolver, the barrel and receiver of a shotgun, and the remains of three victims were collected inside the house that burned down. RR 34, p. 19. The pistol was found in the approximate northwest corner of the house, and the shotgun and victims were found in the approximate northeast corner. RR 34, pp. 19–20.

Jim Swindall, an expert in determining the presence of liquid accelerants, said the following, to wit: (1) he found the "presence of gasoline" on the shoes Holiday was wearing (RR 35, p. 122);

(2) he found no presence of gasoline on Holiday's pants or his shirt (RR 35, p. 123):  (3) he found the presence of gasoline in the debris collected from the laundry room (RR 35, p. 126); (4) he found the presence of gasoline on the debris collected from the kitchen floor (RR 35, p. 127); (5) the "clothing from the body" found in the living room and the fire debris under the "couch where the victims were found" were negative for the presence of gasoline (RR 35, pp. 127–128); (6) the night shirt and pants Beverly Mitchell was wearing were negative for the presence of gasoline (RR 35, pp. 128–129); and (7) the two cigarette lighters taken from Holiday at the jail were negative for the presence of gasoline (RR 35, p. 133).

Dr. Janie McLain, a forensic pathologist, was shown the photographs of Holiday's burns he sustained in the fire.  She said she would categorize his burns as "[P]robably looking at mainly second and some third degree burn."  RR 35, p. 167.  Dr. McLain opined that Holiday's burns were on the lower part of the face—not the upper—"around the nose and the lips and right side of cheek."  RR 35, p. 172.  She said that Holiday's burns were consistent with a situation where a person "reached down with their right arm and bent down and that the accelerate ignited."  RR 35, pp. 173, 175.

Louis Mitchell testified that Tami's house had three air conditioner units—two which were approximately thirty-two inches off the floor and one about four feet off the floor.  RR 33, pp. 151–152.  The house also had a Dearborn heater which used propane and had a pilot flame—which he claimed was not on the night of the fire.  RR 33, pp. 152–153.  There was also a gas stove in the house which had a pilot flame that "should have been" on.  RR 33, p. 153.  Also, the refrigerator, water heater, and washer and dryer—located in the house—were electric.  RR 33, p. 153.

31

Dr. John DeHann, the State's fire expert, said the vapors from gasoline are heavier than air, thus they "sink to the floor and basically fill the room up from the floor." RR 36, p. 169. He said that gasoline vapors have to mix with air in a process called diffusion, and a flammability range is established by the process. RR 36, p. 174. He said that gasoline vapors have a very narrow flammability range. RR 36, pp. 175–176. In order for there to be ignition, Dr. DeHann said that there must be the—

> right concentration of vapor and air ... a suitable ignition source. That's one with enough energy to trigger the reaction. Then we have to have contact between that ignition source and that vapor air mixture while the vapor is in its correct concentration range. And that contact has to be maintained long enough for there to be a reaction started. If I can't satisfy all four of those conditions then I wouldn't get ignition.

RR 36, p. 177.

There can be ignition by "some other source in that room that is not in the immediate vicinity of where the gasoline is poured" if there is "time for the vapors" of a sufficient concentration to move either horizontally or upward. RR 36, p. 179. As "possible ignition sources," Dr. DeHann evaluated the water heater, the room heater, the refrigerator, the stove and air conditioner. RR 36, p. 181. He excluded them as potential ignition sources. RR 36, p. 182–183. He eliminated the hot water because it was in a separate room, and it would take the vapors too much time to reach it. RR 36, p. 183. He eliminated the stove unit in the northwest corner of the kitchen because the pilot flame was in a closed compartment, was too high from the floor, and was too far from the areas where the gasoline was poured. RR 36, pp. 183–184. He eliminated the Dearborn heater on the west wall—which was near where Holiday was standing—because Louis Mitchell said the pilot flame was turned off. RR 36, p. 187. He eliminated the refrigerator because there was not enough time for the

32

vapors to get into the concealed space where the ignition source was located.  RR 36, p. 189.  He eliminated the air conditioner because the glass window located above the air conditioner was melted, and there was no evidence of an explosion.  RR 36, pp. 191–193.  He said that the "thirty seconds or so" that it took Ms. Mitchell to pour the gasoline in the house would not be "enough time for the vapors to spread" and be of "high enough concentration" with any of the ignition sources in the house.  He said that if the time-frame was doubled or tripled his opinion would be no different.  RR 36, p. 195.

Judd Clayton—the fire expert for Holiday- said the Dearborn heater was the "number one candidate" as the source of the fire.  RR 39, p. 96.  He said that during April of 2000 there were two days that approached freezing and that there was no "way that you can determine from the physical condition" of the heater whether its pilot flame was "on or off at the time of the fire."  RR 39, p. 97.  If the pilot was off, then it would be eliminated as a source.  The pilot on the stove was the second most likely source of ignition, followed by the air conditioner, the refrigerator, and lastly the water heater.  RR 39, p. 106.  Regarding the distribution of the gasoline vapors, he said what is important "is how the vapors that emanate from that liquid [the gasoline] mix with the air."   RR 39, p. 107.  He said that in a small area—like the house—the "majority of the vapors will be very rich, that is in excess of the flammable liquids."  RR 39, p. 108.  The air movement caused by the air conditioner and the ceiling fan will "stir those vapors up."  RR 39, p. 108.  According to him, Ms. Mitchell's movement would stir the vapors, and "you reach an area where you can't predict where you're going to have ignitable mixtures."  RR 39, p. 108.  He said that the amount of time it "takes for gas vapors to travel from the area where it is poured to the possible source of ignition" cannot be accurately predicted.  RR 39, p. 109.  He was "very confident that the air conditioner was going to have a

tendency to force the gas vapors to the outer extremity of the walls." RR 39, p. 130. When asked

if he found any physical evidence that indicated an intentional source of ignition he said he saw "no

indication of evidence that was recovered at that scene that would have provided a source of

ignition." RR 39, p. 116. He said there was "ample physical evidence of accidental sources of

ignition." RR 39, p. 116. As to the movement of the gasoline vapors, he said:

> I can say that at some point in time an ignitable mixture would envelope the area
> surrounding the gas range. I don't know at what point in time. It may be in five
> seconds, it may be in a minute and-a-half. But that air will be circulating and sooner
> or later the proper mixture is going to happen because that is a very closed, confined
> area.

> RR 39, p. 133.

> He said the following, to-wit:

> I can't tell you nor do I know of anyone who is being up front with you as to which
> of those possible ignition sources did, in fact, ignite that fire. Because there were
> vapors in and about that room distributed by the mechanisms we talked about that
> could easily have been at the ignitable range and easily have penetrated cracks and
> crevices necessary to get to heat sources and set that fire off.

> RR 39, p. 172.

As to whether the lighters—found on Holiday—could have been a possible source of ignition, Mr.

Clayton said that he did not see any "sooting or discoloration that would indicate" they were near any

ignitable liquids. He said the lighters were "perhaps a remote possibility" as an ignition source. He

said that he could not foresee "somebody using one of these lighters to light a fire and then stick it

back in their pocket." RR 39, p. 186.

This Court has adopted the standard for determining legal sufficiency set out by the United

States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Jackson* directs the reviewing court to view "the evidence in the light most favorable to the

34

prosecution," and if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" then the evidence is legally sufficient.  This *Jackson* standard of review gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  In reviewing the evidence for legal sufficiency, the court must presume the trier of fact resolved any conflicting inferences in favor of the prosecution and must defer to that resolution.  *Turro v. State*, 867 S.W.2d 43, 47(Tex. Crim. App. 1993).

The capital murder of a child statute provides that an offender who intentionally or knowingly murders an individual under six years of age shall bear the risk of a capital murder conviction. *See* TEX. PEN. C. ANN. SECTION  19.03(a)(8).  Additionally, the capital murder statute provides that an offender who intentionally or knowingly murders more than one person in the same criminal transaction shall bear the risk of a capital murder conviction. *See* TEX. PEN. C. ANN. SECTION 19.03(a)(7).

 Intent to kill is a question of fact to be determined by the jury.  *Robles v. State*, 664 S.W.2d 91(Tex. Crim. App.1984).  The fact-finder may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence and may infer knowledge or intent from the acts, words, and conduct of the accused.  *See Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999).

 No rational trier of fact could have found the essential element, *i.e.*, intentional or knowing, beyond a reasonable doubt to support these capital murder convictions.  There was no evidence that Holiday intentionally or knowingly started the fire.  The eyewitness testimony of Ms. Mitchell only

35

established—if one believes her testimony at trial and not her testimony at pretrial—that Holiday bent down and the fire started.  Though she said she was looking at Holiday when the fire started, she never testified that she saw him actually set the fire.  For the evidence to be legally sufficient to support these convictions, it must establish that a rational jury could have found beyond a reasonable doubt that Holiday either intentionally or knowingly started the fire that caused the death of the three children.  No rational jury could so find.  If the fire was accidentally ignited, Holiday was not guilty of the capital murders.  To be guilty of capital murder, Holiday had to either intentionally or knowingly set the fire.  No evidence supports that he did. Holiday directed Ms. Mitchell to pour the gasoline in the house, and at his direction, it was poured away from the children. Holiday's lighters revealed no presence of gasoline, sooting, or discoloration.  If Holiday had started the fire with one of his lighters, it would have been reasonable to infer that there should have been some physical evidence to indicate such; there was none.  An accidental ignition of the fire is a more reasonable inference because Holiday was burned, he dropped his pistol, he left the shotgun in the house, and he was not near an exit when the fire started.  There were at least five potential sources of ignition in the house.  Judd Clayton found no evidence which indicated that the fire was started intentionally. He said that the time it takes vapors to move through the house cannot be accurately predicted.

Viewing "the evidence in the light most favorable to the prosecution" no rational jury could have found beyond a reasonable doubt that Holiday started the fire.

The evidence was legally insufficient to support Holiday convictions for capital murder.

**Claim 2:  The State violated the Sixth Amendment fair jury trial clause and *Wainwright v. Witt*, 469 U.S. 412 (1985), by granting the State's request to remove qualified Juror Servaine Sessions.**

36

**Exhaustion:**  Presented to CCA as point of error number 3 in direct appeal brief.  The claim was presented to the trial court which denied relief.  RR 31:13.  The CCA denied relief on the merits. 2006 Tex. Crim. App. Unpub. LEXIS 737, *18.

On May 21, 2002, after the jury had been selected, but prior to it being sworn, Servaine Sessions—who was selected as a juror—requested to speak to the trial judge.  After conversing with Ms. Sessions, the court conducted a hearing relating to her jury service.  During the brief hearing, the following entire exchange occurred between the trial judge and Ms. Sessions, to-wit:

Q.    And we have met on a couple of occasions because of the fact that you've been on the jury panel and then we had your individual interview.  And as it turns out you are now on the final jury to sit as a trial juror in the case against Raphael Deon holiday; am I correct?

A.    Yes, sir.

Q.    And, of course, we talked to some ninety or so. I don't remember specifically anything you said at that time that would indicate a possible problem dealing with jury service in this matter, but upon my arrival -- I'm saying this for the record that the court reporter is  making -- on my arrival this morning you indicated to me that you needed to talk to me about your jury service; am I correct?

A.    Yes, sir.

Q.    And I have told the lawyers that we had a very brief conversation and I didn't go into what the problem was, but you indicated that you would like to talk; am I correct?

A.    That's correct.

Q.    Okay.  I don't know anything wrong at this point with you.  I may not be able to actually make any  final decisions on what you're about to say.  Chances are, given the circumstances, we are this far along in the trial, you will be required to continue your service.  But I just want the lawyers to know what is in your heart and in your mind because they are entitled to know that.  So you may go ahead and just tell us what it is that you think may be a problem for you.

37

A.   I thought for sure when I was here that I could -- after listening to the trial and receiving all the information I could decide one way or the other on -- after the guilty phase if I had to do the death penalty phase.  And I been praying about it.  And that's just the only thing, I don't know.  I'm not saying I can't serve and do my civil duty, I'm just not sure even after hearing the information if I could say one way or the other yes.

Q.   What do you mean yes?

A.   On the death penalty.  That was the thing.  I thought if he was found guilty and then I didn't know I was going to have to do the sentencing phase or if the Judge was going to do that.  And, if so, after listening to those two questions, if it's going to be considered the death penalty, that's what I was afraid of.  I don't know one way or the other.  I thought yes, I could say if it was put to me yes, this person deserves the death penalty, and now I'm not -- just not certain on that.

Q.   You were certain at the time but since then you have become less certain?  Is that what you're telling us?

A.   Yes.  I'm not totally not certain or totally certain.  It's just that I have had some confusing thoughts on it.

Q.   Okay.

A.   I been praying about it and seem like everything I read -- it wasn't anything dealing with the court, it's just that I read my Bible daily and seem like every page I went to it has something to do with humanaty (sic), it has something to do with Commandments.  And I didn't know if that was God, God's way of speaking to me on what -- on what I was about to do or what.  And I just wanted to be honest and up front and let them know, I don't know one way or the other. If you can understand that?  And this just didn't happen when she told me -- when the County Clerk called me I  was like oh, God.  So I prayed that night.  For two nights I didn't sleep.

Q.   I know it's heavy on your heart and it's a heavy responsibility.  You have made us all aware of the  situation.

A.   That's all I wanted to do was make you aware of it.

RR 30 pp. 9–12.

On May 23, 2002, the trial court heard the State's Motion to Excuse Ms. Sessions from the

jury.  CR Supp. 2, p. 80.  The trial court found that Ms. Sessions was "not qualified to serve" because

38

"her religious views opposing the death penalty are of such a nature that they would, in my opinion, prevent or impair her performance of her duties as a juror and in accordance with the jury's instructions and her oath."  The State's challenge for cause was granted over Holiday's objection. RR 31, p. 13.

The views of Ms. Sessions regarding the death penalty did not prevent or substantially impair the performance of her duties in accordance with her instructions and her oath.  The trial court violated *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) when it granted the state's challenge for cause over Holiday's objection.  Ms. Sessions was qualified to serve on a death penalty jury, and her removal was reversible error.

It was the State's burden to establish that Ms. Sessions would be substantially impaired in her ability to follow the law.  *Hernandez v. State*, 757 S.W.2d 744, 753 (Tex. Crim. App. 1988).  The State did not meet its burden.  In a capital prosecution, a prospective juror is not subject to a challenge for cause merely because she is opposed to or has conscientious scruples regarding the death penalty.  *Witherspoon v. Illinois*, 391 U.S. 510, 515, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In fact, when a prospective juror only voices "general objections to the death penalty or expressed conscientious or religious scruples against its infliction" the defendant's right to an impartial jury under the 6th and 14th amendments in a capital murder case prohibits the exclusion of the prospective juror.  *Id.*, at 1776.  But, a prospective juror—who has conscientious scruples about the death penalty—may be disqualified if her views would "prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath." *Wainwright v. Witt,* supra at 425.  Accordingly, the exclusion of prospective jurors must be limited to those who were "irrevocably committed ... to vote against the penalty of death regardless of the facts and

39

circumstances." Ms. Sessions was not "irrevocably committed" to vote against the penalty of death. In fact, she was far from it.

A challenge for cause of a venire person based upon the person's view of the death penalty is a matter of constitutional dimension. *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998), cert. denied, 528 U.S. 985, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999). If, in fact, a prospective juror is barred from jury service because of his or her view about capital punishment on "any broader basis" than inability to follow the law or abide by their oaths, the death sentence cannot be carried out. Witherspoon, supra. The improper exclusion of a single venire-person under Witt is reversible error. See *Gray v. Mississippi*, 481 U.S. 648, 666 (1987).

The trial court's exclusion of Ms. Sessions was reversible error. Prospective jurors may not be excused merely because their beliefs about the death penalty might influence the decision-making process. *Jones, supra*, at 391. The fact that a prospective juror will be influenced by her feelings regarding the death penalty does not, in and of itself, make her challengeable for cause, nor does it constitute substantial impairment of juror's performance of her duties. *Farris v. State*, 819 S.W.2d 490 (Tex. Crim. App. 1990), rehearing denied, certiorari denied 112 S.Ct. 1278, 503 U.S. 911, 117 L.Ed.2d 504. Ms. Sessions never suggested that she would "consciously distort" her answers to the special issues in order to prevent the imposition of the death penalty. See *Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989). Ms. Sessions never said she was opposed to nor had conscientious scruples about the death penalty; she only said she had "some confusing thoughts." According to *Adams v. Texas*, 100 S.Ct. 2521, 448 U.S. 38 (U.S. Tex. 1980), "conflicting feelings" about the death penalty do not disqualify a person from jury service "who is able to put those feelings

40

aside and impartially serve the simple fact-finding function called for under the special issues." See

Riley, supra, at 300.

The trial court committed reversible error when it granted the State's challenge for cause on

Ms. Sessions. *See Gray, supra.*

> **Claim 3: The State violated Holiday's Sixth Amendment right to confrontation by allowing Nurse Jane Riley to relate damaging banned testimonial hearsay by Tierra Lynch in violation of *Crawford v. Washington*, _____ U.S. _____ (2004).**

**Exhaustion:** Presented to CCA as point of error number 4 in direct appeal brief. The CCA

denied relief on the merits. 2006 Tex. Crim. App. Unpub. LEXIS 737, *25.

> **Claim 4:   The State violated the Fifth and Fourteenth Amendment due process clause provisions by allowing Nurse JaneRiley to relate damaging banned testimonial hearsay by Tierra Lynch.**

**Exhaustion:** Presented to CCA as point of error number 4 in direct appeal brief. This claim

was presented to the trial court which denied relief. RR 32:183-89. The CCA denied relief on the

merits. 2006 Tex. Crim. App. Unpub. LEXIS 737, *25.

The out-of-court statements by Tierra Lynch were testimonial in nature and, therefore,

admitted in violation of the confrontation clause. Further the statements lacked sufficient indicia of

reliability and were not admissible as any exception to the hearsay rule.

Nurse Riley testified that her job was to interview children to determine if they had been

sexually abused. She interviewed Tierra Lynch in March of 2000. Over numerous objections, she

testified about the questions she propounded Tierra and the answers she heard. She asked Tierra if

she knew why there was blood in her panties. Tierra said no. She asked Tierra if something had

happened to her and she responded "yes." She asked if anyone was with her when something

happened and she said her "Step-daddy" (Appellant). She asked if someone told her not tell anyone

and she said "yes, my step-daddy" (Appellant).  Dr. Fred Fason, a psychiatrist with extensive training in the area of interviewing child victims of sexual abuse, indicated that the interview could not be considered reliable because it was not recorded, and that it was the product of suggestive and leading questions.  Dr. Fason reviewed a videotaped statement taken of Tierra Lynch during which she made no statement consistent with that taken by Nurse Riley.  Dr. Fason testified that the tape showed a forensically reliable interview.  RR 32, pp. 155–181.

The interview of Tierra Lynch occurred three days after she had been examined by Dr. Ali who had determined that she had been sexually assaulted.  Nurse Riley had conducted many such interviews and prepared rape kits in other cases but did not do so in this case because of the three-day lapse between the alleged assault and the interview.  She works with a forensic interviewer.  She interviewed Tierra Lynch as result of a referral from the Madisonville Police Department or Child Protective Services.

These out-of-court statements by Tierra Lynch are clearly testimonial.   The recent case of *Crawford v. Washington*, __US___ , 124 S.Ct. 1354, 72 USLW 4229 (2004), provides guidance as to the scope of the confrontation clause protections.  "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  The Court in *Crawford* held that in such circumstances the confrontation clause required the exclusion of such testimony despite the finding of reliability or an exception to the hearsay rule.

In this case Tierra's statement was in response to the questioning of the government's sexual assault nurse whose purpose was to determine if the child was the victim of sexual assault.  The nurse's testimony that such was merely for the purpose of diagnosis and treatment is belied by the

42

circumstances.  Dr. Ali had already determined the medical diagnosis.  Tierra was referred to the nurse by the police investigating the criminal allegation.  The nurse worked with a forensic interviewer whose job was to obtain a forensic statement that could be used in court.  The nurse's questions about who she was with and whether or not the person asked her to not tell anyone is strongly indicative of the investigative purpose of her interview.

Tierra was taken to the sexual assault nurse some three days after a physician had examined her and  concluded she had been sexually assaulted.  As such, Holiday's objection on the grounds of denial of his right of cross-examination and confrontation should have been sustained.

If such statements were not testimonial, they lacked sufficient indicia of reliability and were not properly excepted from exclusion under the hearsay rule.

Three important indicators of reliability are markedly absent in this case, spontaneity, quality recording and consistent repetition.  *Smith v. State*, 61 S.W.3d 409 (Tex Crim. App. 2001).   Here the statement of Tierra to the nurse was not recorded.  The statement consisted of very little more than affirmative answers to leading questions.  The statement was inconsistent with the recorded statement taken by the forensic interviewer.  Dr. Fason, a noted psychiatrist, testified extensively and in detail as the unreliability of the statement taken by Nurse Riley from Tierra Lynch.

The State expressed its view that the statement of Tierra Lynch to Nurse Riley was admissible under the exception of a statement made for the purpose of medical treatment and diagnosis.  RR 32, p. 184.  The evidence does not support that exception.  Nurse Riley testified that she asked the questions to diagnose and treat the child but there was no evidence that the child was seeking treatment.  She had been to a physician several days before.  The child was then referred to Scotty's House by law enforcement where the child was then interviewed by Nurse Riley and later

43

by Nick Cantu, the forensic interviewer.  There was no evidence that the child gave the answers to Nurse Riley in an attempt to get treatment or to be diagnosed.

The admission of such testimony violated Holiday's right to confront and cross examine the witnesses against him as provided for in the VI Amendment of the United States Constitution and his right to the  protection of due process of law as provided in the V and XIV Amendments of the United States Constitution.  Holiday timely objected to such testimony and the court overruled.  RR 32, pp. 183–189.

> **Claim 5:  The State violated Holiday's right to adequate notice of the offense and due process of law provided by the Fifth and Fourteenth Amendment, by refusing to quash the  indictment for failure (1) to notify of the manner and means that Holiday was alleged to have ignited the fire in an arson case, and (2) by failing to allege whether the State sought to impose liability by means of conspiracy or parties law.**

> **Exhaustion:**  Presented to CCA as point of error number 5 in direct appeal brief (see p. 44).

This claim was timely presented to the trial court which denied relief.  RR 2:5-8, CR 162, CR 9, 1; Supp. CR 2 (cause 10,425) 2:18-21; Supp. CR 2 (cause 10,427) 2:18-21.).  This claim was denied on the merits by the CCA.  2006 Tex. Crim. App. Unpub. LEXIS 737, *27.

> **Claim 6:  The State violated Holiday's Sixth Amendment right to be informed of the nature and cause of the accusation against him by refusing to quash the indictment for failure (1) to notify of the manner and means that Holiday was alleged to have ignited the fire in an arson case, and (2) by failing to allege whether the State sought to impose liability by means of conspiracy or parties law.**

> **Exhaustion:**  Presented to CCA as point of error number 5 in direct appeal brief (see p. 44).

This claim was timely presented to the trial court which denied relief.  RR 2:5-8, CR 162, CR 9, 1; Supp. CR 2 (cause 10,425) 2:18-21; Supp. CR 2 (cause 10,427) 2:18-21.)  This claim was denied on the merits by the CCA.  2006 Tex. Crim. App. Unpub. LEXIS 737, *27.

The indictment fails to allege any act or omission committed by Holiday or for which Holiday would be criminally responsible.  Through investigation and discovery Holiday was not able to discern the factual and legal theory by which the State intended to show that hw was guilty of capital murder.  Holiday could not determine if he was being accused of igniting a fire that caused the deaths, or of causing someone else to pour gasoline which ignited accidentally, with intent to cause the deaths, or of failing to protect the children from an accidental fire, or of pouring gasoline on the children and igniting the fire.   Each of these theories were proposed in the discovery and allowed by the indictment.

Holiday has a Sixth Amendment right "to be informed of the nature and cause of the accusation . . ." *Spinkellink v. Wainwright*, 578 F.2d 582, 609 n. 32 (5th Cir.1978), *cert. denied*, 440 U.S. 976 (1979).   "[N]otice of a specific charge, and a chance to be heard in a trial of the issues raised by that charge . . . are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."   *Cole v. Arkansas,* 333 U.S. 196, 201, 68 S. Ct. 514 (1948); *Dunn v. United States*, 442 U.S. 100, 106 (1979)  ("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury offends the most basic notions of due process."); *Eaton v. City of Tulsa,* 415 U.S. 697, 698-99 (1974) (per curiam) ("[T]he question is not upon what  evidence the trial judge could find petitioner guilty but upon what evidence the trial judge did  find petitioner guilty," and constitutional due process is denied when an appellate court sustains a trial court "by treating the conviction as a conviction upon a charge not made."); *In re Ruffalo,* 390 U.S. 544 (1968); *DeJonge v. Oregon*, 299 U.S. 353, 362 (1937); *Cola v. Reardon,* 787 F.2d 681 (1st Cir. 1986).  The Sixth Amendment requires that an information state the elements of

an offense charged with sufficient clarity to apprise a defendant of what he must be prepared to defend against. *Russell v. United States*, 369 U.S. 749, 763-64 (1962).

The seminal decision of *Cole v. Arkansas* set the principle that due process required that the charging document provide notice of the charges against which the citizen must defend himself.  In *Cole*, the state court information (the charging document) charged Cole with violation of a certain statute, the trial judge believed that the information charged violation of the same statute, and the judge informed the jurors that the information charged Cole with violation of that certain statute. Yet the jury instructions authorized conviction under a different statute, and the court's judgment convicted Cole of that different statute, and the state appellate court found that Cole was guilty of violating a different statute.  *See* 333 U.S. at 199-200.  The Supreme Court held that such a conviction is barred by the due process clause of the Constitution because fundamental to the concept of due process is that the charging document provide notice to the citizen of precisely that violation of law against which he must defend.  "It is as much  a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made."  *Id.* at 201.

Where the statutory definition of an offense employs generic terms it is not sufficient for the indictment merely to copy the statute.  Rather, the indictment must, as the Supreme Court says, "descend to particulars" of the wrongful actions of the person charged.  *Russell v. United* States, 369 U.S. 749, 765 (1962); *see also Hamling v. United States*, 418 U.S. 87, 117-18 (1974) ("[t]he language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.");   *Miller v.*

46

*Commonwealth*, 77 S.W.3d 566 (Ky. 2002) (reversing where victim described one rape and estimated the number of times that conduct was repeated, but did not offer any additional information differentiating the first instances from the other 224 instances for which Miller was convicted); *accord Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005) (granting habeas relief for vague indictment for 20 undifferentiated counts each of rape of a minor); *Parks v. Hargett,* No. 98-7068, 1999 U.S. App. Lexis 5133, 1999 WL 157431 (10th Cir. Mar. 23, 1999) (finding indictment insufficient but affirming because notice provided by another record source).

These principles echo in Fifth Circuit precedent.  In *Plunkett v. Estelle*, the Fifth Circuit rejected the reasoning of the Court of Criminal Appeals, much as Cyphers asks the Court to reject the Tyler Court of Appeals's.  Plunkett was convicted of the murder of his girlfriend's two-year old child. The indictment charged that he intentionally or knowingly caused the death in violation of section 19.02(a)(1) of the Texas Penal Code.  Plunkett prepared his defense against that allegation. During closing argument, however, the prosecutor argued that he was guilty of intending to cause a different crime:  serious bodily injury and committed an act clearly dangerous to human life that caused the death, which was a violation of section 19.02(a)(2).  The jury charge, at different points, discussed both the section 19.02(a)(1)  and the (a)(2) language.  The Fifth Circuit concluded that the jury charge unconstitutionally permitted jurors to convict him of two offenses, one of which was not charged in the indictment, violating the Sixth Amendment.  709 F.2d 1004, 1010 (5th Cir. Tex. 1983), *cert. denied*, 465 U.S. 1007 (1984).  Similarly, Cyphers contends that he was charged with a single crime, by three theories, but the state and court converted the single charge into three convictions.  While the three convictions are of the same statute, not different statutes as in *Plunkett*, the principle remains that due process does not allow conviction of a crime not charged (here,

47

Cyphers's two additional convictions), and double jeopardy does not permit repetitive conviction of a single crime (Cyphers's same two additional convictions).

In *Tasco v. Butler,* 835 F.2d 1120 (5th Cir. La. 1988), the Fifth Circuit remanded for an evidentiary hearing to determine whether Tasco received timely notice of enhancement allegations, explaining that "his fundamental liberty interests were at stake, and due process required that the state afford him a fair opportunity to defend himself against the charges of recidivism." *Id.* at 1123. *Tasco* is useful because the issue was not whether he received notice of the statutory offense, but whether he received notice of information which could and did double his sentence. Similarly, Cyphers complains that he was charged with three paragraphs, which is permitted, but not told that these were counts, which directly and powerfully affects sentencing, by tripling the 12-year jury sentence he received to 36 long years.

In *Tarpley v. Estelle*, 703 F.2d 157 (5th Cir.1983), *cert. denied*, 464 U.S. 1002 (1983), Tarpley was charged by indictment with credit card abuse under section a certain Penal Code section, but the trial judge's instructions contained elements of both this offense and the separate offense of receiving property or services obtained by illegal credit card use, criminalized under a separate Penal Code provision. Ordering a new trial, the Fifth Circuit wrote, "As guarantors of this constitutional right, the federal courts have not hesitated to grant habeas relief to a state criminal defendant convicted of an offense other than that for which he was charged." *Id.* at 160.

In *Ricalday v. Procunier*, 736 F.2d 203, 207 (5th Cir. Tex. 1984), the Fifth Circuit denied habeas relief, but did find that Ricalday satisfied the first element of *Strickland v. Washington*'s ineffective assistance of counsel standards by finding that his attorney failed to object to the wide variance between the crime charged by the indictment and the separate crime charged by the jury

48

instructions.  "Under federal constitutional law, a violation of the due process clause results when a criminal defendant is convicted of a crime he was never charged with committing: . . . ."  *Id.* at 207.

In *Gray v. Raines*, 662 F.2d 569 (9th Cir.1981), information charging forcible rape did not provide adequate notice of charge of statutory rape since the two offenses require proof of different elements.  In *Watson v. Jago,* 558 F.2d 330 (6th Cir.1977), the Sixth Circuit granted habeas relief because while the indictment charged first-degree murder, the prosecution proceeded on felony murder theory.  In *Goodloe v. Parratt*, 605 F.2d 1041 (8th Cir. 1979), habeas relief was granted because the information charged Goodloe with driving a vehicle to avoid arrest for driving with a suspended license, but the jury instruction charged a separate offense of flight to avoid prosecution for willful and reckless driving.

The indictment in each cause number alleges in pertinent part that Holiday "caused the death of an individual ... by burning said individual with fire."  Holiday filed a motion to quash contending that he did not receive adequate notice, that the indictment failed to allege the manner and means of the offense and that Holiday had been unable to discern the State's factual and legal theory of the case despite extensive investigation and attempts at discovery.  The trial court denied the motion to quash in each cause.

Here the indictment alleges less than "starting a fire," it merely alleges causing death "by burning said individual with fire."  Holiday properly filed a written motion to quash as to each indictment.  Holiday timely presented said motion prior to trial and obtained an adverse ruling.  RR 2, pp. 5–8. Holiday re-urged the motions to quash after both sides had rested and closed. RR 41, p. 20.

