No. 4:11-cv-01696

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RAPHAEL DEON HOLIDAY,

*Petitioner,*

v.

RICK THALER,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

United States Courts
Southern District of Texas
FILED

MAR 0 2 2012

David J. Bradley, Clerk of Court

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
278th District Court of Madison County, Texas

Amended -JHk

**PETITION FOR WRIT OF HABEAS CORPUS**

**SETH KRETZER**
SBN: 24043764

The Lyric Center
440 Louisiana; Suite 200
Houston, TX 77056

(713) 775-3050 (office)
(713) 224-2815 (fax)
*email: seth@kretzerfirm.com*

**JAMES W. VOLBERDING**
SBN: 00786313

Plaza Tower
110 North College Avenue
Suite 1850
Tyler, Texas 75702

(903) 597-6622 (Office)
(903) 597-5522 (fax)
*e-mail: jamesvolberding@gmail.com*

Court-Appointed Attorneys for the Petitioner

No. 4:11-cv-01696

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

───────────────────────────────────────────────

RAPHAEL DEON HOLIDAY,

*Petitioner,*

v.

RICK THALER,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

───────────────────────────────────────────────

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
278th District Court of Madison County, Texas

───────────────────────────────────────────────

**PETITION FOR WRIT OF HABEAS CORPUS**
───────────────────────────────────────────────

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, RAPHAEL DEON HOLIDAY, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice. This application follows his conviction and death sentence in the 278th District Court of Madison County, Texas, cause numbers 10,423, 10,425 and 10,427, styled *State v. Raphael D. Holiday.*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, RAPHAEL DEON HOLIDAY, certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Raphel Deon Holiday | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | 440 Louisiana Street; St. 200 Houston, TX 77002 | Appointed attorney for current federal habeas |
| Mr. James W. Volberding | 110 North College Avenue Suite 1850, Plaza Tower Tyler, TX 75702 (903) 597-6622 | Appointed attorney for current federal habeas |
| Mr. Alexander L. Calhoun | 11319 Long Branch Austin, TX 78736 | Appointed attorney for state habeas writ petition. |
| Gerald Bierbaum | 1744 Norfolk Houston, TX 77098 | Appointed attorney for state habeas writ petition. |
| Mr. William F. Carter | 102 East 26th Street Bryan, Texas 77803 | Appointed attorney for trial and direct appeal. |
| Mr. Frank Blazek | 1414 11th Street Huntsville, Texas 77340 | Appointed attorney for trial and direct appeal. |
| | | |
| | | |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |
| | Office of the Attorney General *Counsel for the State* Capital Litigation Division P.O. Box 12548, | Asst. Attorney General |

iii

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| | Capitol Station<br>Austin, TX 78711-2548<br>(512) 936-1600 (voice)<br>(512) 320-8132 (fax) | |
| Mr. Tommy Skaggs | Austin | Asst. Attorney General |
| Ms. Tina Dettmer | Austin | Asst. Attorney General |
| Mr. William C. Bennett | Courthouse<br>101 W. Main, Room 207<br>Madisonville, Texas 77864 | Criminal District Attorney<br>Madison County |
| Mr. Charles Mac Cobb | | Asst. District Attorney<br>Asst. Attorney General |
| *Judge* | | |
| Hon. Jerry Sandel | | 278th District Court, Madison<br>County, Texas |

iv

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................... iii

TABLE OF CONTENTS .................................................................................. vi

DESIGNATION OF ABBREVIATIONS AND EXPLANATION OF THE TRIAL RECORD ..............................1

STATEMENT OF JURISDICTION ...........................................................................1

CIRCUMSTANCES SURROUNDING THE FILING OF THIS PETITION ......................................1

STATE COURT PRESUMPTION OF CORRECTNESS ...........................................................1

EXHAUSTION.............................................................................................2

PROCEDURAL HISTORY ...................................................................................3
    A.    Procedural History in State Court....................................................3
    B.    Procedural History in Federal Court ...................................................4

STATEMENT OF FACTS ....................................................................................4

**GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW  IN TEXAS** ...............................9

HOLIDAY HAS MET ALL PROCEDURAL REQUIREMENTS .................................................13
    ALL CLAIMS HAVE BEEN EXHAUSTED ..............................................................14
    NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED..................................................17
    A.    Explanation of Default Principles....................................................17
    ***B.    Holiday's Response to the Trial Court's and CCA's Findings That Holiday Procedurally Defaulted Claims.*** ....................................................19

ASSERTION OF CAUSE AND PREJUDICE ....................................................................21

**ARGUMENT AND AUTHORITIES**..........................................................................22
    Claim 1:    The evidence underlying Holiday's conviction for capital murder fails to satisfy the sufficiency standard of *Jackson v. Virginia*, 443 U.S. 307 (1979) ...........................................................................22
    Claim 2:    The State violated the Sixth Amendment fair jury trial clause and *Wainwright v. Witt*, 469 U.S. 412 (1985), by granting the State's request to remove qualified Juror Servaine Sessions. ................................34
    Claim 3:    The State violated Holiday's Sixth Amendment right to confrontation by allowing Nurse Jane Riley to relate damaging banned testimonial hearsay

by Tierra Lynch in violation of *Crawford v. Washington*, 541 U.S. 36 (2004). ................................................................................................39

Claim 4:       The State violated the Fifth and Fourteenth Amendment due process clause provisions by allowing Nurse Jane Riley to relate damaging banned testimonial hearsay by Tierra Lynch. ........................................................39

Claim 5:       The State violated Holiday's right to adequate notice of the offense and due process of law provided by the Fifth and Fourteenth Amendment, by refusing to quash the  indictment for failure (1) to notify of the manner and means that Holiday was alleged to have ignited the fire in an arson case, and (2) by failing to allege whether the State sought to impose liability by means of conspiracy or parties law. ..................................................................45

Claim 6:       The State violated Holiday's Sixth Amendment right to be informed of the nature and cause of the accusation against him by refusing to quash the indictment for failure (1) to notify of the manner and means that Holiday was alleged to have ignited the fire in an arson case, and (2) by failing to allege whether the State sought to impose liability by means of conspiracy or parties law. ..........................................................................45

Claim 7:       The State violated the Eighth Amendment by barring Holiday's attorneys from informing jurors that when answering the special issues that state law does not require a "Yes" or "No" answer, but will be satisfied if jurors are unable to reach a verdict on any special issue ...........................................52

**Claim 8:       The State violated Holiday's Sixth Amendment right to fair jury trial by denying his challenge for cause of Juror Linda Masters.** ...............63

Claim 9:       The State violated Holiday's Sixth Amendment right to fair jury trial by denying his challenge for cause of Venireman Kenny Penny. ..................68

Claim 10:      The State trial court violated the Due Process Clause of the 14th Amendment when it permitted the State's expert, Dr. John DeHaan, to testify: (1) that the fire could not have been ignited by an electrical appliance or a pilot light, and (2) that the injuries suffered by Holiday were consistent with the hypothesis that he bent down and ignited the gasoline. ....................................................................................................73

Claim 11:      The State trial court violated the Due Process Clause of the Fourteenth Amendment when it permitted evidence that Holiday committed the extraneous offense of raping of Tierra Lynch. ...........................................80

Claim 12:      The State violated the Due Process Clause of the Fourteenth Amendment by refusing to instruct jurors on the law of parties. .........................................88

Claim 13:      The State violated the Right to Remain Silent Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment by commenting to jurors on Holiday's failure to testify. ................................92

Claim 14:      The State trial court violated the Due Process Clause of the Fourteenth Amendment by permitting a State expert, Dr. Edward Gripon, to testify that Holiday would likely commit future acts of violence. ..............................100

Claim 15:      The State trial court violated the Cruel and Unusual Punishment Clause of the Eighth Amendment by permitting a State expert, Dr. Edward Gripon, to testify that Holiday would likely commit future acts of violence. ............100

Claim 16:    The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert, Carroll Pickett, to explain how the death penalty would be administered against Holiday if ordered. ...................................124

Claim 17:    The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert testimony of Carroll Pickett of the effect that administration of the death penalty would have on prison employees required to carry out the execution of Holiday. .......................................124

Claim 18:    The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert testimony of Carroll Pickett to concerning the effect of the death penalty on the survivors of the victim.........................124

Claim 19:    The State court violated the Due Process Clause of the Fourteenth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment and *Skipper v. South Carolina*, 476 U.S. 1 (1986), by refusing to permit Holiday's expert testimony of Carroll Pickett to explain how inmates permitted to serve life sentences often make positive changes in their lives............................................................................................124

Claim 20:    The State court violated the Due Process Clause of the Fourteenth Amendment by restricting Holiday's cross-examination of Beverly Mitchell at the punishment phase of trial.....................................................131

Claim 21:    The State court violated the Cruel and Unusual Punishment Clause of the Eighth Amendment by restricting Holiday's cross-examination of Beverly Mitchell at the punishment phase of trial.....................................................131

Claim 22:    The State court violated *Franklin v. Lynaugh*, 487 U.S. 164, 173 (U.S. 1988), by restricting Holiday's cross-examination of Beverly Mitchell at the punishment phase of trial. ...................................................................131

Claim 23:    Texas Code of Criminal Procedure article 37.071 violates the Cruel and Unusual Punishment Eighth Amendment because it impermissibly restricts mitigating evidence to merely that evidence which the jurors might regard as reducing moral blameworthiness.........................................................135

Claim 24:    The Trial Court Violated the Sixth, Eighth and Fourteenth Amendments to the United States Constitution by Failing to Instruct the Jury That the a "No" Vote by a Single Jury Member Would Result in a Life Sentence Instead of Death Despite the Statutory Requirement of 10 Votes for a "No" Answer to Article 37.071 § 2(b)(1) or for a "Yes" Vote to Article 37.071 § 2(e). .....................................................................................................137

