IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAPHAEL DEON HOLIDAY, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No.4:11-cv-01696 |
| | § | **Death Penalty Case** |
| RICK THALER | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER

This is a federal habeas corpus proceeding initiated by Petitioner Raphael Deon Holiday, a death-sentenced Texas inmate, pursuant to 28 U.S.C. § 2254. But Holiday is not entitled to relief. He does not show that the state courts unreasonably applied clearly established federal law. Thus, Holiday's bid for federal habeas relief should be denied.

## PETITIONER'S ALLEGATIONS

1. The evidence is constitutionally insufficient to support Holiday's conviction.

2. Holiday's Sixth Amendment rights were violated by the removal of prospective juror Servaine Sessions.

3. Holiday's confrontation rights were violated by allowing Nurse Jane Riley to testify to statements made by Tierra Lynch.

4. Holiday's due process rights were violated by allowing Nurse Jane Riley to testify to statements made by Tierra Lynch.

5.    Holiday's due process rights were violated by the trial court's refusal to quash the indictment.

6.    Holiday's Sixth Amendment rights were violated by the trial court's refusal to quash the indictment.

7.    Holiday's Eighth Amendment rights were violated by the trial court's refusal to inform the jurors about the inability to reach a verdict on any special issue.

8.    Holiday's Sixth Amendment rights were violated by denying his challenge for cause of Venireperson Linda Masters.

9.    Holiday's Sixth Amendment rights were violated by denying his challenge for cause of Venireman Kenny Penny.

10.    Holiday's due process rights were violated by the testimony of the prosecution's expert.

11.    Holiday's due process rights were violated by the admission of evidence that Holiday had raped Tierra Lynch.

12.    Holiday's due process rights were violated by the trial court's refusal to instruct jurors on law of the parties.

13.    Holiday's right to remain silent was violated by the State's comment to jurors on Holiday's failure to testify.

14.    Holiday's due process rights were violated by the admission of the prosecutor's expert's testimony that Holiday was likely to commit future acts of violence.

15.    Holiday's Eighth Amendment rights were violated by the admission of the prosecutor's expert's testimony that Holiday was likely to commit future acts of violence.

16.    Holiday's due process and Eighth Amendment rights were violated by the prohibition on his expert's testimony on the administration of the death penalty.

2

17. Holiday's due process and Eighth Amendment rights were violated by the prohibition on his expert's testimony on the effect the administration of the death penalty on Holiday would have on prison officials.

18. Holiday's due process and Eighth Amendment rights were violated by the prohibition on his expert's testimony on the effect of administration of the death penalty on the survivors of the victim.

19. Holiday's due process and Eighth Amendment rights were violated by the prohibition on his expert's testimony on how inmates serving life sentences often make positive changes.

20. Holiday's due process rights were violated by the trial court's restriction of Holiday's cross-examination of Beverly Mitchell during the punishment phase of trial.

21. Holiday's Eighth Amendment rights were violated by the trial court's restriction of Holiday's cross-examination of Beverly Mitchell during the punishment phase of trial.

22. The State court otherwise violated Holiday's constitutional rights by the restriction of Holiday's cross-examination of Beverly Mitchell during the punishment phase of trial.

23. Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because it impermissibly restricts mitigating evidence.

24. The trial court violated Holiday's constitutional rights by failing to inform the jury of the consequences of a single juror vote for "no".

25. Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because it fails to place the burden of proof on the State in regards to the mitigation issue.

26. Texas Code of Criminal Procedure article 37.071 violates the Supreme Court's holdings because it fails to require the State prove beyond a reasonable doubt that the mitigating evidence is sufficient to warrant a life sentence.

27. Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because it fails to define certain key terms.

28. Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because the statute does not provide for meaningful appellate review.

29. Texas Code of Criminal Procedure article 37.071 violates the Fourteenth Amendment because the statute does not provide for meaningful appellate review.

30. Texas Code of Criminal Procedure article 37.071 violates Holiday's constitutional rights because the statute does not define "probability" calling for a yes answer if there is any likelihood rather than a preponderance.

31. Texas Code of Criminal Procedure article 37.071 violates Holiday's constitutional rights because the statute does not define "criminal acts of violence."

32. Texas Code of Criminal Procedure article 37.071 violates Holiday's constitutional rights because the statute does not define "continuing threat to society."

33.-39. (These claims have been omitted. *See* Pet Table of Contents)

40. Holiday's due process rights were violated by the presentation of false or misleading testimony by the prosecution's expert John DeHaan.

41. Holiday's Eighth Amendment rights were violated by the presentation of false or misleading testimony by the prosecution's expert John DeHaan.

4

42. Holiday's due process rights were violated by the presentation of unreliable scientific testimony by the prosecution's expert John DeHaan.

43. Holiday's Eighth Amendment rights were violated by the presentation of unreliable scientific testimony by the prosecution's expert John DeHaan.

44. Holiday's due process rights were violated by the State's withholding of impeachment evidence for the prosecution's expert John DeHaan.

45. Holiday's Eighth Amendment rights were violated by the State's withholding of impeachment evidence for the prosecution's expert John DeHaan.

46. The State violated Holiday's due process rights by presenting false or misleading testimony on pour patterns.

47. The State violated Holiday's Eighth Amendment rights by presenting false or misleading testimony on pour patterns.

48. The State violated Holiday's due process rights by presenting scientifically unreliable testimony on pour patterns.

49. The State violated Holiday's Eighth Amendment rights by presenting scientifically unreliable testimony on pour patterns.

50. Holiday's due process rights were violated by the presentation of false or misleading testimony regarding the prosecution's expert in relation to his doctoral thesis.

51. Holiday's Eighth Amendment rights were violated by the presentation of false or misleading testimony regarding the prosecution's expert in relation to his doctoral thesis.

52. Holiday's due process rights were violated by the presentation of false testimony regarding the prosecution's expert in relation to his doctoral thesis.

53.   Holiday's Eighth Amendment rights were violated by the presentation of false testimony regarding the prosecution's expert in relation to his doctoral thesis.

54.   Holiday was denied effective assistance of counsel due to counsel's inadequate investigation of possible ignition sources.

55.   Holiday was denied effective assistance of counsel due to counsel's inadequate investigation of mitigation evidence.

56.   Holiday was denied effective assistance of counsel due to counsel's inadequate investigation and failure to present evidence of organic brain damage.

57.   Holiday was denied effective assistance of counsel due to inadequate briefing and procedural default.

58.   Holiday may have been denied effective counsel during the jury selection process.

59.   Holiday was denied his right to conflict-free representation.

60.   Holiday's death sentenced as imposed violates the Eighth Amendment.

61.   Holiday will be denied a fair clemency process in violation of his constitutional rights.

## STATEMENT OF THE CASE

Holiday was charged and convicted of capital murder three times over for the burning deaths of three children, including his daughter. Holiday was charged in three separate indictments, each alleging the capital murder of a different named individual. The first case, the death of seven y6ear-old

Tierra, was charged as the murder of multiple people and the second two were charged as the murders of children under the age of six. The cases were tried together, but the jury was submitted a separate charge for each case, and three separate judgments were rendered. Pursuant to the jury's answers to the special issues the trial judge sentenced Holiday to death. 1 CR (10,423/7446) 9 (Tierra Shinea Lynch); 5 CR 642-45; 1 CR (10,425/7447) 2, 18-21 (Jasmine Rockell Dupaul); 1 CR (10,427/7448) 2, 18-21 (Justice Nicole Holiday).[1]

Direct appeal to the Texas Court of Criminal Appeals is automatic and Holiday's three convictions and sentences were affirmed. *Holiday v. Texas*, AP-74,446; AP-74,447; AP-74,448, 2006 Tex. Crim. App. Unpub. LEXIS 737 (Tex. Crim. App. Feb. 8, 2006). Holiday petitioned the United States Supreme

---

[1] "CR" is the abbreviation representing the Clerk's Record, the transcript of all the trial filings. Because there are three different indictments/cause numbers/convictions, the first few volumes of the clerk's record are different for each one. The later volumes containing motions and jury questionnaires are combined for all three as is the trial record. These early volumes will have a parenthetical with the trial court cause number and the last part of the appellate cause number because both are marked on the volume. "RR" refers to the Reporter's Record of the trial proceedings. "SHCR" is the designation for the Clerk's Record of the state habeas proceedings. *Ex parte Garza,* No. 73,027-01. Where relevant the volume numbers precede the designation and the page number(s) follow it. Because the final volume of the state habeas application (with the denial cover page) is not designated as such the generic SHCR will refer to that volume which contains the state court findings.

Court for review but certiorari was denied. *Holiday v. Texas,* 549 U.S. 1033 (2006).

While his direct appeal was pending, Holiday filed three state habeas applications, one for each conviction. 1 SHCR 1. The state court adopted the State's Proposed Findings of Fact. SHCR 21-62, 82-83. The Court of Criminal Appeals adopted the findings of the state habeas court and denied relief. SHCR at cover; *Ex parte Holiday*, Order No. WR-73,623-01, -02, -03 (Tex. Crim App. May 5, 2010). Holiday's federal petition was filed on May 3, 2011. Holiday filed his amended petition on March, 2, 2012. Pet., ECF No. 1; Amend. Pet. ECF No. 12.

## STATEMENT OF FACTS

The Court of Criminal Appeals summarized the facts of Holiday's crime as follows:

> Tami Lynn Wilkerson and Holiday lived together in a log house that Wilkerson's stepfather had built in Madison County. The house was in a secluded, wooded area about ten miles off the main highway, but just a mile or two from the home of Wilkerson's mother, Beverly Mitchell. Wilkerson and Holiday lived with Wilkerson's two daughters, seven-year-old Tierra and five-year-old Jasmine, and with Wilkerson's and Holiday's baby, Justice. In March of 2000, Wilkerson learned that Holiday had sexually assaulted Tierra. Wilkerson filed charges against Holiday and obtained a protective order against him. Wilkerson continued to live in the house in Madison County and Holiday moved out. In the following months, Holiday repeatedly contacted Wilkerson by phone, stating that he wanted to reconcile and that

he wanted to see Justice, and threatening to come to the house while the children were at home. Despite the protective order, Wilkerson met with Holiday numerous times between April and the end of August, in an effort to "handle" Holiday and deal with his threats, and to allow him to see Justice. In August, Holiday came to the restaurant where Wilkerson was working. Wilkerson locked herself in the office. When Holiday tried to pick the lock on the office door, Wilkerson called the police, who came and removed Holiday from the premises. About a week before the instant offenses, Holiday called Wilkerson and asked for her help in jumping his car. When Wilkerson arrived to assist him, Holiday took her keys, told her he had two guns, forced her to have sex with him, and then forced her into the car and threatened to crash the car and kill them both. Wilkerson finally convinced Holiday to let her go. After that incident, Wilkerson stopped taking Holiday's phone calls.

Around 11 p.m., on the evening of September 5, 2000, one of Wilkerson's daughters heard glass breaking outside. Wilkerson looked out of the window and saw a figure walking toward the house. She called her mother, Beverly Mitchell, and asked her to come over. Mitchell and Wilkerson's uncle, Terry Keller, soon arrived at Wilkerson's house. Keller had a shotgun and began walking around the house and yard. Mitchell took Tierra and Jasmine to her car. When she went back inside the house to get Justice, she picked up the telephone to dial 911. As she was holding the phone, Holiday walked in, grabbed the phone out of her hand, and threw it against the wall. When Wilkerson came into the room and saw Holiday, she ran out of the house to go for help. Holiday asked Mitchell how she had known to come to the house because Holiday said he had cut the phone line. Holiday said he was going to make Wilkerson pay for what she had done by taking his baby away. When Keller came into the house, Holiday held Mitchell in a head-lock with a gun to her head until Keller put his gun down and Holiday retrieved it. Keller testified that Holiday began "ranting and raving" that he was not "going to take the rap" on the charges filed against him, that he was "going to take care of it," and that he was "going to burn the house down with everyone in it." Holiday then poured gasoline

around and on the hood of the car where Tierra and Jasmine were. He again said Wilkerson was going to pay for what she had done. He tried to light the gasoline, but it would not ignite. Holiday forced everyone back into the house, shooting off the guns as they went. He ordered everyone to sit on the couch and told them to stay there. He told Keller that if he left, he would kill Mitchell. Holiday made repeated threats to kill everyone if the police came. He then ordered Mitchell to take him to her house to get some more gasoline. They retrieved two five gallon cans of gasoline and returned to Wilkerson's house. Keller was gone, but the girls were still on the couch. Holiday told Mitchell to "soak" the recliner and furniture with the gas. Mitchell poured gas on the recliner in the living room, poured it around the room, into the laundry room and around the washer and dryer, and into and around Wilkerson's bedroom. She did not pour any gasoline on or around the couch where the children were sitting. She saw Holiday bend down and then the fire started. The fire followed the path of the gasoline, and blocked Mitchell from going back into the living room for the children. Mitchell ran outside. Holiday was standing outside watching the fire. He told Mitchell to get in the car, but she ran into the woods. Holiday left in Mitchell's car as police were arriving. He rammed a police car and drove off.

In the meantime, Wilkerson had run to the nearest neighbor's house for help. The neighbors called 911. As Wilkerson ran back down the road to her house, she saw Mitchell's car coming toward her. The car sped up and attempted to run her down but Wilkerson escaped into the woods. The car backed up and sped off as it was pursued by a police car. When Wilkerson arrived back at her house, it was engulfed in flames. Wilkerson's three children died in the fire.

Holiday was apprehended by police after a high-speed chase. Holiday had two cigarette lighters in his pocket when he was arrested. He was treated for burns on his arms, hands, and face. Holiday's pistol and Keller's shotgun were found later inside the house.

In the weeks before the offenses, Holiday stayed with his second cousin, Steven Taylor. Taylor testified that Holiday talked to Wilkerson on the phone almost every day. Taylor once overheard Holiday tell Wilkerson that he would kill her if he did not get his child; Holiday told Taylor he had been joking. Taylor's brother, Robert Lowery, and Holiday's cousin, John White, rode with Holiday to Wilkerson's house around 9:30 on the night of the offenses and dropped Holiday off. Holiday told them he would call in the morning when he was ready to be picked up. Earlier on the day of the offenses, White sold Holiday a gun, and they went to a cemetery for target practice. Holiday told Lowery and White that he was worried and upset about the sexual-assault case pending against him, that Wilkerson and her boyfriend were trying to set him up, and that they were lying about him and trying to take his children away from him. Holiday told White that if you shoot someone and then burn them, you won't get caught. He also told Lowery that he was going to burn down Wilkerson's house and watch her run out.

The State presented expert testimony that the burns on Holiday's right arm and face were consistent with having reached down and ignited the fire. Additionally, a forensic scientist who specializes in the investigation and reconstruction of fires and explosions testified that the household appliances could be excluded as the ignition sources of the fire.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *2-*8.

