IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RAPHAEL DEON HOLIDAY,           §
TDCJ-ID NO. 999419,             §
                                §
            Petitioner,         §
                                §
v.                              §
                                §     CIVIL ACTION NO. H-11-1696
WILLIAM STEPHENS,[1] Director,  §
Texas Department of Criminal    §
Justice - Correctional          §
Institutions Division,          §
                                §
            Respondent.         §

## MEMORANDUM OPINION AND ORDER

Raphael Deon Holiday, an inmate on Texas's death row, has
filed a petition for a writ of habeas corpus. Respondent William
Stephens has filed an answer arguing that procedural limitations
and substantive federal law foreclose habeas relief. Holiday has
filed a reply. After considering the record, the pleadings, and
the applicable law, the court finds that Holiday is not entitled to
habeas relief. Accordingly, the court will deny Holiday's
petition. The court will not certify any issue for appellate
review.

-----

[1]Effective June 1, 2013, William Stephens succeeded Rick
Thaler as the Director of the Correctional Institutions Division of
the Texas Department of Criminal Justice. Pursuant to Rule 25 of
the Federal Rules of Civil Procedure, Director Stephens "is
automatically substituted as a party." FED.R.CIV.P. 25(d).

## I. __Background__

In 2002 a Texas jury convicted Holiday for the capital murder of three children.  The Texas Court of Criminal Appeals summarized the trial evidence supporting his conviction as follows:

> Tami Lynn Wilkerson and Holiday lived together in a log house that Wilkerson's stepfather had built in Madison County.  The house was in a secluded, wooded area about ten miles off the main highway, but just a mile or two from the home of Wilkerson's mother, Beverly Mitchell.  Wilkerson and Holiday lived with Wilkerson's two daughters, seven-year-old Tierra and five-year-old Jasmine, and with Wilkerson's and Holiday's baby, Justice.  In March of 2000, Wilkerson learned that Holiday had sexually assaulted Tierra.  Wilkerson filed charges against Holiday and obtained a protective order against him.  Wilkerson continued to live in the house in Madison County and Holiday moved out.  In the following months, Holiday repeatedly contacted Wilkerson by phone, stating that he wanted to reconcile and that he wanted to see Justice, and threatening to come to the house while the children were at home.  Despite the protective order, Wilkerson met with Holiday numerous times between April and the end of August, in an effort to "handle" Holiday and deal with his threats, and to allow him to see Justice.  In August, Holiday came to the restaurant where Wilkerson was working.  Wilkerson locked herself in the office.  When Holiday tried to pick the lock on the office door, Wilkerson called the police, who came and removed Holiday from the premises.  About a week before the instant offenses, Holiday called Wilkerson and asked for her help in jumping his car.  When Wilkerson arrived to assist him, Holiday took her keys, told her he had two guns, forced her to have sex with him, and then forced her into the car and threatened to crash the car and kill them both.  Wilkerson finally convinced Holiday to let her go.  After that incident, Wilkerson stopped taking Holiday's phone calls.
>
> Around 11 p.m., on the evening of September 5, 2000, one of Wilkerson's daughters heard glass breaking outside.  Wilkerson looked out of the window and saw a figure walking toward the house.  She called her mother, Beverly Mitchell, and asked her to come over.  Mitchell and Wilkerson's uncle, Terry Keller, soon arrived at Wilkerson's house.  Keller had a shotgun and began

walking around the house and yard.  Mitchell took Tierra and Jasmine to her car.  When she went back inside the house to get Justice, she picked up the telephone to dial 911.  As she was holding the phone, Holiday walked in, grabbed the phone out of her hand, and threw it against the wall.  When Wilkerson came into the room and saw Holiday, she ran out of the house to go for help. Holiday asked Mitchell how she had known to come to the house because Holiday said he had cut the phone line.

Holiday said he was going to make Wilkerson pay for what she had done by taking his baby away.  When Keller came into the house, Holiday held Mitchell in a head-lock with a gun to her head until Keller put his gun down and Holiday retrieved it.  Keller testified that Holiday began "ranting and raving" that he was not "going to take the rap" on the charges filed against him, that he was "going to take care of it," and that he was "going to burn the house down with everyone in it."  Holiday then poured gasoline around and on the hood of the car where Tierra and Jasmine were.  He again said Wilkerson was going to pay for what she had done.  He tried to light the gasoline, but it would not ignite.  Holiday forced everyone back into the house, shooting off the guns as they went. He ordered everyone to sit on the couch and told them to stay there.  He told Keller that if he left, he would kill Mitchell.  Holiday made repeated threats to kill everyone if the police came.  He then ordered Mitchell to take him to her house to get some more gasoline.  They retrieved two five gallon cans of gasoline and returned to Wilkerson's house.  Keller was gone, but the girls were still on the couch.  Holiday told Mitchell to "soak" the recliner and furniture with the gas.  Mitchell poured gas on the recliner in the living room, poured it around the room, into the laundry room and around the washer and dryer, and into and around Wilkerson's bedroom.  She did not pour any gasoline on or around the couch where the children were sitting.  She saw Holiday bend down and then the fire started.  The fire followed the path of the gasoline, and blocked Mitchell from going back into the living room for the children.  Mitchell ran outside.

Holiday was standing outside watching the fire.  He told Mitchell to get in the car, but she ran into the woods. Holiday left in Mitchell's car as police were arriving. He rammed a police car and drove off.

In the meantime, Wilkerson had run to the nearest neighbor's house for help.  The neighbors called 911.  As

Wilkerson ran back down the road to her house, she saw
Mitchell's car coming toward her.  The car sped up and
attempted to run her down but Wilkerson escaped into the
woods.  The car backed up and sped off as it was pursued
by a police car.  When Wilkerson arrived back at her
house, it was engulfed in flames.  Wilkerson's three
children died in the fire.

Holiday was apprehended by police after a high-speed
chase.  Holiday had two cigarette lighters in his pocket
when he was arrested.  He was treated for burns on his
arms, hands, and face.  Holiday's pistol and Keller's
shotgun were found later inside the house.

Holiday v. State, Nos. AP-74,446, AP-74,447, AP-74,448 at 2-5 (Tex.

Crim. App. Feb. 8, 2006) (hereinafter "Opinion on Direct Appeal").

The State of Texas brought three charges of capital murder

against Holiday in three separate indictments.  One indictment

charged Holiday with murdering more than one person during the same

criminal transaction.  The other two indictments charged him with

murdering an individual under age six.  Each indictment alleged

that Holiday "intentionally or knowingly cause[d] the death of [the

named victim] by burning said individual with fire."

Holiday's intent was a hotly disputed question at trial.[2]  The

prosecution emphasized statements Holiday made foreshadowing the

murder.  The State highlighted Holiday's actions and statements

during the crime that manifested a murderous intent.  The

prosecution presented scientific evidence excluding the possibility

that an appliance had accidentally ignited the gasoline.

_____

[2]William F. Carter and Frank Blazek represented Holiday at
trial.  The court will refer to Holiday's trial attorneys
conjunctively as "trial counsel."

Importantly, Ms. Mitchell testified that she saw Holiday "ben[d] down and the fire started." Tr. Vol. 33 at 98. She did not see a match or a lighter in his hand, but the fire started "immediately as he reached down." Tr. Vol. 33 at 98-99.[3]

The defense argued that reasonable doubt existed as to whether Holiday intended to ignite the gasoline and kill the children. The defense challenged Ms. Mitchell's recollection because she had

---

[3]The Court of Criminal Appeals reviewed the evidence suggesting that he intended to kill the victims:

> In the weeks before the offenses, Holiday stayed with his second cousin, Steven Taylor. Taylor testified that Holiday talked to Wilkerson on the phone almost every day. Taylor once overheard Holiday tell Wilkerson that he would kill her if he did not get his child; Holiday told Taylor he had been joking. Taylor's brother, Robert Lowery, and Holiday's cousin, John White, rode with Holiday to Wilkerson's house around 9:30 on the night of the offenses and dropped Holiday off. Holiday told them he would call in the morning when he was ready to be picked up. Earlier on the day of the offenses, White sold Holiday a gun, and they went to a cemetery for target practice. Holiday told Lowery and White that he was worried and upset about the sexual-assault case pending against him, that Wilkerson and her boyfriend were trying to set him up, and that they were lying about him and trying to take his children away from him. Holiday told White that if you shoot someone and then burn them, you won't get caught. He also told Lowery that he was going to burn down Wilkerson's house and watch her run out.
>
> The State presented expert testimony that the burns on Holiday's right arm and face were consistent with having reached down and ignited the fire. Additionally, a forensic scientist who specializes in the investigation and reconstruction of fires and explosions testified that the household appliances could be excluded as the ignition sources of the fire.

Opinion on Direct Appeal at 5-6.

previously recounted the events of that evening without mentioning that Holiday bent down before the fire started.  The defense presented testimony from a fire expert who opined that nearby appliances may have accidentally ignited the gasoline fumes.  Tr. Vol. 39 at 96.  The jury, nonetheless, found Holiday guilty on each count of capital murder.

Texas law requires the jury to determine a capital defendant's fate after the presentation of evidence in a separate penalty phase.  The State adduced evidence that Holiday confessed to another inmate that he had actually sexually assaulted Tierra twice.  In addition, Holiday had previously sexually assaulted his maternal aunt and a cousin.  His criminal behavior toward family members also included a physical assault on his mother.  A forensic psychiatrist testified that Holiday suffered from an antisocial personality disorder, rendering him likely to commit violent acts in the future.

The defense called several witnesses in an effort to mitigate against a death sentence.  Friends and family members provided background information about Holiday's childhood, describing him as a respectful, church-going individual.  The defense also secured the services of a psychiatrist who testified that Holiday suffered from depression and had poor internal mechanisms for coping with stress and frustration.  The defense's closing argument urged the jury to give Holiday a life sentence.

The jury decided Holiday's sentence by answering two special-issue questions:

<u>SPECIAL ISSUE NO. 1</u>

Is there a probability that the defendant, Raphael Deon Holiday, would commit criminal acts of violence that would constitute a continuing threat to society?

<u>SPECIAL ISSUE NO. 2</u>

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed? You are instructed that the term "mitigating evidence" or "mitigating circumstances" means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

The jury need not agree on what particular evidence support an affirmative finding on this Special issue.

The jury answered the special issues in a manner requiring the imposition of a death sentence.

Holiday's direct appeal raised 49 points of error. The Court of Criminal Appeals affirmed Holiday's conviction and sentence in an unpublished opinion. <u>Holiday v. State</u>, Nos. AP-74,446, AP-74,447, AP-74,448 (Tex. Crim. App. Feb. 8, 2006). The United States Supreme Court denied his petition for a writ of certiorari. <u>Holiday v. Texas</u>, 549 U.S. 1033 (2006).

Concurrent to his appeal Holiday filed an application for state habeas corpus relief. Holiday raised twelve claims challenging his conviction and sentence. The trial-level habeas court issued explicit factual findings and conclusions of law

recommending that the Court of Criminal Appeals deny Holiday's habeas application. The Court of Criminal Appeals adopted the lower court's recommendation and denied relief. <u>Ex parte Holiday</u>, No. WR-73,623-01, WR-73,623-02, WR-73,623-03, 2010 WL 1797258 (Tex. Crim. App. 2010).[4]

Holiday filed a federal petition for a writ of habeas corpus raising 56 grounds for relief, many of which relate to one other. (Docket Entry Nos. 1, 12)[5] For simplicity, the court will group Holiday's claims as follows:

- Insufficient evidence supports Holiday's conviction for capital murder under <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). (claim 1)

- The removal for cause of prospective juror Servaine Sessions violated the Sixth Amendment and <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985). (claim 2)

- The State violated Holiday's Fifth, Sixth, and Fourteenth Amendment rights by allowing Jane Riley to relate statements made by Tierra Lynch. (claims 3 and 4)

- The trial court's refusal to quash the indictments violated Holiday's due process and Sixth Amendment rights. (claims 5 and 6)

---

[4]The state court proceedings in this case resulted in a voluminous record. The court will cite the transcript containing trial court motions and docket entries as Clerk's Record at ___. The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___. The court will cite to the Court of Criminal Appeals appellate decision as Opinion on Direct Review at ___. The court will refer to the record from Holiday's state habeas proceedings as State Habeas Record at ___. The findings of fact and conclusions of law signed by the lower state habeas court will appear as FFCL, at ___.

[5]Holiday's petition does not contain claims numbered from 33 to 39.

- The trial court erred by not informing the jurors about the potential effect of deadlock.  (claim 7)

- The trial court violated Holiday's Sixth Amendment rights by denying his challenges for cause to two prospective jurors.  (claims 8 and 9)

- The State's reliance on expert witness Dr. John DeHann violated several constitutional principles.  (claims 10 and 40 through 53)

- Admission of evidence that Holiday had sexually assaulted Tierra Lynch violated his due process rights.  (claim 11)

- The trial court violated Holiday's due process rights by not instructing the jury to consider whether Beverly Mitchell was a party to the murders.  (claim 12)

- The State improperly commented on Holiday's failure to testify.  (claim 13)

- An expert witness's testimony that Holiday would be a future societal danger violated his due process and Eighth Amendment rights.  (claims 14 and 15)

- The trial court violated Holiday's constitutional rights by limiting his presentation of evidence and cross-examination in the penalty phase.  (claims 16 through 22)

- Structural issues inherent in Texas's capital punishment scheme violate several constitutional principles.  (claims 23 through 32)

- Trial and appellate counsel provided ineffective representation.  (claims 54 through 59)

- Administration of lethal injection in executing Holiday's sentence will violate the Eighth and Fourteenth Amendments.  (claim 60)

- Texas's clemency process will not comply with constitutional standards when Holiday avails himself of it in the future.  (claim 61)

Respondent filed an answer arguing that federal procedural and constitutional law bar relief on Holiday's claims.  (Docket Entry

No. 16)  Holiday filed a reply.  (Docket Entry No. 22)  This matter
is now ripe for adjudication.

## II.  **Legal Standards**

The writ of habeas corpus provides an important, but narrow,
review of an inmate's conviction and sentence.  See  Harrington v.
Richter, ___ U.S. ___, 131 S. Ct. 770, 787 (2011); Barefoot v.
Estelle, 463 U.S. 880, 887 (1983).  "The States possess primary
authority for defining and enforcing the criminal law.  In criminal
trials they also hold the initial responsibility for vindicating
constitutional rights.  Federal intrusions into state criminal
trials frustrate both the States' sovereign power to punish
offenders and their good-faith attempts to honor constitutional
rights."  Engle v. Isaac, 456 U.S. 107, 128 (1982).  Based on the
primary concerns of finality, federalism, and comity, several
principles circumscribe both federal habeas review and the
availability of federal habeas relief.

As an initial matter, the Anti-Terrorism and Effective Death
Penalty Act (AEDPA) prevents federal courts from overturning a
state court conviction or sentence when an inmate has only shown a
violation of state law.  The AEDPA "unambiguously provides that a
federal court may issue a writ of habeas corpus to a state prisoner
'only on the ground that he is in custody in violation of the
Constitution or laws or treaties of the United States.'"  Wilson v.
Corcoran, ___ U.S. ___, 131 S. Ct. 13, 15 (2010) (quoting 28 U.S.C.

§ 2254(a)).  Accordingly, "federal habeas corpus relief does not lie for errors of state law."  Swarthout v. Cooke, ___ U.S. ___, 131 S. Ct. 859, 861 (2011) (quotation omitted); see also Corcoran, 131 S. Ct. at 16; Estelle v. McGuire, 502 U.S. 62, 67 (1991). Holiday raises several issues (including claims 5, 6, 10, 11, and 14 through 22) that implicate the operation of Texas' independent law.  The court can only consider those claims to the extent that they present an issue of federal constitutional dimension.