49

The indictment allowed for many possible factual scenarios to result in guilt.  The charges to the jury, despite objections by Holiday, provided no additional guidance in that the application paragraph merely tracked the indictment.  The evidence and the record revealed many possible scenarios that may have resulted in the death of the three children.  One such possible scenario is that Beverly Mitchell poured gasoline throughout the house and the fire was ignited by a pilot light.  Another possible scenario is that Holiday poured gasoline in the house and ignited the gasoline with a lighter.  Another possible scenario is that after the fire started or despite the risk of a fire starting, Holiday by omission failed to remove the children from the house to safety.

The State was able to rely on several theories of guilt based upon a theory that Holiday was criminally responsible for the conduct of Beverly Mitchell.  Ms. Mitchell is the person who testified that she poured gasoline throughout the house while the three victims sat on the sofa.  The indictment alleged no facts which would give rise to a conviction based on Sec. 7.02 of the Texas Penal Code.  This Court should re-examine and reject its long-held view that the reliance on the law of parties need not be pled in the indictment.  *Romo v. State*, 568 S.W.2d 298 (Tex. Crim. App. 1977-1978); *Pitts v. State*, 569 S.W.2d 898 (Tex. Crim. App. 1978).

It should also be noted that this case is distinguishable from *Romo* and *Pitts*.  In those cases the State relied on either Sec. 7.02 (a) (1) or 7.02 (b), Texas Penal Code.  With regard to Holiday, the State relied implicitly on Sec. 7.02 (a) (2) and (3), Texas Penal Code.  Despite Holiday's objection, no instruction concerning any law of parties was given to the jury, only an instruction on causation.  Considering the conflicting theories raised by the evidence and argument of counsel, Holiday was clearly denied adequate notice.

The elements of party liability should be required pleadings where the State intends to rely thereon as in the case at bar. See: *Planter v. State*, 9 S.W.3d 156 (Tex. Crim. App. 1999) (Womack, J. dissenting).

It is axiomatic that the indictment needs to allege every element of the offense. *Kellar v. State*, 108 S.W.3d 311 (Tex. Crim. App. 2003). Further, the indictment must provide notice of the prohibited conduct. Here there was either no notice, or only vague, insufficient and indefinite notice.

An examination of just one portion of the prosecutor's argument illustrates the varied theories of guilt suggested: (1) Holiday started the fire, (2) the appliance may have started the fire but it would not have happened but for the conduct of Holiday, or (3) Holiday failed to protect the children from the fire after it started. RR 41, pp. 53–55.

Holiday was entitled to more exact notice of the factual and legal theory upon which the State relied. The failure to grant the motion to quash violates Holiday's right to adequate notice of the offense and due process of law as guaranteed by the V, VI and XIV Amendments of the U.S. Constitution.

We do not believe that the *Branch* or *McKay* rules apply.

In *Branch v. Estelle*, Branch challenged his single burglary indictment which produced his single burglary conviction, alleging that the difference in the alleged and actual offense dates invalidated the indictment. The Court invoked the rule to which it has adhered many times, that "the sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction." 631 F.2d 1229 (5th Cir. Tex. 1980); *see, e.g, Wood v. Quarterman,* 503 F.3d 408 (5th Cir. Tex. 2007) (capital murder indictment properly listed six victims, resulting in a single capital murder conviction and

51

sentence); *Brown v. Johnson,* 224 F.3d 461, 463 (5th Cir. Tex. 2000) (single murder indictment yielded single murder conviction and sentence, challenged unsuccessfully for lack of signature by prosecutor); *Meyer v. Estelle,* 621 F.2d 769 (5th Cir. 1980) (single indictment for robbery resulted in single conviction for robbery; Meyer challenged and lost on identity of victim); *Murphy v. Beto,* 416 F.2d 98 (5th Cir. 1969) (single theft indictment yielded single conviction); *Bueno v. Beto,* 458 F.2d 457 (5th Cir. 1972) (single robbery indictment yielded single robbery conviction); *accord Evans v. Cain*, 577 F.3d 620, 624 (5th Cir. 2009) (Evans was indicted under multiple counts for rape and robbery.  Evans received concurrent sentences for each count.  The Circuit upheld his indictment and conviction and denial of new trial, applying the *Branch* rule.).

The Fifth Circuit applies the rule of construction in *McKay* that requires the reviewing federal court to determine whether a reasonable construction of the indictment actually charges the inmate's conviction and sentence.  *McKay v. Collins*, 12 F.3d 66, 69 (5th Cir. 1994) ("An indictment should be found sufficient unless no reasonable construction of the indictment would charge the offense for which the defendant has been convicted."), *cert. denied*, 513 U.S. 854 (1994).

**Claim 7: The State violated the Eighth Amendment by barring Holiday's attorneys from informing jurors that when answering the special issues that state law does not require a "Yes" or "No" answer, but will be satisfied if jurors are unable to reach a verdict on any special issue.**

**Exhaustion:**  Presented to CCA as point of error number 6 in direct appeal brief (see p. 46). The CCA denied this claim on the merits on page 28 of its opinion.  The claim timely presented and denied on the merits at the trial court.  RR 8, pp. 246–248.

**Factual background:** The State presented an oral motion in limine requesting that the trial court order Holiday not to "inform or suggest to the jury" that they could answer the special issues in three ways because the law "contemplates three different alternatives." RR 8, p. 246. The State contended such statement to the jurors violated Article 37.071. RR 8, p. 246. Holiday countered that he was entitled to tell the jurors that the law does not require a verdict of "yes" or "no" and will be satisfied if the jurors are not able to reach a verdict." RR 8, p. 248. The Court granted the State's motion in limine. RR 8, p. 247. Holiday objected.

### *Argument and Authorities*

This Court addressed this precise issue in *Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992) and held that "[A]bstention is not a jury option" and that it "is not, nor would it be appropriate to suggest that it [no agreement] is, a verdict itself." Id. at 337–338. In *Draughon*, supra, the Court cited *Padgett v. State*, 717 S.W.2d 55 (Tex. Crim. App. 1986) which addressed the effect of the jury's failure to answer a special issue in a capital murder on a second trial involving a different victim. The Court recognized that in 1981, the Legislature amended Article 37.071(e) to require the trial court to sentence the defendant to life imprisonment if the jury "is unable to answer any issue submitted" under Article 37.071. Id. at 58. The jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer. *Id*.

"Truth in sentencing" is most compelling in capital cases because the penalty of death is qualitatively different from other penalties, and, as such, this difference mandates a greater degree of reliability when a sentence of death is imposed. *See Woodson v. North Carolina*, 428 U.S. 280,

53

304; 96 S.Ct. 2978 (1976). Holiday sought to truthfully inform the jurors that the law would be satisfied even if they were unable to answer one of the special issues. This was not a misstatement of the law; it is the law. In *Draughon, supra*, the appellant argued "that jurors should be informed about the consequence of their failure to agree because non-agreement is an optional verdict under our law." The Court held that the appellant was "simply mistaken." *Id*. at 338. *Draughon*, supra, is not controlling in this case because Holiday did not contend that the jurors should be informed of the effect of not answering a special issue; he only wanted the jurors to understand that they were not required to answer the special issues. In *Draughon, id.*, this Court held that "abstention is not a jury option," but the Court was wrong; abstention is a jury option. In fact, there is no requirement that the jurors must answer the special issues because there is no hung jury at punishment. See Art. 37.071, V.A.C.C.P.

The 8th Amendment prohibits procedures that needlessly undermine the reliability of the capital sentencing process. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The trial court erred when it prevented Holiday from informing the jurors that the law did not require them to answer the special issues.

===============================

**Claim 8:     The State violated Holiday's Sixth Amendment right to fair jury trial by denying his challenge for cause of Juror Linda Masters.**

**Exhaustion:**  Presented to CCA as points of error number 8, 11, 12 and 13 in direct appeal brief (see p. 55 reliance on *Penry v. Lynaugh*, and p. 57 on *Eddings v. Oklahoma* and *Morgan v. Illinois* and p. 59, *Caldwell v. Mississippi*).  This claim was timely presented to the trial court which denied relief on the merits.  RR 15, pp. 186–187.

Regarding Special Issue Number 1, when asked whether the State would have to prove that the defendant "is going to kill again?" Ms. Masters said "I'm thinking if that person had already killed three children that should be enough."  RR 15, p. 147.  Continuing, she said "I think my job would to be speak for those dead children as a juror. ... so to ask me not to take that into consideration I think is just ridiculous."  RR 15, p. 150.  Holiday challenged her for cause claiming that she has a bias or prejudice against the law in that she would automatically answer Special Issue Number 1 "YES."  RR 15, p. 186.  The challenge was denied, and Holiday exercised a peremptory challenge on Ms. Masters.

Summary of the Argument - Points 7 and 8

The trial court abused its discretion when it overruled Holiday's challenge for cause on Mr. O'Dwyer and Ms. Masters because both of them indicated they had a bias or prejudice against the law.  Each of them would automatically vote "YES" to Special Issue Number 1.

Argument and Authorities -  Points 7 and 8

Holiday had a right "to not have a particular venire member on the jury if the venire member is challengeable for cause." *Johnson v. State*, 43 S.W.3d 1, 6 (Tex. Crim. App. 2001). Any prospective juror who would automatically answer the future dangerousness special issue in the affirmative is challengeable for cause under Article 35.16(c)(2) for having a bias or prejudice against a law applicable to the case upon which the defense is entitled to rely. *Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). In *Curry v. State*, 910 S.W.2d 490 (Tex. Crim. App. 1995) venire-man Middleton said that he believed "murderers were more likely than not to kill again" and that "seventy-five percent of murderers would murder again." However, he said that the State had to prove the defendant "fell within this seventy-five percent group"; that all of the evidence had to be considered; and that the "burden of proof was always on the State." The challenge for cause was overruled, and this Court concluded the trial court did not abuse its discretion. *Id*. at 494.

Neither Mr. O'Dwyer nor Ms. Masters were like Middleton in Curry, supra. Their responses revealed that they would automatically answer Special Issue Number 1 "YES." Mr. O'Dwyer said that if a person killed once then it still would be "more likely that it would happen once again or twice, yes." His responses revealed a bias or prejudice in favor of a "YES" answer to Special Issue Number 1. See Article 35.16(c)(2). Even more revealing was his belief that a "low chance" of future violence would not require a "NO" answer, but it might justify a "YES" answer, to Special Issue Number 1. Ms. Masters said "I'm thinking if that person had already killed three children that should be enough." In other words, enough to answer Special Issue Number 1 "YES."

Under *Ladd, supra*, neither Mr. O'Dwyer nor Ms. Masters were qualified to serve on a capital murder because they would automatically answer Special Issue Number 1 "YES." The trial court "clearly abused its discretion" when it overruled Holiday's challenge for cause on both of them. *See Ladd, supra; Banda v. State*, 890 S.W.2d 42 (Tex. Crim. App. 1994), certiorari denied, 115 S.Ct. 2253, 515 U.S. 1105, 132 L.Ed.2d 260; *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Furthermore, Holiday demonstrated he was harmed because he used a peremptory challenge to remove these jurors, exhausted his peremptory challenges, requested and was denied additional peremptory challenges, and identified an objectionable juror. See Johnson, supra at 7.

**Claim 9:      The State violated Holiday's Sixth Amendment right to fair jury trial by denying his challenge for cause of Juror _____ Penny.**

**Exhaustion:**   Presented to CCA as point of error number 12 in direct appeal brief (see reliance on *Penry v. Lynaugh*, p. 56 and p. 57 on *Eddings v. Oklahoma* and *Morgan v. Illinois*). This claim was timely presented to the trial court which denied relief.  RR 20, pp. 118, 120.

Mr. Penny stated that he "probably would not" consider age—in answering the special issues—if the accused was "above the age of twenty-one." RR 20 pp. 116–117. When asked if he could "envision in a proper case" finding sufficient mitigating circumstances to warrant a life sentence instead of death, he said "The only thing that comes to mind would be was that person mentally competent to have known what they had done." RR 20, p. 77. When asked if he would consider the state of mind of Holiday in determining his answers to the special issues he stated that he would consider state of mind "only if we are talking about an insanity." Holiday informed the

juror that state of mind was "not about sanity issues," but like "rage or something of that nature," and

the juror said "I wouldn't consider that, no."  RR 20, p. 118.

Holiday challenged Mr. Penny for cause, but the trial court denied his challenge.  RR 20, pp.

118, 120.  Holiday exercised a peremptory challenge on Mr. Penny.


Summary of the Argument - Points 11 and 12:


The accused in a death penalty case has a right to have jurors who will, at least, consider all

relevant evidence, including, but not limited to, age and state of mind, in answering the

special issues.  Neither Ms. Masters nor Mr. Penny were such jurors; they both said they

would not consider age, and Mr. Penny said he would not consider state of mind.


Argument and Authorities - Points 11 and 12


In a death penalty case, in order to ensure "reliability in the determination that death is the

appropriate punishment in a specific case," the jury must be able to consider and give effect to any

mitigating evidence relevant to a defendant's background and character or the circumstances of the

crime.  *Penry v. Lynaugh*, 109 S.Ct. 2934, 2951-52, 492 U.S. 302 (1989).  In a capital murder case

a juror must be willing to consider the defendant's background and character in answering the special

issues, although he or she need not give mitigating weight to any particular type of evidence.

*Maldonado v. State*, 998 S.W.2d 239 (Tex. Crim. App. 1999).  While jurors are free to give any

amount of weight to a particular piece of evidence, refusal to consider all relevant evidence

58

disqualifies the juror under the law. *Raby v. State*, 970 S.W.2d 1(Tex. Crim. App. 1998), cert. denied, 525 U.S. 1003, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998). The law provides that youth is a mitigating factor which must be considered. *Trevino v. State*, 815 S.W.2d 592, 614 (Tex. Crim. App. 1991). However, a juror is not challengeable for cause because he or she refuses to give mitigating effect to particular evidence. *Morrow v. State*, 910 S.W.2d 471 (Tex. Crim. App. 1995), cert. denied, 517 U.S. 1192, 116 S.Ct. 1683, 134 L.Ed.2d 784 (1996).

In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), Justice Powell, writing for the majority, said:

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. ... they may not give it no weight by excluding such evidence from their consideration.

In *Curry, supra*, the appellant claimed that the trial court erred when it denied his challenge for cause on a venire-member "based on his inability to consider certain factors in mitigation of punishment." This Court held that "counsel for the defense did not question whether the venire member would consider a defendant's history of abuse and deprived childhood, but rather whether he would consider these facts as mitigating in nature." This Court overruled the point of error and wrote the following: "Taking the record as a whole, this venire member's responses only show that he did not consider the factors named as mitigating."

59

Ms. Masters and Mr. Penny would not consider age in answering the special issues, and, additionally, Mr. Penny would not consider state of mind. Though neither of them had to give any weight to age or to state of mind, they did have to consider them. Any juror to whom mitigating factors are irrelevant should be disqualified for cause. *Morgan v. Illinois*, 504 U.S. 719, 739 (1992).

The trial court abused its discretion when it denied Holiday's challenge for cause on Ms. Masters and Mr. Penny. *See Guzman*, *supra; Colburn, supra.* Holiday demonstrated he was harmed because he used a peremptory challenge to remove Ms. Masters and Mr. Penny, exhausted his peremptory challenges, requested and was denied additional peremptory challenges, and identified an objectionable juror. *See Johnson, supra* at 7.

**Claim 10:** **The State trial court violated the _____ Amendment when it permitted the State's expert, Dr. John DeHaan, to testify that the fire could not have been ignited by an electrical appliance or a pilot light.**

**Exhaustion:** Presented to CCA as point of error number 18 in direct appeal brief. The CCA denied relief on the merits on page 49 of its opinion. This claim was timely presented to the trial court which denied relief. RR 36, p. 93 – RR 37, p. 142.

The State trial court violated the _____ Amendment when it permitted the State's expert, Dr. John DeHaan, to testify that the injuries suffered by Holiday were consistent with the State's hypothesis that Holiday bent down and ignited the gasoline.

Exhaustion:  Presented to CCA as point of error number 19 in direct appeal brief.  The CCA denied

relief on page 49 of its opinion.  This claim was timely presented to the trial court which denied

relief.  RR 36, p. 93 – RR 37, p. 142.


Dr. DeHaan is a criminalist specializing in fire and explosion investigations.  Fire is a chemical

process governed by the rules of physics and chemistry.  If provided enough information, certain

predictions about the behavior of a fire can be made.  The progress of a fire is difficult to predict

with certainty because they are affected by small random processes that do not repeat.  RR 36, pp.

94–97.


  Dr. DeHaan described his process of investigation as follows:


  You have a puzzle.  You look for a potential solution.  You find some data, some information

about what could be causing it.  You test that and then basically develop a better understanding of

what was actually happening.


RR 36, p. 99.


  The State has failed to offer clear and convincing evidence that the scientific principles of

fire cause and origin were properly applied to reach the witness' conclusions.  There was no way to

determine a potential error rate to this field of "hard science."  There was no evidence of a valid

scientific theory to support his conclusions.  The factual basis for his opinions was insufficient

because he did not know the nature of the sealing on the refrigerator compressor and he was speculating about the effect of weather and air currents which may have affected the movement and concentration of the gasoline vapors.

With regard to the use of the phrase "consistent with," DeHaan's testimony about the injuries received by Appellant being related to the ignition of the fire is speculative and does not aid the jury in determining the likelihood that Appellant in fact ignited the fire.

The prejudicial value of these opinions substantially outweighs any probative value.

Dr. DeHaan based his opinions, in part, on looking at clothes taken from Holiday, photographs of injuries he received, and statements made by Beverly Mitchell. The evidence shows that Beverly Mitchell poured gasoline through certain portions of the home.  She was watching Holiday at the time the fire started.  She did not see Holiday do anything to start the fire.  Mitchell's recollection at the time of trial was that she saw Holiday bend over at the time the fire started.  There were pilot lights and electrical switches in the house that may have been sources of ignition.  Dr. DeHaan testified that the pilot lights and various electrical switches could not be the source of ignition, therefore, someone must have lit the fire.  Dr. DeHaan testified that the proper mixture of gasoline vapors and oxygen could not have reached the pilot lights and electrical switches to allow them to have ignited the fire.  RR 36, pp. 147–183.

DeHaan relied on the description and observations of the burns received by Holiday during the fire—the location, distribution and severity of the burns. He admitted that an examination of the burn evidence would not show whether the burn was caused by radiated, convected or conducted heat. He admitted that the burn pattern could have been caused in a relatively short time period or over a longer period and through a series of events during the fire. RR 36, p. 108.

In excluding the refrigerator as a source, he relied on prior experience with other refrigerators. He did not consult with a manufacturer representative to get information about the particular model in question. RR 36, p. 109. He was told by a David Reiter that the compressor unit was sealed but the nature of the seal was not offered. RR 36, pp. 110–112. On further examination he conceded that the type of seal on the compressor would not prevent it from being a source of ignition. RR 36, p. 113.

Part of his conclusion is based on the likely path traversed by the gasoline vapors after being poured and prior to ignition. RR 36, p. 116. Weather conditions could affect the pattern of spread. RR 36, p. 116. A ceiling fan can affect how the vapors were spread. RR 36, p. 117.

He could not find any evidence that Holiday's scalp hair or facial hair was singed. By contrast, he simply assumed that there was some singeing as part of the ignition process. RR 36, p. 119. There was no evidence that making this assumption was an acceptable practice in his field of expertise. RR 36, p. 120.

He testified that if Holiday were to have ignited the fire, there would be a brief flash of flame that would have singed the hair if it were nearby, and is his explanation of the burns received by Holiday on the underside of his right arm, the outside of his right hand and the underside of his chin.

When he uses the phrase "consistent with," he means that he has several possible explanations but is unable to say which one is more likely.  RR 36, p. 128.

The injuries that Holiday suffered are in his opinion "consistent with" but not "indicative" of the State's theory that Holiday bent down to start the fire. RR 36, p. 129.

Although gasoline vapors tend to go down due to gravity, they may go back up depending on the movement of air.  RR 36, p. 130.

Other materials such as sheer fabrics or loose paper could be ignited by the heat from the initial flash. RR 36, p. 132.

Argument and Authorities

Despite the complexity of DeHaan's testimony, the error of its admission is simple and straightforward.  He offered two opinions that were harmful to Holiday's position and helpful to the State:

64

(1)   The pilot lights and electrical switches in the appliances could not have ignited the fire; and

(2)   The injuries suffered on Holiday's hand, arm and chin were consistent with bending over to start the fire.

Expert testimony should not be admitted over objection unless it is helpful to the jury and is scientifically reliable.  *Kelly v. State*, 824 S.W.2d 568, 569 (Tex. Crim. App. 1992).

In Dr. DeHaan's opinion, an ignitible concentration of gasoline vapors would not have reached the pilot light or the electrical switches in the time period required to start the fire.  No evidence was offered relating to the rate of diffusion of gasoline vapors in the atmosphere.  DeHaan conceded that many indeterminable factors, such as weather, air conditioners and ceiling fans, might affect the spread of those vapors.  RR 36, pp. 116–118.

The State did not offer any scientific formula, rule or law that would prevent gasoline vapors from reaching the possible ignition sources in an ignitible concentration of gasoline and oxygen. This is an area of hard science, in contrast to the so-called soft social sciences.  Yet, Dr. DeHaan tended to rely on his unscientific skills of observation and memory to characterize the phenomena he was studying.

The State, rather than offering scientific evidence, chose to rely on DeHaan's preeminence in the field and the certitude of his opinion to convince the court of its reliability.  Dr. DeHaan did

65

not try to recreate the factors involved in this fire by modeling.  He did not rely on any known scientific principles that relate to the diffusion of gasoline molecules in a room to determine what possible concentrations might exist at any location in that room.

As was apparent to the manufacturers of the air conditioner, the refrigerator and the range, such appliances should not be used where gasoline vapors are present.  No one, not even the preeminent Dr. DeHaan, can safely predict that an ignitible concentration will not be present.

The State has the burden to establish the reliability of the science, the techniques and its application to justify its admission by clear and convincing evidence.

*Mata v. State*, 46 S.W.3d 902, 905 (Tex. Crim. App.  2001).

It is clear that the State did not even attempt to meet that standard.  Regularly when counsel attempted to inquire as the techniques and principles applied by DeHaan, the State objected that such should not be allowed at the Daubert hearing but should be reserved for cross examination before the jury.  Often enough, the trial court agreed.  The State merely established that DeHaan was well recognized and traveled as a witness who gave opinions as to the cause and origins of fires. Assuming arguendo that Dr. DeHaan is an expert does not render his opinions admissible.  There must be a reliable scientific basis in the record for the opinion.

His opinion that the burns suffered by Holiday "were consistent" with bending down and igniting the fire was neither scientifically sound nor helpful to the jury. Those injuries were merely indicative that Holiday was near a source of heat sufficient to cause the injuries.

The use, or misuse, of the phrase "consistent with" is misleading and unhelpful to the jury and, in fact, would mislead the jury. This is the type of testimony that illustrates the "danger" of expert testimony, which is the basis of requiring a trial court to exercise its gate keeping function. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995).

The opinion of an expert may receive excessive credence from a jury, in part because the science may be difficult to understand or because of the perceived expertise of the witness. This opinion testimony about the injuries of Holiday does not properly guide the jury.

The phrase "consistent with" erroneously implies to the jury that the scenario described by the expert is likely to have occurred. Dr. DeHaan's testimony was most likely received by the jury as evidence that "science" shows that Holiday bent down to start the fire.

To the extent that the jurors accurately perceived the honest intent of the evidence, that Holiday hand, arm and chin were burned and at some point those parts of his anatomy were near a source of heat sufficient to cause the injuries, then such testimony is not helpful at all. There was no dispute that Holiday was inside a burning house in a room filled with gasoline vapors that suddenly ignited. His injuries could have been caused any number of ways, none of which were

67

more likely than another.  The trial court abused its discretion in allowing this testimony by Dr. DeHaan.

**Claim 10:   The State trial court violated the Due Process Clause of the Fourteenth Amendment when it permitted evidence that Holiday committed the extraneous offense of raping of Tierra Lynch.**

**Exhaustion:**  Presented to CCA as points of error number 23, 24, 25, 26 and 27 in direct appeal brief, on page 73-74 of the brief.  The claim was timely presented to the trial court which denied relief.  RR 32, pp. 52–53; RR 32, p. 27; RR 32, pp. 189–215.

The prosecution, during its opening argument, suggested its intent to prove that Holiday had raped Tierra Lynch and had been indicted for raping Tierra Lynch prior to the killing of the children. RR 32, p. 27.  Tami Wilkerson testified that on Friday, March 5, 2000, Tierra stayed home from school because she was ill.  Wilkerson went to work and Appellant was at home with Tierra.  When she returned home that night, she found Tierra's panties in the dirty clothes pile with blood on them.

The prosecution offered expert testimony as to the nature of Tierra's injuries that indicated sexual assault and the child's statement to a nurse indicating that Appellant was alone with her when the injuries occurred.  RR 32, p. 204.

In an attempt to avoid substantial prejudice of the detailed evidence of the extraneous offense, Holiday offered to stipulate that Holiday had been accused of sexually assaulting Tierra Lynch. Holiday objected to this evidence out of the presence of the jury.  The trial court overruled.

 Argument and Authorities

68

Evidence of extraneous offenses is inherently prejudicial. *Montgomery v. Texas*, 810 S.W.2d 372 (Tex. Crim. App. 1991). The trial court must exercise discretion and balance the prejudicial effect against the probative value of such evidence.

Here the State offered this evidence to show the motive of Holiday to kill Tierra Lynch. An examination of the record shows that Holiday, although objecting to the admission of such testimony, did not contest the allegation.

Here the State was improperly allowed to offer evidence that focused the jury's attention on an issue that they did not need to resolve. The State established motive merely by offering evidence that Tami was accusing Holiday of sexually assaulting the child.

To avoid hearing evidence of the details of the injury Holiday offered to stipulate that the child suffered penetrating injuries that could have resulted from a sexual assault. RR 32, p. 119; RR 32, p. 188.

To avoid the prejudicial details, Holiday offered to stipulate that he had been accused of the sexual assault of the child and indicated to the trial court that he did not intend to contest the extraneous offense in the presence of the jury. RR 32, pp. 52–53.

By offering detailed evidence that tended to show that Holiday committed the offense of sexual assault of Tierra Lynch, the State went far beyond establishing motive.  The effect of that proof was prejudicial to a substantial degree which outweighed its probative value.

If the evidence is admissible at all, it could have come in by stipulation to which Holiday had offered.  By allowing the evidence of extensive details and by not requiring the State to accept Holiday's offer of stipulation, Holiday was denied due process of law as guaranteed by the V and XIV Amendments of the United States Constitution.  *Old Chief v. United States*, 519 U.S. 172 (U.S. 1997); *Robles v. State*, 85 S.W.3d 211 (Tex. Crim. App. 2002); *Elkins v. State*, 647 S.W.2d 663 (Tex. Crim. App. 1983).

**Claim 11:       The State violated the Due Process Clause of the Fourteenth Amendment by refusing to instruct jurors on the law of parties.**

**Exhaustion:**  Presented to CCA as point of error number 28 in direct appeal brief, on page 79-80 of the brief.  The claim was timely presented to the trial court which denied relief.  RR 41, p. 16, 18; CR 573-590.

The trial court submitted three separate charges, one for each cause.  The instructions did not include any instruction concerning the law of parties.  Holiday objected to the failure to so instruct the jury.  The failure to instruct the jury on the law of parties left the jury unguided with regard to the factual theory relied upon by the State that Holiday was responsible for the burning deaths of the children caused by another, Beverly Mitchell.

70

Argument and Authorities

Under some circumstances a person may be criminally responsible for the conduct or results caused by another.  Sec. 7.02, Texas Penal Code.

Here the State relied upon a factual theory that Beverly Mitchell poured gasoline through the house while three children sat on a couch.  The State contended either that Holiday ignited the gasoline or that the gasoline was ignited by spark or pilot light before anyone could cause the ignition.

In opening argument the prosecuted contended:

[T]hat the three children:  Tierra, Jasmine and Justice were sitting on the couch huddled together. That he (Holiday) forced her (Beverly Mitchell) to place one can of gasoline down in the kitchen area and take the other can of gasoline and start pouring it out in the house.

RR 32, p. 36.

Ms. Mitchell describes pouring the gasoline in her testimony.  RR 33, pp. 97–100.

The prosecution's final argument included this basis for a conviction:

[I]f for some reason you didn't think that the defendant lit the fire here you could still convict him of capital murder if you concluded that his intent was to kill those kids.  And that but for him having Beverly pour gasoline throughout that house they never would have died this night.

RR 41, pp. 53–54.

The charges did not include any instruction concerning criminal responsibility for the conduct of another.  Holiday properly objected.

Specifically, with regard to Cause No. 10,423 ... With regard to number six, which is the application of the law to the facts paragraph ... We would request that that instruction include a specific application of the law to the facts concerning the principal of law of criminal responsibility for the conduct of another.  We believe that that is raised by the evidence of the conduct of Beverly Mitchell.

RR 41, pp. 15–16.

With regard to the next two cause numbers ... 10,425 and 10,427 ... With regard to paragraph number six in both of these causes ... We believe that that does not properly instruct the jury as to the legal principles of criminal responsibility for the conduct of another.

RR 41, p. 17.

72

It is reversible error "where the State's case relied upon the law of parties for conviction and, in light of a proper objection, the trial court failed to apply the law of parties to the facts." *Scott v. State*, 768 S.W.2d 308, 310 (Tex. Crim. App. 1989).

The failure to properly instruct the jury on the principles of criminal responsibility for the conduct of another is compounded by the inclusion of a paragraph concerning causation. Sec. 6.04, Texas Penal Code. Prior to the application of facts paragraph, the jury was instructed:

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.

CR 4, 574, 580, 586.

Appellant timely objected to the inclusion of this paragraph in each charge. Taken together with the absence of a proper instruction on criminal responsibility for the conduct of another, a jury may well have been led to believe that Holiday was guilty of capital murder if the deaths would not have resulted but for his conduct.

The jury was never told by the court that in order to convict Holiday of capital murder by causing gasoline to be poured in a home occupied by three children, they must believe beyond a reasonable

73

doubt that Holiday either intended to kill the children or was aware that such conduct was reasonably certain to result in the killings.

Nothing in the charge guides the jury as to the proper consideration of what circumstances must be found before they can conclude that Holiday is criminally responsible for the conduct of Beverly Mitchell.

The failure to give the required instruction is compounded by the instruction concerning causation. In each charge the trial court instructed the jury on the law of causation.

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.

CR 4, pp. 574, 580, 586.

Holiday objected to this instruction.   No application of the facts was made concerning this instruction.

This paragraph in the charge was the only instruction to the jury that allowed them to consider the acts of Beverly Mitchell in determining Holiday's culpability.  Such an instruction is misleading and lowers the burden of proof required of the State.  The failure to properly instruct on the law of parties

74

allows the jury to convict without regard to his intent.  This charge error violates Holida's right to

the protection of Due Process of Law as guaranteed by the V and XIV Amendments of the United

States Constitution.

**Claim 12:   The State violated the Due Process Clause of the Fourteenth Amendment by refusing to instruct jurors on the law of parties.**

**Exhaustion:**  Presented to CCA as point of error number 28 in direct appeal brief, on page

79-80 of the brief.  The CCA denied relief on the merits.  The claim was timely presented to the trial

court which denied relief.  RR 41, p. 16, 18; CR 573-590.