Claim 25:    Texas Code of Criminal Procedure article 37.071 violates the Cruel and Unusual Punishment Clause of the Eighth Amendment because it fails to place the burden of proof on the mitigation special issue to the State to

establish a "No" answer, and thereby implicitly assigned the burden of proof to Holiday. ....................................................................................146

Claim 26:   Texas Code of Criminal Procedure article 37.071 violates *Ring v. Arizona* because it fails to require the State to prove beyond a reasonable doubt that the mitigating evidence is sufficient to warrant a life sentence. ..............146

Claim 27:   Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because the mitigation special issue demands that jurors apply key terms which are undefined, ambiguous and subject to divergent interpretation:   "probability," "sufficient mitigating circumstances," "personal moral culpability," and "moral blameworthiness." ................156

    *A.*   ***Overview of Constitutional Law*** ............................................................159

    *B.*   ***Social Science Studies***..........................................................................161

    C.   Application to Mr. Holiday's Trial. .......................................................164

    D.   Conclusion .............................................................................................168

Claim 28:   Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because the statute does not permit meaningful appellate review of the jury's answers to the three special issues...........................168

Claim 29:   Texas Code of Criminal Procedure article 37.071 violates the Fourteenth Amendment due process clause because the statute does not permit meaningful appellate review of the jury's answers to the three special issues. ....................................................................................................168

Claim 30:   Texas Code of Criminal Procedure article 37.071 violates (a) *Ring v. Arizona*, (b) the Sixth Amendment right to fair jury trial clause, ( c ) the Fourteenth Amendment Due Process Clause, and (d) the Eighth Amendment Cruel and Unusual Punishment Clause, because the future dangerousness special issue fails to define "probability" that Holiday will commit future acts of violence, permitting jurors to answer "Yes" if there is any statistical probability of future violence, rather than a preponderance of likelihood. ............................................................................................171

Claim 31:   Texas Code of Criminal Procedure article 37.071 violates (a) *Ring v. Arizona,* (b) the Sixth Amendment right to fair jury trial clause, ( c ) the Fourteenth Amendment Due Process Clause, and (d) the Eighth Amendment Cruel and Unusual Punishment Clause, because the future dangerousness special issue fails to define "criminal acts of violence" anticipated by Holiday, thereby permitting his execution even for minor contact or solely use of words................................................................171

Claim 32:   Texas Code of Criminal Procedure article 37.071 violates (a) *Ring v. Arizona,* (b) the Sixth Amendment right to fair jury trial clause, ( c ) the Fourteenth Amendment Due Process Clause, and (d) the Eighth Amendment Cruel and Unusual Punishment Clause, because the future dangerousness special issue fails to define "continuing threat to society" that Holiday will commit future acts of violence, permitting jurors to answer "Yes" when there is no possibility that Holiday would ever be in free society.  ........................................................................................171

Claim 40:    The State violated Holiday's right to Due Process under the 5th and 14th Amendments of the U.S. Constitution by presenting False or Misleading Scientific testimony by the State's expert, John DeHaan.........................178

Claim 41:    The State violated Holiday's right under the 8th Amendment of the U.S. Constitution by presenting False or Misleading Scientific testimony by the State's expert, John DeHaan...............................................................178

Claim 42:    The State violated Holiday's right to Due Process under the 5th and 14th Amendments of the U.S. Constitution by presenting unreliable scientific evidence from John DeHaan which undermined the fundamental fairness of the fact-finding proceedings. ...............................................................179

Claim 43:    The State violated Holiday's right under the 8th Amendment of the U.S. Constitution by presenting unreliable scientific evidence from John DeHaan which undermined the fundamental fairness of the fact-finding proceedings.............................................................................179

Claim 44:    The State violated Holiday's Due Process rights under the 5th and 14th Amendments and to the U.S. Constitution and *Napue* and *Giglio v U.S.* by withholding evidence tending to impeach the state's witness John DeHaan ....................................................................................180

Claim 45:    The State violated Holiday's right under the 8th Amendment to the U.S. Constitution by withholding evidence tending to impeach the state's witness John DeHaan .....................................................................180

Claim 46:    The State violated Holiday's 5th and 14th Amendment Due process Rights by presenting false or misleading testimony regarding "pour patterns.". 200

Claim 47:    The State violated Holiday's 8th Amendment rights by presenting false or misleading testimony regarding "pour patterns."...................................200

Claim 48:    The State violated Holiday's right to Due Process under the 5th and 14th Amendments to the U.S. Constitution by presenting scientifically unreliable testimony regarding "pour patterns" which undermined the fundamental fairness of the fact-finding proceedings...................................................200

Claim 49:    The State violated Holiday's right under the 8th Amendment to the U.S. Constitution by presenting scientifically unreliable testimony regarding "pour patterns" which undermined the fundamental fairness of the fact-finding proceedings. ...............................................................201

Claim 50:    The State violated Holiday's Right to Due Process of Law under the 5th and 14th Amendments to the U.S. Constitution by presenting False or Misleading Testimony by State's Expert John DeHaan Regarding the Applicability of his Doctoral Thesis to the Issue of Broiler Pilot Light Ignition................................................................................208

Claim 51:    The State violated Holiday's Right Under the 8th Amendment to the United States Constitution by presenting False or Misleading Testimony by State's Expert John DeHaan Regarding the Applicability of his Doctoral Thesis to the Issue of Broiler Pilot Light Ignition.................................................208

Claim 52:    The State violated Holiday's Right to Due Process of Law under the 5th and 14th Amendments to the United States Constitution by presenting False

Testimony from John DeHaan Regarding the Applicability of his Doctoral Thesis to the Issue of Broiler Pilot Light Ignition. ...................................208

Claim 53:    The State Violated Holiday's Right Under the 8th Amendment to the United States Constitution by presenting False Testimony from John DeHaan Regarding the Applicability of his Doctoral Thesis to the Issue of Broiler Pilot Light Ignition........................................................................................209

Claim 54:    Holiday was denied effective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution Due to Counsel's Inadequate Investigation of Possible Ignition Sources of Gasoline Vapors and Consequent Preparation of a Viable Defensive Theory .........................212

Claim 55:    Holiday was denied effective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution Due to Counsel's Inadequate Investigation of Available Mitigation Evidence Relating to Holiday's Background. ............................................................................................220

Claim 56:    Holiday was denied effective assistance of counsel at trial in violation of the Sixth Amendment to the U.S. Constitution Due to Counsel's Failure to Investigate and Present Evidence of Organic Brain Damage. .................246

Claim 57:    Holiday Has Been Denied His Right to the Effective Assistance of Counsel on Appeal, or to the Effective Assistance of Counsel at Trial Under the 6th and 14th Amendment to the United States Constitution as a result of inadequate briefing on state direct appeal or other procedural default....248

Claim 58:    During jury selection and trial, Holiday may have been denied his 14th Amendment right to due process, his 6th Amendment right to be tried by an impartial verdict, and his 6th Amendment right to the effective assistance of counsel. ...............................................................................................250

Claim 59:    Holiday was denied conflict free effective assistance of counsel in violation of the 6th Amendment to the U.S. Constitution because, unknown to Holiday, his trial attorney, Mr. William Carter was the attorney who helped Tammy Wilkerson with the divorce from Raphael while he was in county jail and then he became Raphael's attorney for the case..........................253

Claim 60:    Holiday's death sentence by lethal injection, as it will be imposed, is cruel and unusual punishment in violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution... .................254

Claim 61:    Holiday will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments... ...............................................................256

CONCLUSION...........................................................................................................257

RELIEF REQUESTED................................................................................................257

CERTIFICATE OF SERVICE ....................................................................................260

## DESIGNATION OF ABBREVIATIONS AND
## EXPLANATION OF THE TRIAL RECORD

"Petitioner's Record Excerpts" are referred to in this brief with the abbreviation "PRE." References to the trial record statement of facts are abbreviated as "SF" or "RR" for reporter's record. References to the transcript are abbreviated as "CR" for the clerk's record.

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five (due process clause), eight (cruel and unusual punishment clause), and fourteen (due process and equal protection clauses), of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## CIRCUMSTANCES SURROUNDING THE FILING OF THIS PETITION

Holiday's case became final May 5, 2010, when the CCA denied his petition for post-conviction relief. On February 15, 2011, this Court appointed undersigned counsel to represent Holiday in his federal habeas corpus proceedings. Pursuant to current Fifth Circuit authority, Holiday's one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") expires May 5, 2011. *See* 28 U.S.C. § 2244(d). With Court approval, Holiday timely filed an application which listed his claims but which was not fully written and argued.

Holiday now files, with Court approval, this amended application which, while far from perfect, presents his arguments and evidence for a writ of habeas corpus.

## STATE COURT PRESUMPTION OF CORRECTNESS

Holiday hereby provides notice of his intention to challenge the presumption of correctness of certain findings of fact made by the state court in his case. Certain factual findings of the state

1

court in Holiday's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court in Holiday's trial and the opinions by the CCA on direct appeal. Pursuant to 28 U.S.C. § 2254(e)(1), Holiday intends to assert that certain findings of fact by the state court at trial, or on direct appeal, if any are found to exist, are not fairly supported by the record. Holiday also intends to assert other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings; that material facts were not adequately developed at the state court hearings; that Holiday did not receive full, fair and adequate hearings in the state court proceedings; and that Holiday was otherwise denied due process of law in the state court proceedings.