## STANDARD OF REVIEW

In a federal habeas appeal, the district court's findings of fact are reviewed for clear error and the district court's conclusions of law are reviewed de novo. *Martinez v. Johnson,* 255 F.3d 229, 237 (5th Cir. 2001). Under 28 U.S.C. § 2254(d), a federal court may not grant habeas relief unless the state court adjudication (1) "was contrary to federal law then clearly

11

established in the holdings of" the Supreme Court; or (2) "involved an unreasonable application of" clearly established Supreme Court precedent; or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal quotation marks omitted) (quoting *Williams v. Taylor,* 529 U.S. 362, 412 (2000); 28 U.S.C. § 2254(d)(1)–(2)). The Supreme Court has explained that a state court decision is "contrary" to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent, yet reaches an opposite result. *Williams*, 529 U.S. at 405–06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Williams*, 529 U.S. at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. And, as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786. Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti,* 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado,* 541 U.S. at 664. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d), creates a difficult to surmount, "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786. And "[i]t bears repeating that even a strong case for relief

does not mean the state court's contrary conclusion was unreasonable."

*Richter,* 131 S. Ct. at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.* (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion[.]"). Indeed, state courts are presumed to know and follow the law." *Visciotti*, 537 U.S. at 24. And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

14

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. at 786–87. And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests that the proposed rule is not clearly established. *Alvarado,* 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v.*

15

*Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001). And, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2).

## ANSWER

## I.   Holiday's Legal Insufficiency of the Evidence Claim Is Without Merit. (Claim 1)

In his first claim, Holiday contends that the evidence was legally insufficient to convict him. Pet. at 22-34. This claim was raised on direct appeal and properly rejected by the state courts. And, Holiday cannot show this determination was unreasonable, indeed this claim is entirely meritless. Thus, his bid for federal habeas relief must fail.

The Fourteenth Amendment's Due Process Clause requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact

16

beyond a reasonable doubt of the existence of every element of the offense."
*Jackson v. Virginia*, 443 U.S. 307, 316 (1979). In reviewing the legal sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). In applying this standard, all of the evidence is to be considered in a light most favorable to the prosecution, with all reasonable inferences and credibility choices made in support of the verdict. *Id.* (emphasis added). Moreover, where multiple theories of guilt are presented to a jury, the conviction must be sustained if the evidence is sufficient to support any one of the submitted theories. *See Griffin v. United States*, 502 U.S. 46, 56-57 (1991).

Under Texas law, a person commits capital murder if the "person commits murder as defined under Section 19.02(b)(1) and the person intentionally or knowingly murders an individual under six years of age." Tex. Penal Code § 19.03(a)(8) (West 2002).[2] Also under Texas law capital murder is committed as defined under Section 19.02(b)(1) and the person murders more than one person. Tex. Penal Code § 19.03(a)(7) (West 2002). Murder is defined as "intentionally or knowingly caus[ing] the death of an

---

[2] Texas law was amended in 2011 and the age of the victim was changed to ten years of age but Holiday was convicted under the pre-amendment statute.

individual." Tex. Penal Code §19.03(b)(1). The evidence as summarized by the state court and above is more than sufficient to show that a rational trier of fact could have found the essential elements of the crime. Holidays exact claims are that while he brought gasoline and lighters to his estranged girlfriend's house, he didn't mean to start a fire (much less kill three innocent children). Holiday's dispute over his intent is quickly resolved by a review of the record evidence.

As the state court found:

> Viewed in a light most favorable to the verdict, the evidence is legally sufficient to support a finding that Holiday acted intentionally or knowingly. Holiday was worried and angry about the sexual-assault charges against him. In the months before the offenses, Holiday continually harassed and threatened Wilkerson. He threatened to kill her and "make her pay." He told others that he was going to burn down her house. His actions show a planned and calculated effort. He purchased a gun and practiced shooting on the day of the offenses. He arranged to be driven out and dropped off at Mitchell's house in the country. He dressed in black clothing and armed himself with a can of gasoline, cigarette lighters, a gun, and ammunition. He demonstrated his disregard for the lives of the children when he poured gasoline on and around the car they were sitting in and attempted to light it. When that did not work, he ordered everyone into the house with instructions to remain there while he went to get more gasoline. He terrorized Mitchell, Keller, and the children by ordering them around at gunpoint. If he had not wanted to endanger the children, he would not have allowed them to remain in the house while he directed the soaking of various items of furniture and the pouring of gasoline throughout the house. Rather than demonstrate shock, remorse, or anguish at the fact that the children were unreachable inside the burning

> house, Holiday attempted to apprehend Mitchell, and then fled
> the scene, ramming a police car, and leading police on a manic
> high-speed chase. A rational jury could conclude that Holiday
> knowingly or intentionally caused the death of the three victims
> by burning them in a fire.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *9-*10. Thus, the state

court, "viewing the evidence in a light favorable to the jury's verdict," held

that legally sufficient evidence supports the jury's verdict. *Id.* Given the

evidence in this case, Holiday cannot show that this is an unreasonable

application of clearly established federal law. For this reason, habeas relief

must denied.

## II.   Holiday's Constitutional Rights Were Not Violated by the Removal of Prospective Juror Sessions. (Claim 2)

Holiday next claims his constitutional rights were violated by the

removal of prospective juror Servaine Sessions. Pet. at 34-39. This claim was

presented to and rejected by the Court of Criminal Appeals. As shown below,

Holiday does not prove that this rejection is a violation of clearly established

Supreme Court law. As such, federal habeas relief should be denied.

As has long been established, the conduct of voir dire is left to the broad

discretion of the trial court, and the exercise of that discretion is limited by

"the essential demands of fairness." *Morgan v. Illinois,* 504 U.S. 719, 730

(1992) (*citing Aldridge v. United States*, 283 U.S. 308 (1931)). Thus, the Fifth

Circuit has recognized that a trial court has broad discretion in conducting a voir dire and assessing any prejudice held by a potential juror. *United States v. Hinojosa,* 958 F.2d 624, 631 (5th Cir. Tex. 1992). Further, refusal to grant a challenge for cause is within the discretion of the trial court and does not provide a basis for habeas corpus relief unless the disqualifying fact was so prejudicial that the refusal deprived the petitioner of a fundamentally fair trial. *Sudds v. Maggio*, 696 F.2d 415, 416 (5th Cir. 1983). And the Fifth Circuit has explicitly found that the presumption of correctness under 28 U.S.C. § 2254(d) applies to a trial court's determination regarding a challenge for cause. *Andrews v. Collins,* 21 F.3d 612, 619 (5th Cir. 1994).

In *Wainwright v. Witt*, the Supreme Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment. . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The facts of *Witt* involved a "for cause" challenge to a juror who had indicated that her personal reservations regarding the death penalty would negatively affect her ability to be impartial. *Id.* at 415-16. Nevertheless, the Supreme Court has since made clear that the converse is also true—that is, "a juror who will

automatically vote for the death penalty in every case" lacks the requisite sense of impartiality demanded by the Sixth Amendment. *Morgan*, 504 U.S. at 728-29; *see also Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

In this claim for relief, some background is necessary as the Court of Criminal Appeals termed it "a factually unique case." *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *15. During voir dire, Sessions was questioned by the parties and the law pertaining to the punishment phase and the special issues had been fully explained to her. Sessions's voir dire examination by the parties took place on May 8, 2002. The parties exercised their strikes and the jury panel, which included Sessions, was selected on May 15, 2002. On May 21, 2002, before the panel was sworn, Sessions approached the court with her concerns. To address her concerns, the court held a hearing. In the interests of brevity, the Director points this court to both the direct appeal and opinion and to the petition where the exchange is set out in its entirety. *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *16-*18; Pet. at 34-36. Later, the parties were given the opportunity to question Sessions further, but both declined. 31 RR 3. The State challenged Sessions for cause and, over Holiday's objection, the court granted the challenge, stating:

her religious views opposing the death penalty, in my judgment, based on my personal observations of her while on the stand, of her demeanor, that her religious views opposing the death penalty are of such a nature that they would, in my opinion, prevent or impair her performance of her duties as a juror and in accordance with the jury's instructions and her oath.

31 RR 13. Holiday asserts that the trial court violated his constitutional rights by removing Sessions.

The Supreme Court has held that a prospective juror may be excused for cause if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38 (1980). The trial court is given wide discretion in conducting voir dire. *Hinojosa,* 958 F.2d at 631. In reviewing this claim, the Court of Criminal Appeals noted Session's uncertainty and agony, "Even though the nature of the sentencing phase and the jury's role in answering the special issues had been fully explained to Sessions, she was distressed enough to approach the trial court after she was selected and just days before evidence was to be presented." *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *19. The court went on to note that under questioning by the judge Sessions expressed her dilemma, repeatedly stating that she was "not sure" and contending that she could not say "one way or the other" whether she

would be able to answer the special issues. *Id.* at *20. Thus the court concluded that,

> Although the trial court did not utilize the key language from *Wainwright* when questioning Sessions, the record supports the trial court's conclusion that she would be impaired as a juror. As this Court has recognized before, when a potential juror "is persistently un-certain about his ability to follow the law, we will not second guess the trial court."

*Id.* Holiday fails to demonstrate this is a violation of clearly established constitutional law. For these reasons, his claims for relief must be denied.

### III. Holiday's Confrontation Clause and Hearsay Claims Are Without Merit. (Claims 3-4)

Holiday's next complains his due process and confrontation rights were violated by allowing Nurse Jane Riley to testify to statements made by Tierra Lynch. Pet. at 39-45. As shown below, Holiday's claims of error are without merit and the state court did not act contrary to clearly established federal law in denying him relief. Thus, this Court should deny Holiday's petition for relief.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause barred the "admission of testimonial statements of a witness who did not appear at

trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53-54 (2004). The Court later clarified what qualified as a "testimonial" statement in *Davis v. Washington*, where it established:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822 (2006). Further, testimonial statements may be admitted, so long as they are used to prove something other than the truth of the matter asserted. *United States v. Holmes*, 406 F.3d 337, 349 (5th Cir. 2005); *see also Crawford*, 541 U.S. at 59 n. 9 ("The [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (citing *Tennessee v. Street*, 471 U.S. 409 (1985)).

The Court of Criminal Appeals summarized the testimony as follows:

> Wilkerson testified that on March 5, 2000, Tierra stayed home from school with Holiday because she was sick. Wilkerson went to work. When Wilkerson got home that night, she discovered a pair of Tierra's panties that were full of blood. Wilkerson also noticed that the comforter and sheets from her bed had been washed, although Holiday denied washing them. The next

morning Wilkerson took Tierra to be examined by Dr. Ali Al-Himyary. After the doctor's examination, and based upon his conclusions, Wilkerson went to the police station to file charges against Holiday. A case worker from Child Protective Services ("CPS") was called to interview Tierra. Jasmine arrived later and was also interviewed by the CPS worker. After the interviews, two police officers drove Wilkerson to her house. The officers brought Holiday outside while Wilkerson went in to look for the bloody panties. Wilkerson was unable to find the panties, but testified that Holiday later admitted to her that he had burned them. Wilkerson and her children stayed at Mitchell's that night and Holiday moved out the next day.

Dr. Al-Himyary testified that Wilkerson brought Tierra in to see him in early March of 2000. Wilkerson told Al-Himyary that she had discovered bloody underwear belonging to Tierra and was concerned that Tierra had been sexually assaulted by Holiday. Al-Himyary testified that his office was not equipped with a "rape kit" like those used by emergency rooms in such circumstances, but he conducted a physical exam of Tierra. He observed "lacerations and bleeding" on both sides of the labia majora and bruises on Tierra's thighs. Al-Himyary informed Wilkerson that it was his conclusion that Tierra had been sexually abused. As required by law, Al-Himyary contacted CPS.

Jane Riley, a pediatric nurse practitioner, testified that she had specialized training and experience in the areas of sexual and physical abuse. Riley testified that she works with two pediatricians, accepts her own patients, and also takes referrals from CPS and other law enforcement agencies. Riley examined Tierra pursuant to a referral from the police department or CPS. She ex-plained the purpose of her examination of Tierra:

[Tierra] was referred to me for further diagnosis and treatment. . . . My purpose was to determine the extent of her injury, if there was one. I wasn't sure at that point. And to assess how it happened and to provide treatment for her.

25

> Riley testified that Tierra was "bleeding quite a bit," so Riley put cold compresses on the injuries and called in a gynecological associate to help her decide whether stitches were necessary. Although they initially decided that some stitches were called for, they ultimately decided against them because Tierra was so upset and the bleeding had stopped. Instead, they decided to instruct Wilkerson on how to treat for infection and what to do if the bleeding started again. Riley saw Tierra for a follow-up exam ten days later and the injuries were healing well.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *20-*23. The following testimony by Nurse Riley is what Holiday now challenges:

> [PROSECUTOR] Now, what you can remember or what you can recall from reviewing your notes, please use—please tell the jury what you said to the child and what the child said to you as you were doing this medical history. . . .

> [RILEY] I asked her if she knew why she was there with me and she said no. And then I asked her if she knew why there was blood in her panties and she said no. And then I asked her if something had happened to her and she said yes. And then I asked her if anyone was with her when something happened and she stated my step daddy. I then asked her—I told her it was important for her to tell me what happened to her so that I could make sure she was okay. At that point she put her head down and she didn't say anything else. And then I asked her if someone had told her not to tell and she said yes, my step daddy. And then I asked her what he had said and she said that he said if I told anybody he would get in a lot of trouble.

32 RR 201-02. Holiday objected to this testimony on various grounds, including the violation of his rights under the Confrontation Clause.

In reviewing his claims of error, the Court of Criminal Appeals decided not to determine whether error existed under *Crawford*, but instead choose to

assume error and perform a harm analysis. *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *24. The court, citing *Chapman v. California*, 386 U.S. 18, 24 (1967), concluded "beyond a reasonable doubt that any error in admitting the statements did not contribute to Holiday's convictions or punishment." *Id*. The court drew this conclusion from the trial record, noting that the statements "did not inject any new facts or embellish the facts to any extent beyond that testified to by other witnesses." *Id.* Dr. Al-Himyary testified that Wilkerson informed him that she suspected Holiday of abusing Tierra. 32 RR 125. Wilkerson testified that she filed charges against Holiday, that she received a protective order against him, that he was evicted from her home, and that he was indicted for sexually assaulting Tierra. 32 RR 67-78. Thus, the court concluded that "Tierra's statements to nurse Riley identifying Holiday as the responsible person for her sexual assault were neither direct nor elaborate and did not provide any new or more prejudicial information than was admitted on the issue from other sources." *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *25.

Holiday complains that the state court incorrectly applied *Chapman* error standard. But his assertion is incorrect. *Chapman* does not require the prosecution to prove the error was harmless beyond a reasonable doubt, rather it holds the court must find the error to meet that standard. 386 U.S.

at 24. As noted above, the court did just that. Further, to prove the merits of his federal habeas claim, Holiday must show that any error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619 (1993). This he cannot do.

As noted by the state court, Nurse Riley's testimony was cumulative of other testimony in the record and was not more prejudicial than other such testimony. The Fifth Circuit in a similar case held, "Based on our review of the record, we agree with the Court of Criminal Appeals that the evidence was cumulative of other properly admitted evidence and thus its admission did not have a substantial and injurious effect on the verdict." *Shisinday v. Quarterman*, 511 F.3d 514, 524 (5th Cir. Tex. 2007). Thus, Holiday fails to present a meritorious habeas claim.