How an inmate has litigated his federal constitutional claims determines the course of federal habeas adjudication under the exhaustion and procedural-default doctrines.  The AEDPA precludes federal relief on constitutional challenges that an inmate has not first raised in state court.  See 28 U.S.C. § 2254(b)(1).  Also, federal law prevents consideration of claims that an inmate did not litigate in compliance with state procedural law.  See Dretke v. Haley, 541 U.S. 386, 392 (2004); Lambrix v. Singletary, 520 U.S. 518, 523 (1997); Coleman v. Thompson, 501 U.S. 722, 729 (1991).  A federal court may review an inmate's unexhausted or procedurally barred claims only if he shows:  (1) cause and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.].'"  Haley, 541 U.S. at 393 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, the AEDPA provides for a

deferential federal review.  "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief."  <u>Montoya v. Johnson</u>, 226 F.3d 399, 404 (5th Cir. 2000); <u>see also</u> <u>DiLosa v. Cain</u>, 279 F.3d 259, 262 (5th Cir. 2002).  A petitioner cannot meet this burden by merely alleging constitutional error.  Instead, "focus[ing] on what a state court knew and did," <u>Cullen v. Pinholster</u>, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011), an inmate must show that "the state court's adjudication" of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  <u>Berghuis v. Thompkins</u>, ___ U.S. ___, 130 S. Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d)(1)); <u>see also</u> <u>Thaler v. Haynes</u>, ___ U.S. ___, 130 S. Ct. 1171, 1174 (2010); <u>Bell v. Cone</u>, 535 U.S. 685, 698 (2002); <u>Early v. Packer</u>, 537 U.S. 3, 7-8 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000).  This requires a "substantially higher threshold" than merely showing the existence of constitutional error.  <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).[6]

---

[6]In state court Holiday repeatedly alleged both state and federal law violations with regard to some claims he now advances on federal review.  When adjudicating those claims, the Court of Criminal Appeals did not always explicitly mention the federal aspects of Holiday's grounds for relief.  Holiday now contends that "[t]he [Court of Criminal Appeals] did not address his federal claims, permitting *de novo* federal review."  (Docket Entry No. 12 at 46, 89)  Federal law creates a rebuttable presumption that the state courts have adjudicated the merits of an inmate's claims.  <u>See</u> <u>Johnson v. Williams</u>, ___ U.S. ___, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption (continued...)

With those standards in mind, the court turns to Holiday's federal petition.

### III.   <u>Analysis</u>

### A.   **Sufficiency of the Evidence (claim 1)**

Holiday complains that insufficient evidence supported his conviction for capital murder.  Holiday returns to the argument championed by his trial attorneys:  The evidence failed to prove that he intentionally murdered the three victims.  Holiday argues: "Whatever else one may think of Holiday, no rational trier of fact could have found . . . that Holiday intentionally or knowingly started the fire, or that he *actually* started the fire."  (Docket Entry No. 12 at 33)  Holiday's argument emphasizes that (1) no one actually saw him ignite the gasoline and (2) his expert witness testified that nearby appliances could have accidentally set the gasoline fumes aflame.

Courts review insufficiency-of-the-evidence claims under the jurisprudence flowing from <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  <u>Jackson</u> asks whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

---

[6](...continued)
can in some limited circumstances be rebutted.").  Holiday has not pointed to any circumstance suggesting that the Court of Criminal Appeals did not intend to rule on the federal aspects of his arguments.  The court, therefore, will apply AEDPA deference to each claim Holiday raised in state court.

reasonable doubt." <u>Wright v. West</u>, 505 U.S. 277, 283-84 (1992)
(quotation omitted); <u>see also</u> <u>Pilon v. Bordenkircher</u>, 444 U.S. 1,
2 (1979).  This demanding inquiry is highly deferential to, and
resolves any conflicting evidence in favor of, the jury's verdict.
<u>See</u> <u>United States v. Harris</u>, 293 F.3d 863, 869 (5th Cir. 2002);
<u>United States v. Duncan</u>, 919 F.2d 981, 990 (5th Cir. 1990).

The AEDPA augments the deferential <u>Jackson</u> analysis, making
for a doubly high barrier to federal habeas relief.  <u>See</u> <u>Coleman v.</u>
<u>Jackson</u>, ___ U.S. ___, 132 S. Ct. 2060, 2062 (2012); <u>Perez v. Cain</u>,
529 F.3d 588, 599 (5th Cir. 2008).  A federal court questions only
whether the state court's assessment of the already-strict <u>Jackson</u>
standard was unreasonable, creating a "double dose of deference
that can rarely be surmounted." <u>Boyer v. Belleque</u>, 659 F.3d 957,
964 (9th Cir. 2011).

Viewing the evidence in a light most favorable to the verdict,
the Court of Criminal Appeals rejected Holiday's <u>Jackson</u> claim on
direct appeal:

> [T]he evidence is legally sufficient to support a finding
> that Holiday acted intentionally or knowingly.  Holiday
> was worried and angry about the sexual-assault charges
> against him.  In the months before the offenses, Holiday
> continually harassed and threatened Wilkerson.  He
> threatened to kill her and "make her pay."  He told
> others that he was going to burn down her house.  His
> actions show a planned and calculated effort.  He
> purchased a gun and practiced shooting on the day of the
> offenses.  He arranged to be driven out and dropped off
> at Mitchell's house in the country.  He dressed in black
> clothing and armed himself with a can of gasoline,
> cigarette lighters, a gun, and ammunition.  He demon-
> strated his disregard for the lives of the children when

he poured gasoline on and around the car they were
sitting in and attempted to light it. When that did not
work, he ordered everyone into the house with
instructions to remain there while he went to get more
gasoline.   He terrorized Mitchell, Keller, and the
children by ordering them around at gunpoint. If he had
not wanted to endanger the children, he would not have
allowed them to remain in the house while he directed the
soaking of various items of furniture and the pouring of
gasoline throughout the house. Rather than demonstrate
shock, remorse, or anguish at the fact that the children
were unreachable inside the burning house, Holiday
attempted to apprehend Mitchell, and then fled the scene,
ramming a police car, and leading police on a manic
high-speed chase. A rational jury could conclude that
Holiday knowingly or intentionally caused the death of
the three victims by burning them in a fire.

Opinion on Direct Appeal at 6-7. The Court of Criminal Appeals

specifically rejected Holiday's argument that the evidence did not

show that he actually lit the fire:

Holiday points out that he did not tell Mitchell to pour
gasoline on or around the couch where the children were
seated and that Mitchell did not actually see Holiday
lighting the fire. He also points to defense expert
testimony which contradicted the State's expert testimony
regarding potential ignition sources and the amount of
time the gasoline vapors would need to circulate before
igniting with an accidental source. The defense expert
stated that there were other possible ignition sources
such as household appliances, and that the pilot light on
the heater was "the number one candidate" as the source
of ignition. The State's expert excluded the heater as
an ignition source based upon testimony that the pilot
light was turned off. The contrary evidence is not so
strong that the jury could not have found intent or
knowledge beyond a reasonable doubt.

Opinion on Direct review at 8.[7]

---

[7]Texas formerly recognized two species of insufficiency
claims: a Jackson claim and a state law based factual sufficiency
claim.   See Brooks v. State, 323 S.W.3d 893 (Tex. Crim. 2010);
                                                    (continued...)

The Court of Criminal Appeals was not unreasonable in finding that the jury could rationally infer that, since Holiday had already tried to ignite gasoline around the children, he again tried to kill them with fire. Even though Holiday points to conflicting evidence in the record about whether he lit the fire himself, this court must presume that "the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." McDaniel v. Brown, 558 U.S. 120, 133 (2012). Mitchell testified that she saw Holiday bend down, as if to light the gasoline fumes, immediately before the fire started. A rational jury could find that Holiday intended to kill the three children. Because the state court was not unreasonable in denying Holiday's insufficiency-of-the-evidence claim, see 28 U.S.C. § 2254(d)(1), the court will deny this ground for relief.

## B.   Removal of a Prospective Juror for Cause   (claim 2)

Holiday argues that the trial court violated his Sixth Amendment right to a fair trial when it removed prospective juror Servaine Sessions from jury service. In what the Court of Criminal Appeals labeled "a factually unique case," the trial court had to decide whether Ms. Sessions could set aside her feelings and

---

[7](...continued)
Zuniga v. State, 144 S.W.3d 477 (Tex. Crim. 2004); Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996). On direct appeal Holiday briefed both types of claims together. Although the Court of Criminal Appeals used the language cited above in rejecting the state-law factual sufficiency claim, the AEDPA still requires deference to its reasoning.

fulfill her duties as a juror.  Opinion on Direct Appeal at 11.
Holiday complains that the trial court erroneously found that
Ms. Sessions could not follow the law and serve as an impartial
juror.

Both parties questioned Ms. Sessions during individual voir
dire.  Neither party challenged her for cause.  After the parties
selected twelve jurors (including Ms. Sessions) and two alternates,
but before the trial court had sworn them in, Ms. Sessions
approached the trial court with concerns.  The trial court held a
hearing in which the judge questioned Ms. Sessions as follows:

> Trial court:    I don't know anything wrong with [sic] at
>                 this point with you.  I may not be able
>                 to actually make any final decisions on
>                 what you're about to say.  Chances are,
>                 given the circumstances, we are this far
>                 along in the trial, you will be required
>                 to continue in your service.  But I just
>                 want the lawyers to know what is in your
>                 heart and in your mind because they are
>                 entitled to know that.  So you may go
>                 ahead and just tell us what it is that
>                 you think may be a problem for you.
>
> Ms. Sessions:   I thought for sure when I was here that I
>                 could - after listening to the trial and
>                 receiving all the information I could
>                 decide one way or the other on - after
>                 the guilty phase if I had to do the death
>                 penalty phase.  And I been praying about
>                 it.  And that's just the only thing, I
>                 don't know.  I'm not saying I can't serve
>                 and do my civil duty, I'm just not sure
>                 even after hearing the information if I
>                 could say one way or the other yes.
>
> Trial court:    What do you mean yes?
>
> Ms. Sessions:   On the death penalty.  That was the
>                 thing.  I thought if he was found guilty
>                 and then I didn't know I was going to

have to do the sentencing phase or if the Judge was going to do that.  And, if so, after listening to those two questions, if it's going to be considered the death penalty, that's what I was afraid of.  I don't know one way or the other.  I thought yes, I could say if it was put to me yes, this person deserves the death penalty, and now I'm not – just not certain on that.

Trial court:   You were certain at the time but since then you have become less certain?  Is that what you're telling us?

Ms. Sessions:   Yes.  I'm not totally not certain or totally certain.  It's just that I have had some confusing thoughts on it. . . . I have been praying about it and seem like everything I read – it wasn't anything dealing with the court, it's just that I read my Bible daily and seem like every page I went to it has something to do with humanitary [sic], it has something to do with Commandments. And I didn't know if that was God, God's way of speaking to me on what – on what I was about to do or what.  And I just wanted to be honest and up front and let them know, I don't know one way or the other.  If you can understand that?  And this just didn't happen when she told me – when the County Clerk called me I was like oh, God.  So I prayed that night. For two nights I didn't sleep.

Trial court:   I know it's heavy on your heart and it's a heavy responsibility.  You have made us all aware of the situation.

Ms Sessions:   That's all I wanted to do was make you aware of it.

Tr. Vol. 30 at 9-12.

The State filed a "Motion to Exclude Juror" arguing that Ms. Sessions' colloquy raised a serious doubt as to whether her views on the death penalty would impair her ability to serve in the

-18-

jury.  Clerk's Record at 506.  In a subsequent hearing, the defense argued that Ms. Sessions was "fully qualified" as a juror, particularly because neither party had objected to her during individual voir dire.  Tr. Vol. 31 at 10.  The defense asserted that Ms. Sessions' concerns only showed that she "is taking seriously" her role and that she "never said she could not or would not [follow the law] or that she would be unable to do it."  Tr. Vol. 31 at 10-11.

Over trial counsel's objection, the trial court removed Ms. Sessions from the jury panel, stating:

> I'm going to grant the State's motion to challenge Ms. Sessions and accordingly find that she is not qualified to serve on this case because . . . her religious views opposing the death penalty, in my judgment, based on my personal observations of her while on the stand, of her demeanor, that her religious views opposing the death penalty are of such a nature that they would, in my opinion, prevent or impair her performance of her duties as a juror and in accordance with the jury's instructions and her oath.

Tr. Vol. 31 at 13.

The defense afterwards filed a motion for mistrial based on the exclusion of Ms. Sessions, which the trial court denied.  Trial counsel later submitted a bill of exceptions explaining:

> On May 21, 2002, Servaine Sessions testified in Court about her reservations concerning her service as a juror in a death penalty case.

> During her testimony she spoke in a matter-of-fact manner; she did not cry, have trouble breathing nor speak hesitantly.  She spoke in a normal tone of voice. Neither her facial expressions nor body posture appeared other than normal.

Clerk's Record at 646.

On direct appeal Holiday argued that the exclusion of Ms. Sessions violated <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985). <u>Witt</u> and other cases establish the standards governing the exclusion of a prospective juror in a capital case: "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>Id.</u> at 424 (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)); <u>see also</u> <u>Uttecht v. Brown</u>, 551 U.S. 1, 22 (2007); <u>Morgan v. Illinois</u>, 504 U.S. 719, 732 (1992); <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 521-22 (1968). "This standard . . . does not require that a juror's bias be proved with 'unmistakable clarity,'" <u>Witt</u>, 469 U.S. at 424, but gives "deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." <u>Brown</u>, 551 U.S. at 22.[8]

---

[8]The Supreme Court has "establish[ed] at least four principles of relevance" for reviewing courts:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment
> (continued...)

The Court of Criminal Appeals found that the trial court had not "abused its discretion in finding that Sessions' personal beliefs regarding the death penalty rendered her impaired or unable to follow the law as instructed." The Court of Criminal Appeals reasoned that, "[e]ven though the nature of the sentencing phase and the jury's role in answering the special issues had been fully explained to Sessions," she still testified in a manner suggesting that "she would be impaired as a juror." The Court of Criminal Appeals emphasized that "she was distressed enough to approach the trial court after she was selected and just days before evidence was to be presented." In fact, "after receiving word of her selection," Ms. Sessions "had prayed, had read her Bible, and had not slept for two nights." Also, she expressed that she was "not sure" but "repeatedly contend[ed] that she could not say 'one way or the other' whether she would be able to answer the special issues." Ms. Sessions voluntarily "conveyed that she did not know how she would react when seated or how she would consider the special issues in the sentencing phase involving a potential death sentence." Because she was "persistently uncertain about [her] ability to follow the law," the record supported her removal from the jury.   Opinion on Direct Appeal at 14.

---

[8](...continued)
based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

Brown, 551 U.S. at 9 (citations omitted).

Federal courts presume correct any state factual findings regarding the exclusion of potential jurors until an inmate shows otherwise by clear and convincing evidence.   See 28 U.S.C. § 2254(e)(1); Ortiz v. Quarterman, 504 F.3d 492, 501 (5th Cir. 2007).  This court can grant federal habeas relief only if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Ms. Sessions, whose concern about her role as a juror compelled her to prayer and Bible study, could not sleep for two nights worrying about whether she could answer the special issues. Because Ms. Sessions was "not sure" whether she could decide punishment "one way or the other," her obvious turmoil left the trial court with the distinct impression that "her religious views opposing the death penalty . . . would . . . prevent or impair her performance of her duties as a juror[.]"  Tr. Vol. 31 at 13. Defense counsel declined an opportunity to rehabilitate her concerns.  Tr. Vol. 31 at 3-4.  Nothing in Ms. Sessions' colloquy convincingly suggested that she could set aside her obviously deep-seated feelings and faithfully follow her duty as a juror.

Given that record, the state court was not unreasonable in finding that Ms. Sessions' concerns would impede or impair her ability to make a sentencing decision.  Holiday has failed to demonstrate that the state court disposition "resulted in a decision that was based on an unreasonable determination of the facts[.]"  See 28 U.S.C. § 2254(d)(2).  This claim will be denied.

-22-

C.   **Hearsay Testimony**   (claims 3 and 4)

The State alleged that Holiday killed, in part, to avoid pending sexual-assault charges against him.  As previously noted, the chain of events leading up to the murders started when he sexually assaulted Tierra Lynch.  Significant circumstantial evidence suggested that Holiday had committed that crime.  The most damning evidence against him came from Tierra's comments to a nurse identifying him as the one who had raped her.  Holiday claims that the introduction of those statements at trial violated his Confrontation Clause rights under Crawford v. Washington, 541 U.S. 36 (2005).