During closing argument the prosecution made the following statements to the jury:

For instance if I was charged with murder and the evidence showed that I shot someone in the head three times, but at my trial I got up and testified, well— RR 41, p. 25.

 Now, I want to talk to you a little bit just about what is not in dispute in this trial.  What we believe based on the evidence is not in dispute at this trial.  RR 41, p. 29.

I don't think there is any dispute that the defendant is involved in this case.  RR 41, p. 29.

There is no dispute that there were three children killed here which means two or more people— RR 41, p. 30.

We also know that when he was outside with Terry and Beverly and the kids and he was ranting and raving and shooting off the gun and burning things on the ground and lighting fires and scaring everyone half to death, that what he said as the reason he was out there was I'm not going to take the rap on these rape charges.  I'm not going to do it.  I'm going to take care of it tonight.  I'm going to burn the house down with everyone in it.  That's what he said. Those statements have not been refuted and there has been no attempt— RR 41, p. 36-37.

Holiday elected not to testify during the trial.

The State's expert criminalist, Dr. DeHaan, told the jury that he relied on Holiday's statement to assist in forming his expert opinion that the appliances were excluded as potential ignition sources of the fire.   The jury was instructed to disregard but Appellant's motion for mistrial was denied.  RR 36, p. 166.

Argument and Authorities

It is improper for the prosecution to make any comment on Holiday decision not to testify.  *Owen v. State*, 656 S.W.2d 458 (Tex. Crim. App. 1983). Such comment violates Holiday's protection against compulsory self-incrimination as guaranteed by the V Amendment of the United States Constitution.

Prosecutorial comment that refers to an accused's failure to testify violates the accused's Fifth Amendment right against compelled self-incrimination."  *Canales v. State*, 98 S.W.3d 690 (Tex. Crim. App.  2003).

Here the prosecutor made five different references indicating to the jury that Holiday did not testify. On each occasion the trial court properly sustained Holiday objection.  On each occasion the trial court instructed the jury to disregard the comment.  On each occasion the trial court denied the motion for mistrial.

Although usually an instruction to disregard is sufficient, the fact that the prosecution ignored the trial court's ruling and persisted in the argument, the fact that it was repeated five times, and the fact that the last comment was the worst of the series of statements, shows that the trial court's instructions to disregard were insufficient.   The cumulative affect of the repeated comments on failure to testify rendered the comments extreme and manifestly improper and thus not curable by an instruction.

The fifth and final comment by the prosecutor standing alone could not be cured by any instruction.  Here the prosecutor referred to the testimony of Beverly Mitchell and Terry Keller. Both witnesses testified that Holiday made statements at the scene indicating he was going to burn down the house and kill everyone.  This testimony is critically important because it directly relates to the issue of intent.  To argue as the prosecutor did that such testimony was not refuted is clearly directed at Holiday's failure to testify.  Such comment was clearly harmful.

Beverly Mitchell's testimony was impeached by her prior testimony indicating that Holiday never stated he was going to burn the house or kill anyone.  RR 38, pp. 186–188.

The only witness who could have possibly refuted the testimony of Mitchell and Keller would have been Holiday.  The prosecutor's arguments that these statements "have not been refuted" is a direct comment on failure to testify.  There is no other interpretation.  The comment directs to the most critical issue of the case, intent.  The comment is manifestly improper because it came after four previous such comments had been the subject of objections, rulings and instructions.  The

harmful impact of this argument is compounded by the exposure of the jury to the improper testimony of Dr. DeHaan that he reached his opinions after reading Appellant's out-of-court statement, falsely suggesting to the jury that Holiday admitted starting the fire.

The record meets the standard required for a finding of error, harm and reversal.  The evidence and circumstances of the offense do not clearly indicate Appellant's guilt of capital murder. As to motive, there was ample evidence that Appellant loved the children and cared for them. Beverly Mitchell and Tami Wilkerson both testified that at the time they did not believe that Appellant planned to hurt the children.  The evidence was conflicting as to the ignition of the fire. Appellant's fire cause and origin expert concluded that the fire started by either an electrical appliance spark or a pilot light coming in contact with gasoline vapors.  Two of the State's experts could not exclude this accidental source of ignition.

The prosecutor's comment is not a mere indirect implication or allusion to Holiday failure to testify.  *Cf.  McKay v. State*, 707 S.W.2d 23 (Tex. Crim. App. 1985).

Nonetheless, if this Court concludes that the comments of the prosecutor do not constitute a direct comment on Appellant's decision not to testify, Holiday would urge this Court to adopt the rule of the state of Alabama as pronounced in *Beecher v. State*, 294 Ala 674 , 320 So. 2d 727(Ala. Crim. App. 1975).

In *Beecher* the prosecutor summarized the damning evidence and argued:

"No one took the stand to deny it."

The Supreme Court of Alabama concluded:

A defendant's right not to testify must be preserved inviolate. But where the case presented by the prosecutor stands uncontradicted, should he not be allowed to comment on that fact to the jury in a situation where the defendant has not testified, offered no other evidence, nor elicited contradictions in the case of the State by cross-examination of witnesses for the State.

. . .

[W]e hold today that where there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of defendant to testify § 6 (the right against self-incrimination) is violated.

Beecher, id., at 734.

**Claim 13:** **The State trial court violated the Due Process Clause of the Fourteenth Amendment by permitting a State expert, Dr. Edward Gripon, to testify that Holiday would likely commit future acts of violence.**

**Exhaustion:**  Presented to CCA as point of error number 31 in direct appeal brief, on pages 91-92 of the brief.  The claim was timely presented to the trial court which denied relief.   RR 44, pp. 3–110.

> **Claim 14:**      **The State trial court violated the Cruel and Unusual Punishment Clause of the Eighth Amendment by permitting a State expert, Dr. Edward Gripon, to testify that Holiday would likely commit future acts of violence.**

**Exhaustion:**  Presented to CCA as point of error number 31 in direct appeal brief, on pages 91-92 of the brief.  The claim was timely presented to the trial court which denied relief.   RR 44, pp. 3–110.

Dr. Gripon is a psychiatrist with substantial experience in general and forensic psychiatry.  He has testified on numerous occasions on areas relating to forensic psychiatry.  He was asked to form an opinion with regard to the issue of future danger in this case.  RR 44, p. 12.  He knew of three basic techniques used by psychiatrists to form such opinions: the clinical, the demographic and the actuarial.  He uses the first two methods.  In forming his opinion about Appellant he reviewed offense reports, school records, medical records, historical information as to prior allegations and the psychological testing and testimony of the defense expert, Dr. Fason.  He did not conduct a clinical interview of Appellant.   He knew of no study that would show the potential error rate in the techniques he used.  RR 44, p. 20.  He has not performed any research to determine if his methodology is accurate. RR 44, p. 23.  There is no accepted term to describe the methodology he used, but he had no problem accepting the label of "clinical slash demographic."  With regard to the clinical aspect of his approach he looks for information related to Axis One and Two for mental

health issues.  With regard to the demographic part, "that takes into account other factors: educational level, family support system, any number of factors." From his knowledge, others in the field of forensic psychiatry each have a different set of factors that they consider to predict future danger.  RR 44, p. 28.

He had never counted the demographic factors he uses.  When asked he indicated he used the demographic factors of age and education.  The primary factor being age.  He was unable to identify any other demographic factor that he used.  RR 44, pp. 28–30.

He indicated that he considered and used actuarial factors.  He recognizes that studies in this field indicated that most people are not a future danger and he knows of no actuarial study that would indicate that Appellant was a future danger.  RR 44, pp. 30–31.

He does not know if any of his predictions are accurate.  RR 44, p. 34.   He believes it is impossible to do any kind of study that will either validate or invalidate the issue (determining the reliability of the prediction of future danger).  He believes there is no consensus as to the reliability of such predictions.  RR 44, p. 35.

In the field of psychiatry there is no diagnosis of future danger.  The DSM–4 "doesn't give you a diagnosis of future dangerousness and it doesn't give you certainty as to prediction."  RR 44, p. 37.

81

The focus of a psychiatric training is on the diagnosis and treatment of mental illness.   RR 44, p. 38.   Future danger is not a mental illness.

There is no consensus in the field as to what methodology should be used to predict future danger.   RR 44, p. 42.   The doctor is generally aware that various groups advocate various methods but he is not aware of who they are and what they require to make predictions of future danger.   RR 44, p. 44.

He is familiar with one other person that uses a methodology similar to his in making such predictions, Richard Countz, a lawyer and psychiatrist.   RR 44, p. 45.

Appellant called Dr. Fred Fason, a noted forensic psychiatrist.   He listened to Dr. Gripon's testimony and explained in detail the deficiencies of the methodology used by Dr. Gripon.   He concluded that Dr. Gripon's opinion as to future danger was not scientifically sound or reliable.   RR 44, pp. 46–51.

Summary of the Argument

Dr. Gripon did not have adequate training to make a reliable  prediction of future danger. The witness did not use a valid scientific technique or theory that had been accepted as valid by the relevant scientific community.   There is no identified potential error rate to the technique and theory used by Dr. Gripon.   His technique is not generally accepted in the community of psychiatrists.   He

82

had an insufficient factual basis for his opinion. The prejudicial value of his testimony would substantially outweigh any probative value thereof.

Argument and Authorities

This court has previously allowed psychiatrists to testify about their opinions as to future danger. Nonetheless the proponent of such testimony must still establish the expertise of the witness and that it will be helpful to the jury.

> [P]sychiatric testimony during the punishment phase of a capital case is admissible, and the burden lies with the proponent of such testimony to show that it will assist the fact-finder and that the witness possesses the requisite expertise required by TEX.R.CRIM.EVID. 702. ... The special knowledge which qualifies a witness to give an expert opinion may be derived from the study of technical works, specialized education, practical experience, or a combination thereof; and such should indicate to the trial court that the witness possesses knowledge which will assist the jury in making inferences regarding fact issues more effectively than the jury could do so unaided by such opinion.

*Clark v. State*, 881 S.W.2d 682, 698 (Tex. Crim. App. 1994).

Generally, psychiatric testimony falls into the area of soft science.

When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method, Kelly's requirement of reliability applies but with less rigor than to the hard sciences. To speak of the validity of a "theory" or "technique" in these fields may be roughly accurate but somewhat misleading. The appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. These questions are merely an appropriately tailored translation of the Kelly test to areas outside of hard science. And, hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences.

*Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998.).

This Court did not rule out requiring some assessment of peer review, potential error rate, or other methods of validating the traditional hard sciences.

The expert proffered by the State in this case does not have the qualifications of the expert examined in Nenno. He did not study solved cases to understand the dynamics of what had occurred. He did not study in excess of a thousand cases that concerned the issue of future dangerousness. He conducted no research at all on the issue.

Unique to this case, Dr. Gripon did not know the details of the methodology used by others in making such predictions.  His methodology created a great risk of unreliability.  His reliance on demographic factors is particularly troubling.  He could articulate only two factors that he considered, age and education.  The proponent of the testimony did not offer any explanation or theory as to how age and education were appropriate factors to consider in making such predictions. Dr. Gripon said other experts used other demographic factors but he did not know what factors they used.  Thus, it was impossible to determine whether this "expert properly applied the principles of the field."

It is clear that the trial judge abused his discretion in admitting such testimony.  It was literally conceded in the dialogue with the trial  court that the trial court did not believe  that Dr. Gripon's  opinion was  accurate or reliable but that the jury should nonetheless be allowed to consider it.

THE COURT: He basically says that – I don't know what his words were, but he's not guaranteeing that he's correct.

. . .

THE COURT: Or reliable.  He's saying this is what he thinks, this is his opinion.

. . .

85

THE COURT: Whether or not he can predict doesn't help me one bit.

RR 44, pp. 40–41.

Psychiatry is not novel science.  Predicting future danger is junk science.  The record in this case is clear on that.  As Dr. Gripon stated:

There are different methodologies and all of them are criticized by the various individuals using one or another.  There is no consensus of opinion as to specifically what should be done.  If there was we would all be doing it I would assume.

RR 44, p. 42.

Assuming arguendo that predicting future danger is not junk science or novel science, expert testimony in this regard is still not admissible unless the science is properly applied and the proponent must establish that predicate by clear and convincing evidence.  *State v. Medrano*, 127 S.W.3d 781 (Tex. Crim. App. 2004).

At the preliminary hearing, the State did not even attempt to establish that the science was properly applied in this case.  The State did not offer the factual basis of Dr. Gripon's opinion and did not ask him what methodologies were available to predict future danger.  The discussion of the three

"models" came in incidentally in response to the State's question:  "Did you use the valid underlying scientific theories that we have discussed?"   RR 44, p. 12.

At that point only the basic science of psychiatry had been discussed.

Outside the presence of the jury, after the preliminary hearing, Appellant properly objected to the admission of Dr. Gripon's testimony concerning his opinion that Appellant would be a person likely to commit criminal acts of violence in the future.  The trial court abused its discretion in overruling that objection.  The State did not prove by clear and convincing evidence that the science was valid and reliable.  To the extent any such science existed, the State did not show that there was an adequate factual basis for the doctor's opinion, or that the techniques of the science were properly applied.  Further, the opinion of the doctor was not helpful to the jury and its prejudicial effect substantially outweighed its probative value.   The failure to exclude this testimony violates Appellant's right to due process of law as guaranteed by the V and XIV Amendments of the United States Constitution and the protection against cruel and unusual punishment as guaranteed by the VIII Amendment to the United States Constitution.

**Claim 15:    The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert testimony of Carroll Pickett to explain how the death penalty would be administered against Holiday if ordered.**

**Exhaustion:**  Presented to CCA as point of error number 32 in direct appeal brief.  The claim was timely presented to the trial court which denied relief.  RR 43, pp. 94–113.

**Claim 16: The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert testimony of Carroll Pickett of the effect that administration of the death penalty would have on prison employees required to carry out the execution of Holiday.**

**Exhaustion:**  Presented to CCA as point of error number 33 in direct appeal brief.  The claim was timely presented to the trial court which denied relief.  RR 43, pp. 94–113.

**Claim 17:        The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert testimony of Carroll Pickett to concerning the effect of the death penalty on the survivors of the victim.**

**Exhaustion:**  Presented to CCA as point of error number 34 in direct appeal brief.  The claim was timely presented to the trial court which denied relief.  RR 43, pp. 94–113.

**Claim 18:        The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert testimony of Carroll Pickett to explain how inmates permitted to serve life sentences often make positive changes in their lives.**

**Exhaustion:**  Presented to CCA as point of error number 35 in direct appeal brief.  The claim was timely presented to the trial court which denied relief.  RR 43, pp. 94–113.

At the punishment phase of the trial, Appellant offered the testimony of Carroll Pickett. Pickett had a Doctorate Degree including a Doctorate in Clinical Pastoral Education. He served as a minister of several different churches in Texas. After thirteen years at First Presbyterian Church in Huntsville, he became a chaplain to the inmates at the Walls Unit of the Texas Department of Corrections. He served there for fifteen years ministering to the inmates regularly housed there and psychiatric patients transferred from other units and problem cases transferred from other units. During that time he also served as president of the local school board and the Huntsville Drug and Alcohol Abuse Program.

He developed an awareness and understanding of the operations of the prison system at his unit including how the death penalty was administered. He acted as the Warden's representative to the inmates at the death house in the hours leading up to the executions. RR. 42, pp. 94–99.

Appellant attempted to offer testimony from Reverend Pickett of the events related to an execution: (1) that the inmates would enter the death house shackled and chained; (2) they would be totally stripped and searched; (3) the inmate would be assisted to prepare his last statement; (4) the inmate would be assisted in designating the disposition of his body; (5) he would lead the inmate, followed by four or five guards to the death chamber; (6) the inmate would take the eight steps into the chamber and climb on to the table; (7) nine straps would be placed across his body, by the tie down team; (8) the warden would ask if he was in any discomfort and make any adjustment to clothing or straps to suit the inmate; (9) the needles would be inserted; (10) sometimes it would be difficult for the medical technicians to insert the needles; (11) everyone would leave the chamber except the

89

inmate and the Reverend; (12) witnesses would be brought into the viewing area; (13) the inmate

would be allowed to make his last statement; (14) Rev. Pickett would keep his hand on the inmate's

right leg, they wanted to feel that someone was with them at the time of death; (15) the Warden

would signal and the two executioners would allow the lethal chemical to flow; (16) the Warden

would wait a few minutes and then call in a doctor; and (17) the doctor would enter, examine the

body and announce the time of death.  RR 42, pp. 101–107.


Appellant attempted to offer Pickett's testimony concerning the effects on the guards who had to

carry out the executions:  (1) some became nauseated or sick and had to be replaced; (2) some would

quit; (3) one guard became very ill and began visualizing the faces of every inmate he had strapped

down for execution; (4) the guards had difficulty working the next day; and (5) "You just don't watch

people die and just say let it go because these were people."  RR 42, pp. 108–109.


Appellant attempted to offer Pickett's testimony concerning the effects on the victims of the family

that some of them felt that it did not bring closure or that it did any good at all.  RR 42, pp. 109–110.


Appellant attempted to offer Pickett's testimony that he had seen many inmates change their lives

after lengthy incarcerations—they adjust to incarceration, they develop positive relationships,

positive views toward law enforcement, they follow the law, they come in real outlaws and many

of them go out as good members of the community.  RR 42, pp. 112–115.


Argument and Authorities

90

Appellant is allowed to present any evidence that might justify the imposition of life rather than death.  Mitigation is open ended inquiry.

Because the consideration and weighing of mitigating evidence is an open-ended, subjective determination engaged in by each individual juror, we conclude that Article 37.071 §§ 2(f)(4) does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness...

Raby, supra, at 9.

Evidence that does not necessarily relate to Appellant's personal moral blameworthiness is still admissible if it is mitigating in the sense that might serve as a basis for a sentence less than death. *Skipper v. South Carolina*, 476 U.S. 1 (U.S. 1986).

Pickett's testimony concerning how inmates change after lengthy incarcerations is generally mitigating and is directly relevant to the question of future danger.  To exclude such evidence violates Appellant's rights under the VIII and XIV Amendments, denying him Due Process of Law and his protection against cruel and unusual punishment.  The State made no objection or challenge to Rev. Pickett as an expert on the effects of lengthy incarceration.   See:  *Matson v. State*, 819 S.W.2d 839 (Tex. Crim. App. 1991).

91

This Court has held that victim impact evidence is relevant to the issue of mitigation and "that victim impact evidence ?of which a defendant is aware at the time he commits the crime is relevant'" to the issue of future dangerousness. *Jackson v. State*, 33 S.W.3d 828, 833 (Tex. Crim. App. 2000), citing Mosley v. State, 983 S.W.2d 246, 263.

Pickett's testimony concerning the administration of the death penalty and its affect on the guards and the victim's survivors is equally relevant and is mitigating. To exclude such evidence violates Appellant's rights under the VIII and XIV Amendments denying him Due Process of Law and his protection against cruel and unusual punishment.

Claim 19:   The State court violated the Due Process Clause of the Fourteenth Amendment by restricting Holiday's cross-examination of Beverly Mitchell at the punishment phase of trial.

**Exhaustion:** Presented to CCA as point of error number 36 in direct appeal brief. The CCA denied relief on the merits on page 80 of its opinion. The claim was timely presented to the trial court which denied relief. RR 42, pp. 143–146.

**Claim 20:**      **The State court violated the Cruel and Unusual Punishment Clause of the Eighth Amendment by restricting Holiday's cross-examination of Beverly Mitchell at the punishment phase of trial.**

**Exhaustion:** Presented to CCA as point of error number 36 in direct appeal brief. The CCA denied relief on the merits on page 80 of its opinion. The claim was timely presented to the trial court which denied relief. RR 42, pp. 143–146.

**Claim 21:** **The State court violated *Franklin v. Lynaugh*, 487 U.S. 164, 173 (U.S. 1988), by restricting Holiday's cross-examination of Beverly Mitchell at the punishment phase of trial.**

**Exhaustion:** Presented to CCA as point of error number 36 in direct appeal brief. The CCA denied relief on the merits on page 80 of its opinion. The claim was timely presented to the trial court which denied relief. RR 42, pp. 143–146.

Statement of Facts

At the first stage of the trial Beverly Mitchell testified that she watched Holiday bend down just as the fire started. On cross examination she was impeached with her prior statements and testimony that indicated she did not see Holiday do anything to start the fire and did not mention observing Holiday bending down at the moment the fire started. During final summation the prosecutor tried to explain this apparent contradiction.

The defense had gone to great lengths to make you think that her testimony from January to today is inconsistent. Well, you heard Judd Clayton testify. You heard him say that he reviewed the testimony of Beverly Mitchell from the January pre-trial hearing. And you also heard him say that in his review of that testimony he couldn't find one place where she was asked whether or not she saw him bend down. She was asked by the defense whether or not she saw him light the fire. We

93

have never claimed that she said she saw him light the fire.  She never said she saw him light the fire. Its not inconsistent. The question was not asked before.

RR 41, p. 114.

At the punishment phase of the trial, Holiday attempted to cross examine Beverly Mitchell further, to put before the jury all the relevant questions put to Ms. Mitchell at the January hearing.

Further, Holiday attempted to ask Ms. Mitchell if at the pre-trial hearing was she was asked:  "What was he (Appellant) doing immediately prior to the fire starting?"  Holiday wanted to establish that her answer at the pre-trial hearing to that question was as follows:  "He had his foot propped up on the high chair and he said something, I don't remember what it was."  Holiday attempted to ask Ms. Mitchell if the line of questioning was put in the full context.  Holiday attempted to ask Ms. Mitchell if someone at the pre-trial hearing had asked her if Holiday was bending down immediately prior to the start of the fire she would have testified that Holiday was bending down.  Ms. Mitchell indicated that she did not recall.   RR 42, p. 144–146.

Summary of the Argument

Holiday is entitled to present evidence relevant to the punishment issues.  Holiday should have been allowed to cross exam Beverly Mitchell about her testimony that Holiday bent down at the time the fire started.

94

Argument and Authorities

The jury may not be precluded from considering as mitigating the circumstances of the offense.  See: *Franklin v. Lynaugh*, 487 U.S. 164, 173 (U.S.  1988).

It is a circumstance of the offense that Appellant did not bend down at the start of the fire, but that the fire started because the pilot light ignited the gasoline vapors.  The charge to the jury at the guilt phase allowed the jury to convict Appellant of capital murder even if the pilot light ignited the vapors.  As the prosecutor explained the instruction of the law of causation "But what that means is even if for some reason you didn't think that the defendant lit the fire here you could still convict him of capital murder ...."  RR 41, p. 53.

Appellant was not attempting to merely raise residual doubt of Appellant's guilt. *Cf. Blue v. State*, 125 S.W.3d 491 (Tex. Crim. App. 2003).

If Appellant bent down and ignited the vapors that might be an aggravating circumstance.  If he did not bend down and the fire was ignited by an alternative source, that would clearly be mitigating.

Holiday attempted to offer evidence that rebutted the prosecutor's claim that the only reason Mitchell did not mention prior to trial her recollection that Holiday bent over was that no one asked.  The prosecutor argued that her prior testimony taken in proper context was not inconsistent with her testimony at trial.  The State left an arguably false impression with the jury that Holiday was entitled

95

to dispel.  The evidence proffered by Holiday would show that Beverly Mitchell was extensively

questioned at a pre-trial hearing and that her answers taken in context were inconsistent with her

testimony at trial.  If allowed to hear that testimony, at least one juror may have concluded that

Holiday did not bend over and ignite the fire and, therefore, a sentence of less than death should have

been imposed.

The failure to allow this evidence violates Holiday's right to Due Process of Law and against Cruel

and Unusual Punishment as provided by the VIII and XIV Amendments of the United States

Constitution.

> **Claim 23:**     **Texas Code of Criminal Procedure article 37.071 violates the Cruel and
> Unusual Punishment Eighth Amendment because it impermissibly
> restricts mitigating evidence to merely that evidence which the jurors
> might regard as reducing moral blameworthiness.**

**Exhaustion:**  Presented to CCA as point of error number 38 in direct appeal brief, on pages

109-11.  The claim was timely presented to the trial court which denied relief.  _____.

Holiday filed a pretrial motion claiming that Article 37.071 was unconstitutional because it limited

mitigating evidence to only that evidence which the "jury might regard as reducing the defendant's

moral blameworthiness."

Summary of the Argument

Article 37.071 Section 2(f)(4) V.A.C.C.P. impermissibly restricts the jury's consideration of mitigating evidence to only that evidence which the jurors believe "might reduce the defendant's moral blameworthiness."  This definition is unconstitutional because it violates the 8th amendment to the United States Constitution and *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

Argument and Authorities

This claim has been made numerous times in this Court—all in vain.  In Lawton v. State, 913 S.W.2d 942 (Tex. Crim. App. 1995), this Court held that the definition was not in "conflict with the United States Constitution" and was even "congruent with" *Eddings, supra*, and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Without doubt, states are prohibited from limiting the jury's consideration of any relevant circumstance that could cause it to decline to impose the death penalty, and must allow the jury to consider any relevant information offered by the defendant.  *McCleskey v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756, 1774 (1986).  The jury must be able to consider and give effect to mitigating evidence so that "the sentence imposed ... reflects a reasoned moral response to the defendant's background, character, and crime."  *Penry v. Johnson*, 121 S.Ct. 1910, 1915-1916; 532 U.S. 782 (U.S. Tex. 2001).  In order "[T]o meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors."  *Lockett, supra*, 2966–2967.  The United States Supreme Court held that North Carolina's sentencing scheme violated the 8th Amendment

97

because it impermissibly limited jurors' consideration of mitigating evidence. *McKoy v. North Carolina*, 110 S.Ct. 1227, 494 U.S. 433 (U.S.N.C.1990).

The definition of mitigating evidence is unconstitutional because it restricts the jury's consideration to only evidence that "reduces moral blameworthiness." The jury can give weight only to the evidence that "reduces moral blameworthiness" and no other in answering the mitigation special issue. This definition precludes consideration of evidence that might weigh against death, but not reduce moral blameworthiness. Surely, this Court will agree that there is evidence which is relevant to mitigation that does not reduce moral blameworthiness.

**Claim 24:   The 12-10 vote rule created by Texas Code of Criminal Procedure article 37.071, section _____ violates the Sixth Amendment.**

**Exhaustion**: Presented to CCA as point of error number 39 in direct appeal brief, on pages 111-14. The CCA denied the claim on page 82-83 of its decision. The claim was timely presented to the trial court which denied relief. CR 1, p. 19.

25.    The 12-10 vote rule created by Texas Code of Criminal Procedure article 37.071, section _____ violates the Eighth Amendment.

Exhaustion: Presented to CCA as point of error number 39 in direct appeal brief, on pages 111-14. The CCA denied the claim on page 82-83 of its decision. The claim was timely presented to the trial court which denied relief. CR 1, p. 19.

**Claim 26:**     **The 12-10 vote rule created by Texas Code of Criminal Procedure article 37.071, section _____ violates the Fourteenth Amendment.**

**Exhaustion:**  Presented to CCA as point of error number 39 in direct appeal brief, on pages 111-14.  The CCA denied the claim on page 82-83 of its decision.  The claim was timely presented to the trial court which denied relief.  CR 1, p. 19.

Holiday filed a pretrial motion claiming that Article 37.071 was unconstitutional because of the "12/10" rule. The trial court overruled his claim.

Summary of the Argument

Article 37.071 V.A.C.C.P., is unconstitutional because the "12-10 rule" creates a sentencing process that violates the 8th Amendment.

Argument and Authorities

This Court has recognized that this complained-of feature of Texas capital sentencing procedure is "uncommonly enigmatic."  *Draughon, supra.*  In fact, the instructions the jurors "receive from the court suggest that a sentence of life imprisonment is not possible unless ten jurors agree to answer one or more special punishment questions in the negative."  Thus, it is conceivable that the jurors "will surmise later instructions requiring ten votes for a negative answer means that a life sentence

99

will not be imposed otherwise." *Id.*  Nonetheless, this Court is satisfied that "no juror would be misled into thinking that an affirmative answer should be given unless ten or more jurors agree to give a negative one."  *Id*. at 338.

Holiday disagrees with *Draughon, id.*  He believes that this "uncommonly enigmatic" "12-10 Rule" created by Article 37.071 produces—though perhaps unwittingly—an unconstitutional chilling effect on the sentencing process. The United States Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *California v. Brown*, 479 U.S. 538, 541 (1985).  The "12-10 Rule" is perceived by reasonable jurors as suggesting that one juror will not be able to determine if a person lives.  This feature of Article 37.071 creates the potential for unwarranted confusion among reasonable jurors.  It diminishes the individualized role of each juror because it suggests—as *Draughon* says—that a life sentence cannot be assessed unless ten jurors vote for life. Thus, this "12-10 Rule" encourages "majority rule" instead of the individual rule; it encourages collective thinking instead of individualized decision-making; it creates the danger that a juror—who might be vote for life—will conform to the "majority rule" because the juror wrongfully believes that his or her individual vote will never result in a life sentence.  In effect, this statute creates the impression that a single holdout is meaningless. The reliability of the decision to impose death is reduced impermissibly when, among other reasons, jurors are misled into believing that their decision may be less momentous than it really is.  *Caldwell, supra*.  This "12–10 Rule" is so misleading to the jurors that it reduces the reliability of the decision to impose death.

100

**Claim 27:   Texas Code of Criminal Procedure article 37.071 violates the Sixth Amendment because it bars jurors from being informed of the favorable result to Holiday if jurors fail to agree on any special issue.**

**37.071** Presented to CCA as point of error number 40 in direct appeal brief, on page 114 of the brief.  The CCA denied the claim on page 81-82 of its opinion.  The claim was timely presented to the trial court which denied relief.  _____.

**Claim 28:   Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because it bars jurors from being informed of the favorable result to Holiday if jurors fail to agree on any special issue.**

**Exhaustion:**  Presented to CCA as point of error number 40 in direct appeal brief, on page 114 of the brief.  The CCA denied the claim on page 80-82of its opinion.  The claim was timely presented to the trial court which denied relief.  _____.

**Claim 29:   Texas Code of Criminal Procedure article 37.071 violates the Fourteenth Amendment because it bars jurors from being informed of the favorable result to Holiday if jurors fail to agree on any special issue.**

**Exhaustion:**  Presented to CCA as point of error number 40 in direct appeal brief, on page 114 of the brief.  The CCA denied the claim on page _____ of its opinion.  The claim was timely presented to the trial court which denied relief.  _____.

Holiday in his pretrial motion claimed that Article 37.071 was unconstitutional because it prevented the jury from being informed as to the effect of failing to answer a special issue.

101

There is no legitimate reason why the jury should not be informed of the effect of failing to agree on an answer to the special issues. This information—which is the law—insures not only the required heightened reliability but further guarantees the "reasoned moral response" in a death penalty case.

Argument and Authorities

In *Davis v. State*, 782 S.W.2d 211, 222 (Tex. Crim. App. 1989) this Court rejected this claim and wrote that it failed "to see any relevance in informing the jurors the result of their failure to agree; this information has no pertinence to the special issues that are submitted to a jury in a capital murder case." This information concerns a procedural matter and is not the proper subject of an instruction. *Id.*

The United States Supreme Court "has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility'." *Caldwell, supra*, at 2646. Each jury should be made fully aware that their individual vote can determine if a person lives or dies. What better way to insure a reasoned moral response? The failure to provide such information violates the 8th and 14th amendments.