In addition, Holiday asserts that certain findings of fact by the state court in regard to his state post-conviction proceedings, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to: any and all factual findings made by the trial court in regard to Holiday's state post-conviction proceedings, as well as the decisions of the CCA on petition for review. Pursuant to 28 U.S.C. § 2254(e)(1), Holiday intends to assert that certain findings of fact by the state court, concerning his state post-conviction proceedings, if any are found to exist, are not fairly supported by the record.

## EXHAUSTION

Holiday states that most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts[1]. Some claims, however, were not fully

_____

[1]The burden is on the Director to demonstrate that Holiday failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515,

presented to the state court, were not ripe for review, or could only be raised in this forum. Holiday expressly reserves his right to amend this petition. In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition. *Id.* at 497-98. Holiday believes additional claims may be identified following a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Holiday will present any additional claims through amendments to the petition.

## PROCEDURAL HISTORY

### A.    *Procedural History in State Court.*

Holiday was indicted for capital murder in the 278th District Court of Madison County, Texas, and tried in consolidated cause numbers 10,423, 10,425 and 10,427, styled *State of Texas v. Raphael Deon Holiday*. Following a jury verdict in favor of the state, the court imposed a death sentence.

Holiday's conviction and sentence were automatically appealed to the CCA in cause numbers AP-74,446, AP-74,447 and AP-74,448. The CCA denied the appeal entirely on February

---

1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

3

8, 2006. *Holiday v. State*, 2006 Tex. Crim. App. Unpub. LEXIS 737 (Tex. Crim. App. Feb. 8, 2006).

Holiday's motions for rehearing were denied April 26, 2006. *Holiday v. State*, 2006 Tex. Crim. App. LEXIS 848, 849 and 850 (Tex. Crim. App. Apr. 26, 2006).

Holiday timely sought a writ of *certiorari* from the Supreme Court, which denied his petition November 13, 2006. *Holiday v. Texas*, 549 U.S. 1033, 2006 U.S. LEXIS 8661 (Nov. 13, 2006).

Holiday timely sought state habeas relief in an application filed in the same trial court, and assigned the cause numbers 10,423(A), 10,425(A) and 10,427(A), and styled *Ex parte Raphael Deon Holiday*.

The trial court recommended denial of all relief and on May 26, 2009 signed without any changes findings of fact and conclusions of law written by the local prosecutors.

The CCA denied relief May 5, 2010 in a summary order in cause numbers WR-73,623-01, WR-73,623-02 and WR-73,623-03. *See Ex parte Holiday*, 2010 Tex. Crim. App. Unpub. LEXIS 262 (Tex. Crim. App. May 5, 2010).

### B.    *Procedural History in Federal Court.*

As mentioned, Holiday petitioned for appointment of counsel to file an application for writ of habeas corpus under section 28 U.S.C. § 2254. The court appointed counsel February 15, 2011.

During these proceedings, since 2000, Holiday has been confined in the Polunsky Unit by the Director of the Texas Department of Criminal Justice.

### STATEMENT OF FACTS

In support of this post-conviction writ of habeas corpus, Holiday asks this Court to take judicial notice of the state appellate and habeas record and incorporates his federal claims in that record by reference into this writ application.

The testimony at trial is briefly summarized as follows:

Holiday and Tammy Wilkerson formed a romantic relationship in mid 1996 or 1997. Prior to the relationship,  Wilkerson, had already birthed two daughters, Tierra Shinea Lynch and Jasmine Rockell DuPaul, by two different fathers. During the relationship with Holiday, Wilkerson gave birth to Holiday's daughter, Justice Holiday.

The family couple moved to Plantersville in 1998, and then moved to Madison County, where they lived in a residence owned by Wilkerson's parents, Beverly and Louis Mitchell. The residence was located approximately a mile from the Mitchells' own home in a rural area.

In March 2000, Holiday was charged with Aggravated Sexual Assault of Tierra, and was excluded from Wilkerson's residence by a protective order.   Nevertheless, Holiday and Wilkerson saw each other on several occasions, and sometimes engaged in sexual relations, on several instances between March 2000 and September 5, 2000. They also maintained daily phone contact. Although Wilkerson later claimed during the trial of this case that she was coerced into continuing her relationship with Holiday, Wilkerson never notified the authorities regarding the alleged violations of the protective order. In August 2000, Holiday was arrested for violation of a protective order after attempting to see her at her place of employment. Nevertheless, the relationship between Wilkerson and Holiday continued after his release from jail.

On the day of the incident, Holiday drove to Wilkerson's house in the late evening with two friends, Robert Lowery and John White, got out of the car and sent his friends away. When he got out of the car, Holiday took with him a pistol, a can of gasoline, and a screw driver.

5

After Holiday's   friends left, Wilkerson became alarmed after seeing a figure at the window and called her parents. Wilkerson's mother, Beverly Mitchell, and Mitchell's brother, Terry Keller arrived at Wilkerson's residence, Keller armed with a shotgun. As they were placing the girls in the car, Holiday appeared in the house. Wilkerson immediately left through the backdoor of her house to call for help, leaving her mother, uncle and children with Holiday. Holiday compelled Keller to put down the shotgun. Holiday started to pour gasoline from the can he had brought on the ground and on Wilkerson's car. He attempted to light the gasoline, but it would not ignite. Holiday then directed Mitchell and Keller to bring the girls inside the house and sit on the sofa. Holiday and Mitchell left in Mitchell's car to go to her house, leaving Keller alone in the house with the three girls. At this point, Keller left the house – and the girls – to seek help.

On arriving at Mitchell's house, Holiday and Mitchell retrieved two five gallon containers of gasoline and returned to the Wilkerson's residence. Holiday directed Mitchell to pour gasoline through the residence, allegedly starting at some recliners in the livingroom-kitchen area of the residence and moving throughout the house into the washroom and bedroom. While in the bedroom, Mitchell testified that she heard one of her grandchildren call her name and she looked into the living room. Mitchell stated that she saw Holiday bend down toward the floor, and then she saw a fire start and move through the room.    Mitchell escaped through a window in the back bedroom;     Holiday escaped through the front door. The girls, who had been sitting on the couch when the fire started, did not escape.

Outside, Holiday took Mitchell's car and started to drive away. As he was driving away, he collided with a car driven by Madison County Sheriff's Deputy Ivan Linebaugh. Holiday and Linebaugh engaged in a high speed, multi-agency car chase until Holiday's car crashed and caught fire.

6

After Holiday was removed from the car and taken into custody, police and medical personnel observed that Holiday was burned on his hands, fingers, arms, and neck.     A forensic pathologist who reviewed the photographs taken of Holiday's burn injuries opined that the burns were "consistent with" a person being burned by a flash after bending and reaching down as if to light an floor-level accelerant.

A forensic analysis of the debris recovered from the Wilkerson residence and from the person of Holiday and Mitchell revealed the presence of gasoline on debris collected from the laundry room, the kitchen and Holiday's tennis shoes. The results were negative for gasoline on Holiday's shirt and pants,   Mitchell's night shirt and pants, clothing from one of the decedents, debris under the couch on which the decedents had been sitting, and on two cigarette lighters taken from Holiday after his arrest.

Wilkerson's father, Louis Mitchell, testified that the residence had a propane gas stove in which the pilot light was ignited, and a Dearborn heater on which the pilot light had been turned off. The house also had several electric utilities, the refrigerator, water heater, washer and dryer, and three air conditioners, all of which were in working order.

The State presented testimony regarding the causation of the fire by John DeHaan, a fire/arson investigator, and president of Forensic Scientists, Inc., from Viejo, California. DeHaan opined that the only scientifically supportable basis for causation of the fire was Holiday's having ignited the fire. DeHaan excluded as possible bases for the fire's causation the stove pilot light, the refrigerator, the air conditioner units, the water heater, and the floor heater.

The defense expert, Judd Clayton, presented the defense's theory of ignition that the fire could have started from the water heater located in the bathroom, an electrical spark the refrigerator, the window mounted air conditioner units, or the pilot lights on the stove top.

Although Clayton agreed with DeHaan that the broiler pilot light could not have been a possible ignition source, his reasons differed from DeHaan; DeHaan identified the broiler pilot light as a continuously burning gas pilot but concluded that the broiler pilot could not reasonably have ignited the gas vapors because the light was placed too high from the vapors, the light was placed in a compartment which retarded the entrance of the fumes, and that there had been no resulting explosion.   Clayton excluded the broiler as a possible ignition source because he believed it to be an electrical ignition system.

The jury found Holiday guilty of capital murder as alleged in each of the three indictments.

At the punishment phase of trial, the State presented evidence that in addition to the facts leading up and involved in the incident ultimately leading to the fire in the Wilkerson residence, Holiday had previously sexually assaulted his maternal aunt and a cousin, and struck his mother in an argument when he was 15 years of age before leaving home. A forensic psychiatrist testified on behalf of the State, that based on a hypothetical set of facts relating to Holiday, that he had an anti-social personality disorder, and that he was likely to constitute a future danger of violent conduct.

The defense presented several witnesses who testified that  Holiday  had  experienced  a normal, uneventful and Church-going childhood, that he had been respectful to others, that he had been  proud  of  his  (deceased)  daughter,  and  had  adjusted  well  to  incarceration.  A  forensic psychiatrist testified for the defense that Holiday's profile on a personality test, the MMPI revealed that he had suffered from depression and had poor internal mechanisms  for coping with stress and frustration.

The jury answered the future dangerousness question in the affirmative, and answered the mitigation question in the negative, resulting in the imposition of a sentence of death.

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW   IN TEXAS

The following is an overview of capital punishment law in Texas.