## IV.   Holiday's Defective Indictment Claim is Without Merit. (Claims 5 & 6).

Holiday next claims that his constitutional rights were violated by the trial court's refusal to quash the indictment. Pet. at 45-52. But, "[t]he sufficiency of a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment is so defective that it deprives the state court of jurisdiction." *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994).[3] Where the state courts have implicitly held as a matter of state law that an

---

[3] *Citing Branch v. Estelle*, 631 F.2d 1229 (5th Cir. 1980), *Millard v. Lynaugh*, 810 F.2d 1403 (5th Cir.); and *Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985).

indictment is sufficient to confer jurisdiction on the trial court, a federal habeas court should inquire no further. *McKay,* 12 F.3d at 69; *Lavernia v. Lynaugh,* 845 F.2d 493 (5th Cir. 1988).

A 1985 amendment to the Texas Constitution provides that "presentment of an indictment or information to a court invests the court with jurisdiction of the cause." Tex. Const. Art. V, § 12(b); *see McKay,* 12 F.3d at 69. Further, Texas courts have held that the failure to include an essential element of the crime charged, which constitutes a defect of substance, does not deprive the trial court of jurisdiction. *Studer v. State,* 799 F.2d 263 (Tex. Crim. App. 1990), cited in *McKay,* 12 F.3d at 69.

On direct appeal, the Texas Court of Criminal Appeals necessarily, though not expressly, found that the indictment conferred jurisdiction on the trial court and was sufficient:

> The adequacy of an indictment is a question of law. When such a question does not depend upon an evaluation of witness credibility or demeanor, and the trial court is in no better position to make the determination, then the reviewing court will address the issue *de novo.*
>
> The charging instrument must be specific enough to inform a defendant of the nature of the accusations against him so that he can prepare a defense. The indictments in this case specifically allege that Holiday intentionally or knowingly caused the victims' deaths "by burning with fire." By alleging how the victims died — by being burned in a fire—and alleging that Holiday acted intentionally or knowingly in causing such deaths, the State provided enough information to allow Holiday to conduct the

> necessary investigation to prepare his defense.  The trial court
> did not err in overruling the motion to quash on these

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *26-*27. Since the indictment was sufficient under state law, this Court should inquire no further. *McKay*, 12 F.3d at 68.

Finally, all that federal law requires is that the "plain and sensible meaning of the language used" may give the defendant notice sufficient to meet the requirements of the Sixth Amendment. *McKay*, 12 F.3d at 69 (*citing United States v. Haas,* 583 F.2d 216 (5th Cir.1978)). Clearly as the court noted above, Holiday was put on notice that he acted intentionally in regard to the burning death of the victims. Even without notice Holiday must demonstrate harm, which he has not done. *Johnson v. Estelle,* 704 F.2d 232, 236 (5th Cir. 1983). Thus again, Holiday fails to show the state courts denial of relief was unreasonable under clearly established federal law and his claim should be denied.

## V.   Holiday's Constitutional Rights Were Not Violated by Barring Holiday from Informing Jurors About the Power of an Individual Vote. (Claim 7)

Holiday next asserts that the Texas capital sentencing statute violates the Eighth and Fourteenth Amendments of the Constitution in that it fails to inform the jury that a single holdout juror results in a life sentence. Pet. 52-

63. Specifically, he contends that the Eighth and Fourteenth Amendments require jurors to be instructed that a life sentence is automatically imposed if the jury is unable to respond unanimously to the special issues. *Id.*

Holiday contends that the trial court's failure to explain the consequences of the jury's inability to reach a verdict on the special issues generates confusion among jurors and creates a danger that confused jurors will acquiesce to the "majority rules mentality" rather than hold out, thus violating the principles of the Eighth Amendment that protect him from cruel and unusual punishment. But this issue is foreclosed due to the Supreme Court's decision in *Jones v. United States*, wherein the Court explicitly rejected the theory that the Eighth Amendment requires jurors to be instructed as to the consequence of their failure to agree. 527 U.S. 373, 381-82 (1999).

In *Jones*, the Court first noted that petitioner's requested instruction—informing the jury regarding the consequences of a deadlock—was not essential to either of the functions constitutionally required in all capital sentencing schemes. That is, the instruction had no bearing on the "eligibility decision" of the sentencing process, nor did the failure to issue such an instruction prevent the jury from broadly inquiring into all constitutionally mitigating evidence, as required to make the "selection decision." *Id.* at 381.

31

The Court also rejected the idea that the trial court, by neglecting to inform a jury regarding the consequences of its failure to reach a verdict, "affirmatively mislead[s] [the jury] regarding its role in the sentencing process." *Id.* at 281-82. The Court reasoned that an instruction informing the jury that a life sentence would be imposed if it could not reach a unanimous verdict had no bearing on the jury's role in the sentencing process. *Id.* Rather, such an instruction "speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation." Id.

Undaunted, Holiday still contends that a constitutional violation occurs under the Texas scheme because reasonable jurors instructed pursuant to Article 37.071 are led to believe that ten jurors must agree to a "negative" response to a special issue in order to give effect to any mitigating circumstance. Thus, if only one juror was inclined to vote negatively in response to one of the special issues, it would be reasonable for that juror to conclude that his/her vote was meaningless and of no value unless nine other jurors joined them. He further submits that this creates an impermissible risk that such jurors will succumb to "majority rule" rather than hold out.

Further, the plain language of the jury instruction in the instant case does not support Holiday's assertion that a reasonable juror would believe

that an individual negative response was meaningless unless accompanied by similar responses from nine other jurors.  The jury instructions clearly stated that the jury could not answer the first special issue "Yes" unless they agreed unanimously, and explained that the ten jurors needed for a "No" answer "need not agree on what particular evidence supports a 'No' answer to the issue." 5 CR 613; 1 CR (10,425/7447) 14; 1 CR (10,427/7448) 14. Similarly, the jurors were instructed that they could not answer the second special issue "No" unless they agreed unanimously, and explained that the ten jurors needed for a "Yes" answer "need not agree on what particular evidence supports a 'Yes' answer." 5 CR 613-14; 1 CR (10,425/7447) 14-15; 1 CR (10,427/7448) 14-15. With this knowledge, a reasonable juror could deduce, at a minimum, that a jury verdict for a death sentence required unanimity—which one single "no" vote could defeat. Thus, even without the specific knowledge that the effect of a single "no" vote would result in the automatic imposition of a life sentence, a juror could reasonably find value and meaning in his or her individual vote.

Because neither the Eighth Amendment nor the Fourteenth Amendment necessitates a jury instruction regarding the consequences of a jury's inability to reach a unanimous verdict during capital sentencing hearings, the state court's rejection of this claim is reasonable and the claim

must fail. Furthermore, even if this claim had merit, the Fifth Circuit has repeatedly held that a claim challenging the "12-10" rule is barred under the non-retroactivity principle of *Teague*. *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *Webb v. Collins*, 2 F.3d 93, 95-96 (5th Cir. 1993).

For all of these reasons, Holiday has not stated a ground upon which this Court may grant relief, and this claim must be denied.

## VI. Holiday Cannot Demonstrate He Was Deprived of a Fundamentally Fair Trial in the Denial of his Challenges for Cause of Venirepersons Masters and Penny. (Claims 8 & 9)

Holiday next argues his Sixth Amendment rights were violated by denying his challenge for cause of venireperson Linda Masters and to Kenny Penny. Pet. at 63-73.

As stated above, the conduct of voir dire is left to the broad discretion of the trial court, and the exercise of that discretion is limited by "the essential demands of fairness." *Morgan,* 504 U.S. at 730. Thus, the Fifth Circuit has recognized that a trial court has broad discretion in conducting a voir dire and assessing any prejudice held by a potential juror. *Hinojosa,* 958 F.2d at 631. Further, refusal to grant a challenge for cause is within the discretion of the trial court and does not provide a basis for habeas corpus relief unless the disqualifying fact was so prejudicial that the refusal deprived the petitioner of a fundamentally fair trial. *Sudds v. Maggio*, 696 F.2d 415, 416 (5th Cir.

1983). And the Fifth Circuit has explicitly found that the presumption of correctness under 28 U.S.C. § 2254(d) applies to a trial court's determination regarding a challenge for cause. *Andrews v. Collins*, 21 F.3d 612, 619 (5th Cir. 1994).

Holiday claims that his constitutional rights were violated when it denied Holiday's challenge for cause to venireperson Linda Masters on the ground that she had a bias or prejudice in favor of an affirmative answer on the first special issue. Holiday relies on Masters's statement that if the accused had killed three children already, that would be enough to justify a "yes" answer to the first special issue. Although Masters stated toward the beginning of her voir dire that "if that person had already killed three children that should be enough" for an affirmative finding of the future-dangerousness issue, she also gave other responses indicating that she would listen to all of the evidence presented before rendering a decision. 15 RR 138, 141-151. She agreed that she "would answer the first special issue honestly based on the evidence" as opposed to answering it based on the age of the victims, and that she "would wait and hear the evidence and make a decision based on that evidence" with respect to both of the special issues. 15 RR 151-53. The court went on to note that,

> Moreover, Masters was not challengeable for cause on the ground that she would make an affirmative finding of future-dangerousness if the accused had been found guilty of murdering three children. Venirepersons are not challengeable for cause based upon the type and amount of evidence they would require to conclude that there has been a showing, beyond a reasonable doubt, of future-dangerousness. Only a refusal to answer the issue "yes" unless a particular type of evidence is presented, even if the other evidence presented were sufficient to convince them of the special issue beyond a reasonable doubt, would render the venireperson challengeable for cause. Accordingly, the trial court did not err in denying Holiday's challenge to Masters based upon her view that a person who had been found guilty of murdering three children would be a future danger.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *32-33. The court went on to dispute Holiday's additional claims regarding Masters's statement that the decision of death "will not totally rest in my lap" because the defendant "would have appeals." *Id.* at 33. The court restated the trial court's finding that "If anything, she may have overreacted to [defense counsel's] suggestion that she would be killing this person. She was offended by that. I don't think [defense counsel] meant to offend her, but I think his choice of words achieved that result." *Id.* at *34. Thus the Court of Criminal Appeals concluded that, "In view of Masters's voir dire as a whole and the context of her statement, the trial court did not abuse its discretion in overruling Holiday's challenge on this ground." *Id.* at *34-*35.

36

Given the latitude granted to the trial court in conducting voir dire and Masters reasonable answers, Holiday's constitutional claim is without merit. Even assuming that the trial court improperly failed to grant Holiday's challenge for cause, he does not demonstrate a constitutional violation. It   is not sufficient for Holiday to merely object to the other jurors who sat on the jury, he must show that they were impartial. *Ross*, 487 U.S. at 86. In *Ross,* the Court was confronted with a situation where the trial court erroneously refused to grant the defense's challenge for cause.  487 U.S. at 83-84. Yet, just as here, the objectionable veniremember did not sit on the defendant's jury because the defense exercised a peremptory challenge to remove him.  *Id.* at 86. The veniremember "was thereby removed from the jury as effectively as if the trial court had excused him for cause." *Id.* The Court then noted that the defendant was not able to demonstrate that any of the twelve jurors who went on to serve were not impartial. *Id.* It therefore concluded that no Sixth Amendment violation had been presented. *Id.* Although the Ross majority conceded that the "Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error," it rejected the petitioner's argument that "the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Id.* at 88.  Instead, the Court held that "[s]o long as the jury that sits is impartial, the fact that

37

the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.*

Holiday also argues that he was denied an impartial jury by the trial court's denial of his challenge for cause of veniremember Kenny Penny. Pet. at 68-73. The Court of Criminal Appeals also denied this claim, noting "[t]he complained-of exchange regarding state of mind was brief and undeveloped, and the law was not explained to Penny with respect to consideration of such facts." *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *38-39. Holiday fails to demonstrate that this decision was so undeniably prejudicial that it deprived him of a fair trial. Indeed, Holiday fails to make any arguments about the jurors who actually sat on his jury. The state's court's determination is not an unreasonable application of clearly established law and thus relief should be denied.

## VII.  Holiday's Claims of Improperly Admitted Testimony Do Not Demonstrate a Constitutional Violation. (Claims 10, 11)

Holiday argues his due process rights were violated by the testimony of the prosecution's expert regarding the ignition of the fire and the consistency of Holiday's injuries. He also argues his due process rights were violated by the admission of evidence that Holiday had raped Tierra Lynch. Pet. at 73-88. But Holiday fails to demonstrate a constitutional violation much less that the

state courts unreasonably denied his claims. Again, he is not entitled to federal habeas corpus relief.

Both Holiday's claims regard what he contends was the improper admission of testimony. But the Fifth Circuit has stated that "[w]e may not consider the correctness of the evidentiary rulings of the Texas courts; our authority is limited to a determination of "whether there has been a constitutional infraction of [petitioner's] due process rights which would render the trial as a whole "'fundamentally unfair."'" *Trussell v. Estelle,* 699 F.2d 256, 259 (5th Cir. 1983) (*citing Nelson v. Estelle,* 642 F.2d 903 (5th Cir.1981)). If evidence is wrongfully admitted, the evidentiary rulings present cognizable habeas claims only if they violate a particular constitutional right or if the rulings "render the petitioner's trial fundamentally unfair." *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994). An erroneous admission of evidence renders a trial fundamentally unfair if relates to evidence that is "crucial, critical and highly significant." *Pemberton v. Collins*, 991 F.2d 1218, 1227 (5th Cir. 1993) (*citing Mullen v. Blackburn*, 808 F.2d 1143, 1145 (5th Cir. 1987)). Given that Holiday does not demonstrate the evidence was improperly admitted he certainly cannot show that it rose to the level of a due process violation.

First, the Court of Criminal Appeals correctly held that Dr. DeHaan's testimony was properly admitted under Rule 702. *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *48-49. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702. To aid the jury, scientific evidence must be sufficiently reliable and relevant and the proponent of the proffered evidence bears the burden of demonstrating through clear and convincing evidence that the evidence is reliable. *Sexton v. State*, 93 S.W.3d 96, 99-100 (Tex. Crim. App. 2002); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). The burden is met by showing that (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question. *Id*. at 100. As the Court of Criminal Appeals stated,

> The trial court held a hearing outside the presence of the jury to determine the admissibility of DeHaan's testimony. DeHaan, a forensic scientist, had worked as a criminologist for thirty-three years; for the past twenty years his focus had been on fire and explosion investigations or laboratory analysis. He testified that fire is a chemical process governed by certain fixed rules of chemistry and physics. He testified that the basic principles governing fire behavior are generally

40

absolute, but the conditions surrounding a particular fire are variable. He stated that predictions and conclusions can be made made about a particular fire based upon the basic governing principles and how other fires within similar conditions have responded.

DeHaan further testified that, in his research involving fires and explosions, a large percentage of his time had been spent setting fires in various settings and under different conditions and reconstructing fires in order to test and evaluate the principles under varying conditions.