The Confrontation Clause of the Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  In Crawford the Supreme Court revised its prior Confrontation Clause jurisprudence and held that "[t]estimonial statements of witnesses absent from trial" are generally admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]."  541 U.S. at 59.  The court will review the background of Holiday's Crawford claim, the state court's adjudication, and the application of the AEDPA.

1.   Background

The evidence about Holiday's sexual assault of Tierra came through several witnesses, culminating in pediatric nurse Jane

Riley's recitation of certain comments Tierra made during a physical examination. Prior to Ms. Riley's testimony, the State presented extensive testimony about the circumstances leading up to that examination. Ms. Wilkerson testified that on March 5, 2000, seven-year-old Tierra had stayed home from school with the measles. Holiday watched all three girls that day while Ms. Wilkerson went to work. When Ms. Wilkerson returned, she wanted to give the girls a bath, but Tierra uncharacteristically wanted to be alone. Ms. Wilkerson started washing clothing and discovered a pair of Tierra's panties that were full of blood. Tierra was still bleeding, but would not explain what had happened. Ms. Wilkerson also noticed that someone had washed the bedding, although Holiday denied doing it.

The next day Ms. Wilkerson had to leave her employment because she was too preoccupied about her daughter to work. She returned home and took Tierra to be examined by a doctor.

When Dr. Ali Al-Himyary saw Tierra she "was very quiet and didn't say much at all, even when [he] asked her questions." Tr. Vol. 32 at 121. Dr. Al-Himyary's physical examination revealed two-to-three-day-old bruises on Tierra's thighs and "lacerations and bleeding" on both sides of her labia majora. Tr. Vol. 32 at 126. Dr. Al-Himyary concluded that Tierra's injuries were consistent with a penetrating sexual assault.

Dr. Al-Himyary contacted Child Protective Services. Ms. Wilkerson went to the police. A CPS case worker interviewed

-24-

Tierra and her sister.  After the interviews, police officers drove Ms. Wilkerson home.

That night Ms. Wilkerson and her daughters stayed at Ms. Mitchell's house.  Holiday moved out the next day.  When Ms. Wilkerson looked for the bloodstained panties, she could not find them.  Holiday later admitted to her that he had burned Tierra's bloody underwear.

The next day, Ms. Riley, who had specialized training and experience in sexual and physical abuse examinations, met Tierra in her office pursuant to a referral from CPS and other law enforcement agencies.  Ms. Riley explained that Tierra "was referred to me for further diagnosis and treatment. . . . My purpose was to determine the extent of her injury, if there was one.  I wasn't sure at that point.  And to assess how it happened and to provide treatment for her."  Tr. Vol. 32 at 197-98.

While taking her medical history, Tierra made comments that became the basis for Holiday's Confrontation Clause challenge.  The questioning of Ms. Riley at trial proceeded as follows:

> The State:     Now, what you can remember or what you
>                can recall from reviewing your notes,
>                please use — please tell the jury what
>                you said to the child and what the child
>                said to you as you were doing this
>                medical history. . . .
>
> Ms. Riley:     I asked her if she knew why she was there
>                with me and she said no.  *And then I
>                asked her if she knew why there was blood
>                in her panties and she said no.  And then
>                I asked her if something had happened to
>                her and she said yes.  And then I asked*

> *her if anyone was with her when something happened and she stated my step daddy.* then asked her — I told her it was important for her to tell me what happened to her so that I could make sure she was okay. At that point she put her head down and she didn't say anything else. *And then I asked her if someone had told her not to tell and she said yes, my step daddy. And then I asked her what he had said and she said that he said if I told anybody he would get in a lot of trouble.*

Tr. Vol. 32 at 201-02 (emphasis added).

During the subsequent physical examination, Ms. Riley saw that Tierra was still "bleeding quite a bit" and had lacerations. Tr. Vol. 32 at 207. Ms. Riley opined that Tierra had experienced "a penetrating injury to the hymen." Tr. Vol. 32 at 206. When Ms. Riley saw Tierra ten days later for a follow-up exam, the injuries were healing well.

The defense objected to Ms. Riley's recitation of statements made by Tierra. The State explained that it "intend[ed] to offer it as a hearsay statement which is exempted from hearsay exclusion because it is given for the purpose of medical treatment and diagnosis." Tr. Vol. 32 at 183. The trial court allowed the jury to hear Ms. Riley's testimony. Holiday alleges that Ms. Riley's recitation of Tierra's comments violated the Confrontation Clause.

### 2.   Constitutional Violation

When Holiday raised this claim in state court, the Court of Criminal Appeals proceeded directly to the question of whether

-26-

Ms. Riley's recital of Tierra's statements harmed Holiday.  On federal review, however, habeas relief only becomes available if Holiday shows that the trial court violated his constitutional rights.  See 28 U.S.C. § 2254(a).  In other words, as a precursor to the harmlessness analysis Holiday must show a Crawford violation.

The threshold question in a Confrontation Clause analysis is whether a statement was testimonial or non-testimonial.  See Crawford, 541 U.S. at 59.  A testimonial statement "is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact" and includes "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 51-52 (quotation omitted).  Testimonial statements are those "procured with a primary purpose of creating an out-of-court substitute for trial testimony."  Michigan v. Bryant, ___ U.S. ___, 131 S. Ct. 1143, 1155 (2011).  "[I]f a statement is not made for the primary purpose of creating an out-of-court substitute for trial testimony, its admissibility is the concern of state and federal rules of evidence, not the Confrontation Clause."  Williams v. Illinois, ___ U.S. ___, 132 S. Ct. 2221, 2243 (2012) (quotation omitted, emphasis added).

Holiday asserts that Tierra's statements were testimonial under Crawford because she made the equivalent of "'a formal statement to government officers'" when she spoke with Ms. Riley.

(Docket Entry No. 12 at 41) (quoting <u>Crawford</u>, 541 U.S. at 51).
Holiday argues that "Tierra's statement was in response to the
questioning of the government's sexual assault nurse whose purpose
was to determine if the child was the victim of sexual assault."
(Docket Entry No. 12 at 42)  Holiday, however, ignores the totality
of the circumstances surrounding Ms. Riley's examination.  By the
time Ms. Riley saw Tierra, police officers and a CPS worker had
already interviewed Tierra and her sister for seven hours.  Tr.
Vol. 32 at 64.  Ms. Wilkerson had already obtained a protective
order against Holiday.  Tr. Vol. 32 at 67.  Ms. Riley did not
interview Tierra to support a criminal investigation.  She was not
a government officer, though CPS often referred children to her for
sexual-assault examinations.  Ms. Riley examined Tierra "'to
determine the extent of her injury, if there was one. . . . And to
assess how it happened and to provide treatment for her.'"  Opinion
on Direct Appeal at 16 (quoting Tr. Vol. 32 at 197-98).  She
interviewed Tierra "to get information for diagnosis and treatment
of her injury," not to gather evidence.  Tr. Vol. 32 at 152.

The totality of the circumstances – including Tierra's still-
fresh injuries, Ms. Riley's intent to provide medical care, and the
fact that she provided treatment – reflects that Ms. Riley's
examination was not testimonial.  Even though the Court of Criminal
Appeals proceeded directly to the question of harmlessness, the
court concludes that Ms. Riley's recitation of Tierra's responses
did not violate <u>Crawford</u>.  <u>See</u> <u>Giles v. California</u>, 554 U.S. 353,

-28-

359 (2008) (suggesting in dicta that "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules," because they are not "testimonial within the meaning of the Confrontation Clause").[9]

Holiday argues that, even if the statements were not testimonial, "they lacked sufficient indicia of reliability and were not properly excepted from exclusion under the hearsay rule." (Docket Entry No. 12 at 42)  A violation of state hearsay rules is not cognizable on federal habeas review.  See Jones v. Cain, 600 F.3d 527, 536 (5th Cir. 2010).  Further, Holiday has not provided any reason to believe that Ms. Riley's testimony was not reliable or trustworthy.  In sum, Holiday has not shown that the State

---

[9]Even if the comments were testimonial, other common-law principles may still have made them admissible.  The Confrontation Clause is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."  Crawford, 541 U.S. at 54.  The Supreme Court has acknowledged that the common-law doctrine of "forfeiture by wrongdoing permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant."  Giles v. California, 554 U.S. 353, 359 (2008) (citations omitted).  This doctrine "applied only when the defendant engaged in conduct designed to prevent the witness from testifying."  Giles, 554 U.S. at 359.  "Such 'wrongful conduct' includes but is not limited to murdering a witness."  United States v. Jackson, 706 F.3d 264, 267 (4th Cir. 2013).  The State based its case on showing that Holiday killed, in part, to silence Tierra.  Holiday said before the murder that he was not "going to take the rap" in the sexual assault case and that he was "going to take care of it."  The prosecution argued that Holiday killed "to keep from going to prison on these rape charges."  Tr. Vol. 32 at 36.  Because Holiday "intended to prevent a witness from testifying," Crawford would not preclude the admission of Tierra's statements.  Giles, 554 U.S. at 361.

violated his Confrontation Clause rights by adducing Ms. Riley's testimony.   On that basis alone, Holiday has not shown an entitlement to habeas relief.

   3.   Harmless Error

The Court of Criminal Appeals limited its discussion to whether Ms. Riley's testimony harmed Holiday.  Evidence improperly admitted under Crawford "is subject to the doctrine of harmless error." United States v. Hall, 500 F.3d 439, 443 (5th Cir. 2007); see also Bullcoming v. New Mexico, ___ U.S. ___, 131 S. Ct. 2705, 2719 n.11 (2011) (finding Confrontation Clause error and noting that "nothing in this opinion impedes a harmless-error inquiry on remand").  A federal habeas court assesses the prejudicial impact of Crawford error under the "substantial and injurious effect" standard of Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Fry v. Pliler, 551 U.S. 112, 119 (2007).  In looking at the alleged error, federal courts

> consider the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

United States v. Edwards, 303 F.3d 606, 623 (5th Cir. 2002) (quoting Hafdahl v. Johnson, 251 F.3d 528, 539-40 (5th Cir. 2001)).  "The Court must find that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." Coleman, 525 U.S. at 504.

-30-

Here, unquestionably admissible evidence conclusively showed that someone had sexually assaulted Tierra. The Court of Criminal Appeals observed that evidence strongly, almost overwhelmingly, pointed to Holiday as the perpetrator:

> The statements did not inject any new facts or embellish the facts to any extent beyond that testified to by other witnesses. Wilkerson testified that she suspected Holiday when she discovered the bloody panties. Al-Himyary testified that Wilkerson informed him that she suspected Holiday of abusing Tierra. Wilkerson testified that she filed charges against Holiday, that she received a protective order against him, that he was evicted from her home, and that he was indicted for sexually assaulting Tierra. There was testimony from several witnesses referring to the pending charges.

Opinion on Direct Appeal at 17-18.

On those facts, the Court of Criminal Appeals found that Ms. Riley's testimony "did not provide any new or more prejudicial information than was admitted on the issue from other sources." Instead, "abundant evidence established his commission of the sexual assault" and "[t]he challenged statements only served to reemphasize the strong indications that Holiday had been the one to sexually assault Tierra." Opinion on Direct Appeal at 17-18.

The Court of Criminal Appeals correctly found that ample evidence independent of Ms. Riley's testimony pointed to Holiday as the one who sexually assaulted young Tierra. The evidence of sexual assault only placed the capital murders in context. Whether or not the jury knew that Tierra had identified Holiday as the one who sexually assaulted her, strong evidence established Holiday's actions on the night of the murder. Ms. Riley's testimony did not

influence the main issue for the jury's consideration – Holiday's intent to kill.  The court concludes that Ms. Riley's testimony did not have a substantial or injurious effect on the jury's verdict.

As Holiday has not shown that the admission of Ms. Riley's testimony was constitutional error or harmful, the court will deny these claims.

**D.    The Indictment   (claims 5 and 6)**

Holiday's fifth and sixth grounds for relief argue that the indictments against him were constitutionally defective.  The State of Texas brought three charges of capital murder against Holiday in three separate indictments.  Each indictment alleged that Holiday had "intentionally or knowingly cause[d] the death of [the named victim] by burning said individual with fire."[10]  Trial counsel repeatedly moved to quash the indictments on various grounds. Holiday contends that the State violated his Fifth, Sixth, and Fourteenth Amendment rights because the indictments failed to specify the manner and means by which Holiday ignited the fire. Also, Holiday claims that the indictments should have specified that Ms. Mitchell acted as a conspirator or party to the offense because she spread gasoline throughout the house.[11]

_____

[10]Texas law at that time allowed for a capital conviction when an individual "murders more than one person . . . during the same criminal transaction" or "murders an individual under six years of age."  TEX. PENAL CODE § 19.03.

[11]When Holiday raised these claims on direct appeal, the Court of Criminal Appeals affirmed on procedural and substantive grounds.
(continued...)

The Court of Criminal Appeals found no merit to Holiday's complaint that the indictment provided insufficient guidance on how Holiday killed.   The Court of Criminal Appeals held:

> The charging instrument must be specific enough to inform a defendant of the nature of the accusations against him so that he can prepare a defense.   The indictments in this case specifically allege that Holiday intentionally or knowingly caused the victims' deaths "by burning with fire."   By alleging how the victims died – by being burned in a fire – and alleging that Holiday acted intentionally or knowingly in causing such deaths, the State provided enough information to allow Holiday to conduct the necessary investigation to prepare his defense.   The trial court did not err in overruling the motion to quash on these grounds.

Opinion on Direct Review at 19.

Federal constitutional law places few requirements on a State's method of charging crimes.   Federal courts will only "consider the sufficiency of the indictment as a basis for habeas relief if the mistake in the indictment is so fatally defective that it deprives the convicting court of jurisdiction." Riley v. Cockrell, 339 F.3d 308, 313-14 (5th Cir. 2003); see also McKay v. Collins, 12 F.3d 66, 68 (5th Cir 1994); Johnson v. Estelle, 704

---

[11](...continued)
The Court of Criminal Appeals refused to consider any defect relating to a parties-liability theory, because "there was no parties issue presented in this case" and "Holiday did not make the parties argument to the trial court." Thus, the Court of Criminal Appeals "decline[d] to address th[at] aspect of Holiday's claim." Opinion on Direct Appeal at 18.   In essence, the Court of Criminal Appeals found that Holiday had waived appellate review of that portion of his defective-indictment claim by failing to make a specific trial objection.   See TEX. CODE CRIM. PRO. art. 1.14(b). Respondent does not argue that the Court of Criminal Appeals' reliance on TEX. CODE CRIM. PRO. art. 1.14(b) operates as a procedural bar to federal review.

F.2d 232, 236 (5th Cir. 1983).   Even "fail[ing] to include an essential element of the crime charged, which constitutes a defect of substance, does not deprive the trial court of jurisdiction." McKay, 12 F.3d at 69.   The Court of Criminal Appeals considered Holiday's challenge to the indictment and found no jurisdictional defect.   No federal constitutional concern, therefore, arises with respect to his indictment.   See Wood v. Quarterman, 503 F.3d 408, 412 (5th Cir. 2007); Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985).

To the extent federal courts may assess whether an indictment sufficiently notified a criminal defendant of the charges he would face, federal courts heavily defer to a state-court finding that the indictment was sufficient.   The Fifth Circuit has observed that the state court's holding that "the indictment [was] not fundamentally defective should end the inquiry."   Alexander, 775 F.2d at 599; see also Morlett v. Lynaugh, 851 F.2d 1521, 1523 (5th Cir. 1988).   Here, the Court of Criminal Appeals found that the indictments sufficiently advised Holiday of the charges against him by saying he killed by "burning with fire."   Holiday has not shown that state law required more.   Similarly, Holiday has not shown that state law required the designation of Ms. Mitchell as a party in the indictment, or elsewhere.   Thus, the indictments were not "so fatally defective that under no circumstances could a valid conviction result from facts provable[.]"   Liner v. Phelps, 731 F.2d 1201, 1203 (5th Cir. 1984).   The state court's rejection of

-34-

this claim was not contrary to, or an unreasonable application of,
federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).