> **Claim 30:** **Texas Code of Criminal Procedure article 37.071 violates the Cruel and Unusual Punishment Clause of the Eighth Amendment because it fails to place the burden of proof on the mitigation special issue to the State to establish a "No" answer, and thereby implicitly assigned the burden of proof to Holiday.**

102

**Exhaustion:**   This claim was presented to the CCA as point of error number 41 in the direct appeal brief, on pages 115-18 of the brief.  The CCA denied the claim on the merits.  The claim was timely presented to the trial court which denied relief.  _____.

31.    Texas Code of Criminal Procedure article 37.071 violates the Due Process Clause of the Fourteenth Amendment because it fails to place the burden of proof on the mitigation special issue to the State to establish a "No" answer, and thereby implicitly assigned the burden of proof to Holiday.

This claim was presented to the CCA as point of error number 41 in the direct appeal brief, on pages 115-18 of the brief.  The CCA denied the claim on the merits.  The claim was timely presented to the trial court which denied relief.  _____.

32.    Texas Code of Criminal Procedure article 37.071 violates the Ring v. Arizona because it fails to require that the State prove beyond a reasonable doubt that the mitigating evidence is insufficient to justify a life sentence.

This claim was presented to the CCA as point of error number 41 in the direct appeal brief, on pages 115-18 of the brief.  The CCA denied the claim on the merits.  The claim was timely presented to the trial court which denied relief.  _____.

Holiday filed a pretrial motion claiming that Article 37.071 was unconstitutional because it failed to place a burden of proof on the State in Special Issue Number 2, and that it violated the requirements of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

Article 37.071 is unconstitutional because it fails to provide that the State has the burden of proof on the mitigation special issue, instead, it implicitly places the burden of proof on the defendant. Additionally, it violates Ring, supra, because it fails to require the State to prove beyond a reasonable doubt that the mitigating evidence is insufficient to warrant a life sentence.

This Court has held that because there are no constitutional limits on the jury's discretion to consider mitigating evidence, the constitution does not require a burden of proof. *Anderson v. State*, 932 S.W.2d 502, 508 (Tex. Crim. App. 1996) cert. denied, 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997). In *Lawton, supra*, this Court wrote that—

[W]e are unaware of any constitutional requirement that the burden of proof regarding mitigating evidence be placed on either party, and to the extent that the burden is on appellant, we note that it is not unconstitutional to so place the burden.

In fact, neither this Court nor the Texas legislature has ever assigned a burden of proof on the issue of mitigating evidence, and neither the 8th nor the 14th Amendment requires that a burden of proof be placed on the State. *Barnes v. State*, 876 S.W.2d 316, 330 (Tex. Crim. App. 1994).

104

Capital defendants, no less than non-capital defendants, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment. *Ring*, 122 S.Ct. at 2432.  The Court, *citing Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) wrote—

[T]he dispositive question, we said, "is one not of form, but of effect." If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.

*Ring*, 122 S.Ct. at 2439.

This Court addressed the impact of Ring, supra, and in an unpublished opinion in *Basso v. State*, No. 73,672, slip op. at 36-37, 2003 WL 1702283 (Tex. Crim. App. January 15, 2003) wrote:

Under Article 37.071, there is no authorized increase in punishment contingent on the jury's finding on the mitigating special issue ... In other words, a jury's finding on mitigation occurs only after the State has proven the elements of capital murder, at the guilt stage, and the aggravating circumstances--evidence of the defendant's future dangerousness--beyond a reasonable doubt.  By the time the jury reaches the mitigation issue, the State has already demonstrated the defendant's eligibility for a death sentence; a negative answer on mitigation cannot increase his authorized punishment.  The statute mandates only a reduction in punishment to a life sentence upon an affirmative finding of mitigation.

105

Though the reasoning in *Basso, supra*, has been adopted and followed in *Resendiz v. State*, 112 S.W.3d 541, 549-50 (Tex. Crim. App. 2003), Allen v. State, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003), and *Blue, supra*, at 501, Holiday contends that a "negative" answer to the mitigation special issue increases the authorized punishment.   Following an affirmative answer to Special Issue Number 1, the death penalty can only be assessed if there is a negative finding to the mitigation special issue.   Consequently, the State should have to prove beyond a reasonable doubt a negative finding to the mitigation special issue.   A death sentence is contingent on the jury finding a fact: that the circumstances of the offense, the character and background of the defendant, and his moral culpability are not sufficient to warrant a life sentence.   Only then can the sentence be increased from life to death.   Any finding of fact that increases the punishment must be proved beyond a reasonable doubt, but since the mitigation special issue does not place any burden of proof on the State it violates *Ring*.   Hence, in this State the accused can be executed without the State being required to prove beyond a reasonable doubt a fact that warrants death.

> **Claim 33:**   **Texas Code of Criminal Procedure article 37.071, section _____ violates the Eighth Amendment because the mitigation special issue demands that jurors apply key terms which are undefined, ambiguous and subject to divergent interpretation:   "probability," "sufficient mitigating circumstances," "personal moral culpability," and "moral blameworthiness."**

**Exhaustion:**   This claim was presented to the CCA as point of error number 43 in the direct appeal brief, on pages 118-19 of the brief.   The CCA denied the claim on the merits on page _____ of its opinion.   The claim was timely presented to the trial court which denied relief. _____.

Holiday claimed in a pretrial motion that Article 37.071 was unconstitutional because it failed to define the relevant words and phrases appearing therein. The trial court overruled Holiday's motion. CR 1, p. 20.

Summary of the Argument

Article 37.071 violates the 8th Amendment because it contains words and phrases which are left undefined and whose meanings are subject to multiple and quite alarming individual interpretations. "Probability," "sufficient mitigating circumstances," "moral blameworthiness," and "personal moral culpability" are vague and ambiguous, and their meanings are left to the unfettered whim and caprice of each juror.

Argument and Authorities

Though this Court has repeatedly rejected this claim, Holiday contends that the words and phrases are so vague and ambiguous that they fail to provide the heightened reliability and reasoned moral response required in the death penalty sentencing process. *See Chamberlain v. State*, 998 S.W.2d 230, 237-238 (Tex. Crim. App. 1999); *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000), cert. denied, 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001); *Ladd, supra*, at 572-73; *Raby*, supra, at 8. Claims of vagueness directed at capital punishment statutes are analyzed under the 8th Amendment. *Maynard v. Cartwright*, 108 S.Ct. 1853, 1858, 486 U.S. 356 (U.S. Okla. 1988). Generally, such claims assert that the challenged provision fails adequately to inform the jurors what

107

they must find to impose the death penalty, and, as a result, leaves them and the appellate courts with the kind of open-ended discretion which has been held invalid in *Furman.  Id.*  Only when the jury's discretion is "guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty" are the requirements set out in *Furman* satisfied. *Proffitt v. Florida*, 96 S.Ct. 2960, 2969, 428 U.S. 242 (1976).  Where discretion is afforded a [jury] on a matter so grave as the determination of life or death, that discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932 (U.S. Ga. 1976).

The death penalty statutory scheme in this State is unconstitutional because it does not define the relevant words and phrases appeared therein.  Thus, this statutory scheme allows the open-ended discretion which Furman has found invalid.  The danger of an arbitrary and capricious verdict of death is unconstitutionally increased because each juror has the unfettered discretion to reach a verdict based on their own definition.

This vagueness issue—at least in part—was first addressed in *Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975), and this Court summarily rejected it, though there were vigorous dissents by Judges Odom and Roberts.  The honorable Judge Odom wrote that the "essential indefiniteness of the word 'probability' is ignored."  He asked whether probability meant "some probability, any probability?"  To him, "[O]ur common sense understanding of the term leaves the statute too vague to pass constitutional muster." *Id.*, at 944–945.  Judge Odom was right.  Even more illuminating was Judge Roberts' dissent where he wrote "a probability is simply a chance—however large or small",

and, concluded that the future danger special issue would be answered "in the affirmative for all individuals, no matter how saintly." Id. at 947–948.  These dissents have been ignored without good reason.

The United States Supreme Court found that the then existing death penalty statute was constitutional.  *Jurek v. Texas*, 96 S.Ct. 2950, 428 U.S. 262 (1976).  Although this Court and other courts have continuously claimed that the vagueness issues were laid to rest, Holiday contends that Jurek should cease to be precedent since it addressed the old statutory scheme—not the new one.

> **Claim 34:**      **Texas Code of Criminal Procedure article 37.071, section _____ violates the Eighth Amendment because the statute does not permit meaningful appellate review of the jury's answers to the three special issues.**

**Exhaustion**: This claim was timely presented to the CCA as point of error number 44 in the direct appeal brief, on pages 121-22 of the brief.  The CCA denied the claim on the merits on page _____ of the decision.  The claim was timely presented to the trial court which denied relief.  CR 1, p. 21.

> **Claim 35:**      **Texas Code of Criminal Procedure article 37.071, section _____ violates the Fourteenth Amendment due process clause because the statute does not permit meaningful appellate review of the jury's answers to the three special issues.**

**Exhaustion:**      This claim was timely presented to the CCA as point of error number 44 in the direct appeal brief, on pages 121-22 of the brief (see page 122, last sentence of argument).  The

CCA denied the claim on the merits on page _____ of the decision.  The claim was timely presented to the trial court which denied relief.  CR 1, p. 21.

Holiday in a pretrial motion claimed Article 37.071 is unconstitutional because it fails to provide a meaningful appellate review as required by the 8th Amendment and due process of law.

The United States Supreme Court has consistently recognized the crucial role of appellate review in guaranteeing that the death penalty is not imposed arbitrarily or capriciously.  *Whitmore v. Arkansas*, 110 S.Ct. 1717, 1730, 495 U.S. 149 (U.S. Ark. 1990).  Regarding this State's appellate review procedure, in *Jurek, supra*, at 2958, the United States Supreme Court wrote:

By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law.  Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution.

Enabling a reviewing court to examine the specific findings underlying the verdict facilitates appellate review, which the United States Supreme Court has described as "an important additional safeguard against arbitrariness and caprice."  Gregg, 96 S.Ct. at 2936.  This Court has heretofore conceded that it is "impossible to a conduct a sufficiency review to the mitigation special issue," but such impossibility does not "render our capital punishment scheme unconstitutional."  Lawton,

110

supra, at 556-57.  This Court wrote that the "United States Constitution does not require a sufficiency review of the jury's decision regarding mitigation."  Id.

In *Allen, supra*,  Judges Meyers and Womack wrote that this Court can no longer summarily dismiss requests to review the sufficiency of the evidence in support of the jury's answers to the special issues.  Judge Meyers wrote—

   There are also possible situations where this Court should conduct a factual sufficiency review of the future dangerousness special issue.  If a defendant is granted a retrial after serving several years as a model prisoner, this Court should be able to conduct a factual sufficiency review of the future dangerousness special issue.

*Id*., at 287.

Appellate review in this State consists of a legal sufficiency review of the future dangerousness special issue, and nothing more.  This is not a meaningful appellate review and violates the 8th Amendment and due process of law.

> **Claim 36:   Texas Code of Criminal Procedure article 37.071, section _____ violates (a) *Ring v. Arizona*, (b) the Sixth Amendment right to fair jury trial clause, ( c ) the Fourteenth Amendment Due Process Clause, and (d) the Eighth Amendment Cruel and Unusual Punishment Clause, because the future dangerousness special issue fails to define "probability" that Holiday will commit future acts of violence, permitting jurors to answer "Yes" if there is any**

**statistical probability of future violence, rather than a preponderance of likelihood.**

This claim (all four sub-claim parts) were presented to CCA as points of error number 47 and 49 in direct appeal brief (see page 127 of brief), which denied the claim on page 82-83 of the opinion. The claim (all four sub-claim parts) were presented to the trial court which denied relief. CR 5, pp 598–607; CR Supp. 2, pp. 101–110.

37.   Texas Code of Criminal Procedure article 37.071, section _____ violates (a) Ring v. Arizona, (b) the Sixth Amendment right to fair jury trial clause, ( c ) the Fourteenth Amendment Due Process Clause, and (d) the Eighth Amendment Cruel and Unusual Punishment Clause, because the future dangerousness special issue fails to define "criminal acts of violence" anticipated by Holiday, thereby permitting his execution even for minor contact or solely use of words.

This claim (all four sub-claim parts) were presented to CCA as points of error number 47 and 49 in direct appeal brief (see page 127 of brief), which denied the claim on page 82-83 of the opinion. The claim (all four sub-claim parts) were presented to the trial court which denied relief. CR 5, pp 598–607; CR Supp. 2, pp. 101–110.

38.   Texas Code of Criminal Procedure article 37.071, section _____ violates (a) Ring v. Arizona, (b) the Sixth Amendment right to fair jury trial clause, ( c ) the Fourteenth Amendment Due Process Clause, and (d) the Eighth Amendment Cruel and Unusual Punishment Clause, because the future dangerousness special issue fails to define "continuing threat to society" that Holiday will commit

future acts of violence, permitting jurors to answer "Yes" when there is no possibility that Holiday would ever be in free society.

This claim (all four sub-claim parts) were presented to CCA as points of error number 47 and 49 in direct appeal brief (see page 127 of brief), which denied the claim on page 82-83 of the opinion. The claim (all four sub-claim parts) were presented to the trial court which denied relief.  CR 5, pp 598–607; CR Supp. 2, pp. 101–110.

The court's punishment charge failed to include a definition of "probability," "criminal acts of violence" and "continuing threat to society."  Thus, the charge did not provide proper and adequate guidance to the jury in order to prevent a capricious and arbitrary verdict.

In a criminal prosecution the accused has a right under the 6th and 14th amendments to the United States Constitution to a trial by an impartial jury.  Holiday argues that he was denied his 6th amendment right to a trial by an impartial jury because the court's charge failed to properly instruct the jury.  *See Ring, supra.*

Holiday filed written objections to the Court's Punishment Charge.  In objections numbers 1 through 10, he claimed the charge failed to instruct the jury that "probability" meant a high probability of at least 95%, and if denied, then descending to at least 50%.  The court overruled the objections.

Holiday filed written objections to the Court's Punishment Charge.  In objections number 11, 21, and 22, he claimed that the court failed to instruct the jury that "criminal acts of violence" meant "serious criminal activity that caused serious bodily injury or death which was not trivial, accidental, reckless, or highly provoked acts," and "not a property crime committed without serious bodily injury or death," or a "property crime which was not committed in conjunction or in combination with a crime against a person."

The trial court overruled these objections.

Holiday filed his written objections to the Court's Punishment Charge.  In Number 29 he objected that the court failed to instruct the jury as follows:

that continuing threat to society does not mean any threat of harm or death, no matter how minor or remote, that might hypothetically be posed, in any place, in or out of prison, for any length of time after the jury verdict, no matter how short, but instead means a clear and present threat of serious bodily injury  or death to others while in prison or free society, which will continue after the defendant becomes parole eligible, unless death is imposed as a sentence.

In Number 30 he objected that the court failed to instruct the jury as follows:

that continuing threat to society does not mean any threat of harm or death, no matter how minor or remote, that might hypothetically be posed, in any place, in or out of prison, for any length of time

114

after the jury verdict, no matter how short, but instead means that the defendant will be so incorrigible that his serious misconduct will continue after the defendant becomes parole eligible, unless death is imposed as a sentence.

These objections were overruled.

Holiday objected to failure of the Court's Charge at Punishment to instruct the jury as to the meaning of "probability," "criminal acts of violence" and "continuing threat to society."

These objections were made pursuant, in part, to his right to a jury trial under the 6th  and 14th Amendments to the United States Constitution.  The court overruled the objections.

Argument and Authorities

More than 100 years ago, the United States Supreme Court said that on the trial court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be.  Sparf v. U.S., 15 S.Ct. 273, 293; 156 U.S. 51 (U.S. Cal. 1895).  Of course, the trial court declares the law through its charge to the jury. It is the function of the trial court's charge to instruct the jury on how to apply the law to the facts and to "lead and prevent confusion" during jury deliberations. Hence, the charge must contain an accurate description of the law, and when it does not, the "integrity of the verdict is called into doubt." Ex parte Varelas, 45 S.W.3rd 627, 633 (Tex. Crim. App. 2001). In fact, it is not the function

115

of the charge merely to avoid misleading or confusing the jury; it is the function of the charge to lead and to prevent confusion.  A charge that does not apply the law to the facts fails to lead the jury to the threshold of its duty: to decide those fact issues.  Williams v. State, 547 S.W.2d 18 (Tex. Crim. App. 1977).  There should be but one controlling application of the law to the facts, and that application should come from the court.  Its absence impairs the right to trial by jury and, therefore, by definition, is "calculated to injure the rights of defendant," to a trial by jury.  Id.

Because the jurors are "unlikely to be skilled in dealing with the information they are given" it is important to give the appropriate guidance to the jurors because it is a "hallmark of our legal system that juries be carefully and adequately guided in their deliberations."  Gregg, supra, 96 S.Ct. at 2934. The need for heightened reliability in death penalty cases mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms a jury is required to consider.  Simmons v. South Carolina, 114 S.Ct. 2187, 2198, 512 U.S. 154 (U.S.S.C. 1994).  In fact, whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been "arbitrarily or discriminatorily" and "wantonly and ... freakishly imposed."  Id.

Article 37.071 V.A.C.C.P., "does not preclude additional instructions ... because it is the trial court's duty and within its power to instruct the jury."  Matchett v. State, 941 S.W.2d 922, 949 (Tex. Crim. App. 1996).  Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must

be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. Gregg, 96 S.Ct. at 2932.

This Court has held that the trial court need not define the words and phrase—the subject of Holiday's charge objections—because the "jury is presumed to understand them without instruction." Feldman v. State, 71 S.W.2d 738, 757 (Tex. Crim. App. 2002).  It has relied on Article 3.01, V.A.C.C.P. which provides, in part, that "words, phrases, and terms are to be taken and understood in their usual acceptation in common language." Lackey v. State, 819 S.W.2d 111, 118 (Tex. Crim. App. 1989).  When read in context any phrase or word should be open to the broadest possible understanding to which they are reasonably susceptible in the English language.  Bingham v. State, 915 S.W.2d 9, 10 (Tex. Crim. App. 1994).  When death is the issue, the jury should neither be allowed to presume these words and phrases "without instruction" nor to give them the "broadest possible understanding."  To do so results in arbitrary and capricious death sentences.

The trial court erred when it overruled Holiday's objections to the punishment charge.  The actions of the trial court insured that the jury would wander haphazardly through the dark death penalty wasteland and reach a death verdict that was capricious and arbitrary.  Such misguided wanderings violate the 8th Amendment, due process, as well as Furman and its progeny.  Most times, such misguided wanderings result in a death verdict.  The law should violently oppose such a result.

Argument and Authorities

117

When the State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact--no matter how the State labels it--must be found by a jury beyond a reasonable doubt.  Ring, 122 S.Ct 2439.  Holiday contends that Ring is applicable to this State's punishment scheme in death penalty cases because death is contingent on the answers to the special issues.  Since "probability," "criminal acts of violence" and "continuing threat to society" are not defined in order to satisfy Ring, the jury must be instructed as to their meaning.  The failure to properly instruct the jury denied Holiday a jury trial in violation of Ring.  How did Holiday have a jury trial on Special Issue 1 when "probability," "criminal acts of violence"  and "continuing threat to society" were not defined?  A jury trial is based on the instructions given to the jury, and without proper instructions Holiday was denied his right to a jury trial at punishment.  Ring held that a capital defendant is entitled to a "jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  Holiday contends that he was denied his right to jury trial in violation of Ring because the trial court failed to properly instruct the jury as to the meaning of "probability," "criminal acts of violence" and "continuing threat to society."

> **Claim 39.   The State trial court violated Ring v. Arizona when it refused to instruct jurors that the burden of proof was on the State to prove beyond a reasonable doubt that there were no sufficient mitigating circumstances to warrant a life sentence.**

**Exhaustion:** This claim was presented to CCA as point of error number 48 in direct appeal brief.  The CCA denied the claim on the merits on page 82-83 of the opinion.  The claim was presented to the trial court which denied relief.  CR 5, pp 598–607; CR Supp. 2, pp. 101–110.

In objection number 25 Holiday claimed the court's charge failed to instruct the jury that in Special Issue Two (2) the State had the burden of proof to prove beyond a reasonable doubt that there was not sufficient mitigating circumstances to warrant a life sentence.  The objection was overruled.

Summary of Argument

The failure of the Punishment Charge to place the burden of proof on the State to prove beyond a reasonable doubt Special Issue Number Two (2) violated the 8th and 14th Amendments and Ring, supra.

Argument and Authorities

In Ring, 122 S.Ct at 2439, the United States Supreme Court wrote:

The dispositive question, we said, "is one not of form, but of effect." If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.

Since Article 37.071 does not assign a burden of proof on the mitigation special issue it violates Ring, supra.  Holiday contends that Ring requires the State to prove beyond a reasonable doubt that the answer to the mitigation special issue should be "NO."  Article 37.071 does not require the State

119

to prove beyond a reasonable doubt a "NO" answer to the mitigation special issue.  In truth, the statute requires the defendant to prove that the mitigating evidence is sufficient to warrant a life sentence.  This is a violation of Ring, supra.

The trial court erred—and violated Ring—when it overruled Holiday's objection to the failure of the punishment charge to require the State to prove beyond a reasonable doubt there was not sufficient mitigating circumstances to warrant a life sentence.

**Claim 40: The State violated Holiday's right to Due Process under the 5th and 14th Amendments of the U.S. Constitution by presenting False or Misleading Scientific  testimony by the State's expert, John DeHaan.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 1.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 41: The State violated Holiday's right under the 8th Amendment of the U.S. Constitution by presenting False or Misleading Scientific  testimony by the State's expert, John DeHaan.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 1.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 42: The State violated Holiday's right to Due Process under the 5th and 14th Amendments of the U.S. Constitution by presenting unreliable scientific evidence from John DeHaan which undermined the fundamental fairness of the fact-finding proceedings.**

**Exhaustion**:  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 2.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 43: The State violated Holiday's right under the 8th Amendment of the U.S. Constitution  by presenting unreliable scientific evidence from John DeHaan which undermined the fundamental fairness of the fact-finding proceedings.**

**Exhaustion**:  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 2.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 44: The State violated Holiday's Due Process rights under the 5th and 14th Amendments and to the U.S. Constitution and Napue and Giglio v. U.S. by withholding evidence tending to impeach the state's witness John DeHaan.**

**Exhaustion**:  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 3.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 45: The State Violated Holiday's right under 8th Amendment to the U.S. Constitution by withholding evidence tending to impeach the state's witness John DeHaan.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 3.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

The State contacted the Bureau of Alcohol, Tobacco and Firearms in April 2001 to assist in determining the possible causation of the fire at the Wilkerson household. David Opperman, a Certified Fire Investigator employed by the BATF,  met with the prosecutors in this case  to review the evidence and to interview the key witness to the fire, Beverly Mitchell.  As a result of his evaluation,  Opperman advised in a written report that the possibility of accidental ignition of gasoline vapors by the gas stove could not be ruled out as a possible ignition source: "Opperman advised the DA that the piloted natural gas stove and other appliances in the area could not be ruled out as ignition sources."   [See, BATF Report by David Opperman (hereinafter "Opperman Report", p. 2: Exhibit "B"].

2.   Opperman concluded that the prosecution theory should include the possibility of conviction on lesser charges due to the possibility of accidental ignition:

 Opperman suggested approaching prosecution with Holiday making the threats to burn everyone in the house, Holiday forcing Mitchell to pour the gasoline, and the [sic] that the fumes may have prematurely ignited or were intentionally set by Holiday.  The fact that the fumes ignited before Holiday was prepared as irrelevant, and take the approach that he was committing the overt act and he already said he was going [sic] set the fire.  It was also suggested to include possible lesser

charges in the jury instruction to allow the jury to convict him and not limit it to capital murder. Opperman suggested that this approach should take the defense out of the argument by th prosecution admitting an appliance may have prematurely ignited the flames.

[See, Opperman Report, p. 3: Exhibit "B"].

3.    The State subsequently retained John DeHaan, a fire investigator, and president of Forensic Scientists, Inc., from Viejo, California, to evaluate the crime scene and to provide testimony relating to the cause of the fire at the Wilkerson residence.

4.   DeHaan's educational background displays an educational background in physics.  He holds a B.S. in Physics from the University of Illinois.  DeHaan claims to have received a Ph.D in 1995 from the University of Strathclyde, in Glasgow, Scotland in the field of "Pure and Applied Chemistry – Forensic Science."  [See, Resume of John D. DeHaan: Exhibit "C"].

5.   An investigation into the causes of fire is based upon established scientific principles.

6.    DeHaan determined there to have been a number of potential sources for ignition in the Wilkerson residence: the water heater, the room heater, the refrigerator, the oven, the air conditioner, and Holiday himself. [Vol. 36 RR: 182].   DeHaan excluded the appliances as possible sources of ignition. [Vol. 36 RR: 182 - 183].  [See, Testimony of John DeHaan: Exhibit "D"].

7.   DeHaan excluded the oven pilot light as a possible source of ignition because the pilot light was in a closed broiler compartment, the pilot light was located approximately six inches off the floor, and the broiler pan had not been blown out by an explosion resulting from the ignition of the gas vapors. [Vol. 36 RR 182 - 187].

8.   DeHaan explained that the location of the pilot light, approximately 6 inches above the floor, was a significant factor in his analysis because it was similar to an experiment which he had conducted with spilled gasoline and a burning heat source placed six inches off the floor– the candle experiment – which he had conducted in Australia approximately 10 - 12 years previously, which did not result in ignition.  DeHaan explained:

The stove unity was in the northwest corner of the kitchen and it had a pilot flame.  However, the pilot flame was in the broiler compartment in a closed but not air tight compartment, a drawer type compartment, and the flame itself, was about six inches above the floor level.  This is significant because – and the other condition was that it was a number of feet away from the area in which one of the witnesses reported gasoline as having been poured.   And these are important factors because – especially the height of the flame above the floor.  Because I have actually done tests or demonstrations in which I had an open flame, essentially a six inch tall candle lighted and trying to create an incindiary device.  Had a gallon of gasoline released from an open container right at the foot of the candle.  I expected immediate ignition.  After twenty minutes of waiting for the gasoline to be ignited with the candle standing in a lake of gasoline we still have no ignition.  And

124

finally somebody reached in with a long stick and tipped the candle over so we got ignition of the gasoline.

* * *

  . . . the [demonstration] that I remember most vividly was a demonstration for the Australian Fire Service.  And it was a room about fifteen by twenty feet and – fifteen by twenty feet.  And that candle was near the center of the room.

* * *

  [The candle] was six a six inch tall candle.

* * *

    And [sic] container of gasoline next to it with a trip wire.  And we simulated somebody coming in the door, pulling the trip wire and tipping the container of gasoline over and had no ignition.  And it was, in fact, a couple of instances like that which prompted me to do the research I did for my thesis and that was on why there was no ignition.  And we now have a reason why there was no ignition.

* * *

We waited about twenty minutes [for ignition of the candle]

* * *

. . .That's why the position of the pilot light in the broiler unit was significant.  It was some inches above the floor.  So if I had vapors spreading through the house or through that common room then I wold have had to get vapors not only into the corner where the stove was but I would have to get them to rise to six inches before I had ignition.

[See, Testimony of John DeHaan:   Vol. 36 RR: 184 - 186; Vol. 37 RR: 55 - 56; Exhibit "D."].

9.   DeHaan also excluded the broiler pilot light as a possible ignition source of the gasoline vapors because it was encased within the broiler.  He explained to the jury:

The position of that pilot flame inside the closed broiler compartment was also significant.  It wasn't air tight.  I could eventually get vapors in there, but because it was in this largely closed box that would further slow down the movement of vapors into that – into the vicinity of that pilot flame.

[See, Testimony of John DeHaan:   Vol. 36 RR: 186; Exhibit "D"].

10.   Finally, DeHaan based his exclusion of the broiler pilot light as a possible ignition source on the fact that the broiler door had not been blown open by an explosion.  DeHaan explained:

And finally even if there had been ignition with vapors getting into that space and being ignited by the pilot flame, the immediate effect of that would have been to push the broiler compartment open.  Basically push the drawer completely out of the stove.  That had been witnessed in a number of demonstrations and actual accidental fires that I have documented over the years.  And when the stove was found the broiler drawer was in its original position.  And when I examined it a week or so ago the burn patterns, the fire damage patterns indicated that he broiler pan was still in that position.  And there was no mechanical latch. It was easily pulled out.  So had there been an ignition that broiler pan would have expected to be blown out of the stove and it was not.

[See, Testimony of John DeHaan:   Vol. 36 RR: 186; Exhibit "D"].

11.   Opperman testified for the State as a rebuttal witness.  Opperman explained the scientific process involved in fire investigation: an investigator determines all the outstanding hypothesis of fire causation and tests them; if he cannot rule out the hypothesis, then it remains a possible ignition source.  [Vol. 40 RR: 56 - 58].  Opperman was present for DeHaan's testimony and "as far as what is set forth by the guidelines . . . agree[d] with" the procedures which DeHaan followed to exclude possible ignition sources.  Opperman also agreed with DeHaan's conclusions. [Vol. 4 RR 65].

12.    The accidental ignition of gasoline vapors by a pilot light is, and has been a documented phenomena for accidental fires among individuals within the field of fire investigation.  Numerous articles existed prior to, and leading up to the time of John DeHaan's testimony in this case, regarding instances in which gasoline vapors were ignited by pilot lights in gas powered water heaters:  Teenager Sniffing Gasoline Fatally Burned When Vapors Ignite, NFPA Journal, May, p. 26 (1992);   Man Dies When Furnace Ignites Gasoline Vapors, NFPA Journal, June, p. 28 (1992); One Child Dies, Another Injured When Water Heater Ignites Vapors, NFPA Journal, February, p. 21 (1993); Two Die in Garage Fire, NFPA Journal, January, p. 26 (1997).  [See,  NFPA Journal Articles Regarding Gasoline Vapor Ignition by Pilot Lights:  Exhibit "E."].  These articles were written after  after DeHaan's "Candle experiment" and provided anecdotal information which demonstrated incidents in which gasoline vapors had ignited after coming into exposure with pilot lights.

13.    DeHaan is a member of the National Fire Protection Association (NFPA) and served as a member of the Committee drafting the NFPA 921 Guide to Fire and Explosion Investigation.  [See, Resume of John D. DeHaan: Exhibit "D"].

14.    The dangers of accidental ignition of gasoline vapors through inadvertent exposure to pilot lights had also been documented by industry and government organizations.     In 1994, the Consumer Product Safety Commission (CPSC) was provided test data commissioned by the Gas Appliance Manufacturer's Association (GAMA) which addressed safety hazards associated with the ignition of gasoline vapors by the pilot lights and/or burners of water heaters.  Arthur D. Little Inc

128

(ADL), an engineering safety consulting firm commissioned by GAMA, conducted extensive testing on the ignition of gasoline vapors by water heaters.   The test data were ultimately provided to the CPSC and published in a memorandum entitled Briefing Package for Gas-Fired Water Heater Ignition of Flammable Vapor.  The CPSC identified the problem of gasoline vapor ignition by water heaters as a considerable phenomena:

Gas-fired water heaters igniting flammable vapors cause an estimated 1,961 fires each year, resulting in an estimated 316 injuries, 17 deaths, and $26 million in property damage for a total societal cost which may be as high as $395 million.  Typically, injuries occur when the victim is using flammable liquids (usually gasoline) for cleaning purposes, or when the liquid leaks or accidentally spills near the water heater.