The Texas Legislature has designated certain types of murders as eligible for the death penalty. To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder. For instance, kidnaping and then killing a person is a capital offense. So is killing two people, rather than one. Killing a police officer in his line of duty is a capital offense.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys. One of the lawyers is the lead attorney; the other is the second chair attorney. Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions. The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge. Death penalty jurisprudence is thick with constitutional and statutory issues. All unsettled challenges to death penalty procedures must be raised. Failure to do so means that the issues are waived for direct appeal. Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

9

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense. The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts. Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors. Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700. Many jurors exercise certain allowable rights not to serve; others cannot be found. On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel. Either side may ask for the jury to be shuffled at this point. Jurors will be seated randomly in numerical order. Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service. In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror. The judge may excuse some jurors but not others. At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench. Frequently, the lawyers for both sides will agree to excuse a juror for some reason. There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair. Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination. Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

10

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror. After the juror leaves, each side is permitted to challenge for cause. If granted, the juror is finally excused and deleted from the pool. If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges. For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied. This is sometimes called the sequential method of selecting the jury. The State goes first. If the State strikes the juror, the juror is gone. If the State declines to strike the juror, then the right passes to the defense. If the defense strikes the juror, the juror is eliminated. If the defense does not strike the juror, then the juror joins the twelve-member petit jury. This process is repeated until twelve jurors and two alternates are seated. Each side has ten peremptory challenges.

The second method can be referred to as the pool method. The goal is to create a pool of forty-eight death penalty qualified jurors. Each juror is questioned by the parties individually. The court rules upon any challenges for cause by the State or Defense. If the juror is not disqualified, then the juror is added to the pool in consecutive number. When forty-eight are reached, the court designates a day for strikes. Beginning with the first juror qualified, the State announces whether it will accept the juror or exercise one of its peremptory challenges. If not, the Court turns to the Defense, which announces whether it will accept the juror or use a strike. If the juror is not struck by either, then the juror joins the petit jury. The process ceases when twelve jurors and two alternates are seated. *See Rousseau v. State*, 824 S.W.2d 579, 582 n.4 (Tex. Crim. App. 1992), *aff'd,* 855 S.W.2d 666, *cert. denied*, 510 U.S. 919 (1993).

11

Both prosecutors and defense attorneys generally prefer the pool method. Both sides can exercise their strikes intelligently, eliminating the jurors at the extremes based on their death penalty views. This method benefits the defense by allowing identification of each of the *Morgan v. Illinois* jurors who managed to escape a cause challenge, before using any strikes. (In *Morgan v. Illinois*, the Supreme Court held that a juror who would automatically impose the death penalty for a capital murder regardless of the mitigating circumstances may be removed for cause. *See* 112 S. Ct. 2222 (1992).)

Once the jury is selected and sworn, trial proceeds in the usual fashion. If the defendant is found guilty of capital murder, the sentencing phase begins. In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues. The questions have varied over the years.

The method of answering the special issues is complicated. If the jurors unanimously answer all three questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically. If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes. It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue. If this occurs, then the defendant is sentenced automatically to life in prison. There is no retrial. Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case. The result is always either a life sentence or a death sentence. Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence. Unanimity is required for a death sentence. A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor. Again, the answer is that the defendant receives an automatic life sentence.

In a non-capital case, jurors are informed of the effects of parole. In 1990, Texans amended the state constitution to require juries to be informed when a defendant becomes eligible for parole. In the 1970s and 1980s, there was concern that defendants served only a fraction of their sentence. Those supporting accurate sentencing wanted jurors to know when the defendant would be eligible for parole so that this could be taken into consideration when deciding the sentence.

In sharp contrast, in a death penalty case jurors are not permitted to know this information. A defendant who is tried for the death penalty, but who receives a life sentence, is eligible for parole only after he has served forty years.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA"). At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071 application for state writ of habeas corpus. The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal. If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court. Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## HOLIDAY HAS MET ALL PROCEDURAL REQUIREMENTS

## <u>ALL CLAIMS HAVE BEEN EXHAUSTED</u>[2]

There are procedural hurdles which must be crossed before a petitioner may ask a federal court to review a claim entitling him to federal habeas relief. *See generally Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999).

A petitioner seeking a writ of habeas corpus in federal court must show that he has exhausted all avenues of relief in state court. A federal district court may decline to address the merits of a claim that was inexcusably "defaulted" by the petitioner in state court proceedings.

A federal "default" question generally involves an evaluation of whether and how a claim for relief was presented to and considered by a state court. A default question arises in several ways. First, a default question can arise if a claim in a habeas corpus petition was not presented, or not fully presented, to the state court. Presenting a claim to the state courts is called "exhausting" the claim. *See Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1720 (1992) (the exhaustion requirement is grounded in "comity concerns." "The purpose of exhaustion is . . . [to] afford the State a full and fair opportunity to address and resolve the [federal] claim on the merits.")

---

[2]Portions of this and the following section on exhaustion and procedural default were abstracted from a 1995 paper written entitled *Pleading Prejudice in Capital Habeas Corpus Proceedings*, by John H. Blume and Mark E. Olive.

"In order for a claim to have been 'fairly presented' to a state court to fulfill the exhaustion requirement, the applicant 'need not spell out each syllable of the claim before the state court.' Instead, a federal claim must only be the 'substantial equivalent' of one presented to the state courts."   *Fisher*, 169 F.3d at 303 (citations omitted).

Second, a default question may arise if the claim was presented to the state court, but not in the manner that the state court normally and regularly requires that it be presented, such as when the claim is presented untimely, and the state court invoked its state rule to bar consideration of the inmate's claim. This is called a "procedural default."   *See Wainwright v. Sykes*, 433 U.S. 72 (1977). This is discussed below.

**Demonstrating Cause and Prejudice.** A federal district court is required to give considerable analysis and receive evidence when called upon to determine whether there has been a default, and if so, whether the default will be excused so that the federal court can reach the constitutional merits of a claim. Whether there exists an independent and adequate state court basis for barring a claim is decided by the district court, and "[w]hether a petitioner's actions have created a state law procedural bar is a mixed question of law and fact."   *Hansbrough v. Latta*, 11 F.3d 143, 145 (11th Cir. 1994). Even when a state court decides there has been default, the federal district court must make an independent inquiry. *Macklin v. Singletary*, 24 F.3d 1307 (11th Cir. 1994), *cert. denied*, 513 U.S. 1160 (1995).

Even if there has been an enforceable default, the federal district court may still proceed to the merit's of the petitioner's claim if the petitioner can demonstrate "cause" for and "prejudice" from the default. Cause and prejudice are federal questions requiring *de novo* review by the federal district court. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) ("cause and prejudice" is a mixed question of law and fact which the federal court must decide). If the state alleges and the federal

15

court finds that a procedural default is applicable, a petitioner is entitled to an evidentiary hearing on the matter of cause and prejudice. *See Tamayo-Reyes*, 112 S. Ct. at 1721 ("a remand to the District Court is appropriate in order to afford respondent the opportunity to bring forward evidence establishing cause and prejudice"); *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977); *Murray v. Carrier*, 477 U.S. 478, 487 (1986); *Walker v. Davis*, 840 F.2d 834, 839 (11th Cir. 1988); *Harich v. Dugger*, 813 F.2d 1082 (11th Cir. 1987).

Examples of cases applying these principles include:  *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) (new factual allegations supporting claim in federal court do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts); *Beauchamp v. Murphy*, 37 F.3d 700, 704 (1st Cir. 1994) (discussing the fair presentation doctrine, recognizing here that state court would not have viewed the claim differently had the word "federal" appeared in the heading to the issue), *cert. denied*, 115 S. Ct. 1365 (1995).

*Scarpa v. DuBouis*, 38 F.3d 1, 6 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 940 (1995), includes a good discussion of the fair presentation doctrine, discussing ways in which a petitioner can fairly present claims to state courts. These include citing a specific provision of the Constitution, alerting the state court to the claim's federal nature through the substance of the claim, relying on federal constitutional precedents, claiming a particular right guaranteed by the Constitution, and asserting a state law claim that is "functionally identical" to a federal claim.

Other examples include *Laswell v. Frey*, 45 F.3d 1011, 1013-14 (6th Cir. 1995) (Court held that petitioner's pre-state-court trial double jeopardy claim was exhausted), *cert. denied*, 116 S. Ct. 199 (1995); *Williams v. Washington*, 59 F.3d 673, 677-78 (7th Cir. 1995) (Petitioner fairly presented her ineffective assistance of counsel claim; in applying this rule courts should "avoid hypertechnicality"), *cert. denied*, 516 U.S. 1179 (1996); *Shute v. Texas*, 117 F.3d 233, 237 (5th

16

Cir. 1997) (Shute's "double jeopardy claim has been before the Texas Court of Criminal Appeals twice.   So, he need not raise it on direct appeal and is not barred from relief by the exhaustion doctrine.").

*Application to Holiday*. Each of the claims presented by Holiday in this application have been exhausted. Each claim was presented at least once to the state trial court and the CCA.

## NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED

### A.      *Explanation of Default Principles*

As mentioned, a requirement of a state death row petitioner seeking a federal writ of habeas corpus is to show that she has not procedurally defaulted any of the grounds for relief presented. In order for a claim to have been procedurally defaulted, the state court's ruling must *not* be based upon the federal constitution. In other words, the state ruling must be on grounds independent of the federal constitution. In addition, the state court's ruling *must be* based upon an adequate state ground. *See Ford v. Georgia*, 498 U.S. 411, 423 (1991) (discussing what is meant by "adequate" state ground).