DeHaan testified that in twenty-five years of conducting such research and analysis, he had orchestrated and set about five hundred structure fires, one hundred and twenty vehicle fires, and about two hundred small-scale tests involving furniture and fuels. He explained that the process of gathering information and assessing evidence during a fire investigation begins with observations from witnesses. He also testified that it includes: (1) gathering information from the scene, such as the amount of damage, the time frames of detection, suppression, and extinguishment; (2) testing various possibilities as to manner and location of ignition; (3) assessing the way the fire spread and its time frames; (4) studying the physical evidence;  and (5) testing and retesting the possibilities to establish the reliability of the various indicators to arrive at a conclusion about the ignition. DeHaan testified that this method of gathering information, reviewing the physical evidence, and testing possibilities is used in a "very high percentage" of fire investigations and is a valid process that has been verified through numerous tests, training exercises, and demonstration fires. DeHaan testified that he properly applied these established and verified techniques in making his determination in the instant case.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *46-*48.

The court went on to explicitly find that the State met its burden in showing that DeHaan's testimony was reliable. *Id.* at *48. The court further found that

> DeHaan's testimony addressed nearly all of the seven considerations for the trial court, demonstrating that the technique is well-accepted as valid, explaining the theory and technique with clarity and focus, showing evidence of his experience and training, and explaining how he applied those to his investigation of the instant case.

*Id.* at 48.

As for Holiday's complaints that certain aspects of DeHaan's testimony lacked a scientific basis, such as his reasons for ruling out some of the ignition sources and his testimony that Holiday's injuries "were consistent with" the State's theory that he ignited the fire, as DeHaan explained, while certain scientific principles relating to fires are absolute, the surrounding conditions may vary. Thus, the state court properly concluded that the factfinder must assess how much those matters bear upon evaluating DeHaan's overall conclusions in light of the expertise he brings and such complaints go merely to the weight of DeHaan's testimony and not its admissibility. *Id.* at *49.

Holiday fails to demonstrate that the evidence was wrongly admitted under state law. More importantly, without such a demonstration he cannot

show that his due process rights were violated. Holiday has made no showing that his trial was rendered fundamentally unfair by the admission of germane expert testimony. This claim must fail.

Second, Holiday also fails to apprehend that his complaints about the admission of extraneous offense testimony also fail because the testimony was not wrongly admitted. Holiday contends that because he was willing to stipulate to key facts the prosecution untowardly tainted his trial with evidence of his rape of a minor child in his care. Such evidence he believes is more prejudicial than probative, and therefore, a violation of his due process rights. And he asserts that because the state court resolved on state law grounds this Court is entitled to de novo review. But by finding that the evidence was properly admitted under state law, the court forecloses his due process claim. The state court found the evidence to be probative and Holiday does not show this finding to be an unreasonable application of clearly established law instead pointing to the application of the federal rules of evidence. Pet at 86-88. The problem with this argument is that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

43

As the Court of Criminal appeals held, "The extraneous-act evidence here was offered primarily to show Holiday's motive in the instant offense." *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *62. The State's theory of the case was that Holiday committed the murders because he did not want to go to jail for sexually assaulting Tierra, and he was angry at Wilkerson for filing the charges and having him removed from the house. Indeed, Holiday told others that Wilkerson and her alleged boyfriend were "setting him up" and were trying to take the children away from him. As the court stated,

> Although the sexual assault may not have been so intertwined with the murders as to "form an indivisible criminal transaction," it was Wilkerson's discovery of Tierra's injuries that set into motion Holiday's downward spiral that culminated in the murders. The details of the sexual assault and the nature of Tierra's injuries were critical to an understanding of the force behind Holiday's actions. The strength of the State's evidence against Holiday on the sexual assault charges explains his motive for acting.

*Id.* at *63. Despite the danger that admission of extraneous offense testimony may divert the jury's attention, the evidence here was important to understanding the context of and motivation behind Holiday's actions. Thus, the court specifically held that evidence of Tierra's rape "was not so embellished or detailed as to become a diversion from the issues presented." *Id.* at *63-*64. "[T]he evidence was highly prejudicial, [but] it was also highly

probative of the chain of events that drove Holiday's actions in the instant case." *Id.* at *64. Thus, the trial court was not required to accept Holiday's offers to stipulate and the evidence was properly admitted under state law a finding that Holiday cannot attack. For these reasons, this claim must also fail.

## VIII.   Holiday Was Not Entitled to a Law of Parties Instruction. (Claim 12)

Holiday next claims his due process rights were violated by the trial court's refusal to instruct jurors on law of the parties. Pet. at 88-92. But again Holiday does not show the state court unreasonably applied federal law in denying relief and thus, is not entitled to relief.

At the time Holiday committed the capital offense, Section 7.02(b) of the Texas Penal Code provided:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Tex. Penal Code, § 7.02(b) (West 2002).

The trial court submitted three separate jury charges, one for each offense charged. 4 CR 573-78; 1 CR (10,425/7447) 3-8; 1 CR (10,427/7448) 3-8. The charges did not include any instructions on the law of parties. Holiday

45

objected and requested such charge. 41 RR 1-18. But his objection was overruled. 41 RR 18. As the basis of his parties charge request, he contends that the evidence showed that Mitchell poured the gasoline throughout the house.

But Holiday fundamentally mischaracterizes the nature of Mitchell's "participation" and the requirements to be a conspirator. As the state court stated,

> The evidence showed that Holiday terrorized Mitchell, Keller, and the three children at gunpoint, made repeated threats of violence and murder, and randomly shot off the guns. At one point he held Mitchell in a head-lock with a gun to her head. He forced her into her car to retrieve more gasoline and then ordered her to pour it around the house.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *64-*65. The court went on to find "that Mitchell was not a party because Mitchell could not have been convicted of the offenses" because she was "[a]cting under duress and at gunpoint, she did not possess the requisite mental state to be charged with the offenses." *Id.* at *65 Thus, the court concluded that Mitchell was not acting as a party within the meaning of party liability. *Id.*

Holiday fails to show how the state court erred in determining that one of his victims was not a party or conspirator to his crime. Holiday's actions —

46

in terrifying a grandmother into doing his bidding while under threat of death—do nothing to diminish his culpability. This claim should be denied.

## IX. Holiday is Not Entitled to Relief on His Claims the State Commented on his Failure to Testify (Claim 13)

In his next claim, Holiday asserts that his right to remain silent was violated by the State's comment to jurors on his failure to testify. Pet. at 92-100. Holiday claims that the prosecutor repeatedly referred to Holiday's failure to testify and points to the following instances and others:

> For instance, if I was charged with murder and the evidence showed that I shot someone in the head three times, but at my trial I got up and testified, well—. 41 RR 25.
> * * *
> Now, I want to talk to you a little bit just about what is not in dispute in this trial. What we believe based on the evidence is not in dispute at this trial. 41 RR 29.
> * * *
> I don't think there is any dispute that the defendant is involved in this case. 41 RR 29.
> * * *
> There is no dispute that there were three children killed here which means two or more people—. 41 RR 30.
> * * *
> We also know that when he was outside with Terry and Beverly and the kids and he was ranting and raving and shooting off the gun and burning things on the ground and lighting fires and scaring everyone half to death, that what he said as the reason he was out there was I'm not going to take the rap on these rape charges. I'm not going to do it. I'm going to take care of it tonight. I'm going to burn the house down with everyone in it. That's what he said. Those statements have not been refuted and there has been no attempt— . 41 RR 36-37.

Pet. at 92-95.

The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 615 (1968); *United States v. Dula*, 989 F.2d 772, 776 (5th Cir. 1993); *see also Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) ("*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt."). "For there to have been a denial of one's Fifth Amendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) (citing *United States v. Grosz*, 76 F.3d 1318 (5th Cir. 1996)); *accord United States v. Jefferson*, 258 F.3d 405, 414 (5th Cir. 2001); *Beathard v. Johnson*, 177 F.3d 340, 350 (5th Cir. 1999). With regard to the first inquiry, "the prosecutor's intent is not manifestly impermissible if there is some other, equally plausible explanation for the remark. For the second inquiry, the question is not whether the jury might or probably would view the challenged remark in this manner, but whether it necessarily would have done so." *Jackson*, 194 F.3d at 652 (citing *Grosz*, *supra*). Finally, the complained-of

48

comments must be viewed within the context of the trial in which they are made. *United States v. Robinson*, 485 U.S. 25, 33 (1988); *Dula*, 989 F.2d at 776. This contextual analysis is in line with the fact that such error is still subject to *Brecht* harmless-error analysis. *Fry v. Plier,* 551 U.S. 112 (2007); *Chapman v. California,* 386 U.S.18, 45 (1967).

> The Court of Criminal Appeals held that:
>
> The first complained-of statement was made during an attempt by the prosecutor to explain a situation where the evidence might raise a question of a lesser-included offense so that a charge on the lesser offense would be submitted. Holiday's objection to the statement as a comment on his failure to testify was sustained, and an instruction to disregard was given.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *67. As the court noted,

> [T]he statement referred to a situation in which a hypothetical defendant had testified. Even if it could be construed as an indirect allusion to Holiday's failure to testify, it was not manifestly intended to be a comment on Holiday's failure to testify, nor would the jury necessarily and naturally take it that way.

*Id.* The court went on to find that the second, third, and fourth complained-of statements made no direct, or even implied, reference to Holiday's failure to testify. *Id.* at *67-*68. "A reference to evidence that is 'not in dispute' does not necessarily suggest a failure by the defendant to testify." *Id.* Indeed, there are several ways to dispute evidence besides testimony by the defendant, "such

as cross-examination and presenting contrary evidence and other witnesses." *Id.* at *68.

In reviewing the last of these statements, the trial court sustained Holiday's objection and instructed the jury to disregard the comments. Holiday's motion for mistrial was denied. Thus, the Court of Criminal Appeals held that, "To the extent that these comments could be construed as referring to Holiday's failure to testify, the court's instruction to disregard cured any error." *Id.*

The case law surrounding a violation of a defendant's right not testify usually falls into one of two categories: 1) cases where the comment was not intended but was brief and quickly disregarded and 2) cases where the comments were extensive but fully urged the jury to convict based on the defendants silence. *Compare Anderson v. Nelson,* 390 U.S. 523, 523-24 (1968); *United States v. Johnson,* 127 F.3d 380, 399 (5th Cir. 1997); *with United States v. Hastings*, 461 U.S. 499, 512 (1983); *United States v. Griffith,* 118 F.3d 318, 325 (5th Cir. 1997). This case, however, had miminal and unintended comments, quickly objected to and stricken, but where there was never an urging to convict based on the defendant's silence. Thus, there is no indication that the remarks had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638.

Therefore, Holiday has not proven harm. Holiday's failure to prove the necessary harm element illustrates that both the state courts were correct in denying him relief.  Therefore, this Court should deny federal habeas relief.

## X.   Holiday's Claims Regarding Improperly Admitted Expert Testimony Are Foreclosed by Supreme Court Precedent. (Claims 14, 15)

Holiday claims his due process and Eighth Amendment rights were violated by the admission of the State's expert's testimony that Holiday was likely to commit future acts of violence. Pet. at 100-24. But because the future dangerousness special issue has repeatedly been upheld by the Supreme Court, Holiday cannot demonstrate that he is entitled to any relief. As a result, his claim should be denied.

First, the Supreme Court's interpretation of federal rules of evidence, while perhaps persuasive, is not binding on the state courts in their interpretation of parallel state rules of evidence. *Ristaino v. Ross*, 424 U.S. 589, 597 n. 9 (1976); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974); *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) (all holding that this Court's supervisory power—*see McNabb v. United States*, 318 U.S. 332 (1943) and progeny, permitting federal courts to formulate procedural rules not specifically required by the Constitution or federal statutes—does not extend to either state officials or state judicial proceedings). Thus, relief under the

Fourteenth Amendment Due Process requirement is available only where the evidence introduced is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Holiday cannot establish that the trial court's action in admitting Dr. Gripon's testimony was erroneous, much less that it constituted a denial of fundamental fairness.

In his petition to this Court, Holiday argues that he is entitled to relief because the erroneous admission of unreliable psychiatric testimony impacts the process in which the class of death-eligible defendants is determined, thereby implicating the constitutional right to due process. Pet. at 105-09. But, as the state courts held, Holiday never demonstrates how Dr. Gripon's testimony was improperly admitted under *Nenno v. State,* 970 S.W.2d 549 (Tex. Crim. App. 1998). *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *74-*75. Instead Holiday just complains it is inherently unreliable. Therefore, because Holiday cannot show that the state court's evidentiary ruling was erroneous, he also cannot show that it "infected the trial with unfairness [so] as to deny due process," and as such, he is not entitled to federal relief.

Furthermore, even assuming that Dr. Gripon's testimony was improperly admitted, Holiday's due process claim still fails because he cannot

show that this error unfairly infected his whole trial.  In fact, as the Texas Court of Criminal Appeals concluded,

> Viewing the evidence in the light most favorable to the verdict, the record supports the jury's finding that Holiday would be a future danger. Acting out of anger and revenge, Holiday planned his actions and carried them through. He terrorized Mitchell, Keller, and the children at gunpoint. He was undeterred by his initial unsuccessful attempt to kill Tierra and Jasmine and found a way to see his plan through by forcing Mitchell to retrieve more gasoline. In addition to the evidence that Holiday sexually assaulted Tierra on more than one occasion, the State also presented evidence of Holiday's sexual assault of his aunt and of his niece.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *14-*15. In light of the abundant evidence of Holiday's future dangerousness he cannot show that the admission of Dr. Gripon's testimony, even if erroneous, arose to the level of a due process violation.

Additionally, under the future dangerousness special issue, the State must prove beyond a reasonable doubt that there is a probability that Holiday would commit criminal acts of violence that would constitute a continuing threat to society. 5 CR 613; 1 CR (10,425/7447) 14; 1 CR (10,427/7448) 14. This issue is part of the Texas capital-punishment scheme that has been repeatedly upheld by the Supreme Court and continues to withstand constitutional scrutiny. *Jurek v. Texas*, 428 U.S. 262, 272-74 (1976); *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Johnson v. Texas*, 509 U.S.

350, 373 (1993); *see also Scheanette v. Quarterman*, 482 F.3d 815, 827-28 (5th Cir. 2007) (special issue is not so vague as to require additional instruction or definition by the court) (citing *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996), and *James v. Collins*, 987 F.2d 1116, 1120 & n.5 (5th Cir. 1993)). None of the research cited by Holiday purporting to demonstrate the inaccuracies of future danger predictions is sufficient to cast doubt upon the validity of the Supreme Court's decisions ultimately holding that the Texas death-penalty system is constitutionally adequate.

Indeed, the Supreme Court addressed whether evidence of future dangerousness was inherently unreliable in *Barefoot v. Estelle,* 463 U.S. 880 (1983). In *Barefoot*, the petitioner argued that evidence of future dangerousness was unreliable, and that introducing into evidence the answers to hypothetical questions made by a psychiatrist who had not personally examined the defendant was erroneous. The Court did not agree, and specifically refused to convert the American Psychiatric Association's condemnation of psychiatric predictions of future dangerousness into a constitutional rule barring an entire category of expert testimony. *Barefoot,* 463 U.S. at 899; *see also Estelle v. Smith,* 451 U.S. 454, 473 (1981) (same view rejected by Court, stating that it was in "no sense disapproving the use of psychiatric testimony bearing on future dangerousness."). Thus, the

54

Supreme Court has already found that predictions of future dangerousness are not inherently unreliable.