**E.    Refusal to Instruct Jurors on the Results of Deadlock (claim 7)**

Once the jury found Holiday guilty of capital murder, only two
sentences were possible:  life imprisonment or death.  The jury
decided  Holiday's  fate  by  answering  Texas's  special-issue
questions.  If the jury answered the future-dangerousness issue
"yes" and found no mitigating circumstances, Holiday would receive
a  death  sentence.   If  the  jury  answered  the  special  issues
otherwise, or if they could not arrive at an answer, Holiday would
receive a life sentence.  In a requirement called the "10-12" or
"12-10" rule, the trial court informed the jury that any answer to
Texas's special issues which could result in a death sentence must
be unanimous, but that ten or more jurors would have to agree on
any answer supporting a life sentence.  Texas law prevented the
jury from being informed that failing to reach the required
consensus on either special issue would still result in a life
sentence.

Holiday argues that <u>Mills v. Maryland</u>, 486 U.S. 367 (1988),
required that jurors be informed that any failure to answer the
special issues would lead to a life sentence.  The Supreme Court
has described the <u>Mills</u> decision as follows:

> [In Mills] we reversed a death sentence imposed under
> Maryland's capital punishment scheme because the jury
> instructions and verdict form created "a substantial
> probability that reasonable jurors . . . well may have
> thought  they  were  precluded  from  considering  any

> mitigating evidence unless all 12 jurors agreed on the
> existence of a particular such circumstance." We
> reasoned that allowing a "holdout" juror to prevent the
> other jurors from considering mitigating evidence
> violated the principle established in Lockett v. Ohio,
> 438 U.S. 586 (1978), that a sentencer may not be
> precluded from giving effect to all mitigating evidence.

McKoy v. North Carolina, 494 U.S. 433, 439-440 (1990); see also

Druery v. Thaler, 647 F.3d 535, 542-43 (5th Cir. 2011). Holiday

argues that Texas violates Mills because it "mislead[s] jurors

about their individual ability to give effect to mitigating

circumstances[.]" (Docket Entry No. 22 at 6)

The Fifth Circuit has repeatedly held that "the Texas 12-10

rule does not run afoul of . . . Mills." Parr v. Thaler, 481

F. App'x 872, 878 (5th Cir. 2012); see also Druery, 647 F.3d at

542-43; Greer v. Thaler, 380 F. App'x 373, 389 (5th Cir. 2010);

Miller v. Johnson, 200 F.3d 274, 288 (5th Cir. 2000); Alexander v.

Johnson, 211 F.3d 895, 897 n.5 (5th Cir. 2000); Woods v. Johnson,

75 F.3d 1017, 1036 (5th Cir. 1996); Webb v. Collins, 2 F.3d 93, 96

(5th Cir. 1993). The Fifth Circuit reasons that "the instruction at

issue is wholly dissimilar to that involved in Mills." Woods, 75

F.3d at 1036. "Under the Texas system, all jurors can take into

account any mitigating circumstance. One juror cannot preclude the

entire jury from considering a mitigating circumstance." Jacobs v.

Scott, 31 F.3d 1319, 1329 (5th Cir. 1994); see also Hughes v.

Johnson, 191 F.3d 607, 625 (5th Cir. 1999).[12]

---

[12]Holiday tries to distinguish the Fifth Circuit law by arguing
that prior cases only considered the effect of the 12-10 rule on
(continued...)

-36-

Moreover, given the differences between the circumstances in Mills and the Texas statute, the Fifth Circuit has held that granting habeas relief on a 12-10 claim would require the creation of new constitutional law in violation of the non-retroactivity principle from Teague v. Lane, 489 U.S. 288 (1989). See Druery, 647 F.3d at 542–45 (citing numerous Fifth Circuit cases). Accordingly, Holiday's jury-deadlock claim is both Teague-barred and without merit. The state court's rejection of this claim, therefore, was not contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

## F.   The Denial of Two Challenges for Cause   (claims 8 and 9)

Holiday argues that the trial court violated his constitutional rights when it denied his challenges for cause against prospective jurors Linda Masters and Kenny Penny. With regard to Ms. Masters, the defense objected that she would always answer "yes" to the future dangerousness special issue and had a faulty understanding of her duty as a juror. Tr. Vol. 15 at 186. Trial counsel sought to remove Mr. Penny for cause because he allegedly would not consider Holiday's state of mind as a mitigating factor. Tr. Vol. 20 at 119. After the trial court

_____

[12](...continued)
cases arising after the Texas legislature adopted a new, more-comprehensive mitigation special issue in 1991. See Tex. Code Crim. Pro. art. 37.071. The Fifth Circuit, however, has rejected challenges to the 12-10 rule in cases arising well after the 1991 statutory revision. See Parr, 481 F. App'x at 878.

denied his challenges, Holiday removed both objectionable jurors from the panel by peremptory strike.  Tr. Vol. 15 at 186; Vol. 20 at 120.  Holiday complains that the trial court's refusal to excuse these jurors for cause violated his constitutional rights.

The Court of Criminal Appeals considered these claims on direct appeal.  Reviewing the context of the questioning and the record as a whole, the Court of Criminal Appeals held that the trial court had not abused its discretion in denying the challenges for cause.  Opinion on Direct Appeal at 22-25, 27-28.

Holiday renews these claims on federal review.  Whether or not the trial court should have excused the two jurors, Holiday's peremptory strikes removed them "from the jury as effectively as if the trial court had excused [them] for cause."  Ross v. Oklahoma, 487 U.S. 81, 86 (1988).  When the defense uses peremptory challenges against potential jurors that the trial court refuses to dismiss for cause, "[a]ny claim that the jury was not impartial . . . must focus not on [the peremptorily-challenged jurors], but on the jurors who ultimately sat."  United States v. Martinez-Salazar, 528 U.S. 304, 317 (2000); see also Ross, 487 U.S. at 88; United States v. Snarr, 704 F.3d 368, 386-87 (5th Cir. 2013).  "[N]o violation of [a defendant's] Sixth Amendment right to an impartial jury or his Fourteenth Amendment right to due process" flows when "no member of the jury as finally composed was removable for cause[.]"  Rivera v. Illinois, 556 U.S. 148, 158 (2009).  This court's focus "begins and ends" with a determination of whether

-38-

those jurors who served possessed "views [that] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Witt, 469 U.S. at 424 (quotation omitted); see also Jones v. Dretke, 375 F.3d 352, 356 (5th Cir. 2004).

Holiday has not identified any juror whose service violated the federal constitution.  Absent an allegation that the jury who heard his case was not impartial, his claim of trial court error fails under Ross.  Holiday, therefore, has not shown any constitutional violation.  The court will deny claims 8 and 9.

## G.  Testimony from Dr. John DeHaan (claims 10, 40 through 45, and 50 through 53)

Holiday raises several claims relating to forensic scientist Dr. John DeHaan's trial testimony.  The State retained Dr. DeHaan to investigate the ignition and course of the flames that destroyed Ms. Wilkerson's house.  Dr. DeHaan's testimony was especially important to the State because (1) he excluded appliances as an ignition source; (2) he opined that burns on Holiday's hands were consistent with the State's theory that he bent down to light the gasoline; and (3) he suggested that Holiday himself may have spread additional gasoline unobserved by Ms. Mitchell, bolstering the State's argument that Holiday intended to kill the children.

Prior to Dr. DeHaan's testimony before the jury, the parties and the trial judge extensively questioned him regarding his expertise and how he arrived at his conclusions.  Tr. Vol. 36 at

-39-

93-136.   Dr. DeHaan explained that his 20 years in fire investigation allowed him to conduct hundreds of relevant experiments.  He described the scientific principles that govern fire examination and the techniques underlying fire-scene analysis.[13]

_____

[13]The Court of Criminal Appeals summarized his examination as follows:

. . . DeHaan, a forensic scientist, had worked as a criminologist for thirty-three years; for the past twenty years his focus had been on fire and explosion investigations or laboratory analysis.  He testified that fire is a chemical process governed by certain fixed rules of chemistry and physics.  He testified that the basic principles governing fire behavior are generally absolute, but the conditions surrounding a particular fire are variable.  He stated that predictions and conclusions can be made about a particular fire based upon the basic governing principles and how other fires within similar conditions have responded.

DeHaan further testified that, in his research involving fires and explosions, a large percentage of his time had been spent setting fires in various settings and under different conditions and reconstructing fires in order to test and evaluate the principles under varying conditions.  DeHaan testified that in twenty-five years of conducting such research and analysis, he had orchestrated and set about five hundred structure fires, one hundred and twenty vehicle fires, and about two hundred small-scale tests involving furniture and fuels. He explained that the process of gathering information and assessing evidence during a fire investigation begins with observations from witnesses.  He also testified that it includes:  (1) gathering information from the scene, such as the amount of damage, the time frames of detection, suppression, and extinguishment; (2) testing various possibilities as to manner and location of ignition; (3) assessing the way the fire spread and its time frames; (4) studying the physical evidence; and (5) testing and retesting the possibilities to establish the reliability of the various indicators to arrive at a conclusion about the ignition.  DeHaan testified that
(continued...)

-40-

Trial counsel vigorously tried to exclude Dr. DeHaan's testimony. The defense objected that Dr. DeHaan's opinion that appliances were not the ignition source lacked a valid scientific basis. The defense challenged the relationship between Dr. DeHaan's field of expertise and some of his conclusions, such as those involving how gas vapors spread. The defense also attacked Dr. DeHaan's proposed testimony that Holiday had experienced injuries consistent with having ignited the fire. The trial court overruled the defense's objections and allowed Dr. DeHaan to testify as an expert witness.

On direct appeal, Holiday claimed that Dr. DeHaan did not base his testimony on trustworthy scientific principles. Looking at Texas's requirements for reliable expert testimony,[14] the Court of

---

[13](...continued)
this method of gathering information, reviewing the physical evidence, and testing possibilities is used in a "very high percentage" of fire investigations and is a valid process that has been verified through numerous tests, training exercises, and demonstration fires. DeHaan testified that he properly applied these established and verified techniques in making his determination in the instant case.

Opinion on Direct Review at 33-35.

[14]The Court of Criminal Appeals observed:

A number of factors may be helpful to the trial court in assessing reliability, including the following non-exclusive list:

(1)   the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained,

(continued...)

Criminal Appeals held that "the State met its burden in showing that DeHaan's testimony was reliable." Opinion on Direct Appeal at 35. The Court of Criminal Appeals noted that Dr. DeHaan's testimony was reliable because he had shown that his "technique is well-accepted as valid, explain[ed] the theory and technique with clarity and focus, show[ed] evidence of his experience and training, and explain[ed] how he applied those to his investigation of the instant case." Opinion on Direct Appeal at 35. Although Dr. DeHaan had explained that "some speculation is involved in attempting to reconstruct a scene that was destroyed by fire, or in assessing a burn injury based upon numerous variables," concern about those conclusions "goes to the weight of DeHaan's testimony and not its admissibility." Thus, the Court of Criminal Appeals found that "[t]he trial court did not abuse its discretion in concluding that DeHaan's testimony had a reliable scientific basis." Opinion on Direct Appeal at 35-36.

---

[14](...continued)

(2)   the existence of literature supporting or rejecting the underlying scientific theory and technique,

(3)   the clarity with which the underlying scientific theory and technique can be explained to the court,

(4)   the potential rate of error of the technique,

(5)   the availability of other experts to test and evaluate the technique,

(6)   the qualifications of the expert(s) testifying, and

(7)   the experience and skill of the person(s) who applied the technique on the occasion in question.

Opinion on Direct Appeal at 33.

On state habeas review Holiday raised several claims based on Dr. DeHaan's testimony.  Holiday has renewed those claims in his federal habeas petition.  Holiday argues that:

- the trial court violated the due process clause by allowing Dr. DeHaan's testimony to exclude other ignition sources and to opine that Holiday had injuries "consistent with" lighting the gasoline (claim 10);

- the State presented false or misleading testimony through Dr. DeHaan (claims 40, 41);

- Dr. DeHaan's unreliable scientific conclusion undermined the fundamental fairness of the fact-finding process (claims 42, 43);

- the State withheld evidence that could have impeached Dr. DeHaan's testimony (claims 44, 45); and

- the State presented false and misleading evidence through Dr. DeHaan regarding applicability of his doctoral thesis to the issue of broiler pilot light ignition (claims 50-53).

Before considering each claim individually, the court will discuss whether Holiday has shown prejudice flowing from the claims attacking Dr. DeHaan's testimony.

1.  <u>Prejudice from Dr. DeHaan's Testimony</u>

Habeas relief only becomes available on each of Holiday's challenges after a sufficient showing of harm.  Whether under the materiality standard associated with false-testimony claims[15] or the

---

[15]<u>See</u> <u>Nobles v. Johnson</u>, 127 F.3d 409, 415 (5th Cir. 1997) ("False evidence is 'material' only 'if there is any reasonable likelihood that [it] could have affected the jury's verdict.'").

general showing of harm for due-process violations[16] a defendant must still prove that the complained-of error influenced his conviction.

The entire context of the case before the jury frames Holiday's challenge to the expert testimony. The State used Dr. DeHaan's testimony to confirm that Holiday intended to kill the children by lighting the gasoline. Regardless of Dr. DeHaan's opinion, the jury had before it strong evidence suggesting that Holiday intended to set Ms. Wilkerson's house on fire with the children inside. Holiday made violent comments foreshadowing the murders, including saying that he would burn down Ms. Wilkerson's house. He had already attempted to light a car on fire while the children were inside. He fired a weapon around the girls and repeatedly threatened to kill everyone. He forced the children into a house that he was "going to burn . . . down with everyone in it." He ordered Ms. Mitchell to spread gasoline throughout the house. Once the fire started, he stood watching while the flames consumed the house and burned the children to death.

Dr. DeHaan's testimony was not the only indication that Holiday lit the gasoline. All of Holiday's complaints involving Dr. DeHaan depend on disbelieving Ms. Mitchell's testimony that she

---

[16]See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (requiring an inmate to show that the trial court's error had a "substantial and injurious effect or influence in determining the jury's verdict").

saw him bend down immediately before the fire started.  Holiday has repeatedly disparaged her testimony because she did not mention that fact each time she described the events of that evening.  But Holiday has not shown that she lied to the jury.  The jury could reasonably conclude that Holiday intended to ignite the gasoline without Dr. DeHaan's testimony.

Even in light of Holiday's "expert testimony that there were other possible ignition sources," FFCL at 24, and keeping in mind that the "jury was free to accept or reject all or portions of Dr. DeHaan's . . . testimony," FFCL at 35, "[t]he contrary evidence is not so strong that the jury could not have found intent or knowledge beyond a reasonable doubt," Opinion on Direct Appeal at 8.  Removing Dr. DeHaan's testimony from the evidentiary picture, the evidence was "sufficient to support a finding that [Holiday] intentionally or knowingly caused the death of the children . . . by burning them in a fire, as opposed to accidentally starting the fatal fire."  FFCL at 24.  Holiday has therefore not shown that the alleged constitutional errors in the admission of Dr. DeHaan's testimony had a prejudicial effect on the jury's consideration of the evidence.

### 2.   Challenges to Dr. DeHaan's Testimony

Holiday has not shown that the trial court erred in admitting Dr. DeHaan's testimony.  In his tenth claim Holiday asserts that the trial court violated his due process rights because "[t]he

-45-

State failed to offer clear and convincing evidence that the scientific principles of fire cause and origin were properly applied to reach the witness's conclusions." The state courts examined the scientific basis for Dr. DeHaan's testimony and found it admissible. Federal courts "may not consider the correctness of the evidentiary rulings of the Texas courts," but may only decide "whether there has been a constitutional infraction of [the inmate's] due process rights which would render the trial as a whole 'fundamentally unfair.'" Trussell v. Estelle, 699 F.2d 256, 259 (5th Cir. 1983). Given Dr. DeHaan's wide experience, Holiday has not shown constitutional error in the state court's finding that his "credentials qualify him as an expert witness in the investigation of fires and explosions." FFCL at 26. Holiday has not shown that the introduction of Dr. DeHaan's testimony was fundamentally unfair.