[See, Consumer Product Safety Commission, Briefing Package for Gas-Fired Water Heater Ignition of Flammable Vapor: Exhibit "F"].

15.    Testing data provided by Arthur D. Little, Inc. (ADL) in relation to gasoline vapor ignition from floor mounted gas fired water heater pilot lights demonstrates the real possibility that gasoline vapors resulting from a limited gasoline spill occurring several feet from a pilot light can result in fire in less than one minute.   [See, Consumer Product Safety Commission, Briefing Package for Gas-Fired Water Heater Ignition of Flammable Vapor, Appendix L [Arthur D. Little data]: Exhibit "G"].

16.   John DeHaan's testimony, as well as the other evidence in Holiday's case has been reviewed by Dr. Gerald Hurst, a Cambridge educated PhD. in chemistry who has worked as a research scientist and consultant in the field of fire and explosion analysis since 1972.

17.   Based upon the evidence in this case,  Dr. Hurst has identified several instances in which John DeHaan made false or misleading statements in order to exclude the broiler pilot light as a possible ignition source for the fire in the Wilkerson home.  DeHaan's testimony is false or misleading because his conclusion do not follow from an application of the scientific method in excluding possible sources of fire, and the falsity or misleading nature of this testimony would have been reasonably apparent to DeHaan, and any other individual trained in the scientific method to examine the causation for fires.   As a result, neither DeHaan, nor any other trained individual using the scientific method to render an opinion on the possible causation of the fire in this case would have been able to render an objective opinion excluding the broiler pilot light as a possible ignition source. [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H."].

18.   DeHaan's "expert" opinion excluding the broiler pilot light on the basis of his "Candle experiment" is not supported by scientific methodology.  The "Candle experiment" was not a controlled, replicated and published experiment, subject to peer evaluation and testing.  As result, its scientific value is merely as an "anecdotal" and is not based upon established scientific methodology. DeHaan's anecdotal experience with the candle appears to be contradicted by reported incidents of gasoline vapor ignition.  The fact of contrary incidents of gasoline vapor ignition is significant for two key reasons: first, to the extent that DeHaan was simply unaware of these

incidents when arriving at a conclusion that the gasoline vapors could not have been ignited by the broiler pilot light, then his science-based evaluation of the fire scene did not follow established basic principles of scientific methodology – to gather all reasonably available pertinent evidence which supports, and contradicts the hypothesis sought to be proven.   Secondly and equally important, to the extent that DeHaan intentionally or knowingly did not refer to these incidents of gasoline vapor ignition because they would have contradicted his own candle experiment, and undermined his ultimate conclusion regarding the fire causation in this case, then his testimony was not only scientifically invalid, but false and misleading on key aspects.   [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H."].

19.   DeHaan's exclusion of the broiler pilot light as a possible ignition source is also undermined by DeHaan's failure to review, or by his decision to ignore publicly available testing data provided by ADL in relation to the water heater pilot light ignition of gasoline vapors.    The environmental and testing circumstances of ADL's "Test No. 7" are particularly applicable to a conclusion based on established scientific methodology that the broiler pilot light could be excluded as a possible ignition source in the Wilkerson fire.  ADL's Test No. 7 involved the spilling of one gallon of gasoline in a 10' x 20' x 8' room, with still air conditions,  from a distance of 8 feet from the heat source, a pilot light,  and resulted in ignition after only 51 seconds.    This test materially conflicts with the "demonstration" purportedly conducted by DeHaan, which involved spilling one gallon of gasoline one or two feet from an open flame source, in a 10' X 20' room with unknown air conditions, producing no ignition.  The ADL testing is material data which contradicts the data – the Candle experiment – on which his ultimate conclusion heavily relied.   [See, Affidavit of Gerald

Hurst, Ph.D: Exhibit "H."].  DeHaan did not mention the ADL testing during his testimony, nor did he reveal this information to Holiday's counsel prior to, or after his testimony.   None of the other State's expert witnesses revealed this information to Holiday's counsel.

20.   The ADL testing circumstances is analogous to the circumstances in the Wilkerson fire, but not identical.   In both the ADL experiment and the Wilkerson fire, gasoline was poured a considerable distance from the heat source, on a smooth, non-carpeted floor surface, in comparable sized rooms.  [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H."].

21.    The differences between the ADL experiment and the circumstances in the Wilkerson household present a greater likelihood of ignition in the Wilkerson house.    While the ADL experiment involved only one gallon of gasoline, the amount of gasoline poured on the floor of the Wilkerson residence was estimated to have been between 3 - 5 gallons.   Thus, the amount of gasoline to vaporize was considerably larger in the present case.   Further, unlike the ADL experiment, in which there was no air movement, in the present case, the air conditioner(s) were likely running, as well as possible movement by the occupants in the house, contributing to air movement and consequent vapor distribution.  ADL identified air movement as the most significant factor in decreasing ignition time of gasoline vapors. [See, Affidavit of Gerald Hurst, Ph.D: Exhibit "H."].

22.   DeHaan testified to facts which are scientifically false in addressing criticism by Holiday's defense counsel that the Candle experiment was disanalogous to the circumstances in the Wilkerson

132

fire.  De Haan contended that the moving air within the Wilkerson house would have inhibited or delay ignition as compared to the conditions of relatively still air in his Candle experiment. Scientific research has shown, however,  that moving air actually increases both the speed and frequency of the ignition of gasoline vapors by open flame sources near the floor.  This information would have been known to anyone who had reviewed the CPSC's Briefing Package and accompanying ADL data. [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H."].

23.   DeHaan also testified to the fact that gasoline poured on the vinyl floor of the Wilkerson house would generate vapor at a lesser rate than gasoline absorbed in a porous medium, such as in his experiment, which involved a carpeted floor.  DeHaan's testimony is contradicted by research conducted under the auspices of the National Institute of Justice , which demonstrates that when equal quantities of gasoline are poured on carpet and on vinyl, the liquid spreads over an area of the vinyl averaging 10 time the area of a corresponding spill on carpet.  Anthony D. Putorti, Jr., Daniel Madrzykowski and Jay A. McElroy, "Flammable and Combustible Liquid Spill/Burn Patterns," NIJ Report 604–00 (March 2001).  It follows that the gasoline will evaporate faster from the much larger area.  This conclusion is verified by the measured heat release rates of the ignited pools, which show that the evaporation rate during the fire is substantially greater from the vinyl surface.  This information was publicly available from the National Institute of Justice's website prior to the time of Holiday's trial in May 2000.  www.ncjrs.org/ pdffiles1/ nij/ 186634.pdf.   [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H" to state habeas petition].

24.     The ADL testing data, as well as other anecdotal instances of pilot light ignition of gasoline vapors were available prior to DeHaan's evaluation of the evidence in Holiday' case.  Not only do the ADL test data conflict with DeHaan's demonstration – on which he appears to have heavily relied for his exclusion of the broiler pilot light, but it would concurrently have supported the reasonableness of the hypothesis that the broiler pilot light was a possible source of ignition.  It would have been unreasonable for an individual trained in the scientific method and purporting to render an objective opinion based upon a scientific evaluation of the evidence to disregard these data in excluding as a possible ignition source the broiler pilot light.  [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H."].

25.     DeHaan testified to another assumption not supported by objective science in his conclusion that the broiler box would have significantly impeded the gasoline vapors from reaching the pilot light.    A broiler is not sealed against air flow in the sense that DeHaan suggested in his testimony.  Broilers are designed to draw air into the chamber to facilitate burning because the broiler fire cannot burn without sufficient oxygen.   It is not accurate to suggest that a closed broiler would impair the ingress of gasoline vapors in a significant way as to preclude possible ignition in this case.  [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H."].

26.     DeHaan also testified to a scientifically false or misleading assumption, by stating as a conclusive basis to exclude the broiler pilot light that the ignition of gasoline vapors by the broiler pilot light would have resulted in an explosive type force which would have opened the broiler drawer, or pushed the drawer out of the broiler.   DeHaan's statement was misleading because it

suggested to the jury that in order for gasoline vapors to ignite within the broiler, it would necessarily have required sufficiently high quantity of gasoline vapor to produce an explosive effect. This conclusion is not simply incorrect, but it would have been recognizably incorrect by any individual scientifically trained in evaluating fire causation. It is universally recognized in the scientific community that the ignition of gas vapors does not necessarily always result in an explosion. Whether an explosion occurs may depend upon many factors, such as the amount of premixed gas present and the degree of confinement of the mixture. If the gas simply flows as a layer into and under the pilot light, the subsequent burning at the interface of the gas layer and air may proceed at the low rate of about 1.5 feet per second, resulting in no more than a gentle whoosh of combustion gases back out of the inlet vents. Explosions generally occur after enough time has passed to build up a substantial quantity of well-mixed air and gas. The gas in the broiler would have failed to explode for the same reason that the room itself did not explode: insufficient time for mixing. This fact is recognized in the NFPA 921. [See, NFPA 921: Guide for Fire and Explosion Investigators, p. 48, Secs. 6.19.2 - 6.19.2.1 (2004 ed); Exhibit "I"]. Thus, a low quantity of mixed gasoline vapor in the broiler box would not have produced an explosion, but would simply have produced a flash fire which would have run along the vapor trail, ultimately igniting secondary sources of fuel. A conclusion that the pilot light could not have been an ignition source based on the lack of explosion evidence is not scientifically reasonable, and was a plainly inaccurate and highly misleading statement.

27.    The State violates a defendant's right to Due Process of Law under the 5th, 8th and 14th Amendments to the United States Constitution, as well as due course of law under Article I, Sec. 19

135

of the Texas Constitution when the State knowingly presents false or misleading testimony, United

States v. Agurs, 427 U.S. 97, 103  (1976);  Pyle v. Kansas, 317 U.S. 213, 216 (1942);  Mooney v.

Holohan, 294 U.S. 103, 112 (1935);  and, Thomas v. State, 841 S.W.2d 399, 402 (Tex.Cr.App.

1992), or fails to correct false or misleading testimony. Alcorta v. Texas, 355 U.S. 28, 31 (1957);

and, Napue v. Illinois, 360 U.S. 264, 269 (1959).   Knowledge of the falsity of testimony is imputed

among all members of the prosecution team.  Giglio v. United States, 405 U.S. 150, 154 (1972);

Ex parte Castellano, 863 S.W.2d 476, 480 & n.3  (Tex.Cr.App. 1993); and, Ex parte Adams, 768

S.W.2d 281, 291 (Tex.Cr.App. 1989)).  Concurrently, the right to Due Process imposes upon the

State an affirmative obligation to search out and disclose to the defense favorable evidence known

among any members of the prosecution team, including evidence which demonstrates the falsity of

testimony of the State's witnesses.  Kyles v. Whitley, 514 U.S. 499, 437 (1995)("the individual

prosecutor has a duty to learn of favorable evidence known to the others acting on the government's

behalf in the case . . ..").


28.   False testimony requires the conviction be reversed if the testimony was "material."  United

States v. Bagley, 473 U.S. 667, 679 n.9 (1985);  and,  Castellano, 863 S.W.2d at 485.   False

testimony is material unless the Court is convinced beyond a reasonable doubt that the testimony had

no effect upon the jury's verdict.  Bagley, 473 U.S. at 679 n.9; and,  Castellano 863 S.W.2d at 485.


29.   Independent of the dictates of Agurs, supra, and Alcorta, supra, the presentation of materially

false and unreliable scientific testimony violates the right to Due Process under the 5th, 8th and 14th

136

Amendments to the United States Constitution and the right to due course of law under the Texas Constitution because it undermines the fundamental fairness of the fact-finding process.  See, Dawson v. Delaware, 503 U.S. 159, 179 (1992); Payne v. Tennessee, 510 U.S. 808, 825 (1991); and, Barnard v. Henderson, 514 F.2d 744 (5th Cir.1975).  See also, Beck v. Alabama, 447 U.S. 625, 637 - 638 (1980) (Due Process concerns of the 8th Amendment apply to procedures during the guilt-innocence phase of trial which affect the reliability of the guilt-innocence determination).  The admission of scientific opinion testimony is predicated upon its reliability: opinions predicated upon scientific knowledge are admissible precisely because they are derived from the strict application of objectively ascertainable scientific method and principles.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 - 595 (1993).    Whether the expert's opinion follows from a strict application of the scientific method is what differentiates an "expert" opinion from lay speculation:

[A]  key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.

Daubert,  509 U.S. at 593.

The failure to recognize, analyze and distinguish alternative hypothesis which contradict an expert's desired hypothesis regarding causation does not comport with the scientific method and renders the expert's resulting opinion unreliable.  E.I. Du Pont de Nemours and Co. v. Robinson,

923 S.W.2d 549, 559 (Tex. 1995).  "Unreliable . . . scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue;  such evidence obfuscates rather than leads to an intelligent evaluation of the facts."  Kelly v. State, 824 S.W.2d 568, 572 (Tex.Cr.App. 1992)(citation omitted).  The concern with heightened reliability comes into play in the context of expert testimony because jurors may tend to place disproportionate weight upon the opinion of an "expert." Cf.  Flores v. Johnson, 210 F.3d 456,   465 - 466 (5th Cir. 2000) (Garza, J., concurring).

30.   DeHaan testified as a member of the prosecution team, assisting the prosecution in presenting its adopted theory of prosecution – that Holiday intentionally ignited the gasoline vapor, hence, Holiday's conduct amounted capital murder, as opposed to felony murder.

31.   Alternatively DeHaan's testimony, regardless of whether he was a member of the prosecution team, was materially false in that his opinions were not based upon established principles of scientific methodology, and for that reason, fell so are below the requirements for reliability under Daubert and Kelly, as to materially mislead the jury about the scientific reliability of excluding the broiler pilot light as a possible source of ignition, thereby rendering trial fundamentally unfair.

32.   DeHaan's testimony, presented in the form of a scientifically supported opinion, based upon a proper application of the scientific method of inquiry is false and/or misleading.   DeHaan's exclusion of the broiler pilot light as a possible source of ignition was not supported by objectively valid scientific methodology because his opinion was derived based objectively false assumptions,

and either ignorance of, or an intentional disregard of data contrary to his hypothesis.  See, Robinson, 923 S.W.2d at 559.  As a trained scientist, DeHaan would have had to have recognized the material flaws of his methodology in reaching a conclusion necessary to support State's desired theory of prosecution.  As a result of the lack of methodology, or clearly erroneous methodology, DeHaan's opinion had no more probative value to the issues of trial  than mere lay opinion.


33.  DeHaan's testimony was "material" in that his was the only testimony, presented in the form of expert opinion which established the exclusive cause of the ignition in the Wilkerson residence. In the absence of DeHaan's opinion, the jury would have been confronted with an open question regarding the actual cause of the ignition.  This question is more than academic: if any one of the jurors had harbored doubts about whether Appellant actually ignited the fire, then the resulting verdict could well have been for the lesser charge of felony murder,     Tex.Penal Code Sec 19.02(b)(3), as opposed to capital murder, Sec. 19.03.  In the alternative, even if the jury had concluded that the evidence had supported a verdict of guilty of capital murder, such verdict would not have been sustainable on appellate review, either on the grounds of legal insufficiency of the evidence, or of factual insufficiency of the evidence.  Alternatively, had DeHaan disclosed the data and other information which challenged his methodology and conclusion, his opinion would reasonably have been ruled inadmissible under Rule 702 for failure to satisfy the requirements of Daubert and Kelly.


34.  The prosecution has a constitutional obligation, under the 5th and 14th Amendments to the United States Constitution, and Article I, Sec. 19 of the Texas Constitution to timely disclose

evidence which is favorable to the accused. Strickler v. Greene, 527 U.S. 263, 280- 281 (1999); Kyles v. Whitley, 514 U.S. 419;  Brady v. Maryland, 373 U.S. 83 (1963); and, Ex parte Mobray, 943 S.W.2d 461, 466 (Tex.Cr.App. 1997).   Favorable evidence is evidence which is exculpatory of the offense, mitigating as toward punishment, or which impeaches any witness in the State's case. United States v. Bagley, 473 U.S.  at 676.  The failure to disclose favorable evidence violates the right to Due Process and due course of law irrespective of the good or bad faith of the prosecution. Brady,  373 U.S.  at 87.   The rule extends to information known by members of the prosecution team, but not actually known by the individual prosecutor.  Strickler, 527 U.S. at 280 - 281 (citing Kyles,  514 U.S. at 438).

 Suppressed favorable evidence is "material," and hence, harm is established if there is a reasonable probability that, had the evidence been disclosed, the results of the proceeding could have been different.  Strickler, 527 U.S. at 280;  Kyles, 514 U.S. at 433 - 434;  Bagley, 473 U.S. at 675; and, Thomas v. State, 841 S.W.2d at  404.  A reasonable probability is not equivalent to a preponderance of the evidence, but is whether in the absence of disclosure, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence.   Strickler, 527 U.S. at 289 - 290 (citing Kyles,  514 U.S. at 434).

35.    To the extent that the prosecutors were actually aware of deficiencies in DeHaan's methodology, or that DeHaan was aware of, or even consciously disregarded the existence of data which could have contradicted his hypothesis excluding the broiler pilot light as a possible source of ignition, the failure to disclose such information violated Brady because the information, if used

effectively, could have impeached the scientific basis of DeHaan's opinion regarding the possible ignition source,  Thomas, 841 S.W.2d at 405 n.8,  or even been sufficient to exclude DeHaan's opinion altogether under Tex.R.Evid 702.

36.    There is a reasonable possibility that the failure to disclose contrary data to DeHaan's s hypothesis regarding the impossibility of ignition by the broiler pilot light undermined the integrity of the jury's verdict.  The existence of significant contrary data, that which was "anecdotal," as well as that which was specifically established through ADL testing, and that which was based on established scientific principles seriously challenges the scientific basis of DeHaan's conclusion, with respect to both the ultimate conclusion itself, as well as the scientific methodology utilized by DeHaan in reaching that conclusion.   Had the jury been presented with this information, there is a significant probability that one or more jurors would have been persuaded of either the falsity, or of the objective unreliability of DeHaan's conclusions vis-a-vis the broiler pilot light.

37.    Accordingly, for the reasons stated above, Holiday has been denied his right to Due Process of Law and Due Course of Law .  His conviction and sentence should be reversed.

**Claim 46: The State violated Holiday's 5th and 14th Amendment Due Process rights by presenting false or misleading testimony regarding "pour patterns."**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 4.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 47: The State violated Holiday's 8th Amendment rights by presenting false or misleading testimony regarding "pour patterns."**

**Exhaustion:** This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 4. The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 48: The State violated Holiday's right to Due Process under the 5th and 14th Amendments to the U.S. Constitution by presenting scientifically unreliable testimony regarding "pour patterns" which undermined the fundamental fairness of the fact-finding process.**

**Exhaustion:** This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 5. The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 49: The State violated Holiday's right under the 8th Amendment to the U.S. Constitution by presenting scientifically unreliable testimony regarding "pour patterns" which undermined the fundamental fairness of the fact-finding process.**

**Exhaustion:** This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 5. The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

1.   The State's prosecution against Holiday relied in part upon evidence of alleged "pour patterns" on the concrete slab of the Wilkerson household to suggest that Holiday had the intention of causing the decedent's deaths.

2.   During the investigation, State Fire Marshall's Office Investigator Harry Bowers prepared several diagrams of the arson scene as well as prepared a report based on his investigation of the crime scene.

 Within the report, Bowers stated that investigators had identified from an examination of burn patterns on the concrete slab specific pour patterns extending from the front door of the house to the couch area, behind the couch, then to the area of the space heater.   Bowers attributable these pour patterns to Holiday because witness Beverly Mitchell had denied pouring gasoline in these areas.   The State proceeded upon the theory that unbeknownst to Mitchell, Holiday had poured gas from a second gas can in the areas of the front door way and couch area while Mitchell's was herself pouring gasoline throughout the residence.   Holiday then ignited the gasoline.   [See, State Fire Marshall's Office Diagram Sheet (Pour Patterns) and Texas Department of Insurance/State Fire Marshall's Office Report (by Harry Bowers):  Exhibit "J"].


3.   At trial, Beverly Mitchell, testified that she poured gasoline throughout the Wilkerson residence, but had not poured gasoline by the front door/hallway, nor near the couch, on which the decedent's were sitting when the fire started. [Vol. 33 RR: 97, 116 - 119] [See, Testimony of Beverly Mitchell (Excerpt): Exhibit "K."].


4.   Bowers subsequently testified at trial and referred to the "irregular" burn patterns on the slab. The appellate record suggests that Bowers demonstrated to the jury the alleged pour patterns depicted upon the diagram he prepared. [Vol. 35 RR: 83 - 84, 110 - 112] [See, Testimony of Tommy Bowers (Excerpt): Exhibit "L."].   Bowers did not state that the irregular burn patterns might be caused by factors apart from the pouring of gasoline.

143

5.   Bowers also testified that the State Fire Marshall's Office utilized the NFPA 921 Guide for Fire and Explosion Investigators as an authoritative source on fire investigation and relied upon it as a guide in conducting fire investigation. [Vol. 35 RR: 48 - 49] [See, Testimony of Tommy Bowers (Excerpt): Exhibit "L."]

6.   Bower's testimony regarding "pour patterns" on the slab, taken in conjunction with Beverly Mitchell's testimony about the locations in the house in which she poured gasoline leads to a clear inference that the specific "pour patterns" leading into the house from the front door, and by the couch resulted from Holiday having pouring gasoline in those areas.   The necessary inference from Holiday having allegedly pouring gasoline within this area, but specifically on and near the couch containing the three decedents, is that he intended to immolate them along with the house.

7.   Testimony regarding alleged "pour patterns" based upon the burn patterns discerned from the concrete slab is scientifically unreliable and hence, materially misleading.   Dr. Gerald Hurst, in reviewing the testimony and evidence has advised that the burn patterns on the slab cannot be relied upon as a basis to conclude that Holiday or  anyone else poured gasoline on those areas.   Where a prolonged fire results in structural collapse, the burning debris may produce burn patterns on the flooring which mimic or mask patterns which may be caused by the pouring of flammable liquids.
 This fact is well recognized in the arson investigation community, including John DeHaan, who assisted in a renown fire experiment, "The Lime Street Fire" which demonstrated that burn patterns could be produced in a fire not involving the use of gasoline, but which mimicked the appearance of "pour patterns." [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H"].

144

8.   According to Dr. Hurst, the fire in this case involved a full structural collapse of the Wilkerson residence, which would have resulted in burning debris upon the floor, producing burn patterns. These burn patterns could mimic those patterns produced by poured gasoline.  To the extent that the arson investigators and possibly DeHaan relied upon pour patterns for a determination of the origins of the fire, such reliance would have been scientifically unreliable because it would have been impossible under the circumstances to differentiate the burn patterns as caused by a poured flammable liquid, from a pattern resulting from burning debris.  [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H"].

9.   To the extent that Bowers conveyed the impression that these patterns were necessarily the result of poured gasoline, without acknowledging the possibility that the patterns could also have been caused by burning debris, the testimony would have been misleading.   [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H"].

10.   Dr Hurst's discussion of the possible confusion between burn patterns caused by debris and pour patterns is also expressed in NFPA 921, the standard operating procedure for arson investigations in the State Fire Marshall's Office.  NFPA 921 cautions:

Irregular, curved, or "pool-shaped" patterns on floors and floor coverings should not be identified as resulting from ignitable liquids on the basis of observation of the shape alone.  In cases of full room involvement, patterns similar in appearance to ignitable liquid burn patterns can be produced when no ignitable liquid is present.

* * *

These patterns are common in situations of post flashover conditions, long extinguishing times, or building collapse. These patterns may result from the effects of hot gasses, flaming and smoldering debris, melted plastics, or ignitable liquids. . . . In any situation where the presence of ignitable liquids is suggested, the effects of flashover, airflow, hot gasses, melted plastic, and building collapse should be considered.

[See, NFPA 921: Guide for Fire and Explosion Investigators, pp. 45 - 46, Secs.6.17.8.2, 6.17.8.2.2 (2004 ed); Exhibit "M"].

11.   The State violates a defendant's right to Due Process of Law under the 5th, 8th and 14th Amendments to the United States Constitution and the right to due course of law under Art. I, Sec 19 of the Texas Constitution by knowingly presenting false or misleading testimony, United States v. Agurs, 427 U.S. at 103 (1976); Pyle v. Kansas, 317 U.S. at 216; and, Thomas v. State, 841 S.W.2d 399, 402 (Tex.Cr.App. 1992), or by failing to correct false or misleading testimony. Alcorta v. Texas, 355 U.S. at 31; and, Napue v. Illinois, 360 U.S. at 269.   Knowledge of the falsity of testimony is imputed among all members of the prosecution team. Giglio v. United States, 405 U.S. at 154 (1972); and, Ex parte Castellano, 863 S.W.2d at 480 & n.3.   If the false or misleading testimony is material, then the conviction must be reversed.   United States v. Bagley, 473 U.S. at 679 n.9; and, Castellano, 863 S.W.2d at 485.

12.     Bower's testimony and demonstration of alleged pour patterns throughout the Wilkerson residence was false and/or misleading because it conveyed the necessary implication to the jury, when considered in conjunction with Beverly Mitchell's testimony, that Holiday had poured gasoline in the door – entryway area of the Wilkerson residence, as well as the couch containing the decedents.  This impression, conveyed under the auspices that Bowers, a certified arson investigator had arrived at his conclusion of a pour pattern based upon his application of established scientific principles, was, in reality, little more than speculation.  Due to the circumstances of he fire, Bowers would have been unable to differentiate whether the burn patterns resulted from poured gasoline, or from falling debris.  Bowers essentially chose the hypothesis which best suited the prosecution theory that Holiday had poured gasoline in the designated areas, regardless of whether scientific principles of arson investigation could establish this as a fact beyond a reasonable doubt.   This impression was both false, and it was misleading to the jury, which was ultimately called upon to determine whether Holiday intended to kill the decedents.  Testimony which suggested, without a proper scientific foundation,  that Holiday had poured gasoline on the couch containing the decedents improperly directed the jury to arrive at this conclusion.


13.     Bowers testimony was material, and hence prejudicial to Holiday because a court could not reasonably conclude beyond a reasonable doubt that the testimony and evidence of suggesting that Holiday had poured gasoline in the area of the couch did not influence the jury to conclude that Holiday intended to kill the decedents, rather than simply burn down the Wilkerson residence.   In addition to the probative value of the evidence in its own right, this testimony about a pour pattern fit like the piece of a jig saw puzzle with other testimony and evidence presented at trial.  For this

147

reason, the false/misleading testimony presented by Bowers is inextricably tied to the other evidence, and cannot be separated and considered harmless.

14.    Similarly, the presentation of scientifically unreliable evidence violates a defendant's right to due process and due course of law because it denigrates the accuracy, integrity and fundamental fairness of the fact-finding process.  See, Dawson v. Delaware, 503 U.S.  at 179 (1992); Payne v. Tennessee, 510 U.S.  at 825,  and, Barnard v. Henderson, 514 F.2d 744.  See also, Beck v. Alabama, 447 U.S. at 637 - 638.   Scientifically unreliable testimony presented in the guise of an "expert" opinion, in essence "junk science",  threatens principles of fundamental fairness  because it interferes with the accuracy demanded in the fact-finding process.  See generally,  E.I. Du Pont de Nemours and Co. v. Robinson, 923 S.W.2d at 557 (" Scientific evidence which is not grounded "in the methods and procedures of science" is no more than "subjective belief or unsupported speculation." . . . Unreliable evidence is of no assistance to the trier of

fact and is therefore inadmissible under Rule 702)); and,  Kelly v. State, 824 S.W.2d at 572.

15.    Bower's conclusions regarding the alleged "pour patterns" on the floor, and by the couch are without scientific validation; although the burn patterns may demonstrate pour patterns, they are just as likely, if not more likely in the context of the total structural collapse of the Wilkerson residence to demonstrate burn patterns from debris.  Bowers was unable to – and in fact, apparently made no effort – to determine the precise origin of the patterns which he suggested resulted from poured gasoline.  Both his methodology and conclusion were the epitome of junk science and the admission

148

of this testimony affected the fundamental fairness of the fact-finding process by providing a pseudo scientific basis for the jury to have concluded that Holiday poured gasoline on the couch, and the decedents.

16.   For precisely the same reason as argued in the foregoing claim for relief, Bower's testimony was not harmless beyond a reasonable doubt because, taken both individually and in context with the other evidence, was probative toward the State's theory of prosecution that Holiday intended to kill the decedents.

17.   In the alternative, the admission of the fundamentally unreliable testimony had a substantial and injurious influence on the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 - 638 (1993).

18.   Accordingly, for the foregoing reasons, Holiday has been denied his right to Due Process of Law and Due Course of Law .  His conviction and sentence should be reversed.

**Claim 50: The State Violated Holiday's Right to Due Process of Law Under the 5th and 14th Amendments to the United States Constitution by Presenting False or Misleading Testimony by State's Expert John DeHaan Regarding the Applicability of his Doctoral Thesis to the Issue of Broiler Pilot Light Ignition.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 9.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 51:  The State Violated Holiday's Right Under the 8th Amendment to the United States Constitution by Presenting False or Misleading Testimony by State's Expert John DeHaan Regarding the Applicability of his Doctoral Thesis to the Issue of Broiler Pilot Light Ignition.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 9.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

Claim 52:  The State Violated Holiday's Right to Due Process of Law Under the 5th and 14th Amendments to the United States Constitution by Presenting False Testimony from John DeHaan Regarding the Applicability of his Doctoral thesis to the Issue of the Broiler Pilot Light Ignition.

Exhaustion:  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 10.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

**Claim 53:  The State Violated Holiday's Right Under the 8th Amendment to the United States Constitution by Presenting False Testimony from John DeHaan  Regarding the Applicability of his Doctoral thesis to the Issue of the Broiler Pilot Light Ignition.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 10.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

1.    These claims for relief are alleged on a contingent basis within this post-conviction writ application and is based on a good faith belief that the State's expert may have presented false or misleading testimony regarding his experience or knowledge in the area of gasoline vapor ignition by virtue of his doctoral thesis,  "The Reconstruction of Fires Involving Highly Flammable Hydrocarbon Liquids."  Holiday has recently obtained DeHaan's thesis to determine whether the matters within the thesis pertain to, support or contradict DeHaan's testimony at trial, but as of the date of filing, he has been unable to review the thesis and specifically determine the extent to which it is applicable to the issues at trial, or whether it is inconsistent with the testimony and/or evidence at trial, or whether it is false or misleading in any other manner. [See, DeHaan doctoral thesis: "The Reconstruction of Fires Involving Highly Flammable Hydrocarbon Liquids" Exhibit "X"].   In the event that a review of the thesis does not support the claim, then Holiday intends to abandon the claim.

2.    During trial, DeHaan a testified that he held a PhD from the University of Strathclyde, in Glasgow, Scotland.  DeHaan claimed that his doctoral thesis involved the "reconstruction of fires involving highly flammable liquid fuels."  He stated:

  . . . from 1991 to '95 I studied the evaporation of flammable liquids and the propogation of or the generation of vapor layers and the manner which those vapor layers spread and mix in order to support flame.  The ignitability of those pool fires on materials like carpets and floors.

[Vol. 36 RR: 148].