For example, *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995), held that ineffective assistance at guilt phase issue was adequately presented to state courts. Even though the issue was not "precisely articulated" in state post-conviction proceedings, the "necessary arguable factual commonality" existed between claims presented in state court and in the federal petition.

*Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995), held that a petitioner's claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds."

17

In *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998), the court held that a petitioner's failure to object at trial to the admission of a snitch's out-of-court statements did not prevent the federal habeas court from considering the petitioner's confrontation clause claim where the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review.

"A federal court reviewing a state prisoner's habeas claim must respect a state court's determination that the claim is procedurally barred under state law." *Williams v. Cain,* 125 F.3d 269, 275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977). "The rule is quite simple: 'a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Williams*, 125 F.3d at 275 (*quoting Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989) (internal quotation marks and citation omitted)).

"In *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S. Ct. 2546, 2559, 115 L.Ed.2d 640 (1991), the Court explained that the 'clear and express' statement requirement applies to cases where the state court's judgment fairly appears to rest primarily upon federal law, or to be interwoven with federal law, and not to cases where there is no reason to question whether the decision was based upon independent and adequate state law grounds." *Williams*, 125 F.3d at 275 n.3.

Of course, if there has been no adjudication on the merits in state court, and the claim is exhausted, then the statute by its terms requires no deference to the state decision. In that situation,

the general rule that federal courts review questions of law *de novo* would apply. See *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997)   (Where the state appellate court erroneously applied a state procedural default rule to bar review, there was no adjudication on the merits and § 2254(d) did not apply.)

### B.      Holiday's Response to the Trial Court's and CCA's Findings That Holiday Procedurally Defaulted Claims.

As mentioned, each of the claims presented by Holiday in this application have been exhausted. Each claim was presented at least once to the state trial court and the CCA.

Sometimes the State (before the state trial court and CCA) will the position that when a death row inmate presents a claim *twice* to the state courts he procedurally defaults that claim. This position is illogical and contradicted by federal law.

What has occurred is that some Texas prosecutors have adopted a tactic of asking state court judges to sign decisions finding *federal* procedural default has occurred, then asking federal judges to defer to state court findings that an inmate's federal claim was defaulted. This is not permitted by federal law. Procedural default is a federal concept, not a state one. It is not appropriate for state courts to declare whether an inmate's federal claim has been procedurally defaulted for federal court purposes.

Here, all claims have been exhausted and none procedurally defaulted. Under each ground for relief, Holiday identifies the point at which the issue was preserved at trial, and later presented on direct appeal or in his state habeas petition. Issues need only be presented once to the state courts. It is not required that an issue presented to the state courts on direct appeal, and later again in the state habeas action.

In *Cone v. Bell*, 129 S.Ct. 1769 (2009), Tennessee similarly argued that federal courts could not review Cone's *Brady* claim because it was presented twice to state courts, and was thus procedurally defaulted. *Cone* held that state court procedural rules cannot automatically deny federal review of federal claims. It is the prerogative of federal court to decide whether a federal claim was appropriately presented to state courts. *Cone*, 556 U.S. 1782 at slip op. 16. "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review." *Cone*, 556 U.S. 1782 at slip op. 17. "When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted. To the contrary, it provide strong evidence that the claim has already been given full consideration by the state courts and is thus *ripe* for federal adjudication." *Cone*, 556 U.S. 1782 at slip op. 17-18 (emphasis in original). "A claim is procedurally barred when it has not been fairly presented to the state courts for their initial consideration – not when the claim has been presented more than once." *Id.* at 18.

In *Jimenez v. Quarterman*, 555 U.S. 133 (2009), the Court rejected Texas' arguments that an inmate's federal habeas petition was untimely because it was filed more than one year after the date his state conviction became final, notwithstanding that the state permitted an out-of-time direct appeal. The inmate argued that by permitting additional state review of his conviction by granting out-of-time direct appeal, the one-year AEDPA period did not begin until the completion of his direct appeal. The Justices unanimously agreed.

The Court identified the one-year AEDPA limitations period as "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Jimenez*, 555 U.S. 113, slip op. at 5 (quoting 28 U.S.C. § 2244(d)(1)(A)). A state

court judgement is final upon the conclusion of direct review or the expiration of the time for seeking such review. *Id.* at 6.

In the event, however, that the Court feels that a claim may not have been exhausted or may have been procedurally defaulted, Holiday respectfully makes two requests. First, he requests a hearing before the Court where his counsel can address the arguments in person and present evidence. Second, he requests that the Court hold the federal petition in abeyance so that state proceedings can be exhausted. The purpose is to prevent losing the opportunity to present all claims in federal court.

Such action is permitted by the Supreme Court. In *Burton v. Stewart*, 549 U.S. 154, slip op. at 6 (2007), the Court explained, "The plurality opinion in *Rose v. Lundy*, 455 U.S. 509, 520-522 (1982), stated that district courts should dismiss 'mixed petitions' -- those with exhausted and unexhausted claims – and that petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition. We have held that in such circumstances the later filed petition would not be 'second or successive.'   *Slack v. McDaniel*, 529 U.S. 473, 485-486 (2000)."

"Alternatively, prisoners filing mixed petitions may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles."   *Burton*, slip op. at 6 (citations omitted).

## ASSERTION OF CAUSE AND PREJUDICE

If necessary, Holiday is able to demonstrate cause and prejudice for any procedural default because his ineffective trial and appellate lawyers were responsible for the default and their failures may be imputed to the State because the default occurred at a stage of the proceedings at which Holiday was constitutionally entitled to effective counsel with respect to the defaulted issue.

The "cause and prejudice" test requires that the applicant show cause for and prejudice resulting from the default. *Wainwright v. Sykes,* 433 U.S. 72, 87 (1987); *see also Engle v. Isaac,* 456 U.S. 107, 135 (1982); *Murray v. Carrier,* 477 U.S. 478, 495-96 (1986). Generally, cause exists if an objective factor external to the defense excuses counsel's failure to comply with the state procedural rule. *See generally Coleman v. Thompson,* 501 U.S. 722, 749-750 (1991); *Carrier*, 477 U.S. at 488.

Here, if indeed Holiday's attorneys failed to comply with a state procedural rule, their conduct in and of itself was so egregious that it satisfied the *Strickland* Standard.[3]

### ARGUMENT AND AUTHORITIES

**Claim 1:**   **The evidence underlying Holiday's conviction for capital murder fails to satisfy the sufficiency standard of *Jackson v. Virginia*, 443 U.S. 307 (1979).**

---

[3] *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 496; *e.g., Gray v. Lynn*, 6 F.3d 265, 268-69 (5th Cir. 1993) (failure to object to obvious defect in jury instructions IAC); *Freeman v. Lane*, 962 F.2d 1252, 1257-58 (7th Cir. 1992) (failure to raise 5th Amendment claim on appeal was IAC and cause for default); also *Prou v. United States*, 199 F.3d 37, 48 (1st Cir. 1999) (failure to challenge timely charging document was IAC and cause for default of challenge); *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (appellate counsel's failure to raise obvious double jeopardy claim was IAC); *Mason v. Hanks*, 97 F.3d 887, 891-92 (7th Cir. 1996) (appellate counsel omission of meritorious claim was IAC and cause for default).

*Exhaustion*: This claim was presented to the CCA as points of error number 1 and 2 in Holiday's direct appeal brief. *See* Appellant's Brf. at 10-29 (see page 23 for reference to *Jackson*). The CCA denied the claim on the merits in its direct opinion in 2006, and explicitly referenced *Jackson v. Virginia. See Holiday v. State*, 2006 Tex. Crim. App. Unpub. LEXIS 737, *2-11, No. AP-74,446, slip op. at 1-4 (Tex. Crim. App. Feb. 8, 2006).

*Introduction.* According to Tami Wilkerson "around October, '96-'97" Holiday met her in Conroe, Texas, and approximately six months later they started living together. RR 32, p. 43; RR 32, p. 44. When they started living together, Tami was living with her two children: Tierra Shinea Lynch, who was born on November 5, 1992, and whose father was Lorenzo Merchant, and Jasmine Rockell DuPaul, who was born on February 27, 1995, and whose father was Timothy Lewis. RR 39, pp. 92–93. In August of 1998, they moved to Plantersville in Grimes County, Texas, and lived in a trailer house on property owned by his parents, James and Angela Nickerson. RR 39, p. 94. While living in Plantersville, Holiday's daughter, Justice Holiday, was born on November 18, 1998. RR 32, p. 43.

In September of 1999, they moved to the house in Madison County, Texas—where this offense occurred.  RR 39, p. 94. This house was located approximately a mile from the home of Louis and Beverly Mitchell, who were Tami's parents. In March of 2000, Holiday was charged with aggravated sexual assault of his step-daughter, Tierra Shinea Lynch, and a protective order was issued prohibiting him from being around Tami or the children, including his daughter, Justice.

Holiday moved to Grimes County, and, despite the protective order, he and Tami continued to see each other. Tami said she and Holiday saw each other about 10 times from March until September of 2000. RR 32, p. 72. They would meet at Holiday's house, at her house, and at a

motel in Navasota, Texas. RR 32, p. 72. She said that Justice would stay over night with him. RR 32, p. 72. Because they continued to see each other, Louis Mitchell, Tami's father, tried to convince her to notify the necessary authorities regarding the violation of the protective order; she refused to do so. RR 39, p. 45.

In August of 2000, Holiday came to the IHOP where Tami was working to see her, and she called 911; he was arrested for violation of the protective order. RR   32, p. 76. From March until September, 2000, Holiday and Tami talked almost daily on the phone. RR 39, p. 98.