To the extent that this Court would find that Holiday's claim has potential merit, it still would require the announcement and retroactive application of a new rule of constitutional law in violation of *Teague v. Lane,* 489 U.S. 288 (1989). Under *Teague,* new rules of constitutional criminal procedure[4] will not be announced on federal habeas review and then retroactively applied unless an exception applies. 489 U.S. at 301. The first exception to *Teague's* retroactivity limitation is for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways. *Graham v. Collins,* 506 U.S. 461, 477 (1993). The second *Teague* exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. *Id.* In Holiday's case, however, he fails to establish that the relief he requests falls under either exception to *Teague's* retroactivity limitation.

Finally, it should be noted that not only has the future dangerousness special issue itself been held constitutional, but courts are able to review the sufficiency of the evidence in determining whether the State did meet its burden of proof beyond a reasonable doubt. In *McGinn v. State,* 961 S.W.2d

---

[4] *Citing Branch v. Estelle*, 631 F.2d 1229 (5th Cir. 1980); *Millard v. Lynaugh*, 810 F.2d 1403 (5th Cir. 1987); and *Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985).

161 (Tex. Crim. App. 1998), the Court of Criminal Appeals rejected the idea of conducting a factual sufficiency review of the jury's finding of a probability of future dangerousness. *Id.* at 166-68 (citing *Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996)). But, the court held that reviewing the legal sufficiency of the issue under *Jackson v. Virginia*, "is feasible because that standard views evidence in the light that supports the jury's verdict, and asks only whether circumstances are present that a rational person somewhere could find proof of a probability of future dangerousness beyond a reasonable doubt." *Id.* at 169. Indeed, this legal sufficiency review was conducted during Holiday's own direct appeal. *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *11-*15. Furthermore, as explained earlier, the court applied this *Jackson* standard in assessing the sufficiency of evidence, and federal courts review the state-court adjudication to assess whether it is an objectively unreasonable application of *Jackson*. Given these many levels of review, Holiday's concerns over false determinations of dangerousness is erroneous. Accordingly, his allegation is without merit and does not entitle him to relief.

**XI.   Holiday's Eighth Amendment and Due Process Rights Were Not Violated when the Trial Court Refused to Allow Expert Testimony Regarding the Administration and Effects of the Death Penalty. (Claims 16-19)**

Holiday next argues his due process and Eighth Amendment rights were violated by the prohibition on his expert's testimony: 1) on the administration of the death penalty; 2) on the effect the administration of the death penalty would have on prison officials; 3) on the effect of the administration of the death penalty on the survivors of the victim; and 4) on how inmates serving life sentences often make positive changes. Pet. at 124-31.

Holiday claims that such testimony is relevant mitigating evidence as defined by *Tennard v. Dretke,* 542 U.S. 274 (2004). Pet. at 129. But, execution impact testimony is not constitutionally relevant mitigating evidence, and there is no constitutional requirement that a jury be allowed to consider it. Thus, the state court did not act unreasonably when it refused to allow it into evidence. Finally, any error is harmless and the district court's denial of habeas relief should be affirmed.

The state court rejected Holiday's claim on its merits. *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *75-*78. It is well settled that a capital-sentencing jury may not be precluded as a matter of law from

considering, as a mitigating factor, the character and record of the individual offender, as well as the circumstances of the particular offense. *Eddings,* 455 U.S. at 111-12. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh,* 492 U.S. 302, 319 (*Penry I*) (quoting *California v. Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

Yet, as the state court has explained, execution impact testimony is "not offered to provide the jury with information regarding Holiday or the circumstances of his case in particular." *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *77. Indeed, the court noted that,

> [The expert] testimony pertained solely to how others in the criminal justice system are affected by the carrying out of executions. The trial court did not abuse its discretion in concluding that such evidence is not relevant mitigating evidence and is not helpful to the jury in making "an individualized assessment of the appropriateness of the death penalty." Even if Pickett's testimony could be viewed as marginally relevant, the trial court was within its discretion to exclude it under Rule 403. Because the evidence was not particularized to the defendant, the trial court might reasonably conclude that the risk of confusing and distracting the jury substantially outweighed any probative value such evidence might have.

58

*Id.* (citations omitted); *see also Jackson v. Dretke,* 450 F.3d 614, 618 (5th Cir. 2006) ("Evidence of impact on friends and family does not reflect on Jackson's background or character or the circumstances of his crime."). Rather, evidence about the impact Holiday's execution would have on others is *evidence about others.*

As such, it does not "tend[] logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value," and is not constitutionally relevant. *Tennard,* 542 U.S. at 285 (quoting *McKoy v. North Carolina,* 494 U.S. 433, 440-441 (1990)); *see also Jackson,* 450 F.3d at 618 (execution impact evidence "is not relevant either to the degree of harm Jackson's crime caused or to Jackson's moral culpability for the crime"). The exclusion of similarly irrelevant "extraneous emotional factors" like sympathy does not violate the Eighth Amendment; in fact, "it fosters the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Brown,* 479 U.S. at 542-43 (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976)); *see also Saffle v. Parks,* 494 U.S. 484, 493-94 (1990) (Eighth Amendment requirement that "capital sentencing must be reliable, accurate, and

nonarbitrary" prohibits consideration of "emotional responses that are not rooted in the aggravating and mitigating evidence").[5]

Finally, any error is harmless. *Brecht,* 507 U.S. at 623. As explained above, the State presented abundant evidence of Holiday's deathworthiness and Holiday introduced a great deal of mitigating evidence. The opinion of an expert concerning the impact his execution would have would not have substantially affected the jury's verdict. *See e.g. Lugo v. State,* 845 So.2d 74, 115 (Fla. 2003) (noting execution impact evidence carries little weight). Consequently, these claims should be denied.

## XII.  Holiday's Complaints of Limited Cross Examination Are Without Merit. (Claims 20-22)

Holiday next argues his constitutional rights were violated by the trial court's restriction of Holiday's cross-examination of Beverly Mitchell during the punishment phase of trial. Pet. at 131-35. But again Holiday fails to demonstrate that the state courts unreasonably applied clearly established federal law in denying these claims. As such, Holiday is not entitled to relief.

---

[5] In fact, every court except one that has considered this issue has determined that testimony regarding the impact the execution would have on family or friends is inadmissible.  *Williams v. State,* 168 S.W.3d 433, 445 (Mo. 2005) (citing *Commonwealth v. Harris,* 817 A.2d 1033, 1054 (Pa. 2002); *Burns v. State,* 699 So.2d 646, 654 (Fla. 1997); *State v. Stenson,* 940 P.2d 1239, 1282 (Wash. 1997); and *People v. Sanders,* 905 P.2d 420, 459 (Cal. 1995); *but see State v. Stevens,* 879 P.2d 162, 167 (Or. 1994) (holding, based upon a state statute, that the defendant's wife could testify as to whether it would be better for her and her daughter if the defendant was executed or spent his life in prison)).

In all criminal prosecutions, the accused has a right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution "to be confronted with the witnesses against him." U.S. Const. amend VI; *Lilly v. Virginia*, 527 U.S. 116, 123 (1999). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Lilly*, 527 U.S. at 124 (quoting *Maryland v. Craig*, 497 U.S. 836, 845 (1990)). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 19-20 (1985)(quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)(emphasis in original)). Nevertheless, while the Confrontation Clause generally affords an opportunity for effective cross-examination, it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 20 (citing *Ohio v. Roberts*, 448 U.S. 56, 73 n.12 (1980)). "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is

repetitive or only marginally relevant." *Delaware v. Van Ardsall*, 475 U.S. 673, 679 (1986).

The trial court did not abuse this wide latitude in excluding repetitive questioning of a witness. The Court of Criminal Appeals held,

> Mitchell had already responded to numerous pointed questions from defense counsel regarding the context in which her earlier statement and testimony were made. The trial court did not abuse its discretion in limiting continued questioning of Mitchell on an issue on which there had already been considerable testimony.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *80. Holiday fails to show how this ruling violates clearly established federal law. Indeed, "[a] state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999) (citing *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994)). The refusal to permit endlessly repetitive questioning does not render Holiday's trial fundamentally unfair. For this reason, federal habeas relief should be denied.

## XIII.  Holiday's Challenges to the Texas Death Penalty Statute Are Without Merit. (Claims 23-32).

Holiday makes multiple assertions that the Texas death penalty statute is unconstitutional. Yet these claims have been repeatedly rejected by

the higher courts and were soundly rejected by the state court. Thus, Holiday is not entitled to federal habeas relief.

### A.   The Texas statute does not impermissibly restrict the definition of mitigating evidence. (Claim 23)

First, Holiday asserts that Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment because it impermissibly restricts mitigating evidence. Specifically, he argues that Texas's statutory definition of "mitigating evidence" impermissibly restricts the jury's discretion to consider evidence that renders a capital defendant less morally "blameworthy." Yet, this claim lacks merit, as Holiday has not demonstrated that the state court's adjudication is contrary to, or involved an unreasonable application of, clearly established federal law.

Pursuant to article 37.071 § (f)(4) of the Texas Code of Criminal Procedure the jury was instructed that "you shall consider 'mitigating evidence' to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness." 5 CR 614-15; 1 CR (10,425/7447) 15-16; 1 CR (10,427/7448) 15-16. Holiday insists that this definition "effectively limits the relevance of a capital defendant's character and background" and this limitation is unconstitutional in light of Supreme Court holdings that the character of a capital defendant is relevant in assessing the death penalty.

63

Pet. at 135-37. Yet, Holiday is incorrect in his assertions and this claim is foreclosed by precedent.

The mitigating value of constitutionally relevant evidence, as actually proffered during trial, must be within "the effective reach" of the jury in responding to the statutory punishment issues and instructions. *Johnson v. Texas*, 509 U.S. 350, 368 (1993); *Graham v. Collins*, 506 U.S. 461, 475 (1993). But, the Constitution does not require unfettered sentencing discretion in the jury, and a state may guide the sentencer's consideration of mitigating evidence in an effort to achieve a more rational and equitable result. *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998); *Tuilaepa v. California*, 512 U.S. 967, 971 (1994); *Johnson*, 509 U.S. at 362. Thus, there is no requirement that a jury be allowed to give effect to mitigating evidence *in every conceivable manner in which the evidence might be relevant. Johnson*, 509 U.S. at 372. If mitigating evidence is within the effective reach of the jury, the fact that a defendant can identify mitigating value beyond the scope of the statutory issues does not require the submission of an additional issue or instruction allowing the jury to give further mitigating effect to the evidence. *Id.*; *Graham*, 506 U.S. at 474; *see also Boyde v. California*, 494 U.S. 370, 382 n.5 (1990)(defendant is entitled only to a fair vehicle by which sentencer can give effect to mitigating force of his evidence). Further, mitigating evidence is

beyond the effective reach of the sentencer only if there exists a "reasonable likelihood that [the] jurors would have deemed themselves *foreclosed* from considering [the mitigating evidence]" in answering the special punishment issues submitted to the jury. *Johnson*, 509 U.S. at 369(emphasis added); *see Penry I*, 492 U.S. at 315-29 (jury was prevented from giving *any* mitigating effect to the evidence).

Relief on this claim is further precluded under Fifth Circuit precedent explicitly rejecting the notion that Texas's definition of mitigating evidence unconstitutionally limits the evidence that can be considered under the mitigation special issue. *Beazley v. Johnson*, 241 F.3d 248 (5th Cir. 2001). In *Beazley*, the court found that the Texas death penalty statute did not unconstitutionally prohibit the jury from considering any aspect of the defendant's character or record, or any circumstance of the offense, as factors mitigating against a death sentence. *Id.* at 260. The court explained that "virtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's moral culpability apart from its relevance to the particular concerns embodied in the Texas special issues." *Id.* at 260 (citing *Graham*, 506 U.S. at 476)(emphasis original).

For these reasons, the state court reasonably adjudicated this claim, and federal habeas relief is not warranted.

### B.   The Constitution does not require jurors to be instructed regarding the effect of a single negative vote to the special issues. (Claim 24).

Holiday next asserts that the Texas capital sentencing statute violates the Sixth, Eighth and Fourteenth Amendments of the Constitution in that it fails to inform the jury that a single holdout juror results in a life sentence. Pet. 137-46. This claim is essentially identical to the one raised as claim seven above and the Director does not need to reiterate the same arguments here. Because the Supreme Court has not required a jury instruction regarding the consequences of a jury's inability to reach a unanimous verdict during capital sentencing hearings, this claim must fail. Furthermore, even if this claim had merit, the Fifth Circuit has repeatedly held that a claim challenging the "12-10" rule is barred under the non-retroactivity principle of *Teague. Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *Webb v. Collins*, 2 F.3d 93, 95-96 (5th Cir. 1993). The state courts reasonably rejected this claim on direct appeal. *Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *80-*83. Holiday has not shown otherwise. For these reasons, Holiday has not stated a ground upon which this Court may grant relief, and this claim must be denied.

C.   **Holiday's attempt to argue that the mitigation issue requires a burden of proof has been rejected and is without merit. (Claim 25, 26 & "Claim 12(?)")**

Holiday next argues Texas Code of Criminal Procedure article 37.071 violates the Eighth Amendment and Supreme Court precedent because it fails to place the burden of proof on the State in regards to the mitigation issue. Pet. at 146-56. Holiday makes a related argument later in his brief that the future dangerousness finding acts as the functional equivalent of a greater offense, labeled as "Claim Number 12" in the place where claims 33-39 should be. Pet. at 175-78. But The Fifth Circuit has clearly rejected these arguments. *Granados v. Quarterman,* 455 F.3d 529, 536-37 (5th Cir. 2006); *Rowell v. Dretke,* 398 F.3d 370, 378 (5th Cir. 2005). "No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell,* 398 F.3d at 378.

Indeed Holiday's position would lead to absurd and unenforceable results. As the Supreme Court explained in *Penry I,* 492 U.S. at 316-19, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." 492 U.S. at 319. Thus, the definition of "mitigating"

depends on what a "disadvantaged background" is, what emotional or mental problems consist of, and most importantly who is "less culpable." This is precisely why the Court excepted mitigating circumstances from the logic of *Ring*[6] and *Apprendi.*[7]

Indeed, the Court of Criminal Appeals has clearly, and correctly, rejected the idea that any evidence could be *per se* mitigating. *McFarland v. State,* 928 S.W.2d 482, 498 (Tex. Crim. App. 1996). The court explained that, "unlike a particular offense or defense ... which contains specific elements that must be met, ... the weighing of 'mitigating evidence' is a subjective determination undertaken by each individual juror." *Id.*; *see also Colella v. State,* 915 S.W.2d 834, 844 (Tex. Crim. App. 1995) ("The amount of weight that the factfinder might give any particular piece of mitigating evidence is left to 'the range of judgment and discretion' exercised by each juror") (quoting *Banda v. State,* 890 S.W.2d 42, 54 (Tex. Crim. App. 1994)). While the Constitution forbids "untrammeled discretion to *impose* the death sentence," the "untrammeled discretion to *afford life* to a death eligible defendant does not offend the United States Constitution." *Lawton v. State,* 913 S.W.2d 542, 558 (Tex. Crim. App. 1995); *see also Gregg v. Georgia,* 428

---

[6]    *Ring v. Arizona,* 536 U.S. 584 (2002).
[7]    *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

U.S. 153, 199 (1976) ("Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution").