Nor has Holiday shown that the State presented misleading or false testimony through Dr. DeHaan's questioning. In claims 40 and 41 Holiday focuses on his opinion that appliances or other sources could not have ignited the gasoline vapors. Holiday reasons that Dr. DeHaan's opinion was false because:

- a Certified Fire Investigator for the Bureau of Alcohol, Tobacco and Firearms before trial could not rule out appliances as ignition sources;[17]

---

[17]That expert, David Opperman, testified for the State as a rebuttal witness. He had been in the courtroom during Dr. DeHaan's testimony and agreed with his conclusions. Tr. Vol. 40 at 65.

- numerous academic articles document the accidental ignition of gasoline vapors by a pilot light;

- industry and government organizations have also documented accidental ignitions;

- testing data has confirmed "the real possibility that gasoline vapors resulting from a limited gasoline spill occurring several feet from a pilot light can result in fire in less than one minute" (Docket Entry No. 12 at 188);

- Dr. DeHaan's testimony mentioned a "candle experiment" he conducted involving gasoline vapors that Holiday contends did not follow scientific rigor; and

- in state habeas court Holiday presented an affidavit from Dr. Gerald Hurst, a consultant in explosion and fire analysis, who criticized Dr. DeHaan's conclusions.

State Habeas Record at 240-255.[18]  Based on those factors, Holiday argues that Dr. DeHaan's "conclusion[s] do not follow from an application of the scientific method in excluding possible sources of fire, and the falsity or misleading nature of this testimony would have been reasonably apparent to DeHaan, and any other individual trained in the scientific method to examine the causation for fires."  (Docket Entry No. 12 at 188)

"It is well settled that the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected."  Moody v. Johnson, 139 F.3d 477, 484 (5th Cir. 1998); see also United States v. Agurs, 427 U.S. 97, 110-11 (1976).

---

[18]Holiday's federal petition also relies on the "Affidavit of Gerald Hurst, Ph.D.," which he lists as "Exhibit 'H.'"  Holiday did not attach exhibits to his federal petition.

"[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" Giglio v. United States, 405 U.S. 150, 153 (1972) (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)). To succeed on these claims, Holiday must show that (1) Dr. DeHaan's testimony was actually false, (2) the testimony was material, and (3) the prosecution knew the testimony was false. See Fuller v. Johnson, 114 F.3d 491, 496 (5th Cir. 1997).

Holiday has not shown that Dr. DeHaan's testimony was false, much less that the prosecution knew of its falsity. At best, Holiday has shown that expert witnesses may disagree about the application of relevant scientific principles. The state habeas court extensively reviewed Dr. DeHaan's testimony and its relationship to science. The state habeas court emphasized that the State's rebuttal witness, whose credentials Holiday does not challenge, testified that Dr. DeHaan's "testing procedures met the criteria of scientific fire investigation" and that "he agreed with Dr. DeHaan's conclusions." FFCL at 31. The state habeas court concluded that Dr. DeHaan's "testimony was reliable, based on a reliable scientific basis, and was not false or misleading." FFCL at 35. While other experts may disagree with his conclusions, Holiday has not shown that the state habeas court was unreasonable in finding that the State did not knowingly present false testimony.

Claims 44 and 45 argue that the State "withh[e]ld evidence tending to impeach the state's witness John DeHaan." (Docket Entry No. 180)   Holiday does not point to any evidence, witness, or specific item suppressed by the State.   Referring to a report entitled "Briefing Package for Gas-Fired Water Heater Ignition of Flammable Vapor" produced by the Consumer Product Safety Commission, Holiday seems to argue that the prosecution did not divulge that some scientific testing undercut that performed by Dr. DeHaan.   (Docket Entry No. 12 at 189-90)   The state habeas court, however, correctly observed that "the State cannot suppress published reports, studies, or scientific information."   FFCL at 35.   Holiday has not shown that the prosecution suppressed any information.

Finally, Dr. DeHaan's testimony referred to his doctoral thesis – "The Reconstruction of Fires Involving Highly Flammable Hydrocarbon Liquids" – when considering whether the broiler pilot may have ignited the flames.   In claims 50 through 53, Holiday alleges that Dr. DeHaan gave false testimony when he considered the discrete facts of his case in the context of his doctoral thesis. Holiday admits, however, that he has not "review[ed] the thesis" and not "specifically determine[d] the extent to which it is applicable to the issues at trial, or whether it is inconsistent with the testimony and/or evidence." (Docket Entry No. 12 at 209)[19]

_____

[19]Holiday's state habeas counsel included the same statement, word-for-word, in the state habeas application.   State Habeas
(continued...)

Holiday's speculation about one minor theme in Dr. DeHaan's testimony cannot give rise to habeas relief.

Having considered the whole of Holiday's challenges to Dr. DeHaan's testimony, the court finds no constitutional error, much less harm. The state court's rejection of these claims was not contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

## H.   The State Presented False and Misleading Evidence Regarding "Pour Patterns" (claims 46 through 49)

Holiday argues that the prosecution presented false and misleading testimony through the testimony of State Fire Marshall's Office Investigator Harry Bowers. Holiday explains:

> During the investigation, State Fire Marshall's Office Investigator Harry Bowers prepared several diagrams of the arson scene as well as prepared a report based on his investigation of the crime scene. Within the report, Bowers stated that investigators had identified from an examination of burn patterns on the concrete slab specific pour patterns extending from the front door of the house to the couch area, behind the couch, then to the area of the space heater.

(Docket Entry No. 12 at 201) Holiday alleges that the State presented false testimony when "Bowers attribut[ed] these pour patterns to Holiday because witness Beverly Mitchell had denied pouring gasoline in these areas." (Docket Entry No. 12 at 201) According to Holiday, the State relied on the "necessary inference from Holiday having allegedly pour[ed] gasoline within this area,

_____

[19](...continued)
Record at 79. Holiday has apparently still not investigated the substance of the published report.

. . . on and near the couch containing the three decedents, . . . that he intended to immolate them along with the house." (Docket Entry No. 12 at 202)[20]

Holiday argues that the irregular markings found on the concrete slab did not indicate areas where gasoline had been poured. Holiday bases this argument on an affidavit from Dr. Gerald Hurst, a consultant in the field of explosion and fire analysis. State Habeas Record at 240. Dr. Hurst labeled Mr. Bowers' testimony a "scientifically unreliable opinion[]" because "[t]he burn patterns on the slab cannot be relied upon as a basis to conclude that Mr. Holiday, or anyone else[,] poured gasoline in those areas." State Habeas Record at 249, 250. According to Dr. Hurst, other sources such as burning debris on the floor could have caused the contested markings. Thus, Holiday alleges that the State presented false (or at least unreliable) evidence through Bowers' testimony about pour patterns.

The state habeas court found this claim to be without merit. The state habeas court observed that Mr. Bowers "never referred to 'pour patterns'" during his testimony. FFCL at 36. While he did

---

[20]Holiday argues that Mr. Bowers'

testimony regarding "pour patterns" on the slab, taken in conjunction with Beverly Mitchell's testimony about the locations in the house in which she poured gasoline leads to a clear inference that the specific "pour patterns" leading into the house from the front door, and by the couch resulted from Holiday having pouring [sic] gasoline in those areas.

(Docket Entry No. 12 at 202)

-51-

point out "irregular burn patterns" in several areas of the house,
FFCL at 35, Mr. Bowers later clarified that "irregular burn
patterns alone do not tell the origin and cause of a fire[.]"  FFCL
at 36.  The state habeas court found that Mr. Bowers "did not rely
on burn patterns to determine the origin of the fire in the instant
case" and "neither testified nor implied that the irregular burn
patterns supported or established the State's theory that [Holiday]
started the fire[.]"  FFCL at 36-37.  In fact, Holiday "fail[ed] to
show that Bowers' testimony concerning his observation of irregular
burn patterns on the slab established or attempted to establish the
origin of the fire."  FFCL at 56.

Holiday has made no effort to show that the state fact
findings were incorrect, much less that the adjudication of this
claim was unreasonable.  Instead, Holiday copied this claim nearly
word-for-word from his state habeas application without making any
attempt to identify errors in the state court's reasoning or to
meet the AEDPA standard.  Because Holiday has not shown that the
state court's decision was contrary to or involved an unreasonable
application of federal law, the court will deny relief.  See 28
U.S.C. § 2254(d)(1).

## I.   Admission of Extraneous Evidence in the Guilt/Innocence Phase (claim 11)

Holiday argues that the State violated his constitutional
rights by adducing testimony during the guilt/innocence phase about
his sexual assault of Tierra.  Before trial the State indicated

that it intended to place the murder into context by presenting evidence that Holiday had sexually assaulted Tierra.  The State argued that "the fact that he had raped the child and the fact that he had been indicted for raping that child . . . provided a motive for Mr. Holiday to go out and do what he did . . . in burning these three children to death."  Tr. Vol. 32 at 26-28.

Generally, Texas does not permit the admission of extraneous offenses in the guilt/innocence phase.  Such evidence, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]"  TEX. R. EVID. 404(b).  Even so, the trial court may still exclude such evidence if "its probative value is substantially outweighed by the danger of unfair prejudice."  Id.

Holiday offered to stipulate that he faced criminal charges and that Tierra had suffered injuries consistent with the crime. Tr. Vol. 32 at 52-53, 119-20.  Holiday further objected that the prejudicial effect of any testimony about the sexual assault outweighed its probative value.  Tr. Vol. 32 at 53.  The trial court denied the defense's objection and allowed the sexual-assault evidence to come before the jury.

The prosecution called several witnesses to describe how Ms. Wilkerson found out that Holiday had sexually assaulted her daughter, how she kicked him out of the house, and that she informed the authorities.  Medical personnel described forensic

-53-

evidence verifying the evidence of sexual assault.  Ms. Riley related comments Tierra had made that incriminated Holiday.  The prosecution alleged that Holiday committed murder both because "he does not want to go to prison on these rape charges" and because Ms. Wilkerson "is responsible for all the bad things in his life and he is going to make her pay for it."  Tr. Vol. 41 at 38-39.

Holiday argues that the trial court violated the Fourteenth Amendment "[b]y allowing the evidence of extensive details [of the sexual assault] and by not requiring the State to accept Holiday's offer of stipulation[.]"  (Docket Entry No. 12 at 86)  The admission of evidence in state court, however, rarely causes federal constitutional concern.  See Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998); Derden v. McNeel, 978 F.2d 1453, 1458 (5th Cir. 1992).  Due process problems only arise when evidentiary rulings are "so unduly prejudicial that [they] render[ed] the trial fundamentally unfair[.]"  Payne v. Tennessee, 501 U.S. 808, 825 (1991).

The court concludes that discussion of the prior sexual assault during the guilt/innocence phase of the trial was not fundamentally unfair.  Holiday has not shown that the admission of the sexual-assault evidence violated Texas state law, much less the federal constitution.[21]  Holiday's sexual assault of Tierra set into

[21]On direct appeal, the Court of Criminal Appeals held that the trial court did not err in admitting the testimony, especially since the prosecution bore no duty to accept the defense's offer to stipulate:

(continued...)

motion a series of circumstances leading to his actions on the
night of the murder.   In connecting a line from the extraneous
sexual assault to the murders, the State did not cross an
impermissible boundary that violated fundamental fairness.   Even if

---

[21](...continued)
     The extraneous-act evidence here was offered
primarily to show Holiday's motive in the instant
offense.   Part of the State's theory of the case was that
Holiday committed the murders because he was very worried
about the pending sexual assault charges, he did not want
to go to jail, and he was angry at Wilkerson for filing
the charges and having him removed from the house.
Holiday told others that Wilkerson and her alleged
boyfriend were "setting him up" and were trying to take
the children away from him, and he stated that he was not
going to "take the rap," suggesting that the sexual
assault charges against him were untrue.   Although the
sexual assault may not have been so intertwined with the
murders as to "form an indivisible criminal transaction,"
it was Wilkerson's discovery of Tierra's injuries that
set into motion Holiday's downward spiral that culminated
in the murders.   The details of the sexual assault and
the nature of Tierra's injuries were critical to an
understanding of the force behind Holiday's actions.   The
strength of the State's evidence against Holiday on the
sexual assault charges explains his motive for acting.

Opinion on Direct Appeal at 45.   The Court of Criminal Appeals also
rejected Holiday's argument that the sexual-assault evidence was
more prejudicial than probative:

     There is always a danger that admission of
extraneous offenses, and particularly the details of such
offenses, may improperly divert the jury from the charges
at hand or present significantly more prejudice than
evidentiary value.   But the evidence here was important
to understanding the context of and motivation behind
Holiday's actions, and was not so embellished or detailed
as to become a diversion from the issues presented.
Although the evidence was highly prejudicial, it was also
highly probative of the chain of events that drove
Holiday's actions in the instant case.

Opinion on Direct Appeal at 46.

Holiday could show that Texas state law should have barred any testimony about the sexual assault, he has not shown that its admission meets the high standards required for federal habeas relief.  The court will deny Holiday's eleventh claim.

## J.   **Texas's Law of the Parties   (claim 12)**

Holiday claims that the trial court violated his constitutional rights by not instructing the jury on Texas's law of the parties.  Under Texas law "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."  TEX. PENAL CODE § 7.01.[22]  Holiday wanted the jury to consider whether Ms. Mitchell was a party to the murders.  Holiday complained, as he does on federal review, that "[t]hese charges did not include any instruction concerning the law of parties, which Holiday wanted because there was sufficient record evidence that Beverly Mitchell caused arson and the deaths." (Docket Entry No. 12 at 89)

On direct appeal the Court of Criminal Appeals accurately described Ms. Mitchell's part in the circumstances leading up to the murders:

> The evidence showed that Holiday terrorized Mitchell, Keller, and the three children at gunpoint,

---

[22]A defendant is guilty under a conspiracy liability theory if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]"  TEX. PENAL CODE § 7.02(b).

> made repeated threats of violence and murder, and
> randomly shot off the guns. At one point he held
> Mitchell in a head-lock with a gun to her head. He
> forced her into her car to retrieve more gasoline and
> then ordered her to pour it around the house.

Opinion on Direct Review at 47. Based on those facts, the Court of

Criminal Appeals held that

> Mitchell was not a party because Mitchell could not have
> been convicted of the offenses. Acting under duress and
> at gunpoint, she did not possess the requisite mental
> state to be charged with the offenses. Because Mitchell
> was not acting as a party within the meaning of party
> liability, the trial court did not err in overruling
> Holiday's objections and denying his request.

Opinion on Direct Review at 47.

Holiday has not shown that Ms. Mitchell, who herself was a

victim and acted only under duress, was a party to the capital

murder. As observed by Respondent, "Holiday's actions – in

terrifying a grandmother into doing his bidding while under threat

of death – do nothing to diminish his culpability." (Docket Entry

No. 16 at 46-47) Holiday has not shown that the Court of Criminal

Appeals misapplied state, much less federal, law because the jury

instructions did not tell the jury that Ms. Mitchell intended to

kill her grandchildren. The court will deny this claim.

## K.   Improper Prosecutorial Comment on Holiday's Failure to Testify (claim 13)

Holiday complains that the prosecution's closing argument at

the punishment phase repeatedly referred to his choice not to

testify. The Fifth Amendment forbids the prosecution from

commenting on a defendant's silence. See Griffin v. California,

380 U.S. 609, 613 (1965). In essence, "<u>Griffin</u> prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt," <u>Baxter v. Palmigiano</u>, 425 U.S. 308, 319 (1976), because "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 363 (1978). When a defendant complains that the prosecution directly or inferentially referred to his choice not to testify, a reviewing court must discern "'(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.'" <u>United States v. Grosz</u>, 76 F.3d 1318, 1326 (5th Cir. 1996) (quoting <u>United States v. Collins</u>, 972 F.2d 1385, 1406 (5th Cir. 1992)).[23]

Holiday's complaints involve three categories of statements made by the prosecution. The court will consider each separately.