151

3.   Later during his testimony in which he opined that the broiler pilot light could not have been a possible ignition source of gasoline vapors based upon his "Candle experiment" DeHaan again referred to his thesis as following from his observations during the candle experiment. [Vol. 36 RR: 185].   DeHaan claimed that his thesis demonstrated why the broiler pilot light could not have produced ignition of the gasoline vapors: "And it was, in fact a couple of instances like [the candle experiment] which prompted me to do the research I did for my thesis and that was on why there was no ignition.  And we now have a reason why there was no ignition." [Vol. 36 RR: 185].   DeHaan's reference to his doctoral thesis in the context of his exclusion of the broiler pilot light added scientific cache to an opinion, which, for reasons detailed in claims for relief one through three, lacked support by objective scientific methodology.

3.   Prior to trial, defense counsel issued a subpoena duces tecum to DeHaan to produce the following items: "Any research or studies that support as reliable, the scientific theory and/or technique that the witness has or will utilize in formulating any opinions that will be a part of his testimony in this case . . . [and] any literature that supports or rejects the underlying scientific theory that the witness has or will utilize in formulating any opinions that will be given as a part of his testimony upon the trial of this cause."  [Vol 4 Clerk's Record (10,423): 538].   To the best of his belief,  Holiday believes DeHaan failed to comply with the subpoena duces tecum and produce his thesis to defense counsel at any time during this case.

4.    Holiday believes that DeHaan's testimony regarding his thesis may be false or misleading regarding the extent of applicability of the thesis to the subject matter at trial, or to its implied support of DeHaan's ultimate opinion.

5.    The State violates a defendant's right to Due Process of Law under the 5th, 8th and 14th Amendments to the United States Constitution, as well as due course of law under Article I, Sec. 19 of the Texas Constitution when the State knowingly presents false or misleading testimony, United States v. Agurs, 427 U.S. at 103, or fails to correct false or misleading testimony. Alcorta v. Texas, 355 U.S. at 31; and, Napue v. Illinois, 360 U.S. at 269.

6.   The State similarly violates due process of law and due course of law where it presents unreliable scientific testimony.  See, Dawson v. Delaware, 503 U.S. at 179; Payne v. Tennessee, 510 U.S. at 825, and, Barnard v. Henderson, 514 F.2d 744.  See also, Beck v. Alabama, 447 U.S. at 637 - 638.  This is because scientifically unreliable testimony  threatens principles of fundamental fairness by undermining the accuracy demanded in the fact-finding process.  See generally,   E.I. Du Pont de Nemours and Co. v. Robinson, 923 S.W.2d at 557, and,  Kelly v. State, 824 S.W.2d at 572.

7.   To the extent that DeHaan's thesis does not apply, or does not otherwise support his conclusions in excluding the broiler pilot light as a possible ignition source, then the evidence is false and misleading, and undermined the accuracy of the fact-finding process by masking DeHaan's lay opinion under the guise of objectively verified science.

153

**Claim 54: Holiday was denied effective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution Due to Counsel's Inadequate Investigation of Possible Ignition Sources of Gasoline Vapors and Consequent Preparation of a Viable Defensive Theory**.

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 6.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

1.   The defensive theory was predicated on the possibility of accidental ignition of the gasoline vapors.   A jury finding that the gasoline vapors had ignited prematurely, and that Holiday had intended only to burn down the Wilkerson residence, rather than kill the decedents in the fire, would have resulted in a verdict of felony murder.  Tex.Penal Code Sec.19.02 (b)(3).

2.   Prior to trial, defense counsel received discovery prior to trial consisting of owners manuals for the  household appliances, including the kitchen stove.

3.   Defense counsel also received a copy of the report generated by the State's arson expert, John DeHaan..  Within his report, and during trial, DeHaan identified the kitchen stove as containing a continuously burning gas pilot light in the broiler.   DeHaan nevertheless exclude the broiler pilot light as a possible ignition source of the gasoline vapors. [Vol. 36 RR: 103, 114, 183 - 187] [See, Testimony of John DeHaan, Exhibit "D."].

4.   During cross-examination, counsel did not confront DeHaan with scientific data relating to the ADL testing which refuted his candle experiment, or with other independent data challenging the scientific reliability of DeHaan's exclusion of the broiler pilot as a possible source of ignition.  [Vol. 37 RR: 3 - 142].  Rather, defense counsel's questions focused on the possibility that the gasoline vapors could have been ignited by an electrical spark from one of the electrical appliances, or from the gas space heater. [Vol. 37 RR: 27 - 32].

5.   Aside from DeHaan's evaluation, there was additional evidence which established that the broiler had a continuously burning gas pilot light.  Louis Mitchell, Tammy Wilkerson's father testified during the State's case-in - chief that the stove was gas operated. [Vol. 33 RR: 153].  Mitchell subsequently testified several days later in the defense's case-in-chief that the stove was contained gas pilot lights in both the upper burners and in the broiler. [Vol.38 RR: 27 - 29].   When specifically pressed by defense counsel, Mitchell insisted that the stove contained a pilot light in the broiler, and that he had personally observed, and lit the broiler pilot light. [Vol. 38 RR: 30].

6.    Mitchell initially testified on May 29, 2002 and then later testified during the defense's case-in-chief on June 10, 2002.  DeHaan testified on June 4, 2002.

7.   During defense counsel's opening statement to the jury on June 10, 2003, defense counsel advised that it was proceeding under a theory that the stove had an electrical ignition system in the broiler, but that the stove top burners had a pilot light which was a likely source of ignition.  [Vol. 38 RR: 12 - 13].

155

8.    The defense expert was  Judd Clayton, an electrical engineer who owned an engineering and consulting firm. [Vol. 39 RR: 46 - 48].  Clayton testified on the second day of the Defense's case-in-chief, June 11. 2002.   Clayton identified the oven stove as having an electrical ignition system in the broiler, rather than having a continuously burning pilot light.  [Vol. 39 RR: 103 - 104, 105].  Clayton explained that had the stove had a gas pilot light in the broiler it would have increased the possibility of ignition of gasoline vapors, but he concluded that this was not a realistic possibility in the Wilkerson fire because of the electronic pilot. [Vol. 39 RR: 105].  Clayton identified the most likely sources of accidental ignition as: the water heater located in the bathroom, the refrigerator, the window mounted air conditioner units, and the pilot lights on the stove top. [Vol. 39 RR: 107].

9.    Ken Moore, a technical manager for Sears testified during the State's rebuttal that the stove purchased by the Mitchell's and placed in the Wilkerson residence had three gas burners, two on top and one located in the broiler box. [Vol. 40 RR: 91 - 92].  A computer check of the model number indicated that the stove had no power cord or igniters, hence, it had to be a gas model. [Vol. 40 RR: 95- 96].

10.    The defense did not attempt to independently determine prior to trial whether the particular stove model in the Wilkerson residence had a gas or electrical ignition source. Although the defense was provided with documents which indicated the broiler contained a gas pilot light, and independent investigation would have indicated that the broiler contained a gas pilot light, defense counsel did not determine this fact prior to, or during trial, when formulating a defensive strategy on possible sources of ignition.

11.   Even after having formulated an initial defensive strategy which excluded the broiler pilot light as a possible ignition source, but having learning during trial that the broiler contained a gas pilot light, defense counsel did not request Clayton re-evaluate his earlier conclusions relating to ignition via the broiler pilot light in order to determine the scientific viability of a defense based on this theory, or to determine the strength of this hypothesis as compared to the alternative hypothesis presented by the defense at trial.

12.   Due to the defense counsel's failure to recognize the broiler pilot lights' possibility as an ignition source, or defense counsel's failure to evaluate the necessity of a change of strategy in light of the evidence developed at trial, the defense did not conduct any independent evaluation of available scientific, government, or industry data which supported a hypothesis that a gas pilot light would present a reasonable possible basis for the defense's theory of accidental ignition.   Similarly, the defense did not conduct an independent investigation for data which would have been useful in specifically challenging DeHaan's exclusion of the broiler pilot light as possible ignition source.

12.   Dr. Gerald Hurst has evaluated Clayton's testimony and concluded that Clayton's mistaken evaluation of the broiler pilot light necessarily have affected his advice to the defense, and as a result, the defense's ability to present scientifically reasonable alternatives to the State's hypothesis that the sole cause of ignition lay with Holiday.   [See, Affidavit of Gerald Hurst, Ph.D: Exhibit "H"].

13.   Clayton's conclusion that the stove was a "hybrid" kitchen range, that is, a stove with mixed electronic ignition/pilot light systems was unreasonable.   Reference to Sears' publicly available

databases on its Kenmore products, coupled with the owner's receipts for the stove would have revealed that the stove's broiler had a  standing pilot light equipped with a thermomagnetic safety valve.  Dr. Hurst believes that Clayton simply confused the probe for the thermomagnetic valve as an electric wire suggesting an electronic ignition system.   [See, Affidavit of Gerald Hurst, Ph.D: Exhibit "H"].

14.    By misidentifying the broiler ignition system, Clayton's consequent advice to counsel on defensive theories of ignition lead defense counsel to reject the broiler pilot light as a possible ignition source of the gas vapors.  As a result of this, defense counsel did not investigate or significantly prepare a cross-examination of DeHaan based scientific inaccuracy in his methodology for excluding the broiler pilot light.

15.    The defense's chosen theory of possible ignition sources, the water heater, the refrigerator, the heater, and the stove top pilot light presented only remote possibilities of ignition.  It is improbable that an electrical spark from the refrigerator, or the relatively high level stove top burners would have resulted in the fire in the Wilkerson residence given the time interval between the pouring of the gasoline and the broiler pilot light. A more scientifically viable, and sustainable explanation would have been the broiler pilot light.   [See, Affidavit of Gerald Hurst, Ph.D:  Exhibit "H"].

16.   The Sixth and Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Texas Constitution guaranty the right to the effective assistance of counsel.   Strickland v. Washington, 466 U.S. 668, 686 (1984); and,  Hernandez v. State, 726 S.W.2d 53, 56-57 (Tex.Cr.

App. 1986).   In order to render effective assistance of counsel, trial counsel must conduct an extensive and thorough investigation of the facts of the case.  Butler v. State, 716 S.W.2d 48, 54 (Tex.Cr.App. 1986); and,  Ex parte Duffy, 607 S.W.2d 507, 516 (Tex.Cr.App. 1980).  Trial counsel's failure to adequately investigate the facts of a case constitutes ineffective assistance where the result is that any viable defense available to the accused is not advanced. Butler, 716 S.W.2d at 54;  Ex parte Lilly,   656  S.W.2d 490, 492 (Tex.Cr.App. 1983);   Ex parte Ybarra, 629 S.W.2d 943, 946 (Tex.Cr.App. 1982); Duffy, 607 S.W.2d at 517; and,  Bryant v. Scott, 28 F.3d 1411 (5th Cir. 1994). "As is so often the case in those situations where any viable defense has not been raised, the dereliction is because the attorney is not familiar with the defense or he has not adequately investigated the facts of the matter." Ybarra,  629 S.W.2d at 948.


17.   A defendant has been prejudiced by counsel's errors if there is a reasonable probability that the results of trial would have been different absent counsel's deficient conduct.  Strickland, 466 U.S. at 693.  A reasonable probability is measured by whether counsel's errors are sufficient to undermine confidence in the outcome of the proceedings, not by whether it is more likely than not that the result would have been different.  Williams v. Taylor, 529 U.S. 362, 405 - 406 (2000);   Strickland, 466 U.S. at 694;  and,  Snow v. State,  697 S.W.2d 663, 666 (Tex.App.- Hous. [1st  Dist.] 1985).


18.    Counsel may render ineffective assistance of counsel based upon the malfeasance or misfeasance of members of the defense team, see,  Guy v. Cockrell,  343 F.3d 348 (5th Cir. 2003), relief granted on remand, Guy v. Dretke, No. 5:00-CV-191-C, slip op. at 4 (N.D.Tex– Lubbock, June 29, 2004) ("Petitioner received ineffective assistance of counsel . . . because . . . the defense

159

investigator, failed to thoroughly investigate Petitioner's mitigation evidence.), or through counsel's failure to effectively make use of the defense experts. Hooper v. Mullin, 314 F.3d 1162, 1170 - 1171 (10th Cir. 2002);   Skaggs v. Parker,  235 F.3d 261, 269 - 270 (6th Cir. 2000);  Bloom v. Calderon, 132 F.3d 1267 (9th Cir. 1997); and,  Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995).

19.   Trial counsel's representation fell below objectively reasonable limits in the instant case because counsel, either independently, or in conjunction with the advice rendered by the defense's expert failed to accurately ascertain all possible sources of gasoline vapor ignition in the Wilkerson residence.  This failure rendered defense counsel unable to make a reasoned strategic decision on the best defensive theories of accidental/premature ignition to pursue at trial.  Additionally, the failure to accurately ascertain all possible sources of ignition rendered defense counsel unprepared to intelligently and effectively cross-examine the State's expert, DeHaan, on his exclusion of the broiler pilot light as a possible cause of ignition.

20.    In the alternative, defense counsel, upon learning of new facts which undermined or marginalized his adopted defensive theory regarding ignition failed to make either make effective use of his expert, and/or adequately adjust his defensive theory to address the new evidence.  In either event, any strategic decision made by defense counsel was objectively unreasonable given the facts which confronted him, and were made without adequate understanding of the material facts of the case.

21.   Defense counsel's errors lead him to ignore or otherwise reject the strongest defensive theory available to Holiday – that the broiler pilot light, in light of existing scientific and anecdotal data – had presented a significant likelihood of the accidental or premature ignition of the gasoline vapors. Had defense counsel pursued this theory, either in lieu of, or in addition to his other theories of ignition by electrical spark, there is a reasonable probability that one or more jurors would have harbored doubt about whether Holiday intentionally ignited the gasoline vapors, as presented by the State.

21.   For the foregoing reasons, and any other reasons which arise during the litigation of this claim, Holiday was denied his right to the effective assistance of counsel under the Federal and State Constitutions.  His conviction should be reversed and this case should be remanded for a new trial.

**Claim 55: Holiday was denied effective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution Due to Counsel's Inadequate Investigation of Available Mitigation Evidence Relating to Holiday's Background.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 7.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

1   Defense counsel adopted a defensive strategy of presenting evidence of Holiday's background for the purpose of establishing mitigating aspects of his childhood, and to implicitly demonstrate the reason for his character and personality.  Counsel advised the jury during opening statements at the punishment phase of trial that it would present evidence of Holiday's childhood which would assist

in explaining Holiday's character and personality, and that this type of information about a defendant's background was highly relevant evidence which was necessary for the jury's consideration of Holiday as an individual:

"These sorts of facts just sort of tell you what his life is about , what it the nature of his background so you can put it into context. It's not just a plea for mercy. It's context, it's understanding, to understand where he was, his psyche, how his personality was constructed or failed to be constructed to deal with the stresses of life and the unusual situation he found himself in this relationship. And how he failed to cope which resulted in the tragedy of September 06th.  Barely struggling, living with his grandmother, his uncles, his child mother, calling his grandmother momma, calling his mother Diane . . .at an early age one of his uncles shoots one of his cousins right there at home. The young man bleeds to death in the presence of the entire family.

These early childhood dramas are not something that are just about how children may not be able to remember with any detail events early in their lives. But the impact of shaping personalities and shaping their health shaping the way they grow and develop is probably greater than the things that happened yesterday, last week or last month and far more recent because of the formative years. That's when children are shaped. That's when they develop their personalities. That's when they develop their understanding of the world and the need for security and safety and stability if ever in a person's life it's in those early formative years. And clearly it was absent in the formative years of Raphael Holiday.

[Vol. 42 RR 12 - 13].

2.   Defense counsel offered the testimony of Holiday's mother, Angela Nickerson, stepfather, James Nickerson, Jr., an individual who knew Holiday and during his adolescence, J.C. Henry, several individuals who knew of Holiday's good behavior while incarcerated, Sheriff Dan Dauget, Officer Bill Matzke and Deputy Paul Cannon, and a psychiatrist, Dr. Fred Fason.

3.   Angela Nickerson testified that there were no significant problems in the home between Holiday and his step-father, or between Holiday and anyone else.   She also stated that Holiday had been raised in a religious environment, and that he had been taught to pray and go to church.   She further stated that prior to the incident, she had made an appointment for Holiday to receive mental health services, but she did not explain in detail his need for these services. Mrs. Nickerson also stated that Holiday had lived with a woman named  Janet Wilkerson for a period of time while he was a teenager.

4.   James Nickerson, Holiday's stepfather testified that he never had any troubles with Holiday and that he never disciplined Holiday.

5.   J.C. Henry, who knew Holiday as an adolescent, testified that Holiday had done work for him and was respectful. [Vol. 42 RR: 119 - 121].   He was impressed by Holiday's concern for his well being. [Vol. 42 RR: 124].

6.    Jerry High testified that Holiday had obtained his GED in a very short period of time while incarcerated in the Madison County Jail. [Vol. 42 RR: 129 - 130].  Holiday was a dedicated student and respectful toward High. [Vol. 42 RR:  131 - 133].  Holiday also attended Bible Study on a religious basis while jailed. [Vol. 136 - 137].


7.   Sheriff Dan Dauget,  Officer Bill Matzke and Deputy Paul Cannon all testified that Holiday had been a courteous,  well behaved inmate while incarcerated and had not been involved in any disciplinary violations. [Vol. 42 RR: 137 - 146].


8.   Dr. Fred Fason, a forensic psychiatrist  testified for the defense based upon his clinical evaluation coupled with the results of a personality test, the Minnesota Multi-phasic Personality Inventory (MMPI) which had been administered to Holiday pending trial.     Holiday's profile on the MMPI indicated Holiday had an "unusually mixed profile, with paranoid, passive-aggressive, depressive and hysterical conversion and dissociative elements. [Vol. 43 RR: 162 - 163].  He also demonstrated severe depression, tension, worrying, irritability, poor tolerance for frustration. [Vol. 43 RR: 164].

 Fason attributed Holiday's low frustration level as a result of his failure to make an adequate transition during his childhood development. [Vol. 43 RR: 169 - 171].  Holiday's method of dealing with rejection or frustration was "by regression back to an earlier level of development.  And then he becomes self-centered, hostile, and the other things in the report come out." [Vol. 43 RR: 171].  Holiday had clearly impaired coping mechanisms. [Vol. 43 RR: 175- 177].

8.  Dr. Edward Gripon, a forensic psychiatrist testified for the State according to a hypothetical that included a description of Holiday's childhood as "happy," and a relatively stable home family." [Vol. 43 RR:77].  Gripon testified, based upon the facts of the hypothetical that Holiday more likely than not would possess a threat of future dangerousness. [Vol. 43 RR:  90].

9.     The post-conviction writ investigation has revealed material facts relating to Holiday's background which were available at the time of trial, but which were not investigated, and therefore not presented.  Janet Wilkerson, the girlfriend of Holiday's uncle, and with whom Holiday lived for a period of time as an adolescent has provided an affidavit regarding her personal knowledge of Holiday's home life.   Had defense counsel interviewed Janette Wilkerson, she would have provided the following information regarding Holiday:

Raphael Deon Holiday spent many days in my house as he was growing up.  I dated his uncle Eddie Nickerson. I knew his family well.

Life was so hard on Raphael. He never had a chance to live. He never had one.

I used to bring Raphael to my house as often as I could, because of the way his family treated him.

Raphael was his mom's punching bag. I remember one time after my son spent the night with Raphael's family, my son told me Diane woke him up by hitting him with board. When my son

165

popped out from under the blanket, she apologized and said she was 'trying to hit that motherfucker there,' and pointed at Raphael. Diane was angry that Raphael had not got up to warm the house and make his brother's breakfast before she got up.  I remember Diane beating on Raphael because he let the baby spill something one time.  Raphael was punished for everything and responsible for everything.  I remember Diane and James whooping  Raphael with sticks or a belt then making him pray to God that his wounds would heal by Monday so he could go to school. Both Diane and James whooped Raphael all the time. As Raphael got bigger, James would even get his dad to come over to help beat Raphael. I remember James hitting Raphael, and Raphael asking 'why are you hitting me?'  James told Raphael 'because you aint mine and you got no business being here.' On a different day, Raphael was visiting me and told me that he thought 'Boo' [James] was going to kill him one day anyway. Raphael told me, that day, and many times "don't nobody care about me anyway."

Raphael had to wait on his brothers, hand and foot.  He had to do all of the cooking, cleaning, getting the fire ready, dressing them, catering to them. Diane  got in his face and he would get a whooping when he wouldn't wait on the brothers. Diane  even kept Raphael out of school to babysit Tarver or Chase when they couldn't go to school. They treat that boy like a slave. He was a disgrace to them to be around. He had a constant reminder that he didn't belong. He was everybody's scapegoat.

I remember when Raphael was scalded by a pot of beans that was too heavy for him when he was cooking for his brothers. He was trying to take a heavy pot of beans off the stove and slipped and ran

down his arm. I remember this because Raphael was too young to have to cook for the kids and got hurt in the process.

With Raphael, it was always gotta, gotta, gotta.  James made Raphael get out and help him hauling hay by the time he was 10 years old. Raphael was not allowed to play or hang out even though the brothers could, because he had to work whenever possible. Whenever Raphael wasn't working or at school, he had to clean the house or do the wash or do other chores around the house.

Diane constantly told Raphael that he was worthless and didn't amount to nothing.

When Raphael was spending the weekend with me, and when he was living with me, would curl up in a ball and cry. When he got like that we would have to wait it out.

Raphael would not respond to us when he was like that. I saw Raphael curling up outside beside the house after an argument with Tay. The argument started because Raphael jumped up to do something for me that I asked Tay to do. Tay was upset and told Raphael 'she aint your momma.' Raphael was deeply hurt by that and ran outside crying. We found him a few minutes later, beside the house, all curled up and out of it. He cried and cried till his eyes swollen shut.  That hurted Raphael so bad. He wanted to have a momma.

167

Raphael couldn't read anything or write when he lived with me in highschool. When the older kids found out he couldn't read, they'd tease him and he wouldn't go to school anymore. The older kids would say "you dummy," and pick at Raphael and it would freak him out.

Raphael tried to kill himself when he thought I was going to send him back to his family. He had skipped school one day. He knew I was going to find out. I worked late at night. Raphael slept with a boxcutter under his pillow so he could cut his wrists when I came home and told him he had to leave.  He was so cared of being sent back home.

Raphael came to live with me because James' mom called me crying and begged me to come get him. The whole family was upset and James and Diane were both beating on Raphael when grandma came over to break the fight up. James had ripped Raphael's shirt off of him and was beating him badly. Raphael had whelps on him from the fight. Grandma had enough of the trouble between James and Raphael and wanted to get him out of the house. Grandma stayed in the middle, of what was going on in James' home.

Raphael could never stand to be around adult women when he was a teenager or child. When he would stay with me and my sisters would come over, he would not let them hug him or rub on the top of his head. He would physically stay away from adult women.

Raphael used to cry in his sleep, when he lived with me.

168

When Raphael was around me and at my house as a child, he kept his head down, and kept out of everyone's way. When he finally trusted me, he opened up and cried, about how he was treated at home.

My boyfriend Eddie, Raphael's uncle, was such a brute. He'd get jealous if another man even looked at me. He didn't like another guy looking at me.

I suspected both Boo and Eddie were on crack while Raphael was in high school. Boo eventually got off the pipe and kept his job but Eddie was terrible about his addiction.  Eddie's family took up for him, whenever he wronged me. When Eddie was on crack, he'd take my car and be gone for days. I had  to call his mom and threaten to call the police before he gave the car back.

[See, Affidavit of Janette Wilkerson: Exhibit "N"].

9.   Janette Wilkerson's identity, and indications of her available testimony was available to defense counsel independent from any information specifically conveyed by Holiday.  Counsel received open file discovery from the State in this case.  Within the State's file, and presumably given to defense counsel,  is a document entitled "Conroe Independent School District Application for Determination of Residence" signed by Ms. Wilkerson acting as Holiday's guardian.  The document recites that Holiday came to reside in Conroe because of "problems at home" and "child abuse." [See,  Conroe ISD Application for Determination of Residence; Exhibit "O"].

169

10.   Chas Nickerson, Holiday's younger half-brother was briefly interviewed, but not interviewed in depth regarding Holiday's family life.  Had trial counsel interviewed Chas, he would have learned that Chase could have proved the following testimony regarding Holiday:

Growing up, me and my other brothers didn't have it nearly as hard as him.  It seemed like as he got older, he couldn't let go of what happened to him growing up.

Our mom and dad, but especially dad was a lot tougher on him  than they were on the rest of us. All of the us kids got our share of hard whoopings but his share was a lot more than ours. Raphael had an attitude often with dad. Raphael and dad didn't see eye to eye.  My dad would get drunk and come home and trip.  When dad came home drunk, it was always 'the house aint clean - this aint good enough . . .'  He come in and trip for nothing. Dad always got in Raphael's face and used to try to jump on him when he was tripping. Raphael would almost always stand up for himself and get into a fight. Raphael finally went to live with Janette because him and my dad was fighting too much.

When Raphael was sent away, I chased the car down the street crying, 'don't go! Don't go!' Raphael was the only one that protected me from Eric and the older kids picking on me. Raphael raised and cared for me. I remember Raphael stopped the car and got out and hugged and patted me, telling me ' you gonna be alright, stop crying.' Raphael walked me back to the house.

Raphael had to do most of the work taking care of me and my brothers. Raphael did everything for us. He'd cook for us. He'd clean up the house. He had to do it all.  I depended on him growing up.

170

Fights and stuff wasn't just from my dad, we grew up around a lot of fights.  If we have a get together with mom's family, at the end of the night somebody gonna fight and we all gonna cry. There was always violence.  There gonna be a fight. I know this affected Raphael because you can't forget where you come from.

My mom's family liked to pick on Raphael at our get togethers. They wouldn't hit him but they were always teasing him and making him feel or look dumb. They did that to uncle Kenneth all the time too.

Mom and dad fought too when we were young. The fights were physical. It was just as likely that mom hit dad first, as dad hitting first.  Me and my brothers would stand at the end of hall during fights. We would stand there and cry.

My mom and dad both used to drink. They would come home drunk and ready to fight. They stopped fighting when I was about 7 or 8 years old after Raphael got in the middle of a fight.

We stayed in a chicken coop. The two room house we first lived in was like an old chicken coop. You could see the ground through the floors. We had to run a hose from grandfathers' house to have water in the house. We had to fill a bucket with water to flush the commode.  There were animals in the house all the time. The rats that came in were very big.

171

The other kids in the neighborhood used to pick on us  because of our ragged clothes and terrible house. The house we lived in was hard.

I know my brother took his life hard because as a teenager, he would sit and cry while listening to music. Raphael would put on the headphones and sit by himself, thinking no one was watching and cry.  Raphael also would cry and shake in his sleep. He was very bothered about his life but he wouldn't let you know directly.

Raphael felt like his dad wasn't there so he was an outsider. Raphael complained  that he wasn't part of the family because he had a different dad. Raphael or any other kid treated like him  could easily make hisself believe don't nobody love you.

Raphael was in his own world, growing up. He would sometimes space out and if he didn't talk to you, you wouldn't know.

Raphael had a hard time learning new things. If you talked to him about something for a long time he could understand; if you made him understand. Raphael didn't get anything new without a lot of talking.  Raphael never was a good reader.

 . . . .

I heard that Tammy called Raphael the night of the incident and hung up in his face.

172

[See, Affidavit of Chas Nickerson: Exhibit "P"].

11.   Marjorie Minor, Holiday's maternal grandmother attended Holiday's trial and spoke briefly with defense counsel.  However, had defense counsel questioned Ms. Minor in depth, counsel would have learned of the following available testimony from Ms. Minor:

I  had seven brothers and several sisters growing up. Out of all the girls in my family, I was the one that had to stay home and do laundry and cook and clean for my brothers. I was the mother.

Diane was my oldest child. Before Raphael was born, I was proud of Diane, keeping her grades up and working hard in school. Diane was going to go to college until she got pregnant.

Diane never told me she was pregnant. I noticed it one evening when we were sitting watching 'Sanford and Son,' and Diane had a hard time getting out of a chair. Diane had started spreading and had to be 3 or 4 months pregnant at the time. When I found out Andrew Taylor got Diane pregnant, I was angry enough at him to want to shoot him. Diane was only 15 years old. Andrew was in his twenties and married.

Diane told me, just a year or two ago, that  Andrew raped her after blowing marijuana smoke in her face. It made really angry to find out he had done her that way.

173

I was married for a while, when Diane was growing up. I got off work early one night and came home unexpectedly. I went  pushed in the bedroom and saw my husband had Diane in bed and had thrown her panties on the floor. Diane was in tears. I got my gun and went after my husband. I ran him off.

After Raphael was born, I got a babysitter for him and let his momma go back to high school. When I wasn't working, I brought Raphael everywhere with me. I used to even bring him to the beer joints.  I didn't want nobody else to keep him.  Raphael called me 'momma' more than he called Diane 'momma' when he was little.

When Diane married James, she moved and took Raphael off to Stoneham. Raphael's life was much different in Stoneham than it had been with me. The first house they had in Stoneham wasn't fit to live in.

Raphael was the child that was made to do all the work in the family.  Raphael would have to come in from playing to change his brother's diaper or give him a bottle or rock the baby.  As he got bigger, he still had to do the majority of the chores. He cook, clean; he do it all for them little brothers. He raised all them children.  Diane could be watching t.v. or resting on the couch and she would call Raphael, 'the baby wet, come take care of him.'

Raphael wanted to play football while he was going to school in Navasota. Neither James nor Diane wanted to be bothered by picking him up after practice. Both James and Diane would jump on

him when he got home for missing the bus and having to stay with their family in town. They punished him because they couldn't be bothered by picking him up.  They was against it and James wouldn't pick him up.

It seemed like James and Raphael could never get along. James would constantly pick at Raphael. All of the kids could be sitting around and James would say 'come here and do this here,' to Raphael and let the other brothers be. James and Raphael never did get along.

Raphael was upset by his daddy James picking at him. Raphael used to call to me crying "momma I aint doing nothing and they jumping on me." Raphael felt like nobody cared about him. He has told me grandmother many times that his mom doesn't care about him and James doesn't like him.

Raphael loved his kids. Raphael always took good care of his child and her sisters. He fixed them food, cleaned up after them, made sure they had a bath, etc.  I just can't see Poochie man hurting his kids intentionally.

While Raphael was growing up, I used to cook big dinners most Sundays. My whole family would come to my house and hang out and eat.

Kenneth is my son and Raphael's uncle. Raphael hung around and looked up to Kenneth while growing up. My son Kenneth tried to rape me when he was high.  I eventually put Kenneth out of my

house and don't talk to him anymore. I try to support all of my children but Kenneth keeps on smoking and doing bad.

I get mad and lose my temper sometimes. When I get lose my temper, I can get mad 'til I just don't have no sense.

[See, Affidavit of Marjorie Minor: Exhibit "Q"].

12.   Michael Blackshear is a cousin to Holiday's step-father, James Nickerson but is only two years older than Holiday.  Mr. Blackshear lived in Navasota and visited in Stoneham throughout Holiday's life, and for that reason, possessed personal knowledge relating to the circumstances of Holiday's upbringing.  Mr. Blackshear was not interviewed by counsel prior to trial.  Had defense counsel interviewed Mr. Blackshear, he would have been able to provide the following testimony regarding Holiday:

When Raphael was growing up in Stoneham, It was all about Eric, Tarvis, and Chase. Raphael was the odd one out in the family. He wasn't James' son. He was treated like he was the worker. He was the oldest had to take care of the younger children. He was doing all the chores.