Holiday stayed with Steve Taylor in Grimes County during the two weeks prior to this incident. RR 36, p. 5. Taylor said that during the two week period Holiday and Tami talked on the phone on a daily basis. RR 36, p. 8. He said that one time Holiday told Tami he would kill her if "I can't get my kid", but he told Taylor that he was joking. RR 36, p. 9. During the two week period Tami came to visit Holiday twice. RR 36, p. 10. One night Taylor took Holiday  to meet Tami—near her residence—and Holiday got in the trunk of Tami's car; they went to Tami's house. RR 36, p. 24. Holiday talked about "Tami and another man" and said he was "going to kill somebody."  RR 36, pp. 11–12.

Robert Lowery said Holiday told him that "he was going to go up there and burn the house down and watch her [Tami] run out."  RR 36, pp. 37–38.

On the night of this incident, Holiday asked Robert Lowery and John White to ride around with him, and unbeknownst to them, Holiday drove to Tami's house. RR 36 p. 51. When they arrived, Holiday got out of the car and told them to take his car back to his mother's house in Grimes County; he had a screwdriver, a gas can and a pistol. RR 36, p. 54. That night Tierra told Tami she heard glass break, and Tami looked out the window and saw a figure. She immediately

24

called her mother, and Ms. Mitchell and her brother, Terry Keller, drove to Tami's house; they had a shotgun with them. RR 33, p. 77. When they arrived, Ms. Mitchell put Tierra and Jasmine in her car, asked Tami if she had called 911—she had not—and started to call 911. When Ms. Mitchell turned around, Holiday was in the house "staring right at" her. RR 33, p. 80. Holiday "jerked" the phone out of her hand and "threw it against the wall and broke it."  RR 33, p. 81. Then, Tami—who was standing near Mr. Mitchell—took off running through the bedroom and out the back door. RR 33, p. 83. Tami ran to a neighbor's house and called 911. Holiday pulled out a pistol and held it to his head, and Ms. Mitchell "thought he was going to shoot his self" so she tried to stop him. RR 33, p. 84. Holiday pulled the gun down from his head, and said "I'm going to make Tami pay for what she did to me taking my baby away."  RR 33, p. 84. Ms. Mitchell said that Holiday was angry, and she could not calm him down. RR 33, p. 85. When Terry Keller realized that Holiday was in the house, he went to the door. Holiday then grabbed Ms. Mitchell and said "tell Terry to put the gun down or I'm going to kill you."  RR 33, p. 85. Terry complied with his instruction and dropped the shotgun. Then, Holiday took Ms. Mitchell outside and ordered her to pick up the shotgun; she picked it up and gave it to Holiday. RR 33, p. 88. Holiday begin pouring the gasoline—he had brought with him—in front of the house and on the cars; he again said he would make "Tami pay."  RR 33, p. 89. Jasmine and Tierra were in the car where he had poured gasoline. Holiday tried to light the gasoline, but it "didn't light."  RR 33, p. 91. During this time, Justice had been in the house asleep, and Holiday told Terry Keller to get her and bring her outside—which he did. RR 33, p. 92. Holida took possession of the shotgun and the pistol; he shot the pistol "down in the ground" and the shotgun "up into the air"; he said "you see I'm not playing now."  RR 33, p. 92. He then took all of them in the house and made them sit on the sofa, and he asked if there was any more gasoline; Ms. Mitchell said she did not know. He then told Ms.

Mitchell to come with him, and they left the house in her car. RR 33, pp. 93–94. They drove to the

Mitchell residence and got "two five gallon things of gas" and drove back to Tami's house. When

they returned, the children were still there, but Terry Keller was gone. RR 33 p. 95. He had left to

find Ms. Mitchell. Ms. Mitchell said:

> We got to the house. He said "bring the gas into the house". Excuse me—so he went
> into the house and I put the gas down behind—in  front of the table on the floor.
> And he said "pick up one and soak down the recliners". And I said "okay".

> RR 33, p. 96.

> Ms. Mitchell said:

> I come in the door and I sat the gas can here and Raphael over here, high chair. I go
> by him and start at the first recliner and go around it. And he said soak it good so I
> poured a whole bunch on it. And I go over to this recliner and pour it. All the time
> it's upside down. And I go in the room and I pour it around the room, washers and
> dryers. And I come back out and I go in her bedroom over to the dresser and around
> her bed and the gas cans are empty.

> RR 33, p. 118.

She did not pour any gasoline around the couch where the children were sitting. RR   33 p.

119. When she was in the bedroom she heard Tierra call her name, and she turned back toward

where the children were sitting.   RR   33, pp. 97–98. When she turned around she said "I see

Raphael with his foot up on the high chair and he was saying something, and I don't know what he

was saying, and he bent down and the fire started."   RR 33, p. 98. She said that she did not see a

match or a lighter in his hand—when be bent down—but that the fire started "immediately as he

reached down."   When the fire started she said it "went the way that I poured the gas," and that she

could not "get to the girls" so she went out the back door. RR 33, pp. 98–99.

Ms. Mitchell admitted that during the pretrial hearing she did not remember saying

anything about "seeing Raphael [Holiday] bend down at the time the fire started."   RR 38, p. 169.

Furthermore, in her statement to Ranger Frank Malinak on September 6, 2000, she admitted that she did not mention that Holiday "bent down" at the time the fire started. RR 38, p. 186.

After Ms. Mitchell went out the backdoor she was unable to go back in the house because of the fire. She saw Holiday "standing out by a big mimosa tree ... and he said ' what happened'."  RR 33, p. 103. Holiday tried to force her into the car, but she "took off running" because she "didn't know if he had the gun or not."  RR 33, p. 103. Holiday then got in Ms. Mitchell's car and drove off.

As Deputy Ivan Linebaugh was approaching the scene in his vehicle Holiday—in Ms. Mitchell's car—rammed into the deputy's vehicle. Deputy Linebaugh proceeded to give chase and Holiday's car "swerved off the road ... like he was trying to run over somebody. I seen another female running off in the woods and he went that way and then come back on the road and that's when I caught back up to him."  RR 33, p. 169. The female was Tami Wilkerson.

Deputy Linebaugh engaged in a high-speed pursuit of Holiday in excess of twenty miles into Walker County where the engine of Holiday's car caught fire. Deputy Linebaugh effected an arrest. After Holiday was handcuffed, Deputy Linebaugh searched him and found fourteen bullets and "two cigarette lighters in his pocket" which he did not remove. RR 33, pp. 177–178. Deputy Linebaugh observed burn injuries on Holiday's hands, his fingers, the back of his ear, the back of his neck and "some burning on his arms."  RR 33, pp. 199–200.

Holiday was transported to the Madison County Jail,  and during the booking process William Babee, one of the jailers, took two cigarette lighters from him. RR 34, pp. 95–96. The cigarette lighters were sent to the lab  for analysis. RR 35, p. 85. That same morning, Robert Dunn, chief deputy of the Madison County Sheriff's Department, observed that Holiday had "suffered some burns," and he was taken to the hospital. RR 34, p. 121.

27

Ivan Wilson, a trace evidence expert, testified that a .38 caliber revolver, the barrel and receiver of a shotgun, and the remains of three victims were collected inside the house that burned down. RR 34, p. 19. The pistol was found in the approximate northwest corner of the house, and the shotgun and victims were found in the approximate northeast corner. RR 34, pp. 19–20.

Jim Swindall, an expert in determining the presence of liquid accelerants, said the following, to wit:   (1) he found the "presence of gasoline" on the shoes Holiday was wearing (RR 35, p. 122); (2) he found no presence of gasoline on Holiday's pants or his shirt (RR 35, p. 123); (3) he found the presence of gasoline in the debris collected from the laundry room (RR 35, p. 126); (4) he found the presence of gasoline on the debris collected from the kitchen floor (RR 35, p. 127); (5) the "clothing from the body" found in the living room and the fire debris under the "couch where the victims were found" were negative for the presence of gasoline (RR 35, pp. 127–128); (6) the night shirt and pants Beverly Mitchell was wearing were negative for the presence of gasoline (RR 35, pp. 128–129); and (7) the two cigarette lighters taken from Holiday at the jail were negative for the presence of gasoline (RR 35, p. 133).

Dr. Janie McLain, a forensic pathologist, was shown the photographs of Holiday's burns he sustained in the fire. She said she would categorize his burns as "[P]robably looking at mainly second and some third degree burn."   RR 35, p. 167. Dr. McLain opined that Holiday's burns were on the lower part of the face—not the upper—"around the nose and the lips and right side of cheek."   RR 35, p. 172. She said that Holiday's burns were consistent with a situation where a person "reached down with their right arm and bent down and that the accelerate ignited." RR 35, pp. 173, 175.

Louis Mitchell testified that Tami's house had three air conditioner units—two which were approximately thirty-two inches off the floor and one about four feet off the floor. RR 33, pp.

151–152. The house also had a Dearborn heater which used propane and had a pilot flame—which he claimed was not on the night of the fire. RR 33, pp. 152–153. There was also a gas stove in the house which had a pilot flame that "should have been" on. RR 33, p. 153. Also, the refrigerator, water heater, and washer and dryer—located in the house—were electric. RR 33, p. 153.

Dr. John DeHann, the State's fire expert, said the vapors from gasoline are heavier than air, thus they "sink to the floor and basically fill the room up from the floor."   RR 36, p. 169. He said that gasoline vapors have to mix with air in a process called diffusion, and a flammability range is established by the process. RR 36, p. 174. He said that gasoline vapors have a very narrow flammability range. RR 36, pp. 175–176. In order for there to be ignition, Dr. DeHann said that there must be the—

> right concentration of vapor and air ... a suitable ignition source. That's one with enough energy to trigger the reaction. Then we have to have contact between that ignition source and that vapor air mixture while the vapor is in its correct concentration range. And that contact has to be maintained long enough for there to be a reaction started. If I can't satisfy all four of those conditions then I wouldn't get ignition.