In essence, accepting Holiday's interpretation would punish the State of Texas for doing exactly as it was told to do in *Penry I*—allow the jury open-ended discretion to consider mitigating circumstances and impose a life sentence if appropriate to the defendant and the crime. At the same time, the application of *Ring* and *Apprendi* to the Eighth Amendment context of mitigation would lead to impossible and absurd results by forcing the State to *objectively* refute fundamentally *subjective* moral considerations urged to a jury in defense of a man's life. Holiday's argument is also untenable because the absence of mitigating circumstances is not an element of the crime or a sentencing aggravator that must be pled and proved by the State beyond a reasonable doubt. Thus, the core Sixth Amendment principles of due process and fair notice recognized in *Ring* and *Apprendi* are not implicated here.

Moreover, Holiday's entire *Ring*/*Apprendi* argument is based on a fallacy, *i.e.,* the *absence* of mitigating circumstances amounts to an aggravating circumstance that increases the maximum penalty for capital murder. *Ring* and *Apprendi* are inapplicable to the Texas capital sentencing scheme for two reasons. First, the prescribed statutory maximum penalty for capital murder in Texas is death, and each element of the offense and

69

aggravating sentencing factor was proved to the jury beyond a reasonable doubt. Thus, Holiday was not denied fair notice or subject to an enhanced sentence based on judicial fact findings. Second, the absence of sufficient mitigating circumstances is not an element of capital murder and is not an *aggravating* fact that increases the penalty for capital murder. Rather, the presence of sufficient mitigating circumstances is plainly a *mitigating* fact which allows a defendant to *escape* the maximum penalty for capital murder. As a result, the Sixth Amendment rationale of *Ring* and *Apprendi* is inapposite to the instant case, and habeas relief should be denied.

Nevertheless, the mitigation special issue is not an element of the offense of capital murder nor is it an aggravating circumstance as defined by *Tuilaepa*.[8] Rather, the mitigation issue gives the jury a chance to make an individualized determination of the offender's moral culpability, as the Supreme Court has repeatedly required. *Penry II,* 532 U.S. 782, 797 (2001) (*Penry II*); *Penry I,* 492 U.S. at 316-19; *Eddings v. Oklahoma,* 455 U.S. 104, 111-12 (1982); *Woodson v. North Carolina,* 428 U.S. 280, 303-04 (1976). The Court has explained that such a determination need not be structured in any

---

[8]     Analogously, this Court has held that "neither *Ring* and *Apprendi* nor *Atkins* [*v. Virginia,* 536 U.S. 304 (2002)] render the absence of mental retardation the functional equivalent of an element of capital murder which the [S]tate must prove beyond a reasonable doubt." *In re Johnson,* 334 F.3d 403, 405 (5th Cir. 2003). This is because "the absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense." *Id.*

particular way, as long as the jury is allowed to judge for itself what is mitigating and in what way. *Franklin v. Lynaugh,* 487 U.S. 164, 179 (1988) (plurality opinion); *Mills v. Maryland,* 486 U.S. 367, 373-75 (1988); *Booth v. Maryland,* 482 U.S. 496, 502 (1987), *overruled on other grounds, Payne v. Tennessee,* 501 U.S. 808 (1991); *Zant,* 462 U.S. at 875-76. The Texas mitigation special issue serves this constitutionally mandated function, instructing the jury to consider all of the evidence—the circumstances of the offense, the defendant's character and background, and the general moral culpability of the defendant—and that it need not agree on what evidence supports an affirmative answer. Tex. Code Crim. Proc. art 37.071 § 2(e) & (f); 3 CR 488. Thus, the mitigation issue confers upon the jury a broad ability to show leniency and *reduce* the defendant's sentence to life imprisonment.[9] *See Penry II,* 532 U.S. at 803 (approving the "brevity and clarity" of the current mitigation special issue as a catchall mitigation instruction).

For these reasons, and because the Fifth Circuit has expressly found no constitutional violation, Holiday has not demonstrated the state courts unreasonably denied his claim in violation of clearly established federal law.

---

[9] Similarly, "proof of mental retardation 'exempts' one from the death penalty, the maximum statutory punishment for capital murder." *Ex parte Briseno,* No. 29,819-03, 2004 WL 244826, *5 & n.36 (Tex. Crim. App. 2004).

**D.   Holiday's claim that he was denied due process because Texas law does not adequately define certain terms is without merit. (Claim 27, 30-32)**

Holiday argues that the aggravating factors employed in the Texas capital sentencing scheme are vague and do not properly channel the jury's discretion in violation of the Eighth and Fourteenth Amendments. Pet. 156-68. Specifically, he complains that the trial court failed to define the terms "probability," "sufficient mitigating circumstances," "personal moral culpability" and "moral blameworthiness." Pet. at 157-68. Holiday later complains that the statute does not define "probability" calling for a yes answer if there is any likelihood rather than a preponderance. Pet. at 171-175. He next complains that the statute does not define "criminal acts of violence." *Id*. Finally, he asserts the statute is unconstitutional because it does not define "continuing threat to society." *Id*. But the Texas courts and the Fifth Circuit have repeatedly rejected claims of vague terms. Further, the claim is utterly devoid of merit as Holiday cannot show a violation of clearly established federal law. For these reasons, Holiday's plea for federal habeas relief should be denied.

This rejection is supported by federal precedent. The Supreme Court has specifically commended the current Texas capital-sentencing scheme, calling the new statute "[a] clearly drafted catchall instruction on mitigating

evidence" and a model of "brevity and clarity". *Penry II*, 532 U.S. at 802-803. Furthermore, the Fifth Circuit has repeatedly held that "Texas's definition 'encompasses' virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 Fed. App'x 270, 277 (5th Cir. 2007)(quoting *Beazley*, 242 F.3d at 260). Indeed, the Fifth Circuit has consistently rejected habeas challenges based on a failure to define the terms contained in the Texas special sentencing issues. *Rivas v. Thaler*, 432 Fed. Appx. 395 (5th Cir. Tex. 2011); *see also e.g., Hughes v. Johnson*, 191 F.3d 607, 615 (5th Cir. 1999) ("We similarly have rejected contentions that 'probability' and other terms included in the statutory special issues are unconstitutionally vague"); *Woods v. Johnson*, 75 F.3d 1033-34 (5th Cir. 1996) (citing cases demonstrating that Fifth Circuit has "frequently rejected challenges to the lack of definition of diverse terms in the first two [Texas] punishment special issues") (citations omitted).

Moreover, precise definitions are not a prerequisite to an appropriate sentencing scheme. The Supreme Court has held, "[e]nsuring that a sentence of death is not so infected with bias or caprice is our 'controlling objective when we examine eligibility and selection factors for vagueness.' Our vagueness review, however, is 'quite deferential.' As long as an aggravating factor has a core meaning that criminal juries should be capable of understanding, it will pass constitutional muster." *Jones*, 527 U.S. at 400

(*quoting Tuilaepa*, 512 U.S. at 973); *see also Jurek*, 428 U.S. at 274-76 (rejecting vagueness challenge to the future dangerousness special issue). Indeed, as the Court noted in *Pulley v. Harris*, the Texas punishment issues are not vague as they have "a common sense core of meaning." 465 U.S. 37, 50 n.10 (1984); *see Jurek*, 428 U.S. at 279 (White, J., concurring, Burger, CJ., and Rehnquist, J., joining) (the issues posed in the sentencing proceeding have a "common sense core of meaning" and criminal juries "should be capable of understanding them").

As for Holiday's argument that the capital-sentencing statute is invalid because it limits his mitigating evidence to evidence that could be considered as reducing his moral blameworthiness, the Court itself has broadly used the term "moral blameworthiness" to describe that which a jury considers in effectuating the mitigation inquiry. *Schriro v. Landrigan*, 550 U.S. 465, 499 (2007); *South Carolina v. Gathers*, 490 U.S. 805, 818 (1984). Specifically, the Court has used the term to describe how a jury gives effect to good character evidence that is not "directly relevant" to the crime. *Gathers*, 490 U.S. at 818.

This Court's case law simply does not suggest that Texas's current vehicle for the consideration of mitigating evidence is impermissibly narrow. Accordingly, Holiday's claim is without merit and the Court of Criminal Appeals acted properly in denying it.

74

### E.   There is no clearly established federal law requiring appellate review of a death sentence. (Claims 28, 29)

Holiday next complains that the Constitution requires a reviewing court to engage in a proportionality review in death penalty cases. Pet. 168-71. Yet again, it is clear under Fifth Circuit and Supreme Court precedent that the Constitution does not mandate a comparative proportionality review of a death sentence, and because Holiday has failed to establish that the state court's adjudication of this claim was either contrary to or involved an unreasonable application of clearly established federal law, his request for federal habeas relief on this claim should be denied.

To the extent that Holiday believes that his due process rights are being violated by the Court of Criminal Appeals' failure to review the sufficiency of the jury's answer to the mitigation special issue, his claim still fails because the sufficiency of such evidence is not a matter for appellate review. The Supreme Court has held that meaningful appellate review of death sentences is crucial to the preservation of a fair and just system of capital punishment. *Parker v. Dugger,* 498 U.S. 308, 321 (1991)*; Clemons v. Mississippi,* 494 U.S. 738, 749 (1990). But Supreme Court jurisprudence distinguishes between a jury's "eligibility decision," in which the jury must convict the defendant of murder and find at least one aggravating

75

circumstance, and its "selection decision," in which the jury must determine whether a defendant who is eligible for the death penalty should, in fact, receive it. *Tuilaepa*, 512 U.S. at 972-73. The Court further recognized that "separate requirements" apply to each decision. *Id.* at 972. The "eligibility decision" must be made with "maximum transparency" so as to make the process for imposing the death penalty "rationally reviewable." *Id.* at 973. On the other hand, the "selection decision" requires "individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Id.*

In Texas, the "eligibility decision" is made at guilt-innocence where the trier of fact determines whether to convict the defendant of capital murder. *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002). Once the defendant is convicted, or determined to be "death eligible," the jury then answers the statutory punishment issues and decides whether that defendant receives the death penalty or life imprisonment. During this selection process, the sentencing jury is "free to consider a myriad of factors to determine whether death is the appropriate punishment." *California v. Ramos*, 463 U.S. 992, 1008 (1983). Indeed, the Supreme Court has authorized "unbridled discretion" in the jury's determination of whether to impose the death penalty. *Zant*, 462 U.S. at 875.

76

Such unfettered discretion assures a capital defendant that the punishment imposed is "an individual determination on the basis of the character of the individual and circumstances of the crime." *See id.* at 879. That is, the jury is free to hear, consider, and give effect to all relevant evidence before assessing such a severe penalty. As such, there is no restriction on the jury's ability to extend mercy and choose *not* to sentence a defendant to death. Requiring an appellate court to second-guess a jury's subjective determination of extenuating circumstances would inevitably result in courts prioritizing certain mitigating factors over others and, therefore, restricting a sentencing jury's capacity to individually assess the circumstances and situation of each defendant in violation of the Supreme Court's directive.

Thus, although a capital defendant is entitled to "meaningful appellate review" of a death sentence under the Eighth and Fourteenth Amendments, appellate courts are not required to conduct an independent review of the jury's mitigation finding. *Pulley*, 465 U.S. at 48 (rejecting an argument that the Constitution required states to conduct a comparative proportionality review of a death sentence); *Parker*, 498 U.S. at 321 (holding that the Constitution does not require appellate review of punishment evidence). Indeed, the Supreme Court has explained:

> an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind." *When we held that a defendant has a constitutional right to the consideration of [mitigating] factors...we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses.*

*Caldwell v. Mississippi*, 472 U.S. 320, 330-31 (1985)(internal citations omitted)(emphasis added).

Accordingly, the Fifth Circuit has emphatically upheld the constitutionality of Texas courts' refusal to review the sufficiency of mitigating evidence. *Hughes*, 191 F 3d at 621-22(citing *Pulley*, 465 U.S. at 37); *Moore v. Johnson*, 225 F.3d 495, 507 (5th Cir. 2000) (holding that "Texas followed Supreme Court instruction to the letter. No court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of the obvious."). Circuit precedent also holds that the absence of mitigation sufficiency review does not violate constitutional concerns because the state appellate court satisfies federal constitutional requirements when it provides a meaningful review of the evidence supporting the future dangerousness special issue. *Beazley*, 242 F.3d at 261.

Finally, because appellate review of mitigating evidence has never been required, any recognition of Holiday's claim on federal habeas review would require the announcement and retroactive application of a new rule of constitutional law in violation of *Teague, supra*. For these reasons, the state court's adjudication of this claim was reasonable, and this Court should refuse Holiday's request to require the lower court to review the sufficiency of the evidence to support the jury's negative answer to the mitigation special issue, and deny federal habeas relief.

## XIV. Holiday's Claims Regarding the Prosecution's Expert Are Without Merit. (Claims 40-53)

In his next set of claims, Holiday makes multiple allegations that his due process and Eighth Amendment rights were violated by false or misleading testimony or the presentation of unreliable scientific testimony. Pet. at 178-212. But Holiday is not able to demonstrate the underlying basis of his claims—namely that the testimony is false, misleading or scientifically unreliable, much less that he has provided clear and convincing evidence to rebut the state court's conclusions to the contrary. Holiday also claims the prosecution suppressed evidence regarding this expert testimony. But again, Holiday is unable to demonstrate the fundamental premise of his claim much less an unreasonable state court denial. Indeed, the state court made

numerous, methodical, detailed findings which Holiday cannot show to be clearly erroneous or unreasonable. For this reason, the Court should deny Holiday's claims.

### A.   Holiday's claims regarding DeHaan's testimony as related to possible ignition sources are without merit. (Claims 40-45)

In his first set of allegations, Holiday asserts his due process and Eighth Amendment rights were violated by the presentation of false or misleading testimony by the prosecution's expert John DeHaan. He also contends these same rights were violated by the same expert by the presentation of unreliable scientific testimony. Lastly, he argues the State improperly withheld impeachment evidence regarding this witness. Pet. at 178-200. These claims were all presented to the state courts in his state habeas petition. The trial court entered detailed findings regarding DeHaan's testimony finding it not to be false or misleading and finding it scientifically reliable. SHCR 35 (#53). Further, the court found the impeachment evidence was publically available and thus not suppressed by the State. SHCR 35 (#50). The Court of Criminal Appeals adopted these findings. *Ex parte Holiday*, Order No. WR-73,623-01, -02, -03 (Tex. Crim App. May 5, 2010). Holiday fails to overcome these findings with clear and convincing evidence to the contrary. His claims fail.