In the first category, the prosecution used a hypothetical example, such as: "If I was charged with murder and the evidence showed that I shot someone in the head three times, but at my trial

---

[23]"If there is an 'equally plausible explanation for the remark,' the prosecutor's intent is not manifest." <u>Virgen-Moreno</u>, 265 F.3d at 291 (quoting <u>Grosz</u>, 76 F.3d at 1326). Likewise, if the jury only possibly or probably viewed the challenged remark as a comment on the defendant's silence, then a petitioner has not met the "naturally and necessarily" prong. <u>See</u> <u>Grosz</u>, 76 F.3d at 1326. If the comment impinges on the defendant's right to silence, the court must consider whether the comments were harmless.

I got up and testified . . . ."  Tr. Vol. 41 at 25.  The trial
court sustained trial counsel's subsequent objection, instructed
the jury to disregard the statement, and denied an oral motion for
a mistrial.  Tr. Vol. 41 at 26.  On appeal, the Court of Criminal
Appeals found no error:  "The statement referred to a situation in
which a hypothetical defendant had testified.  Even if it could be
construed as an indirect allusion to Holiday's failure to testify,
it was not manifestly intended to be a comment on Holiday's failure
to testify, nor would the jury necessarily and naturally take it
that way."  Opinion on Direct Appeal at 49.

In the second category, the prosecution repeatedly observed
that the defense had not refuted certain facts.  The prosecution
three times referred to "what is not in dispute in this trial."
Tr. Vol. 41 at 29; see also Tr. Vol. 41 at 29 ("I don't think there
is any dispute that the defendant is involved in this case."); Tr.
Vol. 41 at 30 ("There is no dispute that there were three children
killed here which means two or more people.").  Twice, the trial
court denied the defense's objection that the prosecution commented
on Holiday's failure to testify.  After the final objection, the
defense explained why they objected to the phrases involving the
term "dispute":

> Every time she uses the word no dispute, these are
> elements that my client could choose to dispute or not
> dispute.  The fact that he has chosen not to testify is
> not something she should put into her argument.  She
> shouldn't make hay on the fact that my client did not
> testify, the comment on his failure to testify.

-59-

Tr. Vol. 41 at 31.   The trial court sustained the objection and instructed the jury to disregard.   Tr. Vol. 41 at 31.

The Court of Criminal Appeals found that the prosecution's reference to whether Holiday disputed issues did not intentionally mention Holiday's right to silence:

> A reference to evidence that is 'not in dispute' does not necessarily suggest a failure by the defendant to testify.  There are many ways to dispute evidence besides testimony by the defendant, such as cross-examination and presenting contrary evidence and other witnesses.  Any failure of the trial court to rule in Holiday's favor regarding his objection to these statements was not an abuse of discretion.

Opinion on Direct Appeal at 49.

Third, the prosecution referred to the defense's failure to refute Holiday's inculpatory statements:

> We also know that when he was outside with Terry and Beverly and the kids and he was ranting and raving and shooting off the gun and burning things on the ground and lighting fires and scaring everyone half to death, that what he said as the reason he was out there was I'm not going to take the rap on these rape charges.  I'm not going to do it.  I'm going to take care of it tonight. I'm going to burn the house down with everyone in it. That's what he said.   Those statements have not been refuted and there has been no attempt—

Tr. Vol. 41 at 36-37.   The trial court sustained the defense's objection, instructed the jury to disregard, and denied a motion for mistrial.   Tr. Vol. 41 at 38.   The Court of Criminal Appeals held that "[t]o the extent that these comments could be construed as referring to Holiday's failure to testify, the court's instruction to disregard cured any error."   Opinion on Direct Appeal at 50.

Holiday has not shown that the Court of Criminal Appeals'
decision was contrary to, or an unreasonable application of,
federal law. With regard to the first two categories, the Court of
Criminal Appeals concluded that the "prosecutor's manifest intent
was [not] to comment on the defendant's silence." Opinion on
Direct Appeal at 49. See United States v. Bohuchot, 625 F.3d 892,
901 (5th Cir. 2010) (quotation omitted). The Supreme Court
instructs that "a court should not lightly infer that a prosecutor
intends an ambiguous remark to have its most damaging meaning or
that a jury, sitting through lengthy exhortation, will draw that
meaning from the plethora of less damaging interpretations."
Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974). Consequently,
the "plausible explanation for [the] comment[s]" prevents the court
from finding that the prosecution "manifestly intended to comment
on the defendant's silence[.]" United States v. Martinez, 894 F.2d
1445, 1451 (5th Cir. 1990).

With regard to the third category, the Court of Criminal
Appeals concluded that the curative instruction was sufficient to
remedy any error. Federal law presumes that juries follow their
instructions. See Richardson v. Marsh, 481 U.S. 200, 211 (1987);
Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985). The Supreme
Court has held that "[i]t is reasonable enough to expect a jury to
comply with [a curative] instruction since, as we observed in
Griffin, the inference of guilt from silence is not always 'natural
or irresistible.'" Portuondo v. Agard, 529 U.S. 61, 67 (2000)

-61-

(quoting <u>Griffin</u>, 380 U.S. at 615).  The Court of Criminal Appeals was not unreasonable in finding that the jury could follow its instruction to disregard any improper comments.

Holiday has failed to show that the Court of Criminal Appeals unreasonably applied federal law in finding no constitutional error in the prosecution's penalty-phase arguments.  The court will deny this claim.

## L.   Expert Testimony that Holiday Would be a Future Societal Danger  (claims 14 and 15)

Holiday complains that the State based its case for future-dangerousness on unreliable expert testimony.  During the penalty phase of trial, the prosecution called Dr. Edward B. Gripon, a board-certified psychiatrist, as a rebuttal witness to testify concerning Holiday's future threat to society.  Dr. Gripon did not interview or examine Holiday, but reviewed information that included offense reports, school records, and historical information.  Before Dr. Gripon testified before the jury, the trial court held a <u>Daubert</u>[24] hearing regarding his opinions. Dr. Gripon detailed his extensive experience evaluating criminal defendants.  With specific relevance to his role at this trial, Dr. Gripon testified that the psychological community recognizes several scientifically valid methods of assessing future

---

[24]<u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993). Texas courts often call this a <u>Kelly/Daubert</u> hearing after the comparable state case, <u>Kelly v. State</u>, 824 S.W.2d 568 (Tex. Crim. App. 1992).

dangerousness, including:   (1) a pure clinical model; (2) a clinical approach that includes consideration of certain demographic and actuarial information; and (3) a pure actuarial model.   Dr. Gripon explained that his evaluations generally followed the second approach, allowing for mental-health history, past behavior, and demographics to influence his assessment. Dr. Gripon specifically rejected the use of the actuarial approach because it lacked adequate controls and involved immeasurable variables.   Tr. Vol. 44 at 3-45.

From his review of the available information, Dr. Gripon testified before the jury that Holiday suffered from an "antisocial personality, that is a disorder that tends to persist over time." Tr. Vol. 44 at 84.[25]   Dr. Gripon opined that Holiday would be in a "higher category than the average" person with regard to the potential for violence.   In sum, "[g]iven the history of antisocial personality and the clear history of escalation of violent behavior, culminating in capital murder, . . . it would be more

---

[25]Dr. Gripon explained that "because a person is antisocial . . . doesn't mean that they will be violent," but when "combined with aggression and violence, it is believed in forensic psychiatry that [it] does increase the likelihood that if one predicts that there will be a . . . future problem that it's going to be reliable."   Tr. Vol. 44 at 89.   Dr. Gripon's review showed a "progression of behaviors that are negative and detrimental," including "fighting . . . then the use of knives, guns, forcible sexual assault, then ultimately culminating . . . in the death of one or more individuals."   Tr. Vol. 44 at 81.   Those behaviors constituted "a pervasive pattern" that would continue "to get worse over time."   Tr. Vol. 44 at 82.

likely than not" that Holiday would commit criminal acts of violence in the future.

Holiday criticizes Dr. Gripon's "unstructured clinical assessment[] of future dangerousness[.]" (Docket Entry No. 12 at 109) Holiday argues that, while courts have long allowed mental-health experts to testify concerning a defendant's future propensity toward violence, in the past years "researchers have developed better methods of assessing future dangerousness in a number of contexts," which "are based on scientific principles and can be reliable in assessing risk of future dangerousness in appropriate cases." (Docket Entry No. 12 at 110) Because Dr. Gripon's methodology did not rely on more-recently developed risk-assessment techniques, Holiday argues that he provided the jury an unreliable basis to answer the future-dangerousness special issue.

Questions about the admissibility of evidence are generally left to the sound discretion of state courts. See Castillo v. Johnson, 141 F.3d 218, 222 (5th Cir. 1998). "A state court's evidentiary rulings present cognizable habeas corpus claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." Johnson v. Puckett, 176 F.3d 809, 820 (5th Cir. 1999) (citation omitted). Here, insofar as a federal court may consider Holiday's arguments, he has not shown any constitutional violation.

Psychological opinions on future dangerousness have long informed the capital sentencing process.  The Supreme Court has observed that

> [t]he suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel.  In the first place, it is contrary to our cases. If the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty, which it is, Jurek v. Texas, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed.2d 929 (1976), and if it is not impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.

Barefoot, 463 U.S. at 896-97; see also Ake v. Oklahoma, 470 U.S. 68, 83-84 (1985) (observing that the Supreme Court had "upheld the practice in many States of placing before the jury psychiatric testimony on the question of future dangerousness"); Estelle v. Smith, 451 U.S. 454, 473 (1981) (stating that the Supreme Court was in "no sense disapproving the use of psychiatric testimony bearing on future dangerousness").[26]

-------------------------------------

[26]The Supreme Court has cautioned that

> [p]sychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but as generally so unreliable that it should be ignored.  If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.

Barefoot, 463 U.S. at 898-99.

While recognizing the prevalence of psychological testimony about future-dangerousness, the Supreme Court has not told mental-health experts how they must arrive at that determination.   As Dr. Gripon testified, mental-health experts apparently have different views about how to assess an inmate's future threat to society.   This court's role on habeas review is not to constitutionalize one method of psychological inquiry.   Instead, as the Court of Criminal Appeals observed on direct appeal:

> The trial court was within the zone of reasonable disagreement in holding that the State had met its burden of establishing Gripon's qualifications and the reliability of his testimony.   As a board-certified psychiatrist with years of experience and specializing in forensic psychology, Gripon was shown to be qualified. While making predictions about future behavior is controversial among psychiatrists, forensic psychiatry is a legitimate and recognized field by the American Psychiatric Association.  Gripon testified that his method of assessing future-dangerousness was considered valid. While Holiday points to issues that were legitimate areas for cross-examination, his objections went to the weight and not the admissibility of Gripon's testimony.

Opinion on Direct Appeal at 54.   Holiday has not shown that the Court of Criminal Appeals' assessment of the state of forensic psychiatric science was incorrect, much less unreasonable, particularly since Dr. Gripon's testimony was only one piece in a strong punishment case against Holiday.   The court will deny this ground for relief.

## M.   Limitations on the Defense's Case at Punishment   (claims 16 through 22)

Holiday complains that the trial court unconstitutionally limited the testimony of Reverend Carol Lamar Pickett, a former

jailhouse minister. The defense called Rev. Pickett as its first witness in the penalty phase. Rev. Pickett began his testimony by describing his 15 years of ministry for the Walls Unit, the facility where Texas executes its death sentences. As Rev. Pickett began to describe his efforts to counsel and assist inmates immediately before execution, the prosecution objected that his testimony was not relevant to the special issues. Tr. Vol. 42 at 100. The trial court agreed. Tr. Vol. 42 at 100.

The defense made a proffer that Rev. Pickett would have described Texas's execution procedure, his experiences consoling inmates, and the psychological difficulty experienced by prison guards. Also, Rev. Pickett would have explained that an execution did not always bring closure to a victim's family. Finally, Rev. Pickett would have testified that some inmates improve themselves in prison and become less of a societal threat. Tr. Vol. 42 at 101-09, 113-15. The trial court excused Rev. Pickett and the substance of his testimony never came before the jury.

Holiday argues that the due process clause and the Eighth Amendment authorize the presentation of mitigating testimony such as that Rev. Pickett would have given. Holiday argues that "the definition of 'mitigating' is extremely broad" and will "allow the defendant to present what the defendant believes is mitigating, subject only to asking whether the proffered evidence possesses any tendency to be perceived as mitigating by a single juror." He argues that because "Rev. Pickett's testimony concerning the

-67-

administration of the death penalty and its affect on the guards
and the victim's survivors were powerfully relevant mitigating
circumstances within the scope of the mitigation special issue,"
excluding such evidence as irrelevant violated the Constitution.
(Docket Entry No. 12 at 129-30)

The Constitution requires that a capital sentencer "not be
precluded from considering as a mitigating factor, any aspect of a
defendant's character or record, and any of the circumstances of
the offense that the defendant proffers as a basis for a sentence
less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978)
Despite this broad language, the Supreme Court has refused to limit
"the traditional authority of a court to exclude, as irrelevant,
evidence not bearing on the defendant's character, prior record, or
the circumstances of his offense." Id. at 605 n.12. Lockett and
its progeny never preempted or federalized a State's ability to
exclude some evidence under its traditional evidentiary framework.
See Nevada v. Jackson, ___ U.S. ___, 133 S. Ct. 1990, ___ (2013)
("[O]nly rarely have we held that the right to present a complete
defense was violated  by the exclusion of defense evidence under a
state rule of evidence."); Romano v. Oklahoma, 512 U.S. 1, 12
(1994) ("The Eighth Amendment does not establish a federal code of
evidence to supersede state evidentiary rules in capital sentencing
procedures."); Skipper v. South Carolina, 476 U.S. 1, 7 n.2 (1986)
("We do not hold that all facets of the defendant's ability to

adjust to prison life must be treated as relevant and potentially mitigating.").

Texas state law generally governs the admission of irrelevant testimony.  The Court of Criminal Appeals held that the trial court did not abuse its discretion by excluding Rev. Pickett's testimony:

> [Pickett's] testimony pertained solely to how others in the criminal justice system are affected by the carrying out of executions.  The trial court did not abuse its discretion in concluding that such evidence is not relevant mitigating evidence and is not helpful to the jury in making "an individualized assessment of the appropriateness of the death penalty."  Even if Pickett's testimony could be viewed as marginally relevant, the trial court was within its discretion to exclude it under Rule 403.  Because the evidence was not particularized to the defendant, the trial court might reasonably conclude that the risk of confusing and distracting the jury substantially outweighed any probative value such evidence might have.

Opinion on Direct Appeal at 56.  Federal habeas courts defer to a state court's interpretation of its own law.  See Schaetzle v. Cockrell, 343 F.3d 440, 448-49 (5th Cir. 2003) ("It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law.") (citation omitted).  Rev. Pickett's proposed testimony would have aided the jury little, if any, in their deliberations on the special-issue questions.  Holiday has not shown that the trial court violated his constitutional rights by not allowing Rev. Pickett to testify.  The court will deny these claims.

**N.   Texas's Capital Punishment Scheme   (claims 23 through 32)**

Holiday raises several claims that attack the constitutionality of Texas's capital-sentencing procedure. Holiday argues that Texas's death-penalty scheme:

- uses language that limits the jury's consideration of mitigating evidence (claim 23)

- fails to inform the jury of the consequences of a single juror's "no" vote (claim 24)

- fails to place the burden of proof on the State with regard to the mitigation issue (claim 25)

- does not require the State to prove beyond a reasonable doubt that any mitigating evidence is insufficient to warrant a life sentence (claim 26)

- fails to define certain key terms in the mitigation special issue (claim 27)

- does not provide for meaningful appellate review of the jury's answers to the special issues (claims 28, 29)

- does not define "probability" under the future-dangerousness issue (claim 30)

- does not define "criminal acts of violence" (claim 31)

- does not define "continuing threat to society" (claim 32)

Defendants have regularly raised similar challenges to Texas's statutory scheme. Because of its entrenched case law with regard to each argument, the Court of Criminal Appeals summarily denied each claim without substantive discussion. Opinion on Direct Appeal at 59-60.