James treated Raphael like anything he was doing was wrong.  Raphael could be doing chores or sitting around not working and either way whatever he was doing was wrong. He was doing the chore wrong or he was being lazy and not doing anything. I remember when Raphael was pushing a

176

baby carriage back and forth when he was up in age. He hit a rock and dumped the baby over and James jumped on him for it. James started pushing and smacking Raphael. It was not James way, to sit and talk to a child. James would get in Raphael's face or jump on him.

Raphael's mom treated him the same way. Diane was the one that would slap or hit whenever she was mad at Raphael. Diane could hit Raphael for talking back or for not doing a chore right.  I saw Diane throw a cordless phone at Raphael because he stayed out in her car longer than he was supposed to.

I remember one time Raphael stood up to Diane. She called her brothers in Navasota and they all went out to Stoneham to jump on Raphael.

Raphael got blamed when anything went wrong or was broken in the family home. Half the time it'd be the other boy's fault, and Raphael would get the blame and get beaten.

James used to jump on Diane all the time when we were little. I've seen Diane with black eyes, busted lips, bruises.  James can be a jealous type guy. He'd come home late or suspect mom was gone longer than she should be and he would jump on her. The talk in the family was that James would run around with other women and then come home and accuse Diane of running around and jump on her.

177

I stayed out at Raphael's house for a little while one summer. I called and asked to come home because they were feeding me sandwiches everyday. The family had something to eat but the food was poor and not much.

I was at the house in Bedias when Raphael, Anthony [Robert], and Pooh were leaving to go rob the store in Shiro. I didn't want to have anything to do with it and thought they shouldn't do it. I was like 'don't do that.' They were drinking and high and sure they were going to get some money. The talk that evening was that they were going to rob the store. Neither Raphael nor anyone else was talking about going over to Tammy's or causing trouble with Tammy's family.

When they came back from the store in Shiro, I first saw the gun. When they left again, they were taking Raphael to meet Tammy in Madisonville. I  thought Tammy was going to meet Raphael in Madisonville.

I thought that Raphael and Tammy were going to work things out. She came by to see him in Bedias when he was staying there. She would call him on the phone  and he would get happy. Raphael wanted to get through the problems and get married with Tammy. I've  seen Raphael crying over being separated from the kids and Tammy. At Bedias, Raphael had a bottle with his kids picture in it that he looked at all the time.

[See, Affidavit of Michael Blackshear: Exhibit "R"].

178

13.    Eric James Nickerson is Holiday's half- brother.  Although the trial investigator spoke with Nickerson briefly over the telephone, defense counsel did not interview or otherwise discuss with Mr. Nickerson information he might possess regarding the circumstances of Holiday's childhood.  Had he been interviewed in a meaningful manner, Mr. Nickerson would have revealed the following information regarding Holiday:

My brother raised us. Raphael had to cook, clean, everything. Raphael did everything for me and my brothers. Our mom and dad worked often and Raphael did all the work around the house. Grandma was next door whenever mom wasn't home but Grandma put him to cooking and taking care of us.

We had a wood-burning stove for warmth and to cook. Raphael had to cut all the wood when we was kids. I remember Raphael cutting wood and me and Chase watching and picking up the little pieces when Raphael was about 7 years old.

When Raphael was not working around the house, he would go find odd jobs to do. He worked and brought momma home the money.  Raphael was working in the hayfields or mowing grass or working on farms at 10 or 11 years old.

Raphael used to black out every once in a while. Raphael kicked and fell out  at school one time, hitting his head on a desk. It was big news at school. I remember my brother frequently had headaches growing up.

179

My brother never could read very well, he wasn't at all a good reader.  Raphael wasn't good in math either. He could barely do homework and had a very hard time at school.

Raphael and my dad always had trouble getting along because Raphael would think he can run things, and his dad would knock him back down.  My dad was very strict about the house. My dad would get mad if we were sitting around running the air conditioner or had the lights on all day.  If dad said something to Raphael and Raphael said anything back, my dad wasn't trying to hear it.

The house we grew up in didn't have running water, then didn't have hot water, for a long time. We had to bring a hose from Grandpa's house to have water. We had to fill a bucket up to flush the commode. We had to cut wood up to keep warm on cold nights.

As a family, we went over to my mom's mom's house on Sundays for dinner. The get togethers with mom's family got rowdy, all the time. We went over to grandmother's almost every Sunday and there would always be drinking and brothers fighting.

[See, Affidavit of Eric James Nickerson: Exhibit "S"].

14.    John "Pooh" White lived on the same street as Holiday growing up, and was a close friend to Holiday's younger brother, Eric.  Mr. White testified during the guilt portion of the trial.  Despite his status as a witness, no one from Holiday's trial team interviewed Mr. White prior to trial.  Had he been approached, John White would have advised Holiday's trial team of the following:

Raphael Holiday is one of the guys I grew up with. I was very close to his brother, Eric Nickerson. I lived down the street from Raphael and Eric, next to the store in Stoneham. My nickname is Pooh. I testified at Raphael's trial. Raphael's trial lawyers never talked to me before trial.

. . . .

Raphael went to live in Conroe after a big fight between him and James. Raphael and James fought all the time. The fights were mostly about 'you aint grown yet.' Raphael would be trying to be a man or make some decision and James would jump on him.

Chas was very close to Raphael growing up. Eric wasn't as close to Chas because Chas always wanted to tag along and Eric wouldn't have it. When Raphael left for Conroe, Chas would call him all the time. When Raphael had the first baby, Chas would call and ask Raphael to bring the baby around.

The first house the family had in Stoneham  was not in good shape. I pray they don't ever have to go back to live in something like that. It was an 1800s house and the floors all up and down. They had  problems with animals coming in through the floor and the house just falling apart.

Me and Eric got to be good friends because we would sneak each other food or other things when our momma's weren't looking. I remember sneaking around the backdoor to Eric's house. Eric snuck out some popcorn and gave it to me. I ran off and Eric got whipped for giving food away. Both of our

181

mom's told us not to share food with the neighbors but Eric and me would give each other whatever we had when we were hungry.  I watched out for Eric and he watched out for me.

I spent many, many days hanging out at Eric's house until his mom or dad got home and I run off 'cause they wasn't supposed to have no company.

Diane and James used to argue regularly before she became a minister. I always left when they started arguing because I was a child and it wasn't any of my business.

Raphael went down to Conroe to spend the weekend many times while we were growing up. I didn't know Jeanette Wilkerson very well but I knew when Raphael was gone and where he went.

 Growing up in the country was much more rowdy and much freer than the city. Everybody in Stoneham drank or used drugs. The older ones drank and the kids smoked pot. They'd get drunk. We'd get high. No one called the police for fights or other troubles. The police were rarely out in Stoneham. The area was policed by Grimes County Sheriff but we never saw patrols growing up.

Every  family get together that I knew about in Stoneham involved drinking and people being rowdy.  That's just the way it was out there.

There wasn't anything going on around Stoneham other than walking around the country roads and getting high. The older folks didn't do anything other than get drunk until crack came around. There was nothing to but chill out there.

Raphael was on the phone with Tammy at my house the day before it happen. They was on the phone a couple hours off and on. Raphael had to get off the phone a few times so someone else could use it.

When Raphael and Tammy were living in the trailer behind his momma's house, he kicked me out of the house when Tammy came home or was hanging around. Raphael and Tammy fought often. I remembers Raphael turning up with a big ass knot on his forehead, and saying he fell off the porch. Everyone assumed Tammy beat his ass.

I saw Raphael with Tammy's kids countless times. Raphael loved the kids and would play with them all the time. Raphael aint trying to burn the children. I know he didn't do that.

[See, Affidavit of John White: Exhibit "T"].

15.   Holiday's mother, Angela Diane Nickerson, testified at the punishment phase.   Although she was presented as a witness at punishment, neither defense counsel nor investigator interviewed her in depth regarding available mitigation. The trial investigator met with Mrs. Nickerson approximately

two times, once at a restaurant.   Defense counsel met with Mrs. Nickerson possibly two times, once in his office, and once as part of a group meeting along with other family members.

16.   Post-conviction counsel contacted Diane Nickerson numerous times.   Post-conviction counsel and an investigator both spoke with Mrs. Nickerson on the phone in excess of ten times, emailed her several times and made three personal visits to interview her.   During the course of this on-going, trust building mitigation investigation, Diane Nickerson revealed the following, which would have been available at the time of trial had defense counsel established a level of trust:

"I was the oldest of my brothers and sisters. I used to have to take care of all of them when my mom was at work.  I had to do the cleaning and cooking and housework.

When I was young, my mom used to say horrible things to me . She drank and called me names like 'bitch,' and 'mother-fucker.'

I was 15 years old when Raphael was born.  I was living with my mom.  I remember my mom effected the way I raised Raphael. I remember my mom used to take him and I to clubs and let him drink a little beer. He might have been big enough to walk.  When he was a baby, if I smacked him to correct him, mom would tell him to hit me back.

Raphael always talked back. He could make me so mad. I often whooped him.

184

Whenever he made me real mad, I'd whoop him.

I was young when I was raising Raphael. I used to call him stupid and cuss him  when I got mad. He had a hard time learning things. I had a hard time teaching him his ABCs and sometimes it made me mad.

Raphael had a lot of responsibility around our house. He had to change diapers, clean, cook. He took care of the house a lot of the way I had to.

At this same time, while Raphael was young, James and I were both drinking.  When we drank, we'd argue or fight. Sometimes I'd get physical and smack James. The fights were seen by Raphael.

At times, I felt James wasn't very responsible. He would be taking care of us like  a man should. We struggled with getting the lights turned off, water turned, etc.

I know Raphael felt like he didn't belong growing up. He felt like he was outside  the family and not loved. He did get called names and berated. He is still my baby but I can see how he thought he had a hard time.

[See, Affidavit of Angela Nickerson: Exhibit "U"].

17.     Gerald Byington was retained by defense counsel as a mitigation specialist.   Mr. Byington advised trial counsel on the mitigating nature of the evidence developed by the trial investigator, Kay Sanders and by defense counsel. Mr.  Byington did not supervise or direct Ms. Sanders in the interviews of family members, but acted in an advisorial capacity based upon the information provided to him.. Mr. Byington has been provided the information uncovered during the post-conviction writ investigation and recognizes that the information varies greatly from the information developed by the trial investigator or which was otherwise known to defense counsel. Mr. Byington agrees the information uncovered during the post-conviction writ investigation, which relates to the infliction of physical violence and neglect upon Holiday, the exposure to drug and/or alcohol usage, the parental conflict, the delegation of age-inappropriate responsibilities, and his relegation to near servant status would have been important mitigation evidence   Similarly, Mr. Byington agrees the cycle of abusive treatment received and expressed by Holiday's  mother and grandmother was important mitigating evidence. The inter-generational abuse could have shown the jury that the forces which affected Holiday's character development were not specific to him, but were part of a larger family-cultural process.  Had this information been made available to Mr. Byington, he  would have strongly advised trial counsel to present this information to the jury.  [See, Affidavit of Gerald Byington: Exhibit "V"].


18.   The right to the effective assistance of counsel under the Sixth and Fourteenth Amendment to the United States and Article I, Sec. 10 of the Texas Constitution entails a thorough evaluation of a defendant's background and personal characteristics. Wiggins v. Smith, 539 U.S. 510, 522 (2003); Williams v. Taylor, 529 U.S. 362, 396 (2000); and,  Ex parte Duffy, 607 S.W.2d 507, 516

(Tex.Cr.App. 1980).   Counsel's failure to conduct an adequately thorough investigation deprives counsel of a sufficient factual familiarity with the case in order to make a reasoned strategic decision on what evidence to present. Wiggins, 539 U.S. at 517;  Anderson v. Johnson, 338 F.3d 382, 392 (5th Cir. 2003);  Ex parte Welborn, 785 S.W.2d 391, 393 (Tex. Cr. App.1990);  and, Duffy, 607 S.W.2d at 526.  As a result, counsel's failure to present testimony with which he was unaware, but would have been aware had he undertaken an adequate investigation, is not regarded as a matter of strategy.  Duffy, supra.   Prejudice, in the context of ineffective assistance of counsel in a capital sentencing proceeding is measured by whether there is a reasonable probability that had counsel presented the omitted evidence, one juror might have arrived at a different verdict.  Wiggins, 539 U.S. at 537.


19.   The information developed during the post-conviction investigation, information which was unknown to defense counsel, was unknown due to a deficient pre-trial factual investigation.  Defense counsel failed to interview, or to effectively interview witnesses who possessed information which was facially relevant to the defense's professed mitigation strategy.  As a result of the inadequate investigation, defense counsel were unable to present a comprehensive picture of Holiday's childhood as a means of providing an "explanation" for Holiday's conduct, an explanation of his character, or simply as an offer of evidence in mitigation.   Defense counsel was similarly rendered unable to effectively challenge the State's psychological expert, who predicated his hypothetical evaluation of Holiday's future dangerousness based upon the erroneous factual recitation that he had had a "happy" and normal childhood.  Similarly, in the absence of a comprehensive and adequate understanding of Holiday's background, counsel was unable to effectively challenge, or otherwise mitigate against the psychological expert's diagnosis of Holiday as being "anti-social."  An accurate and comprehensive

187

understanding of Holiday's background would have enabled defense counsel to present an etiological explanation of Holiday's personality/character disorder.  In the absence of an adequate pre-trial investigation, defense counsel was simply unable to develop or present a reasoned defense at the punishment phase of trial.

20.    There is a reasonable probability that had the jury been presented with the available mitigation evidence, at least one juror would have been persuaded to return a different verdict at the punishment phase of trial.

### Claim 56: Holiday was denied effective assistance of counsel at trial in violation of the Sixth Amendment to the U.S. Constitution Due to Counsel's Failure to Investigate and Present Evidence of Organic Brain Damage.

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 8.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

1.    This claim for relief is alleged on a contingent basis within this post-conviction writ application and is based on a good faith belief that Holiday may have organic brain damage which was not investigated by trial counsel.  In the event that factual investigation of the claim post-filing does not substantiate this claim, then Holiday intends to abandon the claim.

2.    Holiday is indigent, and at all times through his trial, appellate, and post-conviction proceedings has been represented by appointed counsel.  For this reason,  Holiday has required the assistance of court-funded experts and investigative assistance during trial and post-conviction proceedings.

3.   Prior to the filing of this writ application, Holiday, acting through counsel filed with the 278th District Court an ex parte motion seeking approval for funds to retain the assistance of a neuropsychologist to evaluate Holiday for the purposes of determining whether Holiday has organic brain damage.   As of the date of filing, the 278th District Court has not approved Holiday's request for funding and for this reason, Holiday has been unable to retain a neuropsychologist to evaluate Holiday.  Holiday is unable to plead with specificity the existence of organic brain impairment absent a thorough neuropsychological evaluation.

4.   The belief that Holiday may have organic brain impairment is based upon a number of factors which have been determined from an investigation into Holiday's background:   Holiday, as well as family members and friends have reported a history of "black out" periods,    there are or two identified instances in which Holiday has received a head injury of unspecified severity, Holiday has a history of migraine headaches, and Holiday has displayed cognitive dysfunction/educational impairment as reflected in his school grades, and measured deficiencies in his reading and mathematical abilities. [See, Affidavit of Gerald Bierbaum: Exhibit "W"].

5.   Although Holiday had the assistance of psychological professionals during trial, Dr. Wendell Dickerson, a consulting psychologist, and Dr. Fred Fason, a testifying psychiatrist, the extent of psychological testing of Holiday consisted of an MMPI, which is a test designed to measure personality and psychological disorders, but is not specifically designed to measure the existence and extent of organic brain damage.   Holiday was not specifically tested or otherwise evaluated to

189

determine whether he suffered any form of organic brain damage.  Therefore, no evidence of brain damage – if such damage exists – was presented at either phase of Holiday's trial.


6.   The right to the effective assistance of counsel under the Sixth and Fourteenth Amendment to the United States and Article I, Sec. 10 of the Texas Constitution entails a thorough evaluation of a defendant's background and personal characteristics. Wiggins v. Smith, 539 U.S. 510, 522 (2003); Williams v. Taylor, 529 U.S. 362, 396 (2000); and,  Ex parte Duffy, 607 S.W.2d 507, 516 (Tex.Cr.App. 1980).   Counsel's failure to conduct an adequately thorough investigation deprives counsel of a sufficient factual familiarity with the case in order to make a reasoned strategic decision on what evidence to present. Wiggins, 539 U.S. at 517;  Anderson v. Johnson, 338 F.3d 382, 392 (5th Cir. 2003);  Ex parte Welborn, 785 S.W.2d 391, 393 (Tex. Cr. App.1990);  and, Duffy, 607 S.W.2d at 526.  As a result, counsel's failure to present testimony with which he was unaware, but would have been aware had he undertaken an adequate investigation, is not regarded as a matter of strategy.  Duffy, supra.   Prejudice, in the context of ineffective assistance of counsel in a capital sentencing proceeding is measured by whether there is a reasonable probability that had counsel presented the omitted evidence, one juror might have arrived at a different verdict.  Wiggins, 539 U.S. at 537.


7.   In the event that funds are made available for a neuropsychological evaluation and that such an evaluation uncovers evidence of organic brain damage in Holiday, then Holiday would seek to show that defense counsel's failure to investigate this possibility, based on the evidence available to counsel,  and/or to subsequently  present such evidence fell below objective professional conduct and

that such deficient conduct prejudiced Holiday at either the guilt-innocence or punishment portions of his trial.

**Claim 57: Holiday Has Been Denied His Right to the Effective Assistance of Counsel on Appeal, or to the Effective Assistance of Counsel at Trial Under the 6th and 14th Amendment to the United States Constitution as a result of inadequate briefing on state direct appeal or other procedural default.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 11.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

1.   Holiday is represented on direct appeal from his conviction and sentence for capital murder by attorneys William Carter and Frank Blazek.   Carter and Blazek (hereinafter "Appellate counsel") represented Holiday during the trial.

2.   Appellate counsel filed an appellate brief with the Texas Court of Criminal Appeals on or about June 24, 2004.   A copy of Appellant's brief on direct appeal is included as Exhibit "Y".

3.   As of the filing of Holiday's application for post-conviction writ of habeas corpus, the resolution of his direct appeal is still pending with the Texas Court of Criminal Appeals.  Because the direct appeal is still pending, it is impossible to determine whether any ground for relief on direct appeal has been rejected on procedural grounds, either because it has been inadequately briefed by appellate counsel, see,  Tex.R.App.Pro. Rule 38.9; Hankins v. State, 132 S.W.3d 380, 385 (Tex.Cr.App. 2004)

191

and Bell v. State,  90 S.W.3d 301, 305 (Tex.Cr.App. 2002), or procedurally defaulted by trial counsel through inadequate preservation of error. Tex.R.App. Pro. Rule 33.1; and, Tex.R.Evid. Rule 103(a).

5.     Instances of procedural default at trial or on appeal and legal-factual "facts" which are unavailable at the time of filing the writ application.  Holiday would contend that instances of procedural default by appellate or trial counsel, which may ultimately be determined by the Texas Court of Criminal Appeals may constitute instances of ineffective assistance of counsel at trial and/or on appeal, in violation of the 6th and 14th Amendments to the United States Constitution and Art. I, Sec. 10 of the Texas Constitution, by virtue of counsel's failure to properly present an issue on appeal, or by counsel's failure to properly preserve error.

6.   Holiday would accordingly seek leave to supplement this post-conviction writ application with any claims relating to the performance of trial and appellate counsel which are resolved on the grounds of procedural default or inadequate briefing.

**Claim 58:  During jury selection and trial, Holiday may have been denied his 14th Amendment right to due process, his 6th Amendment right to be tried by and impartial verdict, and his 6th Amendment right to the effective assistance of counsel.**

**Exhaustion:**  This claim was presented to the CCA and the trial court in Holiday's state application for writ of habeas corpus in claim 12.  The trial court's FFCL adopted by the CCA denied this claim on the merits in paragraphs _____ of the FFCL.

1.     Holiday was tried to a jury in Huntsville, Walker County, Texas.   The jury consisted of 10 Caucasian jurors and two African-American jurors.

192

2.   Although the instant case involved domestic violence in the course of an inter-racial relationship between Holiday, who is African-American, and Tammy Wilkerson, who is Caucasian, trial counsel did not meaningfully voir dire the jurors on their racial attitudes.

3.   Holiday's counsel  has discussed the matter of racial attitudes among Walker County jurors with an attorney practicing law in Walker County, who has advised that the issue of racial bias is a reasonable ground for inquiry, both in voir dire, as well as in post-conviction proceedings.

4.   Holiday is also aware that the instant case involved considerable press coverage during trial and that the jurors were not sequestered during trial.

5.   Based upon these facts, Holiday, through an investigator, has attempted to contact jurors in this case to discuss the possibility of racial prejudice, exposure to extraneous information, or other potential jury misconduct, but his inquiries have been rebuffed.

6.    To the extent that any juror concealed racial prejudice, falsely stated, or withheld material information from defense counsel during voir dire, or was exposed to extraneous information during trial, then Holiday would have a cognizable ground for relief under the 5th, 6th and 14th Amendments to the United States Constitution and Article I, Secs 10 and 19 of the Texas Constitution.

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "A fair trial in a

193

fair tribunal is a basic requirement of due process." Id.  The jury must be "capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Even if only a single juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury.  Morgan v. Illinois, 504 U.S. 719, 729 (1992); Salazar v. State, 562 S.W.2d 480, 482 (Tex. Cr. App. 1978); and,  Norwood v. State, 58 S.W.2d 100, 101 (Tex. Cr. App. 1933).  Voir dire is an important method of protecting a defendant's right to a fair trial.  McDonough Power Equip. Co. v. Greenwood, 464 U.S. 548, 554 (1984).  "The voir dire process is designed to insure, to the fullest extent possible, that an intelligent, alert, disinterested, impartial, and truthful jury will perform the duty assigned to it."  Armstrong v. State, 897 S.W.2d 361, 363 (Tex. Cr. App. 1995).  A juror's failure to honestly disclose to counsel material matters violates the defendant's right to Due Process, right to a fair trial, and right to the effective assistance of counsel.

Similarly, if counsel fails to properly inquire during voir dire regarding material issues, counsel may render ineffective assistance of counsel.

Finally, a defendant is deprived of his right to a fair trial where the jury is exposed to, or otherwise considers matters which were not admitted as testimony or evidence.

7.   Post-conviction counsel requests the authority to subpoena jurors for personal interviews or in the alternative, that this Court grant an evidentiary hearing to allow him to further investigate and develop this claim, or otherwise supplement this claim should evidence in support become available.

**Claim 59:  Holiday was denied conflict free effective assistance of counsel in violation of the 6th Amendment to the U.S. Constitution because, unknown to Holiday, his trial attorney, Mr William Carter was the attorney who helped Tammy Wilkerson with the divorce from Raphael while he was in county jail and then he became Raphael's attorney for the case.**

We have received information that Holiday's trial attorney, William Carter, represented Tammy Wilkerson to divorce Holiday while he was in the county jail.  If true, then Mr. Carter would have been conflicted from representing Holiday.  Wilkerson later testified for the State against Holiday.

This conflict adversely affected the attorney's performance and prejudiced Holiday because the attorney's duty of loyalty to Wilkerson prevented the attorney from aggressive cross examination of her and establishing other causes for the deaths other than Holiday.  As a result, Holiday was denied his Sixth Amendment right to effective assistance of counsel and is therefore entitled to relief.

The Sixth Amendment guarantees defendants effective assistance of counsel at trial.  Pursuant to Strickland, 466 U.S. at 686-87, a petitioner must show that counsel's deficient performance resulted in prejudice in order to establish a constitutional violation.  However, "prejudice is presumed when counsel is burdened by an actual conflict of interest."  Id. at 692 (citing Cuyler, 446 U.S. at 345-50); Cuyler, 466 U.S. at 349-50 ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").  An actual conflict of interest exists when the conflict adversely affects counsel's performance.  Mickens v. Taylor, 535 U.S. 162, 171 (2002).

**OTHER CLAIMS ASSERTED TO PRESERVE HOLIDAY'S RIGHTS UNTIL COMPLETION OF THE AMENDED WHC:**

Claim 60.    The Texas Capital Murder statutes, both Texas Penal Code § 19.03 and Art. 37.071, V.A.C.C.P., are unconstitutional, violating Holiday's rights to due process under the Fourteenth Amendment to the United States Constitution, and due course of law under Article I, § 19, of the Texas Constitution;

Claim 61.    Holiday was denied his rights under the Fourth and Fourteenth Amendments to the United States Constitution, and under Article I, § 9, of the Texas Constitution, in that evidence which was illegally seized was admitted into evidence against him;

Claim 62.    Holiday was denied his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Under Article I, § 10, of the Texas Constitution, in that he was denied the right to confront the witnesses against him;

Claim 63.    Holiday was denied his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and under Article I, § 10, of the Texas Constitution, in that he was denied the right to present witnesses in his own behalf;

Claim 64.    Holiday was denied his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and under Article I, § 10, of the Texas Constitution, in that he was denied counsel during a critical phase of trial;

Claim 65.    Holiday was denied his rights under the Eighth and Fourteenth Amendments to the United States Constitution, and under Article I, § 13, of the Texas Constitution, in that he was sentenced to a cruel and unusual punishment due to the procedures utilized during his trial;

Claim 66.    Holiday was denied his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and under Article I, § 10, of the Texas Constitution, in that he was denied the effective assistance of counsel at both the guilt/innocence and punishment phases of trial;

Claim 67.    Holiday was denied due process under the Fifth and Fourteenth Amendments to the United States Constitution, and due course of law under Article I, § 19, of the Texas Constitution, in that constitutionally inadmissible evidence was admitted against him during the course of trial;

Claim 68.    Holiday was denied his right to a fair and impartial jury under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and under Article I, §§ 10 and 15, of the Texas Constitution.

Claim 69:  Holiday was denied effective assistance of counsel during his capital sentencing proceeding in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

As noted above, Holiday has a constitutional right to the effective assistance of counsel at sentencing.  See, e.g., Rompilla v. Beard, 545 U.S. 374, 393 (2005); Wiggins v. Smith, 539 U.S. 510,

519-20 (2003); Williams (Terry) v. Taylor, 529 U.S. 362, 390 (2000).  In Strickland v. Washington, 466 U.S. 668, 686-87 (1984), the Supreme Court outlined the standard for determining when counsel has provided ineffective assistance.  As described by the Court, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland, 466 U.S. at 686.  Under Strickland, counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 686-87.  Effective assistance of counsel is ultimately concerned with the fundamental right to a fair trial, "a trial whose result is reliable."  Id. at 687.  "Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial."  Mak v. Blodgett, 970 F.2d 614, 619 (9th Cir.1992).

  The inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances."  Strickland, 466 U.S. at 688. Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney.  Id. at 687.  Although defense counsel has broad discretion when making strategic decisions, those decisions must be reasonable and informed.  Id. at 691; see also Correll v. Ryan, 539 F.3d 938, 949 (9th Cir. 2008) (holding that an "uninformed strategy" is "no strategy at all").  In assessing counsel's performance, the United States Supreme Court has determined that the 1989 and 2003 ABA Guidelines are "guides to determining what is reasonable."  Rompilla, 545 U.S. at 387; Wiggins, 539 U.S. at 524.

Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id. A reviewing court must evaluate "the totality of the evidence before the judge or jury." Id. at 695. However, the prejudice analysis does not depend on whether the outcome of the proceeding would have been different. "[T]he [outcome determinative] standard is not quite appropriate." Id. at 694. Rather, Holiday must show "a probability sufficient to undermine confidence in the outcome" of the proceeding. Id. "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

Claim 70: Holiday was denied effective assistance of counsel during the liability phase of his capital trial in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

The Sixth Amendment to the United States Constitution provides that in "all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense." U.S. Const. amend. VI. The failure to provide adequate legal assistance undermines the entire adversarial process and does not satisfy the Sixth Amendment. See Strickland, 466 U.S. at 685-87; Cuyler v. Sullivan, 446 U.S. 335, 244 (1980); Richardson, 397 U.S. at 771; Reece v. Georgia, 350 U.S. 85, 89-90 (1955); Johnson, 304 U.S. at 462. In such cases when the defendant is prejudiced by counsel's failures, the defendant is entitled to relief. Murray v. Carrier, 477 U.S. 478, 496 (1986) (holding that even a single

199

isolated error of counsel can give rise to relief under the Sixth Amendment "if that error is sufficiently egregious and prejudicial").

Holiday's claim that his Sixth Amendment right to the effective assistance of trial counsel was violated is subject to the two-prong standard established in Strickland, 466 U.S. at 687, under which "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins, 539 U.S. at 521 (citing Strickland, 466 U.S. at 687). First, the inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688. Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney. Id. at 687. Although defense counsel has broad discretion when making strategic decisions, those decisions must be reasonable and informed. Id. at 691; see also Correll, 539 F.3d at 949 (holding that an "uninformed strategy" is "no strategy at all"). In assessing counsel's performance, the United States Supreme Court has determined that the 1989 and 2003 ABA Guidelines are "guides to determining what is reasonable." Rompilla, 545 U.S. at 387; Wiggins, 539 U.S. at 524.

Second, "to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Wiggins, 539 U.S. at 534 (quoting Strickland, 466 U.S. at 694). "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695; see also Williams, 529 U.S. at 397; Alcala v. Woodford, 334 F.3d

200

862, 882-83 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); Harris, 64 F.3d at 1439 (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief).

In this case, Holiday's trial counsel failed to render reasonably effective assistance of counsel throughout all proceedings of his capital murder trial, and the errors "were so serious as to deprive [Holiday] of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 682; see also Williams, 529 U.S. at 390-91.

Trial counsel was ineffective for failing to cross-examine multiple witnesses.

Cross-examination is essential to a defendant's right to a fair trial and to confront his accusers. "[N]o one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case." Pointer v. Texas, 380 U.S. 400, 404 (1965).  During Holiday's trial, his trial counsel may have failed to cross-examine multiple witnesses for the State including.

A reasonable attorney would have made an effort to cross-examine witnesses and not merely rely on the State's examination of a witness to be presented to the jury.  If this occurred, then the trial counsel's failures to cross-examine these witnesses constituted deficient performance.  Because

Holiday was prejudiced by his attorney's deficient performance, Holiday was denied his Sixth and Fourteenth Amendment rights, and is therefore entitled to relief.

Trial counsel was ineffective for failing to adequately investigate facts related to the guilt phase, failing to retain an expert witness to evaluate the physical evidence and crime scene, failing to consult with an expert in order to effectively rebut the State's evidence, and failing to present expert testimony at trial.

Consistent with "the need for reliability in the determination that death is the appropriate punishment in a specific case," Woodson v. North Carolina, 428 U.S. 280, 305 (1976), the skills required of counsel "are even more highly specialized and must be carefully developed." 1989 ABA Guidelines § 9.1 cmt. "At the heart of effective representation is the independent duty to investigate and prepare." Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir. 1982). "The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." Rompilla, 545 U.S. at 387 (citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)); see also Wiggins, 539 U.S. at 533; Strickland, 466 U.S. at 691; Duncan v. Oronski, 528 F.3d 1222, 1235 (9th Cir. 2008) ("When defense counsel merely believes certain testimony might not be helpful, no reasonable basis exists for deciding not to investigate.").