> RR 36, p. 177.

There can be ignition by "some other source in that room that is not in the immediate vicinity of where the gasoline is poured" if there is "time for the vapors" of a sufficient concentration to move either horizontally or upward. RR 36, p. 179. As "possible ignition sources," Dr. DeHann evaluated the water heater, the room heater, the refrigerator, the stove and air conditioner. RR 36, p. 181. He excluded them as potential ignition sources. RR 36, p. 182–183. He eliminated the hot water because it was in a separate room, and it would take the vapors too much time to reach it. RR 36, p. 183. He eliminated the stove unit in the northwest corner of the kitchen because the pilot flame was in a closed compartment, was too high from the floor, and was too far from the areas

29

where the gasoline was poured. RR 36, pp. 183–184. He eliminated the Dearborn heater on the west wall—which was near where Holiday was standing—because Louis Mitchell said the pilot flame was turned off. RR 36, p. 187. He eliminated the refrigerator because there was not enough time for the vapors to get into the concealed space where the ignition source was located. RR 36, p. 189. He eliminated the air conditioner because the glass window located above the air conditioner was melted, and there was no evidence of an explosion. RR 36, pp. 191–193. He said that the "thirty seconds or so" that it took Ms. Mitchell to pour the gasoline in the house would not be "enough time for the vapors to spread" and be of "high enough concentration" with any of the ignition sources in the house. He said that if the time-frame was doubled or tripled his opinion would be no different. RR 36, p. 195.

Judd Clayton—the fire expert for Holiday- said the Dearborn heater was the "number one candidate" as the source of the fire. RR 39, p. 96. He said that during April of 2000 there were two days that approached freezing and that there was no "way that you can determine from the physical condition" of the heater whether its pilot flame was "on or off at the time of the fire."   RR 39, p. 97. If the pilot was off, then it would be eliminated as a source. The pilot on the stove was the second most likely source of ignition, followed by the air conditioner, the refrigerator, and lastly the water heater. RR 39, p. 106. Regarding the distribution of the gasoline vapors, he said what is important "is how the vapors that emanate from that liquid [the gasoline] mix with the air."   RR 39, p. 107. He said that in a small area—like the house—the "majority of the vapors will be very rich, that is in excess of the flammable liquids."   RR 39, p. 108. The air movement caused by the air conditioner and the ceiling fan will "stir those vapors up."   RR 39, p. 108. According to him, Ms. Mitchell's movement would stir the vapors, and "you reach an area where you can't predict where you're going to have ignitable mixtures."   RR 39, p. 108. He said that the amount of time it

30

"takes for gas vapors to travel from the area where it is poured to the possible source of ignition"
cannot be accurately predicted. RR 39, p. 109. He was "very confident that the air conditioner was
going to have a tendency to force the gas vapors to the outer extremity of the walls."  RR 39, p.
130. When asked if he found any physical evidence that indicated an intentional source of ignition
he said he saw "no indication of evidence that was recovered at that scene that would have
provided a source of ignition."  RR 39, p. 116. He said there was "ample physical evidence of
accidental sources of ignition."  RR 39, p. 116. As to the movement of the gasoline vapors, he
said:

> I can say that at some point in time an ignitable mixture would envelope the area
> surrounding the gas range. I don't know at what point in time. It may be in five
> seconds, it may be in a minute and-a-half. But that air will be circulating and sooner
> or later the proper mixture is going to happen because that is a very closed,
> confined area.

> RR 39, p. 133.

> He said the following, to-wit:

> I can't tell you nor do I know of anyone who is being up front with you as to which
> of those possible ignition sources did, in fact, ignite that fire. Because there were
> vapors in and about that room distributed by the mechanisms we talked about that
> could easily have been at the ignitable range and easily have penetrated cracks and
> crevices necessary to get to heat sources and set that fire off.

> RR 39, p. 172.

As to whether the lighters—found on Holiday—could have been a possible source of ignition, Mr.
Clayton said that he did not see any "sooting or discoloration that would indicate" they were near
any ignitable liquids. He said the lighters were "perhaps a remote possibility" as an ignition source.
He said that he could not foresee "somebody using one of these lighters to light a fire and then stick
it back in their pocket."  RR 39, p. 186.

31

*Analysis.* The standard in 2006 when the CCA decided Holiday's appeal for determining legal sufficiency for federal due process purposes is *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Jackson* directs the reviewing court to view "the evidence in the light most favorable to the prosecution," and if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" then the evidence is legally sufficient. This *Jackson* standard of review gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. In reviewing the evidence for legal sufficiency, the court must presume the trier of fact resolved any conflicting inferences in favor of the prosecution and must defer to that resolution.

The Texas capital murder of a child statute provides that an offender who intentionally or knowingly murders an individual under six years of age shall bear the risk of a capital murder conviction. *See* TEX. PEN. C. ANN. SECTION 19.03(a)(8). Additionally, the capital murder statute provides that an offender who intentionally or knowingly murders more than one person in the same criminal transaction shall bear the risk of a capital murder conviction. *See* TEX. PEN. C. ANN. SECTION 19.03(a)(7).

Intent to kill is a question of fact to be determined by the jury. *Robles v. State*, 664 S.W.2d 91(Tex. Crim. App.1984). The fact-finder may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence and may infer knowledge or intent from the acts, words, and conduct of the accused. *See Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999).

32

The CCA's decision was unreasonable, thereby overcoming AEDPA 2254(d)(2) because the CCA unreasonably applied the facts. The problem in this case — which the CCA never seems to have recognized — is lack of proof of one of the elements of the State's elements for conviction: causation. Whatever else one may think of Holiday, no rational trier of fact could have found the essential element, *i.e.*, intentional or knowing, beyond a reasonable doubt to support these capital murder convictions. There was no evidence that Holiday intentionally or knowingly started the fire, or that he *actually* started the fire. The eyewitness testimony of Ms. Mitchell only established—if one believes her testimony at trial and not her testimony at pretrial—that Holiday bent down and the fire started. Though she said she was looking at Holiday when the fire started, she never testified that she saw him actually set the fire. For the evidence to be legally sufficient to support these convictions, it must establish that a rational jury could have found beyond a reasonable doubt that Holiday either intentionally or knowingly started the fire, *and actually* started a fire, that caused the death of the three children. No rational jury could so find. If the fire was accidentally ignited, Holiday was not guilty of the capital murders. To be guilty of capital murder, Holiday had to either intentionally or knowingly set the fire. No evidence supports that he did. Holiday directed Ms. Mitchell to pour the gasoline in the house, and at his direction, it was poured away from the children. Holiday's lighters revealed no presence of gasoline, sooting, or discoloration. If Holiday had started the fire with one of his lighters, it would have been reasonable to infer that there should have been some physical evidence to indicate such; there was none. An accidental ignition of the fire is a more reasonable inference because Holiday was burned, he dropped his pistol, he left the shotgun in the house, and he was not near an exit when the fire started. There were at least five potential sources of ignition in the house. Judd Clayton found no

33

evidence which indicated that the fire was started intentionally. He said that the time it takes vapors to move through the house cannot be accurately predicted.

Viewing "the evidence in the light most favorable to the prosecution" no rational jury could have found beyond a reasonable doubt that Holiday started the fire.

The evidence was legally insufficient to support Holiday convictions for capital murder.

**Claim 2:**     **The State violated the Sixth Amendment fair jury trial clause and _Wainwright v. Witt_, 469 U.S. 412 (1985), by granting the State's request to remove qualified Juror Servaine Sessions.**

**_Exhaustion:_**  This claim was presented to the trial court which denied relief. RR 31:13. It was then presented to CCA as point of error number 3 in direct appeal brief. _See_ Appellant's Brf. at 30-35. The CCA denied relief on the merits, and explicitly referred to the federal claim. _Holiday v. State_, 2006 Tex. Crim. App. Unpub. LEXIS 737, *15-20, No. AP-74,446, slip op. at 5-6 (Tex. Crim. App. Feb. 8, 2006). The CCA did not hold this claim to be procedurally defaulted.

**_Introduction._**  On May 21, 2002, after the jury had been selected, but prior to it being sworn, Servaine Sessions—who was selected as a juror—requested to speak to the trial judge. After conversing with Ms. Sessions, the court conducted a hearing relating to her jury service. During the brief hearing, the following entire exchange occurred between the trial judge and Ms. Sessions, to-wit:

> Q.   And we have met on a couple of occasions because of the fact that you've been on the jury panel and then we had your individual interview. And as it turns out you are now on the final jury to sit as a trial juror in the case against Raphael Deon holiday; am I correct?
>
> A.   Yes, sir.
>
> Q.   And, of course, we talked to some ninety or so. I don't remember specifically anything you said at that time that would indicate a possible problem dealing with jury service in this matter, but upon my arrival -- I'm saying this for the

34

record that the court reporter is  making -- on my arrival this morning you indicated to me that you needed to talk to me about your jury service; am I correct?

A.   Yes, sir.

Q.   And I have told the lawyers that we had a very brief conversation and I didn't go into what the problem was, but you indicated that you would like to talk; am I correct?

A.   That's correct.

Q.   Okay. I don't know anything wrong at this point with you. I may not be able to actually make any  final decisions on what you're about to say. Chances are, given the circumstances, we are this far along in the trial, you will be required to continue your service. But I just want the lawyers to know what is in your heart and in your mind because they are entitled to know that. So you may go ahead and just tell us what it is that you think may be a problem for you.