First, Holiday's assertions that DeHaan's testimony is false or misleading are specious. Holiday bases these accusations on both misinterpretations of the record and statements made by his expert. In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that a prosecutor's knowing use of, or deliberate failure to correct, perjured testimony violates a defendant's Fourteenth Amendment rights. 360 U.S. at 271; *see also Spence v. Johnson*, 80 F.3d 989, 996 (5th Cir. 1996); *Cordova v. Collins*, 953 F.2d 167, 171 (5th Cir. 1992). To establish a constitutional violation based on *Napue*, a habeas petitioner must demonstrate that (1) the statements were actually false, (2) the State knew the statements were false, and (3) the statements were material. *Giglio v. United States*, 405 U.S. 150, 153-54 (1963); *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). In order to show that the statements were material, the petitioner must establish that there is a reasonable likelihood that the false testimony could have affected the jury's verdict. *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Spence*, 80 F.3d at 997; *Kirkpatrick*, 992 F.2d at 497.

Presently, Holiday contends that DeHaan presented false testimony by asserting that various other possible ignition sources including the water heater and stove were ruled out. Pet. 188-93. But all Holiday shows are

differing expert opinions, not that DeHaan's testimony is false much less that the State knowingly presented false testimony. The state habeas court made detailed findings about the specificity of DeHaan's testimony on these points. SHCR 27-30 (#25-37). The court went on to note that the jury was presented with the testimony of two experts—one for each side—and that the jury "was free to accept or reject all or portions of DeHaan's and Judd Clayton's testimony." SHCR 35 (#52), 54 (#5). The court further concluded that DeHaan's testimony "was not false or misleading." SHCR 35 (#53); 55 (#9).

Further, Holiday has not demonstrated that DeHaan's testimony is scientifically unreliable. The state court specifically found that "DeHaan's credentials qualify him as an expert witness in the investigation and reconstruction of fires and explosions." SHCR 26 (#22). The court went on to find that the State met its burden in showing the testimony was reliable, and that DeHaan's testimony addressed nearly all of the seven considerations for admissibility." *Id.* at (#23); 53-54 (#3). Holiday cannot overcome these findings with his mere aspersion.

Finally, it is well established that a prosecutor must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to the defendant's guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *United*

*States v. Bagley*, 473 U.S. 667, 674-75 (1985); *Brady v. Maryland,* 373 U.S. 83, 87 (1963). Both impeachment material and exculpatory evidence fall within this general rule. *Bagley*, 473 U.S. at 676. To establish a *Brady* violation, a defendant must make three showings: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. Favorable evidence is any evidence that "if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676. The prejudice requirement, known as materiality, applies "only where there exists a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. A reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding. *Id.*

Yet, the Court has never held that prosecutors must investigate a defendant's case for him or explain the possible significance of the evidence they are bound to disclose. *See e.g. Agurs,* 427 U.S. at 109 (prosecution is not under duty to make complete and detailed report of all police investigatory work). Although Holiday might wish it were otherwise, as the state court found, "the State cannot suppress published reports, studies or scientific

information." SHCR 35 (#51). Indeed the court went on to conclude that Holiday had failed "to show any lack of disclosure." SHCR at 54-55 (#6) (citing *May v. Collins*, 904 F.2d 228, 232 (5th Cir. 1999); and *United States v. Newman,* 849 F.2d 156 (5th Cir. 1988)). Thus, Holiday fails to prove the underlying premise of a *Brady* claim—suppressed evidence. Without this fundamental showing Holiday cannot meet AEDPA standards for granting relief.

### B.    Holiday's claims regarding testimony about "pour patterns" are without merit. (Claims 46-49)

In his next set of claims, Holiday again asserts a violation of his due process and Eighth Amendment rights in the presentation of testimony about "pour patterns" that he contends was false or misleading and scientifically unreliable. Pet at 200-207. Holiday uses the affidavit of the Dr. Hurst to recall other infamous arson convictions. But Holiday's conviction based on qualified expert testimony in 2002, bears no resemblance to significantly older proceedings. Indeed, if Holiday's above claims were specious these are beyond. In short, the state never presented testimony or evidence of "pour patterns." And Holiday's arguments that the State used such discredited testimony are flatly deceptive.

First, the state court specifically found that Bowers, the State's expert in question, never referred to "pour patterns" in his direct or cross-examination or any other testimony. SHCR 36 (#56, 58, 60). Indeed in testifying Bowers notes that "irregular burn patterns" were found and loosely diagramed but he refers to these as "irrelevant." 35 RR 83-84. Second, it was Holiday who elicited testimony that irregular burn patterns can be an important factor in determining the source and origin of the fire. SHCR 36 (#57); 35 RR 110. And, it was the State on redirect that had Bowers acknowledge "that irregular burn patterns alone do not tell the origin and cause of a fire." SHCR 36 (#59); 35 RR 113. Finally, the state courts found that Bowers "did not rely on burn patterns to determine the origin of the fire in the instant case; that he neither testified nor implied that irregular burn patterns supported or established the State's theory that [Holiday] started the fire." SHCR 36-37 (#61). This led the state courts to conclude, "[Holiday] fails to show that the State presented any evidence of 'pour patterns' much less scientifically unreliable, false or misleading testimony concerning 'pour patterns.'" SHCR 56 (#10).

Thus for Holiday to now argue in direct conflict with the record and his own actions that the State presented false, misleading or even scientifically unreliable testimony related to "pour patterns" is abjectly wrong. The state

court findings are based on the *actual* record in the case and have not been overcome by clear and convincing evidence to the contrary. Federal habeas relief should be denied.

### C.   Holiday's remaining claims of false or misleading testimony by State's expert DeHaan are without merit. (Claims 50-53)

Finally, Holiday again asserts various constitutional claims regarding the presentation of false or misleading testimony by the State's expert DeHaan. Pet. at 208-12. Holiday asserts these claims on a "contingent" basis saying that he might abandon them after further review. Pet. at 209. Holiday should do so.

As the Court of Criminal Appeals stated in regard to similar claims raised on direct appeal:

> The trial court held a hearing outside the presence of the jury to determine the admissibility of DeHaan's testimony. DeHaan, a forensic scientist, had worked as a criminologist for thirty-three years; for the past twenty years his focus had been on fire and explosion investigations or laboratory analysis. He testified that fire is a chemical process governed by certain fixed rules of chemistry and physics. He testified that the basic principles governing fire behavior are generally absolute, but the conditions surrounding a particular fire are variable. He stated that predictions and conclusions can be made about a particular fire based upon the basic governing principles and how other fires within similar conditions have responded.
>
> DeHaan further testified that, in his research involving fires and explosions, a large percentage of his time had been spent setting fires in various settings and under different conditions and

86

reconstructing fires in order to test and evaluate the principles under varying conditions.

DeHaan testified that in twenty-five years of conducting such research and analysis, he had orchestrated and set about five hundred structure fires, one hundred and twenty vehicle fires, and about two hundred small-scale tests involving furniture and fuels. He explained that the process of gathering information and assessing evidence during a fire investigation begins with observations from witnesses. He also testified that it includes: (1) gathering information from the scene, such as the amount of damage, the time frames of detection, suppression, and extinguishment; (2) testing various possibilities as to manner and location of ignition; (3) assessing the way the fire spread and its time frames; (4) studying the physical evidence; and (5) testing and retesting the possibilities to establish the reliability of the various indicators to arrive at a conclusion about the ignition. DeHaan testified that this method of gathering information, reviewing the physical evidence, and testing possibilities is used in a "very high percentage" of fire investigations and is a valid process that has been verified through numerous tests, training exercises, and demonstration fires. DeHaan testified that he properly applied these established and verified techniques in making his determination in the instant case.

Holiday objected to the admissibility of DeHaan's opinion testimony as not based upon a valid scientific theory, as having an insufficient factual basis, and as largely speculative.

We find that the State met its burden in showing that DeHaan's testimony was reliable. DeHaan's testimony addressed nearly all of the seven considerations for the trial court, demonstrating that the technique is well-accepted as valid, explaining the theory and technique with clarity and focus, showing evidence of his experience and training, and explaining how he applied those to his investigation of the instant case. Holiday complains that certain aspects of DeHaan's testimony lacked a scientific basis, such as his reasons for ruling out some of the ignition sources and his testimony that Holiday's injuries "were consistent with" the

> State's theory that he ignited the fire. As DeHaan explained, while certain scientific principles relating to fires are absolute, the surrounding conditions may vary. Common sense dictates that some speculation is involved in attempting to reconstruct a scene that was destroyed by fire, or in assessing a burn injury based upon numerous variables. That a factfinder will have to assess how much those matters bear upon evaluating DeHaan's overall conclusions in light of the expertise he brings to the issues goes to the weight of DeHaan's testimony and not its admissibility. The trial court did not abuse its discretion in concluding that DeHaan's testimony had a reliable scientific basis.

*Holiday,* 2006 Tex. Crim. App. Unpub. LEXIS 737 at *47-49. Holiday again fails to prove DeHaan's testimony is in any way flawed much less false or misleading. He also fails to demonstrate the state court unreasonably denied his "contingent" claims. Further, even if Holiday was able to finally pinpoint some real and serious discrepancy such a claim would be unexhausted and procedurally defaulted. This court should deny relief.

## XV.  Holiday's Ineffective Assistance of Counsel Claims Are Without Merit. (Claims 54-58).

Holiday next complains the state courts unreasonably denied his ineffective assistance of counsel claims. Specifically, Holiday argues counsel inadequately investigated the possible ignition sources; mitigation evidence and failed to present evidence of organic brain damage. Pet. at 212-48. Holiday also argues he denied effective assistance of appellate counsel due to his inadequate briefing and procedural default. Pet. at 248-50. Finally,

Holiday asserts he may have been denied effective counsel during the jury selection process. Pet. at 250-52.

The burden of proof in a habeas corpus proceeding attacking the effectiveness of counsel is on the petitioner, who must demonstrate both deficient performance and resultant prejudice. *Carson v. Collins*, 993 F.2d 461, 466 (5th Cir. 1993). The familiar standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 687-88. In so doing, a convicted defendant must overcome a strong presumption that the conduct of his trial counsel fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Loyd v. Whitley*, 977 F.2d 149, 156 (5th Cir. 1992).

"[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland,* 466 U.S. at 692. In order to establish that he has sustained prejudice, the convicted defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine the confidence in the outcome." *Id.* at 694; *Loyd*, 977 F.2d at 159. This showing of prejudice must be "rather appreciable"; thus, a mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*. *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994). Because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Strickland,* 466 U.S. at 697; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992). Further, as the Supreme Court reminded, review of *Strickland* claims is "doubly deferential." *Knowles v. Mirzayance,* 566 U.S. 111, 123 (2009).

In his first claim of ineffective assistance of counsel, Holiday claims his lawyer was ineffective for failing to fully investigate the stove as a possible ignition source of the fire. But counsel did investigate the stove as a possible ignition source as well as every other appliance but the retained expert improperly concluded the stove was part electrical and therefore ruled it out as a probable source. SHCR 37-39 (#64-68). Holiday now asserts that counsel should have recognized this error at trial and reexamined the stove as a potential source of the fire. Pet. at 212-17. Holiday fails to recognize that such a strategy would have required his own expert to admit to a mistake, thus undermining his credibility, and that counsel's decision not to do so can

90

be regarded as a reasonable strategic decision. Regardless, the state courts concluded Holiday "fails to show ineffective assistance of trial counsel based on alleged inadequate investigation of possible accidental ignition sources." SHCR 57 (#15). The court also noted that strategic decisions made after thorough investigations such as the one counsel undertook are "virtually unchallengeable." SHCR 57-58 (citing *Kunkle v. State,* 852 S.W.2d 499, 505 (Tex. Crim. App. 1993)). Holiday is not able to show these conclusions are unreasonable, thus, federal habeas relief is not warranted.

In his next claim for relief Holiday contends that counsel failed to present mitigating evidence from his childhood of abuse and deprivation. The state courts categorically rejected Holiday's claim summarizing the entirety of Holiday's mitigation case. SHCR 39-51. The court also made specific positive credibility determinations regarding trial counsels' affidavits regarding their investigation and their questioning of Holiday's relatives. SHCR 50 (#115-16). The court found that his actual complaint was about the manner and/or depth of the presentation of mitigating evidence. SHCR 51 (#120). The court concluded that Holiday failed "to show deficient performance, much less harm, based on trial counsels' thorough investigation and presentation of mitigation evidence." SHCR 60 (#20). Again Holiday's

reiterations of the same evidence fail to overcome the deference due the state court's denial of relief.

Holiday also alleges counsel were ineffective regarding the failure to investigate and present evidence of organic brain damage. Pet. at 246-48. Again Holiday asserts he is presenting this claim on a "contingent basis." And that if Holiday's investigation determines that no such brain damage exists he will withdraw the claim. So in essence Holiday is saying he might be brain damaged and that if so counsel was deficient in failing to so ascertain. In response the court found that Holiday was administered medical testing and that all mitigating evidence was presented. SHCR 52 (#123). Thus, again the court concluded that this claim was without merit. SHCR 60 (#20).

Finally, although the lower courts found that Holiday failed to prove deficient performance which alone is fatal to his claim, it must be noted that it would be extremely difficult for Holiday to affirmatively prove prejudice as required. In addition to the heinous crime Holiday committed where three young children were burned to death, this crime stemmed from Holiday's sexual assault of a seven year-old. SHCR 22 (#7). Moreover, after being kicked out for that offense Holiday terrified his former girlfriend/common law wife, Tammy Wilkerson, with threats to blow up her house, and sexually

assaulted her. SHCR 22-23 (#8-9). This culminated in Holiday coming to Wilkerson's place of employment and threatening her when he was escorted away by police. SHCR 23 (#10). Moreover, any evidence that the fire was accidentally ignited was clearly overshadowed by Holiday's prior threats (SHCR 23 #11), his earlier attempts to light the car on fire (SHCR 23 #12), and the burns he received in lighting the fire. SHCR 30 (#36). The idea that any counsel could have prevented Holiday's capital murder conviction is dubious at best. *Wilkerson v. Whitley*, 16 F.3d 64, 68 (5th Cir. 1994), *opinion reinstated in part on other grounds,* 28 F.3d 498 (if evidence at trial is so overwhelming that even the best attorney would not have obtained an acquittal any ineffective-assistance-of-counsel claim must fail). For these reasons, Holiday also cannot demonstrate the necessary prejudice prong.

Holiday also argues he denied effective assistance of appellate counsel due to possible inadequate briefing and procedural default. Pet. at 248-50. With an ineffective-assistance-of-counsel-on-appeal claim, a petitioner must satisfy the two-pronged test enunciated in *Strickland,* 466 U.S. at 687. *Smith v. Robbins*, 528 U.S. 259, 286 (2000) (proper standard for evaluating appellate counsel is *Strickland v. Washington*). Thus, a petitioner must demonstrate counsel was deficient, and that the deficiency prejudiced his case. *Strickland,* 466 U.S. at 687. Counsel's assistance becomes ineffective

when counsel's errors are prejudicial, in that there is a reasonable probability that but for the error the ultimate result would have been different.  So, to prove prejudice, a petitioner must show that but for counsel's deficient performance "he would have prevailed on appeal." *Smith*, 528 U.S. at 286. Furthermore, to demonstrate deficiency he must show that "counsel unreasonably failed to discover [and raise] nonfrivolous issues." *Id.* Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Id.* at 765 (*citing Jones v. Barnes,* 463 U.S. 745 (1983)). Thus, it is possible that an ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id.* (*citing Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)). So, to do this, he must show "that a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Gray,* 800 F.2d at 646.