The Fifth Circuit has also regularly and consistently denied those challenges to Texas's death penalty.[27]  Because the Fifth Circuit has repeatedly rejected the merits of similar claims, and Holiday has not meaningfully distinguished that case law, he has not shown an entitlement to habeas relief.  The Court of Criminal Appeals' rejection of claims 23 through 32 was not contrary to, or an unreasonable application of, federal law.  See 28 U.S.C. § 2254(d)(1).

## O. Trial and Appellate Counsel  (claims 54 through 59)

Holiday raises several complaints relating to his trial and appellate representation.  Holiday claims that

> (1)   trial   counsel   inadequately   investigated   the possibility of other ignition sources (claim 54);

----

[27]Specifically, the Fifth Circuit has rejected claims that Texas improperly constricts the presentation of mitigating evidence.  See Blue v. Thaler, 665 F.3d 647, 666-67 (5th Cir. 2011); Oliver v. Quarterman, 254 F. App'x 381, 387 (5th Cir. 2007); Beazley v. Johnson, 242 F.3d 248, 259 (5th Cir. 2001).  The Constitution does not require a trial court to inform juries of the result of a single juror's vote.  See Druery, 647 F.3d at 542-43; Hughes v. Dretke, 412 F.3d 582, 593-94 (5th Cir. 2005); Alexander, 211 F.3d at 897 n.5.  Texas's special issues do not violate the Constitution by not defining certain terms.  See Rivas v. Thaler, 432 F. App'x 395, 405-06 (5th Cir. 2011); Turner v. Quarterman, 481 F.3d 292, 299-300 (5th Cir. 2007); Woods, 75 F.3d at 1033-34.  Texas law does not improperly allocate the burdens in the penalty phase.  See Paredes v. Quarterman, 574 F.3d 281, 292 (5th Cir. 2009); Varga v. Quarterman, 321 F. App'x 390, 398 (5th Cir. 2009); Berkley v. Quarterman, 310 F. App'x 665, 673 (5th Cir. 2009); Woods v. Cockrell, 307 F.3d 353, 359 (5th Cir. 2002).  Finally, Texas law does not inhibit meaningful appellate review of the jury's answers to the special issues.  See Roach v. Quarterman, 220 Fed. App'x 270, 275 (5th Cir. 2007); Busby v. Dretke, 359 F.3d 708, 718 (5th Cir. 2004); Martinez v. Johnson, 255 F.3d 229, 241-42 (5th Cir. 2001); Moore v. Johnson, 225 F.3d 495 (5th Cir. 2000).

(2)   trial counsel inadequately investigated available
      mitigation evidence (claim 55);

(3)   trial counsel failed to investigate and present
      evidence of organic brain damage (claim 56);

(4)   appellate counsel inadequately briefed issues
      (claim 57);

(5)   trial counsel engaged in inadequate voir dire
      questioning (claim 58); and

(6)   trial counsel labored under a conflict of interest
      (claim 59).

Holiday raised each of these claims on state habeas review.
A reviewing court assesses counsel's representation under the
standards established in Strickland v. Washington, 466 U.S. 668,
686 (1984).   Under Strickland's two-pronged test a criminal
defendant's Sixth Amendment rights are "denied when a defense
attorney's *performance* falls below an objective standard of
reasonableness and thereby *prejudices* the defense." Yarborough v.
Gentry, 540 U.S. 1, 3 (2003) (emphasis added); see also Rompilla v.
Beard, 545 U.S. 374, 387 (2005); Wiggins v. Smith, 539 U.S. 510,
520 (2003).   To establish deficient performance, the petitioner
must show that "counsel made errors so serious that counsel was not
functioning as the 'counsel' guaranteed . . . by the Sixth
Amendment." Strickland, 466 U.S. at 687.   A petitioner must also
show actual prejudice, meaning "there is a reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceedings would have been different." Id. at 694; see also
Wiggins, 539 U.S. at 534.

The state habeas court relied on the Strickland framework and denied each claim. "Surmounting Strickland's high bar is never an easy task," especially when considered under the AEDPA's deferential review. Padilla v. Kentucky, 559 U.S. 356, ___, 130 S. Ct. 1473, 1485 (2010). The question of "whether the state court's application of the Strickland standard was unreasonable . . . is different from asking whether defense counsel's performance fell below Strickland's standard" because "[a] state court must be granted deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 785 (2011). The court will address each allegation against counsel in light of the above-stated standards.

1.   Investigation of Possible Ignition Sources of Gasoline Vapors (claim 54)

Holiday argues that trial counsel insufficiently investigated whether the pilot light from a stove unit set the gasoline fumes ablaze. The defense retained Judd Clayton, an electrical engineer with an extensive background in fire investigation, to help ascertain what sources may have accidentally ignited the gasoline. Mr. Clayton came to the defense team highly recommended by several individuals for his expertise. State Habeas Answer at 200, 204. Mr. Clayton investigated the possibility that appliances, such as the oven unit, could have ignited the fire. In preparation of that defense Mr. Clayton reviewed witness statements, photographs, and

appliance manuals. He also made two visits to the crime scene and consulted with others about whether that particular appliance had a gas or an electric ignitor for the oven. While the stove portion had a gas pilot light, he opined that the oven part had an electrical ignition system. Tr. Vol. 39 at 3-9, 97-105. From that investigation, Mr. Clayton excluded the oven part of the stove unit as a possible ignition source.

Through discovery, trial counsel had learned that "Dr. DeHaan had reported that there was a gas pilot light flame for the oven," though he excluded it as an ignition point. State Habeas Answer at 200, 204. Trial counsel asked Mr. Clayton to "re-evaluate the pilot light [for the oven], take pictures thereof, and explain . . . what aspects of the appliance forced him to conclude that it was a[n] electric." State Habeas Answer at 200, 204. Even after the renewed inquiry, Mr. Clayton did not change his opinion that the lower ignitor was electric, and thus not a potential ignition source.

Trial testimony was mixed about whether the oven unit had a gas or electric ignition system. The State called an appliance technician who verified that the unit had a pilot light for the oven. Tr. Vol. 40 at 87-96. Mr. Mitchell testified that he lit the gas pilot light. Tr. Vol. 38 at 30. Trial counsel extensively questioned Dr. DeHaan about his conclusion that the broiler pilot light did not ignite the fumes. Tr. Vol. 37 at 33-40, 91-97. Mr. Clayton, while not retreating from his position that it was an

electric ignitor, testified that if it had been a gas pilot light it would increase the likelihood of it as an ignition source. Tr. Vol. 39 at 105.

Holiday claims that trial counsel did not do enough to verify whether the oven had a gas pilot light. Trial counsel knew at trial that his expert's testimony did not verify an important defensive argument. Even when presented with contrary information and asked to reassess his conclusions, Mr. Clayton did not revise his opinion. To mitigate that result, trial counsel extensively cross-examined other witnesses to establish that it was indeed a gas pilot light. He also asked Mr. Clayton to hypothesize if the oven could have been a possible ignition point if it had a gas pilot light.

No constitutional right exists to the effective assistance of expert witnesses. See Campbell v. Polk, 447 F.3d 270, 285-86 (4th Cir. 2006); Fisher v. Angelone, 163 F.3d 835, 853 (4th Cir. 1998). Once the defense has engaged in a sufficient investigation and turned over relevant evidence, trial counsel has a right to rely on the expert's conclusions. Although trial counsel ascertained that Mr. Clayton's opinion was not entirely beneficial to the defense, he still took steps to bolster the defensive theory that an appliance accidentally started the fire. Through cross-examination and hypothetical questions, trial counsel elicited testimony that the oven had a pilot light and that it could not conclusively be ruled out as an ignition source. Furthermore, as discussed with

-75-

regard to the claims involving Dr. DeHaan's testimony, no reasonable probability of a different result would have resulted had the jury before it a different account of the ignition. The state habeas court was not unreasonable in finding no deficient performance or resulting prejudice from trial counsel's interaction with Mr. Clayton.

2.   <u>Investigation of Available Mitigation Evidence (claim 55)</u>

In his fifty-fifth claim Holiday faults trial counsel's preparation of a mitigating case in the punishment phase. Capital defense attorneys have "the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." <u>Neal v. Puckett</u>, 286 F.3d 236, 236-37 (5th Cir. 2002) (quoting <u>Baldwin v. Maggio</u>, 704 F.2d 1325, 1332 (5th Cir. 1983)). The court must decide whether the state habeas court reasonably found that trial counsel's preparation and presentation of mitigating evidence complied with constitutional requirements.

a.   Trial Preparation and Testimony

During the state habeas process Holiday's trial attorneys provided affidavits explaining the defense team's efforts to secure a life sentence. According to them, "everyone on the defense team was looking for any evidence, such as deprivation, trauma, hardship, abuse, etc., that might be mitigating." State Habeas Record at 201. Trial counsel attested that "prior to and during trial" the attorneys developed mitigating evidence through "several

-76-

interviews of [Holiday] and his mother and stepfather." State Habeas Record at 201. Trial counsel emphasized the importance of gathering information about Holiday's childhood and "encourag[ed] them to be honest and not worry about embarrassing information." State Habeas Record at 201, 205. Trial counsel personally interviewed several people who knew Holiday, including a former employer and a religious leader. Additionally, trial counsel spoke with prison personnel and court security staff to ascertain whether Holiday was a threat while incarcerated.

Trial counsel employed both an investigator and a mitigation expert. State Habeas Record at 201. Trial counsel asked the investigator to "visit with every member of [Holiday's] primary family." State Habeas Record at 201. Also, trial court "engaged the services of a psychiatrist, Dr. Fred Fason of Houston, and a psychologist, Dr. Windel Dickerson of Bryan. Both of these mental health experts had significant experience in developing mitigating themes and were regularly consulted throughout the trial." State Habeas Record at 201. "Dr. Dickerson administered the [Minnesota Multiphasic Personality Inventory]" and "did an EEG on [Holiday] and consulted with a neurologist regarding the EEG results." State Habeas Record at 205. With that investigation, "[a]ny [mitigating] evidence that was found was presented to the jury." State Habeas Record at 201.

After that preparation the defense called eleven witnesses in the punishment phase of trial: Reverend Carol Pickett, Louis

-77-

Mitchell, Beverly Mitchell, Angela Nickerson, James Nickerson, J.C.
Henry, James Wayne High, Sheriff Dan Douget, Bill Matzke, Deputy
Paul Cannon, and Dr. Fred Fason.   These witnesses provided four
categories of information.   First, the defense tried to paint a
picture for the jury of what their sentencing determination would
mean for Holiday, his family, and others.   To that end, the defense
called Reverend Pickett, a former death-row chaplain, to testify.
Before the prosecution objected to the remainder of his proposed
testimony, Reverend Pickett briefly explained the execution
process.   Tr. Vol. 42 at 94-101.

Second, the defense called family members to provide insight
into Holiday's background and the circumstances leading up to the
murders.   The witnesses testified as follows:

- Louis Mitchell, who is Tami Wilkerson's father,
  described the relationship and financial problems
  Holiday faced before the murders.   Mitchell opined
  that Holiday had difficulty reading.   He testified
  that Holiday seemed to care for Ms. Wilkerson and
  the three girls he killed.   Tr. Vol. 42 at 116-24,
  129-30.

- The defense called Beverly Mitchell to show how
  fighting and infidelity plagued Holiday's
  relationship with Ms. Wilkerson.   The defense also
  tried to make the most of residual doubt by
  pointing out inconsistencies in Ms. Mitchell's
  various accounts of the crime.   Tr. Vol. 42 at 130-
  140.

- Holiday's mother, Angela Nickerson, testified that
  she grew up poor and got pregnant with Holiday at
  age 15.   Because they could not afford a hospital,
  Holiday was born at home with the help of a
  midwife.   Holiday's father provided no support so
  he also grew up poor, in a small house with no air

conditioning.[28]  Holiday never communicated with his
real father.  His mother married James Nickerson
after she graduated from high school, but they
still struggled financially.  They had three
children together.  Holiday got along well with his
half-brothers.  Holiday's mother tried to raise him
right.  She took him to church and tried to teach
him to pray.  She whipped him when he misbehaved.
Holiday failed first grade, had difficulty in
school, and may have had a learning disability.
Notwithstanding, he was a happy, cheerful child.
He always wanted to take care of his younger
siblings.  Holiday moved to live with his
grandmother in ninth grade, but she soon returned
him.  At age 15 Holiday moved into Conroe to live
with a friend's mother.  Two years later he got a
girl pregnant.  His mother did not know if he ever
graduated from high school.  While he usually did
not have problems with his step-father, the police
were called once when the two had a physical fight.
His mother described his relationship with
Ms. Wilkerson and how its end impacted him.  She
described him as sad and remorseful after his
arrest.  Tr. Vol. 43 at 3-52.

- Holiday's step father James Nickerson described
  Holiday as a normal, happy child who got along with
  his half-siblings.  His mother administered
  spankings and "whuppings" when Holiday misbehaved.
  Mr. Nickerson was proud of Holiday.  Holiday seemed
  to have a good relationship with Ms. Wilkerson, but
  was quiet and kept to himself when it ended.  He
  said that Holiday did not have a serious criminal
  record before the offense.  Holiday was hurt and
  crying after the offense.  Tr. Vol. 43 at 81-108.

- A former employer, J.C. Henry, described Holiday as
  polite, a good worker, and respectful.  Tr. Vol. 43
  at 115-24.

Third, witnesses described Holiday's good behavior while
incarcerated:

---

[28]In addition, "Angela Nickerson further testified that his
brother, while playing with a shotgun, accidentally shot and killed
a relative's son," but the habeas court found "that there was no
evidence that the two or three-year old applicant witnessed the
incident."  FFCL at 42.

- James Wayne High, a pastor at Lakeview Baptist Church, taught Holiday in the GED program while incarcerated.  Holiday voluntarily participated in classes, was attentive and respectful, and worked diligently on his GED.  Holiday discussed spiritual matters and attended Bible study.  Tr. Vol. 43 at 125-34.

- Madison County Sheriff Dan Douget testified that Holiday was polite and responsive to jail personnel.  He did not cause any problems while incarcerated before trial.  Tr. Vol. 43 at 138-40.

- Bill Matzke and Paul Cannon transported Holiday to and from the courtroom during trial.  Holiday was polite, was not disrespectful, and followed directions.  Sometimes Holiday showed tearful emotions.  Tr. Vol. 43 at 140-45, 146.

Finally, the defense presented mental-health evidence through a rebuttal witness, psychiatrist Fred Fason.  The State had called an expert who testified that Holiday had an antisocial personality disorder, making him a future societal danger.  Dr. Fason testified that the results from the MMPI examination indicated that Holiday suffered from psychotic depression and alcoholism, which "interfered with his decision-making process so that [he] lost control" on the night of the murders.  FFCL at 48.  Dr. Fason described Holiday as a person with a "mixed profile with paranoid, passive-aggressive, depressive, and hysterical conversation and dissociative elements, including oral dependency often associated with alcoholism[.]"  FFCL at 47.  This profile "suggested psychotic decompensation," meaning that he had "some loss of contact with reality[.]"  FFCL at 47.  Also, he suffered from "poor tolerance for frustration, lack of insight and awareness of anger, efforts to hide strong emotional reactions to frustration of his impulses and

loss of emotional support, and vulnerability to the loss of a family member or separation from an emotionally supportive person." FFCL at 48.

Given the investigation and focus on those four areas of evidence, the state habeas court found that "trial counsel conducted [a] reasonable investigation of mitigation evidence" and that "trial counsel zealously and competently attempted to mitigate the heinous offense through the extensive presentation of such evidence." FFCL at 52.

### b.    State Habeas Affidavits

Holiday alleges that "[t]he post-conviction writ investigation has revealed material facts relating to Holiday's background which were available at the time of trial, but which were not investigated, and therefore not presented." (Docket Entry No. 12 at 223)  Holiday recognizes that trial counsel put before the jury mitigating evidence, but alleges that the defense failed to appreciate the full depth of the information available.  In specific, Holiday criticizes counsel for not emphasizing the turbulent world in which he was raised.  Through several affiants familiar with him as a child, Holiday describes a childhood filled with physical abuse, poverty, and exposure to substance abuse.[29]

---

[29]Holiday proffers this unpresented information through Janet Wilkerson, the girlfriend of Holiday's uncle; Chas Nickerson, his younger half-brother; Marjorie Minor, his maternal grandmother; Michael Blackshear, a cousin to Holiday's stepfather; Eric James Nickerson, his half-brother; John White who lived on the same
(continued...)