There were many unexplained discrepancies in the physical evidence at the crime scene and competing theories of what transpired during the course of the crime. The witnesses that testified

regarding the physical evidence as it related to the crime scene were law enforcement officers and the medical examiner. Each witness's testimony offered inconsistent and conflicting opinions about the implications of the evidence in relation to how the crime occurred.

The attorneys' failures to adequately investigate, retain an expert, and to call an expert witness at trial constituted deficient performance because no evidence was presented to challenge the State's theory or substantiate the defense theory. See Oronski, 528 F.3d at 1234-35; see also 1989 & 2003 ABA Guidelines. White was prejudiced because "but for counsel's unprofessional errors," there is a reasonable probability that "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Because the attorneys rendered ineffective assistance of counsel, Holiday was denied his Sixth and Fourteenth Amendment rights, and is therefore entitled to relief.

The cumulative prejudicial impact of trial counsel's deficient performance denied White's rights under the Sixth and Fourteenth Amendments.

The Ninth Circuit Court of Appeals has held that "errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." Alcala, 334 F.3d at 883 (internal quotation marks omitted); Harris, 64 F.3d at 1439 (cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief); Mak, 970 F.2d at 622 (finding counsel's deficiencies taken in combination with two other errors constituted a denial of petitioner's due process rights). The multiple errors create a level of prejudice that renders

a trial fundamentally unfair, which "constitutes a separate and independent basis for granting [relief]." Alcala, 334 F.3d at 882-83.

The trial attorneys rendered deficient performance throughout Holiday's trial that impacted the reliability of the entire proceeding. The cumulative prejudicial impact of the trial attorney's deficient performance produced a trial setting that was fundamentally unfair and denied Holiday's Sixth and Fourteenth Amendment rights. Holiday is therefore entitled to relief.

**Claim 71: Holiday's trial counsel performed deficiently by failing entirely to conduct any mitigation investigation and by failing to develop and present readily-available mitigation evidence to the sentencing court.**

It is well-settled that when representing capital clients, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691; see also id. ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). The Supreme Court later reaffirmed this mandate, holding that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background." Williams (Terry), 529 U.S. at 396.

Subsequent decisions of the Supreme Court and the Ninth Circuit all affirm the previous holding that counsel is required to conduct a reasonable and adequate investigation of the defendant's history.

See, e.g., Wiggins, 539 U.S. at 521 (holding that the "deference owed such strategic judgments" of trial counsel is "defined . . . in terms of the adequacy of the investigation supporting those judgments"); see also Allen v. Woodford, 395 F.3d 979, 1001 (9th Cir. 2005) (holding that "[c]ounsel's obligation to discover and appropriately present all potentially beneficial mitigating evidence at the penalty phase should influence everything the attorney does before and during trial . . . . The timing of this investigation is critical.  If the life investigation awaits the guilt verdict, it will be too late.") (citation omitted; alteration in original); Stankewitz v. Woodford, 365 F.3d 706, 716, 720 (9th Cir. 2004) (holding that counsel's duty to conduct a thorough investigation at the penalty phase "is not discharged merely by presenting some limited evidence[]" and stating that "tantalizing indications" in the record should have led counsel to investigate further); Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999) (holding that "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase") (alteration in original; citation omitted).

Further, the 1989 and 2003 ABA Guidelines plainly set forth the obligations of defense counsel in death penalty cases.  Recent cases from the United States Supreme Court and federal circuit courts of appeals have made clear that while the 1989 ABA Guidelines were in place at the time of White's resentencing, McVay's performance should be examined in light of the 2003 ABA Guidelines.

The Supreme Court has recognized the 2003 ABA Guidelines as instructive in assessing the reasonableness of attorney representation that occurred as far back as 1985.  For example, in Wiggins, 539 U.S. at 524, the Court cited and discussed the 1989 ABA Guidelines.  In Florida v. Nixon, 543

205

U.S. 175, 191 (2004), the Supreme Court twice referred to the 2003 ABA Guidelines in its decision that capital defense counsel's performance was not ineffective.  In Nixon, which went to trial in July 1985, defense counsel admitted defendant's guilt and "urged the jury to focus on the penalty phase." 543 U.S. at 181-82.  The Court cited with approval the 2003 ABA Guidelines in determining that counsel's decision was reasonable. Id. at 191.  The Court directly cited the commentary to 2003 ABA Guideline § 10.9.2 in support of counsel's actions.  Id. at 191 n.6.


Holiday was prejudiced by his trial counsel's deficient performance in failing to investigate and present mitigation evidence on Holiday's behalf.


"There is no more important hearing in law or equity than the penalty phase of a capital trial." Gerlaugh v. Stewart, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt, J., concurring in part and dissenting in part).  The Eighth Amendment demands that all relevant evidence bearing on a defendant's character, propensities, and record be considered by the sentencer in determining the appropriateness of the penalty.  See, e.g., Lockett v. Ohio, 438 U.S. 586, 605 (1978).  If the sentencer is deprived of this evidence through the Sixth Amendment failings of counsel, the sentencing proceeding is unfair, the sentence itself is suspect and one cannot have "confidence in the outcome" of the proceedings. Strickland, 466 U.S. at 694.  A sentencing proceeding infected by constitutionally deficient investigation and presentation of mitigation establishes prejudice because the reviewing court cannot have "confidence in the outcome" of such a proceeding.  Id.  Cumulative prejudice from counsel's multiple deficiencies will also support a finding of ineffective assistance of counsel.  See, e.g., id. at 695; Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

Prejudice is not determined by a court on habeas review through a mere numerical weighing of the aggravation evidence adduced at trial against the mitigation evidence adduced at trial and in post-conviction, but must include a consideration of the appropriateness of the penalty as applied to an individual defendant in light of his record and character.  Williams articulated this standard plainly, holding that although the newly-presented mitigation evidence, when combined with that presented to the sentencer at the time of trial "may not have overcome [the aggravating circumstance], the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."  Williams, 529 U.S. at 398 (citing Boyde v. California, 494 U.S. 370, 387 (1990)).

This Court must analyze how the mitigation evidence bears on the "development of the person who committed the crime," Ainsworth v. Woodford, 268 F.3d 868, 878 (9th Cir. 2001), how it affects "the individualized sentence required by the Constitution," id., and how it "might well have influenced the [sentencer's] appraisal of . . . moral culpability."  Williams, 529 U.S. at 398.  The Court must determine whether there is a reasonable probability that the mitigation evidence now proffered might have made a difference to at least one juror.  Stankewitz, 365 F.3d at 718 n.6; Douglas, 316 F.3d at 1090.

INSERT DISCUSSION

All of this evidence is exactly the type of evidence that, if properly presented and argued, could have affected the outcome at sentencing.  See, e.g., Wiggins, 539 U.S. at 534-35 (finding counsel's

performance deficient when, among other things, counsel failed to investigate and present evidence of Wiggins's poverty, homelessness, and diminished mental capacity). The state court's finding that Holiday was not prejudiced by his trial counsel's failures is objectively unreasonable and unsupported by law.

The state court's findings were unreasonable in another aspect as well – the court's findings of fact and conclusions of law fail to assess the sufficiency of mitigating evidence, as a whole, weighed against the sole aggravating factor. It is not appropriate for a court to discard each proffered mitigating factor by deciding that it alone was not sufficiently substantial to call for leniency. See, e.g., Wiggins, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

Because the trial counsel completely failed to investigate and present available mitigation evidence to the sentencing court, and because the mitigation evidence he failed to present is substantial and sufficient to undermine confidence in the result, the state courts were objectively unreasonable in determining that his performance was reasonable and sufficient. Accordingly, Holiday's Sixth Amendment right to the effective assistance of counsel was violated, and Holiday is entitled to relief.

### Claim 72:  Holiday was denied his right to effective assistance of counsel on appeal in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

Holiday raised this claim in his first post-conviction proceedings. (PCR 1 Am. Pet. for Post-Conviction Relief at 31-32 (Nov. 17, 1995); PCR 1 Pet. for Review at 8, 12 (Jan. 8, 1997).) In

208

denying this claim, the state court, which provided no legal analysis for the decision, "clearly erred in its application of Supreme Court law."  Pirtle, 313 F.3d at 1167.

The effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts, 469 U.S. at 396 ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); see id. at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits.").  As such, "nominal representation" during an appeal "does not suffice to render the proceedings constitutionally adequate."  Id. at 396.

Ineffective assistance of appellate counsel claims are governed by the standard of review set forth in Strickland, 466 U.S. at 686-87.  See Robbins, 528 U.S. at 285.  Accordingly, Holiday must show that appellate counsel's representation "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.  In addition, the ABA Guidelines are instructive in evaluating the reasonableness of counsel's conduct.  See Rompilla, 545 U.S. at 387.

Regarding appellate performance, the 1989 ABA Guidelines indicate that "[a]ppellate counsel should seek, when perfecting the appeal, to present all arguably meritorious issues."  1989 ABA Guidelines § 11.9.2.D (emphasis added).  Moreover, "[a]ppellate counsel should be familiar with all

state and federal appellate and postconviction options available to the client, and should consider how

any tactical decision might affect later options." 1989 ABA Guidelines § 11.9.2.A. Therefore, when

appellate counsel fails to raise meritorious issues that could have resulted in a reversal of conviction

or a sentence, counsel has necessarily caused prejudice to the defendant. See, e.g., Strickland, 466

U.S. at 694 (stating that prejudice occurs when, absent counsel's deficiencies, there is a reasonable

probability that the result of proceeding would have been different).


**Claim 73:  Holiday's constitutional rights to due process, equal protection, effective representation of counsel, individualized sentencing and freedom from cruel and unusual punishment were violated when the Texas state courts refused post-conviction counsel's repeated requests for appointment of a mental health expert to evaluate Holiday.**


This claim was not raised in Holiday's post-conviction proceedings.  If it was, then the state

court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly

established federal law, as determined by the United States Supreme Court.


 In Ake v. Oklahoma, 470 U.S. 68, 83 (1985), the United States Supreme Court held that due process

and equal protection demand that an indigent defendant be provided with the necessary assistance of

expert witnesses at state expense.  See also Britt v. North Carolina, 404 U.S. 226, 227 (1971) (holding

that indigent prisoners are constitutionally entitled to "the basic tools of an adequate defense or

appeal").  In addition, the Eighth and Fourteenth Amendments require that a sentencer consider any

relevant evidence in mitigation of a capital defendant's crime.  See, e.g., Eddings, 455 U.S. at 110-12;

Lockett, 438 U.S. at 604.  All of these rights were violated by the Texas courts' repeated refusal to appoint a mental health expert to evaluate Holiday.

Here, in their role as post-conviction counsel, Holiday's attorneys were evaluating his trial attorney's performance as Holiday's sentencing counsel and requesting appointment of mental health experts to aid in that process is a necessary and common task.  In evaluating the effectiveness of sentencing counsel, post-conviction counsel must examine both counsel's performance and any prejudice resulting from that performance.  See, e.g., Strickland, 466 U.S. at 669.  In addition, according to the 2003 ABA Guidelines, post-conviction counsel in capital cases are obligated to thoroughly reinvestigate the sentencing phase of a trial.  For example, the Guidelines note that:

Counsel's obligations in state collateral review proceedings are demanding.  Counsel must be prepared to thoroughly reinvestigate the entire case to ensure that the client was neither actually innocent nor convicted or sentenced to death in violation of either state or federal law.  This means that counsel must obtain and read the entire record of the trial, including all transcripts and motions, as well as proceedings (such as bench conferences) that may have been recorded but not transcribed. In many cases the record is voluminous, often amounting to many thousands of pages.  Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, again scrutinizing them for what is missing as well as what is present.

Like trial counsel, counsel handling state collateral proceedings must undertake a thorough investigation into the facts surrounding all phases of the case.  It is counsel's obligation to make an

independent examination of all of the available evidence– both that which the jury heard and that which it did not– to determine whether the decisionmaker at trial made a fully informed resolution of the issues of both guilt and punishment.

2003 ABA Guidelines § B.1 (footnote omitted).

Accordingly, Holiday's state habeas counsel were required to investigate all aspects of the trial counsel's performance, including the trial counsel's failure to request appointment of any mental health experts despite numerous indications that Holiday was mentally ill.

The state courts' failure to grant counsel's requests for funding denied counsel the opportunity to properly represent Holiday in his post-conviction proceedings, and denied Holiday his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  Accordingly, Holiday is entitled to relief.

### Claim 74:  Holiday is mentally retarded and therefore ineligible for execution pursuant to the Eighth Amendment to the United States Constitution.

The Eighth Amendment prohibits the execution of mentally retarded individuals.  Atkins v. Virginia, 536 U.S. 304, 321 (2002).  Upon information and belief, Holiday is mentally retarded both now and at the time of the crime in this case.  Holiday has not previously made a mental retardation claim.  However, given the speed of this case and the shortage of time, his attorneys make the claim to preserve it for further investigation and review.  Due to the severe time constraints for filing this

petition, at this time Holiday has not yet been evaluated for mental retardation.  Thus, counsel is limited to pleading this claim based solely on the evidence currently in the record, and the claim will be expanded in the amended petition.

As the Atkins Court noted, "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."  Atkins, 536 U.S. at 318.  Holiday may have an IQ lower than 70.  In addition, Holiday suffered from numerous adaptive behavior deficits, including his poor life decisions, dysfunctional relationships with women, diminished capacity to reason, calculate and plan, inability to hold a job and constant failing or near-failing grades throughout his school years.

Had a mental retardation expert been appointed to properly evaluate all available IQ scores in light of prevailing professional standards and to review and assess the evidence regarding Holiday's adaptive behavior deficits, upon information and belief that expert would have determined that Holiday is mentally retarded and therefore ineligible for execution.  As a result, Holiday's rights under the Eighth Amendment to the United States Constitution have been violated, and Holiday is entitled to relief.

> **Claim 75: The state courts deprived Holiday of his rights to a fair sentencing and due process under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution when it failed to consider as a mitigating circumstance his possibility to be rehabilitated.**

213

Holiday did not raise this claim in his appeal or at trial, but some of his other claims may be large enough to encompass this claim.

During his sentencing, Holiday may have argued that the jury and the court should consider his potential for rehabilitation as a mitigating circumstance.

Over a decade before Holiday was sentenced, the United States Supreme Court recognized that, consistent with the Eighth and Fourteenth Amendments, "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination."  Skipper v. South Carolina, 476 U.S. 1, 7 (1986). Relying on its precedent in Eddings, 455 U.S. at 113-14, and Lockett, 438 U.S. at 604-05, the Court reiterated that the sentencer must be permitted to considered any relevant mitigating evidence. Skipper, 476 U.S. at 4.  Ultimately, the Court held that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating."  Id. at 5.

Because the Texas courts failed to consider facts presented related to Holiday's ability to be rehabilitated and live peacefully in prison, Holiday was denied his constitutional rights to a fair sentencing and due process under the Fifth, Eighth, and Fourteenth Amendments.  He is therefore entitled to relief.

**Claim 76:  The CCA deprived Holiday of his rights to a fair sentencing and due process under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution when it affirmed his death sentence upon independent review.**

214

This claim was not raised in direct appeal or state habeas application, but some of the claims may have been large enough to permit this claim.

As it was required to do, the CCA conducted an independent review of Holiday's death sentence. Holiday argued that mitigating evidence outweighed any aggravating evidence in the case, requiring a life sentence. The CCA ignored the mitigating evidence.

The United States Supreme Court recognizes that a reviewing court "may determine the weight to be given relevant mitigating evidence." Eddings, 455 U.S. at 114-15. "But," as the Court makes clear, "they may not give it no weight by excluding such evidence from their consideration." Id. at 115; see also Woodson, 428 U.S. at 304 ("[T]he Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."). Because the CCA failed to consider certain mitigating evidence in its independent review of Holiday's death sentence, the state court's decision cannot withstand constitutional muster. Holiday was denied his constitutional rights to a fair sentencing and due process under the Fifth, Eighth, and Fourteenth Amendments, and he is therefore entitled to relief.

**Claim 77: The death penalty is categorically cruel and unusual punishment in violation of the Eighth Amendment.**

215

Holiday did not raise this claim in his direct appeal or state habeas application, but some of his claims may be large enough to permit this claim.

Holiday must concede that thirty-two years ago the United States Supreme Court held that "the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." Gregg, 428 U.S. at 187. The Court reached this conclusion because it believed that the death penalty could serve the "two principal social purposes" of "retribution and deterrence of capital crimes by prospective offenders." Id. at 183. Nevertheless, empirical evidence has emerged over the last thirty-two years that has eroded these two justifications for the death penalty. See, e.g., Carol S. Steiker, No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty, 58 Stan. L. Rev. 751 (2005). Holiday submits that because the death penalty serves neither the goal of retribution nor that of deterrence, it should be abolished pursuant to the "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101 (1958). Accordingly, his sentence is constitutionally infirm under the Eighth Amendment, and he is entitled to relief.

Claim Forty-Two

**Claim 78: Holiday's due process rights were violated when he was brought before the jury in shackles without an essential state interest.**

216

"[N]o person should be tried while shackled and gagged except as a last resort."  Allen, 397 U.S. at 344.  When a defendant is shackled during trial it "is so likely to cause a defendant prejudice, it is [therefore] permitted only when justified by an essential state interest specific to each trial."  Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir. 1999) (citing Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986)).

Counsel has not had time or resources for investigating this claim, but are nonetheless raising this claim in the event that investigation results in support for it.

In the instant case, Holiday was brought before the jury in shackles during his trial without justification from the State.  As a result, Holiday was prejudiced.  Because the jury saw him in shackles and the State had no reason for shackling him, Holiday's constitutional rights to due process were violated.  He is, therefore, entitled to relief under the Fifth and Fourteenth Amendments to the United States Constitution.

> **Claim 79:  Holiday's actual innocence of murder enables this Court to address the merits of the constitutional claims alleged in this petition and, in the alternative, constitutes an independent claim for relief, in that Holiday's execution for a crime which he did not commit would itself be a constitutional violation.**

Counsel for Holiday allege this claim to preserve Holiday's rights under House v. Bell, 547 U.S. 518 (2006), Schlup v. Delo, 513 U.S. 298 (1995), and Herrera v. Collins, 506 U.S. 390 (1993).  Given the urgency with which this petition was prepared and counsel's complete lack of opportunity to investigate this case, including the issue of Holiday's actual innocence of the crimes for which he was

convicted, counsel for Holiday can allege only that evidence may exist that demonstrates Holiday's

actual innocence.  In the event such evidence exists, Holiday is entitled to rely on his innocence to

overcome any defense of procedural default alleged by Respondent, and in the event that this or any

other United States court were to conclude that no constitutional violations occurred with regard to

Holiday's convictions and sentences, he is nevertheless entitled to relief from his conviction for

first-degree murder and the resulting death sentence because the execution of an innocent person is

constitutionally impermissible.

**Claim 80:  Holiday's death sentence by lethal injection, as it will be imposed, is cruel and unusual punishment in violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution.**

If executed under Texas's current lethal injection protocol, Holiday's sentence will be carried out

in a manner that is in violation of the Eighth and Fourteenth Amendments to the United States

Constitution.  In light of the recent decision in Baze, 128 S. Ct. at 530 (plurality), Holiday is entitled

to, at a minimum, discovery and a hearing on the issue.

Prior to Baze, there was no binding constitutional precedent holding that a death-sentenced prisoner

could potentially prove, through discovery and a hearing, that a state's lethal-injection protocol

violated the Eighth Amendment.  Id. at 1526 (Roberts, C.J., plurality) (observing that in the absence

of "extensive hearings," it will be difficult to ascertain whether the "risk of pain from

maladministration" of lethal-injection protocols is sufficient to trigger Eighth Amendment

protections).  Of particular significance was that in Baze, unlike in Holiday's case, "the [state] trial

court held extensive hearings and entered detailed Findings of Fact and Conclusions of Law" relating to the state's lethal-injection procedures and practice. Id. at 1526. Only "[a]fter a 7-day bench trial during which the trial court received the testimony of approximately 20 witnesses, including numerous experts," did the state court in Baze decide the Eighth Amendment question. Id. at 1529. Because there has been no post-Baze determination by any state or federal court as to the constitutionality of Texas's lethal injection protocol, this Court should hold an evidentiary hearing to determine precisely that issue.

On information and belief, the Texas Department of Criminal Justice intends to execute Holiday by means of lethal injection as set out in the current lethal injection protocol. If Holiday's sentence is carried out under the current protocol, there is a "substantial risk" that he will suffer "serious harm" and there are "feasible, readily implemented" alternatives that the State refuses to adopt without legitimate penological justification. Id. at 1531.

The current protocol is problematic for many reasons, including but not limited to its failure to: (1) set out the execution procedures in a sufficiently clear manner to ensure that the execution is carried out in a manner that does not cause a substantial risk of pain and suffering; (2) adhere to contemporary standards of care in the administration of percutaneous central lines and to eliminate the risk that a cut-down may be used to create IV access; (3) ensure that the Department Director does not authorize deviations from the procedures that would further heighten the substantial risk of serious pain and suffering; (4) assure adequate visualization of the IV sites and IV patency before and during an execution, and to properly assess anesthetic depth throughout an execution; (5)

219

appropriately address the individual condemned inmate's particular medical condition and history; (6) ensure the participation of qualified and trained personnel in the execution process; and (7) provide the appropriate physical conditions to safely perform the execution, and (8) violation of federal or state import laws or regulations pertaining to the acquisition of the drugs used to conduct the execution.

Unlike the protocol in Baze, which "put in place several important safeguards to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner," 528 S. Ct. at 1533 (plurality), Arizona's current execution procedure lacks the necessary safeguards to ensure that Holiday will not be executed in a cruel and unusual manner.  Under Baze, Holiday has stated a claim and is entitled to discovery and an evidentiary hearing on this issue and will further develop facts in support of his claim at that time.

### Claim 81: The State violated White's Fifth and Fourteenth Amendment rights pursuant to Miranda v. Arizona when officers continued to question him after he asserted his right to an attorney.

The Fifth Amendment to the United States Constitution protects one from being "compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   This fundamental, constitutionally-protected right has been clearly established by the United States Supreme Court for decades.  See generally Quinn v. United States, 349 U.S. 155, 161 (1955) (noting that "[t]he privilege against self-incrimination is a right that was hardearned by our forefathers"); Miranda v. Arizona, 384

U.S. 436, 457 (1966) (establishing "adequate safeguards to protect precious Fifth Amendment rights").

When conducting a custodial interrogation, law enforcement must first inform the subject that he has, inter alia, "a right to the presence of an attorney." Miranda, 384 U.S. at 444. The Miranda court recognized that, like most rights, these rights could be waived if done so knowingly, intelligently, and voluntarily. Id. ("The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.). "If, however, [a suspect] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Id. at 444-45. As was clearly established when Holiday was arrested, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Edwards v. Arizona, 451 U.S. 477, 484 (1981).

Holiday was deprived of his Fifth Amendment right to counsel when he asked for counsel, but the officers continued to press on about the crime. Alternatively, the police have adopted a surrepticious question-first-warn-later practice.

Any statements or questions by Holiday did not open the door to further questioning about the crime. Once his request for an attorney was made, the officers had a duty to cease any questioning about the

crime.  Because Holiday's right to counsel as protected under the Fifth and Fourteenth Amendments

was violated, he is entitled to relief.

### Claim 82:  The State improperly withheld exculpatory and/or impeachment evidence in violation of Brady v. Maryland.

The State failed to provide defense counsel with crucial exculpatory and impeachment evidence in

direct violation of Brady v. Maryland,  373 U.S. 83, 87-88 (1963), and Giglio v. United States, 405

U.S. 150, 153-54 (1972).  The State's obligation to provide such evidence exists regardless of whether

the evidence is exculpatory or whether it is used for impeachment purposes.  See Kyles v. Whitley,

514 U.S. 419, 434-35 (1995); United States v. Bagley, 473 U.S. 667, 678 (1985).  In the instant case,

the State's failure to comply with its heightened duty to disclose such evidence violated Holiday's

rights to due process, a fair trial and a reliable sentencing proceeding as guaranteed by the Fourth,

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### Claim 83:  Holiday was denied Equal Protection under the Fifth and Fourteenth Amendments to the United States Constitution the when the State purposefully excluded people of color from serving on his jury.

As clearly established by the Supreme Court, a "defendant does have the right to be tried by a jury

whose members are selected pursuant to nondiscriminatory criteria."  Batson v. Kentucky, 476 U.S.

79, 85-86 (1986); see also Miller-El v. Dretke, 545 U.S. 231 (2005).   "Purposeful racial

discrimination in selection of the venire violates a defendant's right to equal protection because it

denies him the protection that a trial by jury is intended to secure."  Batson, 476 U.S. at 86.

Holiday was convicted by an all-white or largely white jury.  During the selection of individuals who would ultimately serve on his jury, the prosecutor impermissibly struck jurors based on race.  Holiday was denied the protection guaranteed to him by the Equal Protection Clause of the Fourteenth Amendment, and he is therefore entitled to relief.

**Claim 84:  Holiday's rights to a fair and impartial jury were  violated by the jurors' failure to truthfully disclose information on voir dire and the jurors' consideration of extraneous evidence during deliberations.**

Holiday's right to a fair and impartial jury was violated due to jurors' failure to respond truthfully to multiple questions on voir dire.  See generally Morgan, 504 U.S. at 727; McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984).  Additionally, the introduction of extraneous information into the deliberations in this case, as well as other juror misconduct, see generally Turner v. Louisiana, 379 U.S. 466, 472 (1965), violated Holiday's rights to due process and a fair trial, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Claim 85:  Holiday will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments.**

Holiday has not yet presented this claim to the Texas courts because his opportunity to seek executive clemency has not yet become ripe.  Holiday presents this claim now in order to avoid future difficulties with raising this claim in future federal habeas proceedings.  See Stewart v. Martinez-Villareal, 523 U.S. 637, 643-46 (1998).

223

Under Texas law, Holiday has a right to seek executive clemency before execution.   See _____.  This is part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences.  See Herrera, 506 U.S. at 415.  Accordingly, Holiday has a due process liberty interest in the impartiality of the system by which clemency may be afforded to him.  See generally Mathews v. Eldridge, 424 U.S. 319 (1976).

  Holiday's clemency proceedings will not be impartial.  On information and belief, Holiday asserts that both the selection process for members of Texas's Board of Executive Clemency ("the Board") and the conflicting roles of the Texas Attorney General's Office will work to deprive him of a fair clemency proceeding.  Without judicial review of the bias inherent in Texas's clemency process, Holiday will never have an opportunity to vindicate his right to a fair and impartial clemency process.

The Board consists of 18 members appointed by the Governor.  _____.  The Governor may remove members of the Board for cause.  _____.  On information and belief, Holiday asserts that the Attorney General's Office is responsible for training the members of the Board regarding their duties.  Also on information and belief, Holiday asserts that the Attorney General's Office will also be an advocate against him when it comes time for him to seek clemency from the Governor.  On information and belief, Holiday asserts that he will neither have notice of the time and place of the hearing, the evidence the Governor will use when he decides whether to grant or deny clemency, or an opportunity to present evidence to her in favor of granting clemency.

Moreover, the current governor, Rick Perry, has made clemency proceedings a sham.  He has no interest in granting clemency to any inmate.  During his ten years in office he has granted only one clemency petition, and that was merely because the inmate did not actually commit the murder.  For political reasons, he has decided in advance to deny all clemency petition, absent proof that the inmate did not actually commit the murder.

For all these reasons, Texas's clemency procedures do not comport with the procedural due process protections guaranteed to him by the Fourteenth Amendment.  Holiday is entitled to habeas corpus relief.

### Claim 86:   The numerous errors committed during Holiday's trial cumulatively produced a trial setting that was fundamentally unfair and violated his due process rights under the Fourteenth Amendment to the United States Constitution.

In cases where no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the Ninth Circuit Court of Appeals recognizes that the cumulative effect of multiple errors may still prejudice a defendant.  See Parle, 505 F.3d at 934 (finding habeas relief warranted when combined effect of multiple trial errors resulted in injurious effect on jury's verdict); Alcala, 334 F.3d at 894-95 (affirming grant of habeas relief where multiple errors by court and counsel deprived defendant of a fundamentally fair trial); Killian, 282 F.3d at 1211 (stating that the cumulative effect of errors may be so prejudicial as to require reversal); Harris, 64 F.3d at 1439 (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief); Mak, 970 F.2d at 622 (finding that counsel's

deficiencies taken in combination with two other errors constituted a denial of petitioner's due process rights).

Multiple errors were committed during Holiday's trial.  Even if this Court were to find that none of them merit relief alone, the cumulative effect of all the errors is so prejudicial that Holiday is also entitled to relief on that basis.  For all the reasons discussed in the trial-related claims presented in this petition, Holiday's due process rights were violated and he is entitled to relief under the Fourteenth Amendment to the United States Constitution.

## CONCLUSION

As this petition demonstrates, Holiday's rights under the federal constitution were violated, unremedied by Texas courts.

## RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Holiday respectfully prays this Court:

1.    Order that Holiday be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Holiday to utilize the processes of discovery set forth in Federal

Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.    Order that upon completion of discovery, Holiday be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Holiday be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.    Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.    Issue a writ of habeas corpus to have Holiday brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.    In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Holiday brought before it to the end that he may be relieved of his unconstitutional sentences;

6.    Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

227

WHEREFORE, PREMISES CONSIDERED, the Holiday RAPHAEL DEON HOLIDAY asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Holiday from custody, or alternatively, to reverse Garcia' conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Garcia also asks the Court to allow a reasonable time to amend this petition rather than to dismiss for failure to exhaust remedies.  He also requests reasonable time to respond to the State's answer to this petition.  Finally, he asks for such other relief as the Court finds the Holiday justly entitled.

Respectfully submitted this 4 day of May 2011,

*/s/ Seth Kretzer*

_____

**SETH KRETZER**
SBN: 24043764

Two Post Oak Central
1980 Post Oak Blvd
Houston, TX 77056
(713) 775-3050 (office)
*seth@kretzerfirm.com*

*James W. Volberding*

_____

**JAMES W. VOLBERDING**
SBN: 00786313

228

Plaza Tower

110 North College Avenue

Suite 1850

Tyler, Texas 75702

(903) 597-6622 (Office)

(903) 597-5522 (fax)

*e-mail: jamesvolberding@gmail.com*

**<u>CERTIFICATE</u> <u>OF</u> <u>SERVICE</u>**

I hereby certify that a true and correct copy of this pleading has been delivered this 4th day of May 2011 to:

Ms. Tina Dettmer

Office of the Attorney General                                                   *Counsel for the State*

Capital Litigation Division

P.O. Box 12548, Capitol Station

Austin, TX 78711-2548

(512) 936-1600 (voice)

(512) 320-8132 (fax)

by the following means:

\_\_\_\_\_          By U.S. Postal Service Certified Mail, R.R.R.

\_\_\_\_\_          By First Class U.S. Mail

\_\_\_\_\_          By Special Courier _____

\_\_\_\_\_          By Hand Delivery

\_\_\_\_\_          By Fax <u>before</u> 5 p.m.,

\_\_\_\_\_          By Fax <u>after</u> 5 p.m.

\_X\_\_\_          By Email at Tina.dettmer@oag.state.tx.us.

*Seth Kretzer*

_____

SETH KRETZER

229