A.   I thought for sure when I was here that I could -- after listening to the trial and receiving all the information I could decide one way or the other on -- after the guilty phase if I had to do the death penalty phase. And I been praying about it. And that's just the only thing, I don't know. I'm not saying I can't serve and do my civil duty, I'm just not sure even after hearing the information if I could say one way or the other yes.

Q.   What do you mean yes?

A.   On the death penalty. That was the thing. I thought if he was found guilty and then I didn't know I was going to have to do the sentencing phase or if the Judge was going to do that. And, if so, after listening to those two questions, if it's going to be considered the death penalty, that's what I was afraid of. I don't know one way or the other. I thought yes, I could say if it was put to me yes, this person deserves the death penalty, and now I'm not -- just not certain on that.

Q.   You were certain at the time but since then you have become less certain?   Is that what you're telling us?

A.   Yes. I'm not totally not certain or totally certain. It's just that I have had some confusing thoughts on it.

Q.   Okay.

A.   I been praying about it and seem like everything I read -- it wasn't anything dealing with the court, it's just that I read my Bible daily and seem like every page I went to it has something to do with humanitary (sic), it has something

to do with Commandments. And I didn't know if that was God, God's way of speaking to me on what -- on what I was about to do or what. And I just wanted to be honest and up front and let them know, I don't know one way or the other. If you can understand that?   And this just didn't happen when she told me -- when the County Clerk called me I   was like oh, God. So I prayed that night. For two nights I didn't sleep.

Q.   I know it's heavy on your heart and it's a heavy responsibility. You have made us all aware of the   situation.

A.   That's all I wanted to do was make you aware of it.

RR 30 pp. 9–12.

On May 23, 2002, the trial court heard the State's Motion to Excuse Ms. Sessions from the jury. CR Supp. 2, p. 80. The trial court found that Ms. Sessions was "not qualified to serve" because "her religious views opposing the death penalty are of such a nature that they would, in my opinion, prevent or impair her performance of her duties as a juror and in accordance with the jury's instructions and her oath."   The State's challenge for cause was granted over Holiday's objection. RR 31, p. 13.

**Analysis.** The views of Ms. Sessions regarding the death penalty did not prevent or substantially impair the performance of her duties in accordance with her instructions and her oath. The trial court violated *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) when it granted the state's challenge for cause over Holiday's objection. Ms. Sessions was qualified to serve on a death penalty jury, and her removal was reversible error.

In a capital prosecution, a prospective juror is not subject to a challenge for cause merely because she is opposed to or has conscientious scruples regarding the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 515, 88 S.Ct. 1770, 20 L. Ed.2d 776 (1968). In fact, when a prospective juror only voices "general objections to the death penalty or expressed conscientious or religious scruples against its infliction" the defendant's right to an impartial jury under the 6th and 14th

36

amendments in a capital murder case prohibits the exclusion of the prospective juror. *Id*., at 1776. But, a prospective juror—who has conscientious scruples about the death penalty—may be disqualified if her views would "prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath." *Wainwright v. Witt,* supra at 425. Accordingly, the exclusion of prospective jurors must be limited to those who were "irrevocably committed ... to vote against the penalty of death regardless of the facts and circumstances."   Ms. Sessions was not "irrevocably committed" to vote against the penalty of death. In fact, she was far from it.

If a prospective juror is barred from jury service because of his or her view about capital punishment on "any broader basis" than inability to follow the law or abide by their oaths, the death sentence cannot be carried out. *Witherspoon, supra*. The improper exclusion of a single venire-person under *Witt* is reversible error. *See Gray v. Mississippi*, 481 U.S. 648, 666 (1987).

The CCA unreasonably applied the facts, thereby permitting Holiday to overcome the AEDPA 2254(d)(2) barrier to relief. First, the CCA noted, the State conceded that she said nothing to disqualify her for cause. Sessions was actually selected. Second, the CCA relied upon the wrong factors, finding her dismissal proper because she was "distressed," she was uncertain what her answer to the special issues might be as this point, she had not slept well for two nights, and she prayed and read her Bible. All of this, to the CCA, amounted to juror uncertainty about what she would do when the time came, which in the CCA's mind was sufficient to justify excusing a perfectly qualified juror. Consequently, according to the CCA's view, excusing the juror was perfectly within the orbit of a trial judge's discretion. What the CCA failed to do was to apply the trial judge's permitted discretion within the analytical federal constitutional created by the Supreme Court, thereby improperly applying existing Supreme Court jurisprudence. Stunningly,

37

the CCA even recognized the trial judge's failure to apply the required federal constitutional standard: "[T]he trial court did not utilize the key language from *Wainwright* when questioning Sessions, . . . ." *Holiday*, slip op. at 6; LEXIS at 20. And since the trial judge did not comply with *Wainwright*, the CCA decided not to do so either. This utterly the wrong decision.

Prospective jurors may not be excused merely because their beliefs about the death penalty might influence the decision-making process. The fact that a prospective juror will be influenced by her feelings regarding the death penalty does not, in and of itself, make her challengeable for cause, nor does it constitute substantial impairment of juror's performance of her duties. Ms. Sessions never suggested that she would "consciously distort" her answers to the special issues in order to prevent the imposition of the death penalty. Ms. Sessions never said she was opposed to nor had conscientious scruples about the death penalty; she only said she had "some confusing thoughts."   According to *Adams v. Texas*, 100 S.Ct. 2521, 448 U.S. 38 (U.S. Tex. 1980), "conflicting feelings" about the death penalty do not disqualify a person from jury service "who is able to put those feelings aside and impartially serve the simple fact-finding function called for under the special issues."

In *Stevens v. Horn*, 319 F.Supp.2d 592 (W.D.Pa. 2004), *aff'd in part, remanded in part*, 288 Fed.Appx. 4 (3rd Cir. July 25, 2008), Noting that petitioner's claim challenged the state court's factual determination and that the state court denied petitioner's claim on the merits, the district court held, pursuant to §2254(d)(2), that the state court based its decision on an unreasonable determination of the facts in light of the evidence presented at trial. During *voir dire*, the court asked "Do you have an opinion about the death penalty which would prevent you from following the Court's instructions as to what penalty should be imposed?" The veniremember responded, "I

38

don't believe in the death penalty." Immediately, the prosecutor challenged the veniremember for cause, and the trial judge excused the veniremember. The district court determined that a review of the state court record revealed an unreasonable determination of the facts because the prosecutor did not ask any additional questions to determine whether the veniremember could set aside her opposition and apply the law and the court's instructions as required under *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 460 U.S. 412 (1985). The district court granted the death-sentenced petitioner a new sentencing hearing.

A new trial for Holiday is required.

> **Claim 3:** **The State violated Holiday's Sixth Amendment right to confrontation by allowing Nurse Jane Riley to relate damaging banned testimonial hearsay by Tierra Lynch in violation of *Crawford v. Washington*, 541 U.S. 36 (2004).**

> **Claim 4:** **The State violated the Fifth and Fourteenth Amendment due process clause provisions by allowing Nurse Jane Riley to relate damaging banned testimonial hearsay by Tierra Lynch.**

*Exhaustion.* Holiday timely presented these federal claims to the trial court which overruled. RR 32, pp. 183–189. He carried the claims to the CCA as point of error number 4 in his direct appeal brief. *See* Appellant's Brf. at 35-39 (see pgs. 37, 39 for constitutional references). The CCA denied the claims on their merits, without finding procedural default. *Holiday v. State*, 2006 Tex. Crim. App. Unpub. LEXIS 737, *20-25, No. AP-74,446, slip op. at 6-7 (Tex. Crim. App. Feb. 8, 2006).

*State Disposition.* The CCA disposed of the *Crawford* claim by finding that whether there was a violation or not, there was no harm to Holiday, because the nurse's testimony repeated without elaboration what came from other sources independently. Once again, the CCA failed to apply the correct analysis. When a state court evaluates a federal constitutional claim, it must apply

the federal constitutional claim harm analysis under *Chapman v. California,* 386 U.S. 18 (1967), which holds that when an appellant establishes that the lower court proceedings contained error impacting his or her federal constitutional rights, the error requires reversal unless the prosecution can establish it was harmless beyond a reasonable doubt. The CCA conducted no such analysis. Failing to do so was an unreasonable application of Supreme Court law, permitting relief through AEDPA 2254(d)(2). *See, e.g., Eddleman v. McKee*, 471 F.3d 576, 588 (6th Cir.2006) ("We hold that, when a state court has found an error to be harmless, we should ask on collateral review whether the state court's harmless-error decision was contrary to, or an unreasonable application of, the clearly established federal rule that a trial error is harmless only if it is harmless beyond a reasonable doubt. Applying this standard of review to the case at hand, we hold that the Michigan Court of Appeal's harm-less error determination was an unreasonable application of the Supreme Court's decisions in *Chapman v. California* and *Arizona v. Fulminante*.") (citations omitted).

**Analysis**. In light of the CCA's presumption that there was *Chapman* error, this Court should find that that indeed occurred, and focus only on the reasonableness of the CCA's harm analysis.

The out-of-court statements by Tierra Lynch were testimonial in nature and, therefore, admitted in violation of the confrontation clause. Further the statements lacked sufficient indicia of reliability and were not admissible as any exception to the hearsay rule.

Nurse Riley testified that her job was to interview children to determine if they had been sexually abused. She interviewed Tierra Lynch in March of 2000. Over numerous objections, she testified about the questions she propounded Tierra and the answers she heard. She asked Tierra if she knew why there was blood in her panties. Tierra said no. She asked Tierra if something had happened to her and she responded "yes."  She asked if anyone was with her when something

40