The state courts also summarily rejected Holiday's ineffective assistance of appellate counsel claim. SHCR 61 (#24). Holiday doesn't allege any specific defects or procedural defaults. As such this unsupported claim should be summarily rejected.

Finally, Holiday asserts he may have been denied effective counsel during the jury selection process. Pet. at 250-52. The undersigned believes

94

this Court need only deal with allegations of constitutional errors. In order for a federal writ to issue, there must be a violation of "the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Indeed, that state court found the claim to be "speculative" and denied the claim on that basis. SHCR 53 (#126); 62 (#25).

In summary Holiday has not shown any merit to his ineffective assistance of counsel claims, much less the required showing for relief under AEDPA. As such federal habeas relief should be denied.

## XVI. Holiday's Conflicted Counsel Claim Is Unexhausted, Procedurally Defaulted, Conclusory, And Without Merit. (Claim 59)

Holiday next asserts he was denied his right to conflict-free representation. Yet, this claim is unexhausted and procedurally defaulted by his failure to raise in the court below. Additionally, Holiday provides no proof to support his allegation. Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is required to plead facts in support of his claims. Conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal. *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition . . .

to be of probative evidentiary value."); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990). For these reasons this Court should deny this claim.

First, Holiday's claim was never presented to the state courts making it unexhausted. But since Holiday has no avenue to raise this claim anew the claim is procedurally defaulted. The exhaustion doctrine codified in 28 U.S.C. § 2254(b)(1) reflects a policy of comity consistently adhered to by the Supreme Court and the Fifth Circuit. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8-10 (1992); *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971); *Dowthitt v. Johnson*, 230 F.3d 733, 745-46 (5th Cir. 2000). Thus, before a federal court will entertain the alleged errors, a petitioner must have first provided the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Thomas v. Collins*, 919 F.2d 333, 334 (5th Cir. 1990). This requirement is designed to give state courts the initial opportunity to pass upon and, if necessary, correct errors of federal law in a state prisoner's conviction. *Picard*, 404 U.S. at 275-76.

Where a petitioner "advances in federal court an argument based on a legal theory distinct from that relied on in the state court, he fails to satisfy the exhaustion requirement." *Nobles v. Johnson*, 127 F.3d at 420 (citing *Vela*

*v. Estelle*, 708 F.2d 954, 958 n. 5 (5th Cir. 1983)). Moreover, state court remedies are not exhausted when "material additional evidentiary support [is presented] to the federal court that was not presented to the state court," even if the evidence "came into existence after the state habeas relief had been denied." *Dowthitt*, 230 F.3d at 745-46 (quoting *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996) and *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir. 1986)).

In order to satisfy exhaustion, all of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts. *Id; Nobles*, 127 F.3d at 420. The Supreme Court has reasoned that the purpose of exhaustion "is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney*, 504 U.S. at 10. "Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court." *Id.*

As Holiday has never presented this claim either on direct appeal or in state collateral review, he has clearly failed to exhaust state court remedies. It is well settled that habeas relief "shall not be granted" under any

circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1) (West 2009). It is equally clear, however, that Holiday would be barred from raising this claim in a successive state habeas application under Texas Code of Criminal Procedure, Article 11.071, Section 5(a). "Because [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (internal citations omitted); *see also Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Graham*, 94 F.3d at 969 ("exhaustion is not required if it would plainly be futile"). Nonetheless, such an unexhausted claim is subject to denial in federal court as procedurally defaulted. Further "[a]lthough AEDPA authorizes a district court to *deny* relief on an unexhausted claim, it does *not* authorize a district court to *grant* relief on an unexhausted claim, 'unless the State, through counsel, expressly waives the requirement'." *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir. 1998) (emphasis added). Although under *Harris v. Reed*, 489 U.S. 255, 265 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.  In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1989). Further, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default," or that the federal court's failure to consider the claim will result in a miscarriage of justice. *Gray*, 518 U.S. at 162 (barring claim on basis that claim would be barred in state court if it were presented there); *Coleman*, 501 U.S. at 750; *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995).

Therefore, the Fifth Circuit has held that a petitioner's failure to exhaust a claim that is clearly foreclosed by Article 11.071, Section 5(a), is an adequate state procedural bar foreclosing federal habeas review of the claims. *Nobles*, 127 F.3d at 422; *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998). Holiday does not attempt to distinguish his case from *Nobles* and *Muniz*; nor does he attempt to demonstrate cause and prejudice or a miscarriage of

justice exception for his failure to raise the claims in state court. Circuit precedent compels the denial of this claim as procedurally defaulted.

Second, Holiday's mere allegation without proof is insufficient to demonstrate the serious constitutional violation he asserts. Holiday asserts that he has "received information that Holiday's trial attorney, William Carter, represented Tammy Wilkerson" in divorce proceedings. But Holiday presents no proof. This Court cannot find a constitutional violation merely on Holiday's word.

Finally, in most Sixth Amendment ineffective assistance of counsel cases, the defendant must meet two requirements to prove a violation occurred: (1) demonstrate that the assistance fell below the bounds of prevailing, objective, professional standards of reasonableness, and (2) affirmatively prove that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88. Yet, a different standard is applied in cases where an attorney's representation of multiple clients is alleged to have created a conflict of interest. *Perillo v. Johnson*, 79 F.3d 441, 447 (5th Cir. 1996) (*Perillo I*). In such cases and where no objection was raised at trial, the petitioner bears the burden to demonstrate that his attorney labored under an actual conflict which adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Beets v. Scott*, 65 F.3d 1258, 1265 (5th

Cir. 1995) (en banc). Although the Fifth Circuit noted that the Supreme Court stated it had not extended the *Cuyler* standard to successive representation, that court has found the *Cuyler* standard appropriate where certain factors are present. *United States v. Infante*, 404 F.3d 376, 391 n.12 (5th Cir. 2005) (citing *Mickens v. Taylor*, 535 U.S. 162 (2002)).

An "actual conflict" "for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance" which is "not merely hypothetical." *Infante*, 404 F.3d at 392 (citations omitted). The Fifth Circuit has clarified that "[a] conflict exists when defense counsel places himself in a position conducive to divided loyalties," a question which is "highly fact-sensitive." *Id.* The finding of a conflict of interest may "depend[ ] on a number of factors," including proximity in time and subject matter of the charges and counsel's representation. *Id.* Further, "'[i]t must be demonstrated that the attorney made a choice between possible alternative courses of action,'" otherwise "the conflict remained hypothetical." *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006).

"Adverse effect" may be demonstrated by "evidence that counsel's judgment was actually fettered by concern over the effect of certain trial decisions on other clients." *Infante,* 404 F.3d at 393 (citation and internal quotation marks omitted). A petitioner must show adverse effect by

"demonstrat[ing] that some plausible defense strategy or tactic might have been pursued but was not, because of the conflict of interest." *Beathard v. Johnson,* 177 F.3d 340, 346 (5th Cir. 1999) (quoting *Perillo I,* 79 F.3d at 449) (even where petitioner asserted four defense strategies not pursued, proper facts or defense strategy illustrating conflict of interest were not pled).

The Fifth Circuit has also noted that, absent a demonstration of an "actual conflict," a defendant "'must show a reasonable probability that the conflict 'prejudiced the defense, undermining the reliability of the proceeding.'" *United States v. Garza,* 429 F.3d 165, 171 n.3 (5th Cir. 2005) (reviewing an alleged conflict of interest between attorney's ethical interests and client's interests) (citing *Beets,* 65 F.3d at 1273).

Additionally, the right to conflict-free counsel is, itself, one which can be waived. *Garcia-Jasso,* 472 F.3d at 243. In order to waive conflict-free counsel, the defendant: (1) must have been aware that a conflict of interest existed; (2) realized the consequences to his defense that continuing with counsel under the onus of a conflict could have; and (3) been aware of his right to obtain other counsel. *United States v. Casiano,* 929 F.2d 1046, 1052 (5th Cir. 1991) (citation omitted).

In his quest to prove his claim, all Holiday has shown is that his trial counsel might have represented his wife in an unrelated divorce proceeding.

He then alleges this might have affected counsel's ability to cross-examine that witness during the trial. Holiday then takes a massive leap and posits that a more thorough cross-examination might have resulted in "establishing other causes for the deaths other than Holiday." Pet. at 253. But this leap is not supported by logic or facts. As iterated above, Holiday caused the death of three children by pouring gasoline (and directing gasoline be poured) all around them and lighting a fire. There was an eye witness who lived to tell the tale and not one unfamiliar with Holiday. Moreover, that witness is not his wife. The idea that a more thorough cross-examination of Tammy Wilkerson could reveal another cause for the deaths of these innocent children is patently ridiculous. This rank speculation as to how this alleged conflict may have impacted his representation and his utter lack of proof to substantiate these claims is fatal to his attempt to show the state courts unreasonably denied him relief.

## XVII. Holiday's Challenge to Texas' Method of Lethal Injection Is Procedurally Defaulted And Must Be Denied. (Claim 60).

Holiday also asserts that Texas's lethal injection protocol violates his Eighth Amendment rights. Pet. at 254-56. As an initial matter, this claim is procedurally barred. Holiday raised this claim for the first time in this

application. For that reason and as explained below, this claim must be denied.

First, Holiday's claim is procedurally barred because he failed to ever raise this claim before the state courts. As explained in section above **XVI**, this failure to present the claim in state courts dooms any attempt to seek relief now.

Second, this claim is completely without merit. The government may not impose "cruel and unusual punishments," U.S. Constit., amend. VIII, and in the execution of a death sentence it may not inflict "unnecessary pain." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947). A method of execution amounts to cruel and unusual punishment where it creates a substantial risk of wanton and unnecessary infliction of pain, torture, or lingering death. *Webb*, 750 A.2d at 455 (citing *Campbell v. Wood*, 18 F.3d 662, 683 (9th Cir. 1994)); *Resweber*, 329 U.S. at 464; *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

Under *Baze v. Rees*, 553 U.S. 35 (2008), to prevail on an Eighth-Amendment challenge, condemned inmates must demonstrate "a 'substantial risk of serious harm,'" or "an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they [are] 'subjectively blameless for purposes of the Eighth Amendment.'" 553 U.S. 50-51 (*quoting Farmer v.*

*Brennan*, 511 U.S. 825, 846, & 847 n.9 (1994)). Noting the settled principle that "capital punishment is constitutional" and that "there must be a means of carrying it out," *Baze*, 128 553 U.S. 47 (*citing Gregg*, 428 U.S. at 177), the Court recognized that "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." *Id.* But a risk of future harm can qualify as cruel and unusual punishment only if the conditions presenting the risk are sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers. *Id.* at 48-53 (citations omitted). "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual" under the Eighth Amendment. *Id.* at 50.

The procedure now used is effectively the same as the preceding three-drug procedure, approved of by the Fifth Circuit in *Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010). The procedure is only materially changed in that the lethal injection consists solely of a 100 milliliter solution containing 5 grams of pentobarbital rather than a three-drug cocktail. Several circuits have fully litigated state prisoner challenges to changes in lethal-injection protocols based on the substitution of another drug for sodium thiopental. *See*, *e.g.*,

*Jackson v. Danberg*, 656 F.3d 157, 160, 164 (3rd Cir. 2011); *Powell v. Thomas*, 641 F.3d 1255, 1258 (11th Cir. 2011) (per curiam); *Pavatt v. Jones*, 627 F.3d 1336, 1338, 1340 (10th Cir. 2010). Likewise, other circuits have also approved use of a one-drug protocol. *See, e.g., Cooey v. Strickland*, 589 F.3d 210, 221 (6th Cir. 2009) ("Ohio's new one-drug IV procedure reveals that the similarities with *Baze* are considerable and the risk of severe pain no greater —and likely less—than the risk of pain inherent in any lethal injection procedure found constitutional by a federal court"). Indeed, even a *one-drug pentobarbital* procedure has been vetted. Respondents would direct the Court's attention to the opinion from the Ninth Court of Appeals in *Towery v. Brewer*, 672 F.3d 650, 659 (9th Cir. 2012). In *Towery*, the Ninth Circuit was satisfied that a procedure involving only a massive overdose of pentobarbital would be consistent with the Eighth Amendment to the United States Constitution.[10] Thus, because the TDCJ's new protocol does not run afoul of *Baze*, there is no merit to Holiday's contentions.

---

[10] It is noteworthy that, in *Baze*, the inmate petitioners proposed a one-drug barbituate-only protocol, using either pentobarbital or sodium thiopental as the suggested alternative drug. *Baze*, 553 U.S. at 56-58.

### XVIII. Holiday's Challenge to the Texas Clemency Process Is not Ripe for Review and Is Wholly Without Merit. (Claim 61)

Holiday next asserts he will be denied a fair clemency process in violation of his constitutional rights. This claim is unexhausted and procedurally defaulted as set in section **XVI**.

As an initial matter, Holiday's challenge to the clemency procedures is premature because his execution is not imminent, and he has yet to file a request for clemency with the Texas Board of Pardons and Paroles. *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007)(holding that a claim that defendant was incompetent to be executed was not ripe for review because the defendant's execution was not imminent); *Stewart v. Martinez-Villareal,* 523 U.S. 637, 644-45 (1998)(same). As the Supreme Court suggested in *Martinez-Villareal,* such a claim should be treated as if it were unexhausted and be dismissed without prejudice to refiling at a future date when the claim is actually exhausted and execution is imminent. *Id.*

Further, Holiday's contention is foreclosed by the Fifth Circuit's opinion in *Faulder v. Texas Board of Pardons and Paroles*, 178 F.3d 343, 344-45 (5th Cir. 1999). In *Faulder*, the court held that the clemency process employed by the Board did not violate due process, rejecting the claim that the Board's actions were "an arbitrary exercise of administrative power." *Id.* at 344.

Although set in the context of a due process challenge as opposed to one based on equal protection, the court found that the clemency proceedings met the minimal procedural safeguards required by the Supreme Court in *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998), in that the state officials do not arbitrarily deny prisoners access to the clemency process nor "flip a coin" to determine whether to grant clemency. *Id.*

Finally, other than his conclusory assertions that his belief is that the Attorney General's office trains members of the Board and advocates against him, Holiday has provided no explanation as to how the process the Board currently employs fails to pass the minimal standards set out in *Woodard*. Such conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal. *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011. As a result, Holiday's challenge to the clemency procedures is utterly without merit and should be dismissed.

## CONCLUSION

For the foregoing reasons, Holiday's petition for writ of habeas corpus should be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

108

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


  s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General
State Bar No. 24028011

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
(512) 320-8132 (Fax)
*E-mail: ellen.stewart-klein@texasattorneygeneral.gov*

*Lead Counsel                    ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I certify that on October 25, 2012, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who have consented in writing to accept this Notice as service of this document by electronic means:

James W. Volberding
Plaza Tower
110 North College Avenue
Suite 1850
Tyler, TX 75702
volberding@att.global.net

Seth H. Kretzer
Two Post Oak Central
1980 Post Oak Blvd.
Suite 1900
Houston, TX 77056-3877
seth@kretzerfirm.com

   s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General