Conflict between his parents made their home a confrontational and contentious place. As the oldest child, his parents "relegat[ed] [him] to near servant status" and made him a frequently abused scapegoat. (Docket Entry No. 12 at 244) His parents, however, only heaped upon him the results of "inter-generational abuse" that was not "specific to him, but . . . part of a larger family-cultural process." (Docket Entry No. 12 at 244)

The state habeas court found that Holiday's "contention of alleged ineffective assistance of counsel based on investigation and presentation of mitigating evidence is actually a complaint about the manner and/or depth of the presentation of mitigating evidence." FFCL at 51. The state habeas court found that "the evidence that [Holiday] now contends should have been presented during punishment was essentially presented to [his] jury." FFCL at 50. Specifically, the state habeas court noted that the trial testimony included themes similar to those found in the affidavits: poor living conditions, heavy responsibilities placed on Holiday, emotional problems from not having a relationship with his biological father, learning problems, a conflicted relationship with his stepfather including assault, his mother "whupping" him, substance abuse, inattention and neglect by his parents, and his love for his children. FFCL at 50-51. To the extent that

---

[29](...continued)
street as Holiday growing up and testified for the State in the guilt/innocence phase; and Holiday's mother, Angela Diane Nickerson.

Holiday's habeas affidavits exceeded the contours of trial
testimony, the state habeas court found their contents irrelevant
or unsupported by the record.  FFCL at 51.  Accordingly, the state
habeas court found that trial counsel's performance was not
deficient, and "there is not a reasonable probability that
additional introduction of information, if any, that was presented
on habeas but not presented at trial would have changed the course
of the proceedings."  FFCL at 51.

   c. The AEDPA

  Trial counsel "confronted a challenging penalty phase with an
unsympathetic client, which limited their feasible mitigation
strategies."  Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388,
1405 (2011).  Holiday had murdered three small children, including
his own daughter, to exact revenge and to avoid pending sexual-
assault charges.  The prosecution presented evidence of additional
crimes and bad behavior which, while not of the same gravity as the
murders, showed little redeemable in Holiday's character.

  Against that backdrop trial counsel prepared by interviewing
family, friends, and associates.  While possibly not amplified to
the same extent, the trial testimony followed many of the same
mitigating themes as contained in the habeas affidavits.  The
evidence presented at trial varies little in mitigating effect from
that contained in the state habeas record.  To the extent that
Holiday wishes counsel had placed more emphasis on those mitigating
theories through additional testimony, "[t]here are countless ways

to provide effective assistance in any given case[.]" <u>Strickland</u>,
466 U.S. at 689. "Even the best criminal defense attorneys would
not defend a particular client in the same way." <u>Id.</u>; <u>see also</u>
<u>Pinholster</u>, ___ U.S. ___, 131 S. Ct. at 1403; <u>Richter</u>, ___ U.S.
____, 131 S. Ct. at 788-89. Holiday has not shown that the state
habeas court was unreasonable in finding that he had not met
<u>Strickland</u>'s performance prong.

Holiday has also failed to show <u>Strickland</u> prejudice. Actual
prejudice does not exist for evidence that is "in the main
cumulative" to that from trial. <u>Banks v. Dretke</u>, 540 U.S. 668, 700
(2004). Despite substantially similar information already aired in
the penalty phase, the jury returned answers to Texas's special
issues requiring the imposition of a death sentence. Even to the
extent that the habeas affidavits included some information outside
the mitigation theories presented at trial, not all of it was
helpful to the defense. Taken as a whole, the state habeas court
was not unreasonable in finding that the additional information
would not have changed the course of the proceedings. <u>See</u> <u>Berghuis</u>
<u>v. Thompkins</u>, ___ U.S. ___, 130 S. Ct. 2250, 2264 (2010) ("[C]ourts
must consider the totality of the evidence before the judge or
jury.").

Importantly, the Fifth Circuit has stated that a court looks
to see if the petitioner's new evidence will "lessen the impact of
the other evidence against him[,]" <u>Conner v. Quarterman</u>, 477 F.3d
287, 294 (5th Cir. 2007), because "overwhelming aggravating

factors" can outweigh unpresented mitigating evidence.  Sonnier v. Quarterman, 476 F.3d 349, 360 (5th Cir. 2007).[30]  While by their nature all capital murders involve terrifying facts, the manner and means by which Holiday killed three small children hung heavily over the punishment phase.  Viewing the entirety of the trial testimony and the post-judgment evidence, the state habeas court could reasonably conclude that Holiday's new proffered testimony would not have created a reasonable probability of a different result.  Holiday has not met the AEDPA standard with regard to failure-to-investigate-and-present-mitigating-evidence claim.

3.  Investigation of Possible Organic Brain Damage (claim 56)

In his fifty-sixth claim, Holiday states that he has "a good faith belief that [he] may have organic brain damage which was not investigated by trial counsel."  (Docket Entry No. 12 at 246)  Holiday premises this belief on a history of head injuries, "black out" periods, migraine headaches, poor educational performance, and intellectual deficiencies.  Holiday, however, has not produced any affirmative evidence of brain damage.  Instead, Holiday states that because the state habeas court "has not approved [his] request for

----

[30]For instance, the "horrific facts of the crime," Martinez, 481 F.3d at 259, the "brutal and senseless nature of the crime," Smith v. Quarterman, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which he killed," Miniel v. Quarterman, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against a finding of Strickland prejudice.  See also Strickland, 466 U.S. at 700; Knight v. Quarterman, 186 F. App'x 518, 535 (5th Cir. 2006); Ladd v. Cockrell, 311 F.3d 349, 360 (5th Cir. 2002); Andrews v. Collins, 21 F.3d 612, 624 n.23 (5th Cir. 1994); Russell v. Lynaugh, 892 F.2d 1205, 1213 (5th Cir. 1989).

funding," he "has been unable to retain a neuropsychologist to evaluate Holiday.  Holiday is unable to plead with specificity the existence of organic brain impairment absent a thorough neuropsychological evaluation." (Docket Entry No. 12 at 247)

The state habeas court rejected this claim because trial counsel had "Dr. Dickerson administer[] the MMPI and EEG to [Holiday] and consulted with a neurologist concerning the results of the EEG[.]" FFCL at 50, 52.  Nothing in the record suggests that those examinations uncovered any hint of brain damage or dysfunction.  Accordingly, the state habeas court found that Holiday "fail[ed] to show that trial counsel [was] ineffective for not investigating and presenting evidence of brain damage in light of the defense having an EEG administered to [Holiday], consulting with a neurologist concerning the results, and presenting all available mitigating evidence." FFCL at 60-61.

Strickland requires Holiday to show that trial counsel's reliance on experts to investigate his mental health was constitutionally insufficient in a manner that was actually prejudicial.  Holiday's federal habeas petition has not substantiated his claim of brain damage; he can only speculate that additional neurological testing would uncover some brain abnormality.  Holiday's reliance on mere allegations cannot meet the AEDPA standard for showing the state court's decision was unreasonable, much less prove a constitutional violation in trial counsel's representation.

4.   Inadequate Briefing (claim 57)

Holiday claims that his appellate counsel, who were the same attorneys who served at trial, provided ineffective representation. When Holiday filed his state habeas application he stated:

> Instances of procedural default at trial or on appeal and legal-factual "facts" which are unavailable at the time of filing the writ application.  Holiday would contend that instances of procedural default by appellate or trial counsel, which may ultimately be determined by the Texas Court of Criminal Appeals may constitute instances of ineffective assistance of counsel at trial and/or on appeal, in violation of the 6th and 14th Amendments to the United States Constitution and Art. I, Sec. 10 of the Texas Constitution, by virtue of counsel's failure to properly present an issue on appeal, or by counsel's failure to properly preserve error.

State Habeas Record at 84.  The state habeas court summarily denied this claim.  Holiday presents the same claim, copied word-for-word, in his federal petition.  As Holiday has not made any effort to describe what errors appellate counsel committed, much less meet the AEDPA standard, this court will likewise summarily deny this claim.

5.   Voir Dire Questioning (claim 58)

Holiday argued on state habeas review that trial counsel had ineffectively questioned prospective jurors.  Holiday asserted that, "[a]lthough the instant case involved domestic violence in the course of an interracial relationship between Holiday, who is African-American, and Tammy Wilkerson, who is Caucasian, trial counsel did not meaningfully voir dire the jurors on their racial attitudes."  (Docket Entry No. 12 at 251)  Holiday faults trial

counsel's voir dire questioning for not ferreting out whether any potential juror had racial bias against him.  Also, Holiday fears that because "the instant case involved considerable press coverage during trial and that the jurors were not sequestered during trial," the jurors were exposed to extraneous information.

Holiday has not pointed to any specific jurors who should have been subjected to more probing questioning by trial counsel. Holiday has not shown that any prospective juror harbored undisclosed racism or bias.  Accordingly, the state habeas court held that his claim "of alleged 'possible' denial of due process during voir dire is speculative and does not rise to the level of pleading and providing claims that, if true, entitle [him] to relief."  FFCL at 53.  As Holiday has also not substantiated his allegations in this forum, the court will summarily deny his claim.

### 6.   Conflict of Interest (claim 59)

In a brief argument Holiday states he has received information that his trial attorney, "William Carter, represented Tammy Wilkerson to divorce Holiday while he was in the county jail. If true, then Mr. Carter would have been conflicted from representing Holiday." (Docket Entry No. 12 at 253)  Holiday argues that this alleged conflict of interest "adversely affected the attorney's performance and prejudiced Holiday because the attorney's duty of loyalty to Wilkerson prevented the attorney from aggressive cross examination of her and establishing other causes for the deaths other than Holiday." (Docket Entry No. 12 at 253)

Holiday did not exhaust this claim in state court, making habeas relief unavailable to him.   See 28 U.S.C. § 2254(b)(1). Moreover, Holiday has not provided any supporting evidence for his supposition that trial counsel labored under a conflict of interest.   In fact, the record suggests that Holiday is wrong in challenging the loyalty of his trial attorney.   The record contains a volume titled "Final Hearing on Divorce" that transcribes a May 17, 2001, trial-court proceeding.   Tr. Vol. 2.   In that action the transcript lists Mr. Carter as counsel for Holiday, and Carter stated that he was "here on behalf of the Respondent, Mr. Holiday." Id. at 3.   Another attorney represented Ms. Wilkerson.   Because Holiday has not shown any merit to his conflict-of-interest claim, the court summarily denies its merits.   See 28 U.S.C. § 2254(b)(2).

### 7.   Conclusion of *Strickland* Claims

Holiday has not shown that his trial attorneys' performance fell below constitutional requirements in a way that prejudiced his defense.   The court will deny claims 54 through 59.

## P.   Lethal Injection   (claim 60)

Holiday argues that Texas employs an unconstitutional method of execution.   Holiday summarily argues that "the current lethal injection protocol" creates a "substantial risk" that he will suffer "serious harm" even though "there are 'feasible, readily implemented' alternatives that the State refuses to adopt without legitimate penological justification."   (Docket Entry No. 12 at

255)[31] Holiday argues that this court should authorize discovery and hold a hearing to flesh out the constitutionality of Texas's lethal-injection procedure.

Respondent correctly observes that this claim is subject to dismissal as unexhausted. Even if this claim came before the court in a procedurally proper manner, Holiday's arguments do not provide a valid basis for habeas relief. A challenge to a state's method of execution does not concern the fact or duration of an inmate's sentence, making a habeas petition an ineffective vehicle for its resolution. See Hill v. McDonough, 547 U.S. 573, 580 (2006); Nelson v. Campbell, 541 U.S. 637, 645 (2004); Rachal v. Quarterman, 265 Fed. App'x 371, 377 (5th Cir. 2008). Additionally, the Fifth Circuit in Raby v. Livingston, 600 F.3d 552 (5th Cir. 2010), has approved an execution protocol similar to that which Texas apparently now employs. Holiday does not provide any meaningful argument to distinguish Raby from Texas's current procedure. For those reasons, the court will dismiss this claim without prejudice.

**Q.  Texas's Executive Clemency Process (claim 61)**

In his final claim Holiday argues that when his federal habeas proceedings run their course and he seeks clemency from the state executive branch his "clemency proceedings will not be impartial."

---

[31]Holiday provides no specific detail about what features of Texas's execution protocol violate the federal constitution. In fact, he summarily states that "*Arizona*'s current execution procedure lacks the necessary safeguards to ensure that Holiday will not be executed in a cruel and unusual manner." (Docket Entry No. 12 at 255-56) (emphasis added).

(Docket Entry No. 12 at 256)  Holiday complains that the Attorney General's Office will "be an advocate against him," that he will not receive adequate notice of his clemency hearing, and that he will not have an opportunity to present evidence.  (Docket Entry No. 12 at 257)  "Moreover, the current governor, Rick Perry, has made clemency proceedings a sham" because he has only granted clemency to a death-row inmate once in the past decade.  (Docket Entry No. 12 at 257)  On that basis, Holiday argues that he is entitled to habeas corpus relief.

Holiday has not exhausted his complaints about Texas's clemency process.  Even so, this claim is not yet ripe for adjudication.  Holiday "does not have an execution date, and he has not filed a petition for executive clemency." White v. Thaler, ___ F. App'x ___, ____, 2013 WL 1442568 (5th Cir. April 1, 2013).  Any possible harm from these alleged defects in the process is purely hypothetical and will occur, if at all, at some future time.  See Texas v. United States, 523 U.S. 296, 300 (1998); New Orleans Pub. Serv., Inc. v. Council of New Orleans, 833 F.2d 583, 586-87 (5th Cir. 1987).  Holiday seems to recognize that this claim is not ripe, stating that he "presents this claim now in order to avoid future difficulties with raising this claim in future federal habeas proceedings."  (Docket Entry No. 12 at 256)  Accordingly, the court will dismiss this claim without prejudice.[32]

---

[32]The court observes, however, that Holiday does not make a strong showing of a constitutional violation.  Some due process (continued...)

## IV.   **Certificate of Appealability**

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal.  <u>See</u> 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule 22(b).  Although Holiday has not requested that the court grant him a Certificate of Appealability ("COA"), the court can consider the issue <u>sua sponte</u>.  <u>See</u> <u>Alexander v. Johnson</u>, 211 F.3d 895, 898 (5th Cir. 2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); <u>see also</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Clear and binding precedent forecloses relief on Holiday's claims.  Under the appropriate standard Holiday has not shown that this court should authorize appellate consideration of any claim.  This court will not certify any issue for review by the Fifth Circuit.

---

[32](...continued)
safeguards apply to clemency procedures. <u>See</u> <u>Ohio Adult Parole Auth. v. Woodard</u>, 523 U.S. 272, 288–89 (1998) (O'Connor, J., concurring) (plurality opinion). But these requirements are minimal: "Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." <u>Id.</u> at 289.  The Fifth Circuit has held that the Texas clemency procedures do not violate due process. <u>Faulder v. Texas Board of Pardons and Paroles</u>, 178 F.3d 343, 344–45 (5th Cir. 1999); <u>Moody v. Rodriguez</u>, 164 F.3d 893 (5th Cir. 1999).  Since Holiday "d[oes] not provide evidence that he would be denied access to the [clemency] process or evidence that the decision will be made arbitrarily," <u>Roach v. Quarterman</u>, 220 F. App'x 270, 275 (5th Cir. 2007), he has not raised the specter of a future constitutional violation.

## V.   <u>Conclusion and Order</u>

For the reasons described above, the court finds that Holiday has not shown entitlement to federal habeas relief.   Accordingly, the court **DENIES** Holiday's habeas petition with the exceptions of his lethal-injection and executive clemency claims, which the court **DISMISSES WITHOUT PREJUDICE**.   No Certificate of Appealability will issue in this case.

**SIGNED** at Houston, Texas, on this the 10th day of July, 2013.

                                   _____
                                              SIM LAKE
                                   UNITED STATES DISTRICT JUDGE